UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRFERRED MUTUAL INSURANCE COMPANY, Plaintiff, ) ) ) ) | |
| v. ) ) | CIVIL ACTION NO.  3:13-cv-30138-MAP |
| LEONARD C. LODIGIANI, EVINS C. BRANTLEY, C&K II, LLP, FREDERICK G. WOHLERS, and ADNAN YILDIRIM, Defendants. ) ) ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO COMPEL TESTIMONY AND DOCUMENT PRODUCTION**

**INTRODUCTION**

In bringing this rescission action, Preferred Mutual Insurance Company ("PMIC") has placed at issue the basis for its determination that Mr. Lodigiani negligently or intentionally misrepresented the legal structure of his business in connection with the application for insurance. PMIC's 30(b)(6) designee, Raymond Kagels, testified that the decision to rescind the policy was based on the information and advice provided by two attorneys, Joseph Doyle and John Stewart. It is well settled that a party waives all applicable privileges by placing work product or privileged communications "at issue" in the litigation. *Federal Deposit Ins. Corp. v. R. W. Beck, Inc.*, 2004 WL 1474579, at *1 (D. Mass. July 1, 2004). Insofar as PMIC's decision to rescind the policy was based on the advice of Mr. Doyle and Mr. Stewart, defendants are entitled to all documents reflecting that advice, and are entitled to the answers to questions (posed to Mr. Kagels) seeking the substance of that advice. In addition, whether PMIC intends to present Mr. Doyle and Mr. Stewart as witnesses at trial or not, defendants are entitled to take their depositions to ask about the advice they provided to PMIC.

According to Mr. Kagels, although PMIC retained Mr. Doyle to represent the interests of Mr. Lodigiani, he relied upon information and advice provided by Mr. Doyle to reach his preliminary decision to rescind the policy. PMIC then retained Mr. Stewart to examine Mr. Lodigiani under oath, despite there being no adversary proceeding between PMIC and Mr. Lodigiani, to elicit further information on which to base its rescission claim. Mr. Kagels disclosed some of the information provided by Mr. Doyle on which PMIC relied to rescind the policy, but has refused to disclose any of the information provided by Mr. Stewart on which it relied to rescind the policy. In addition, on the basis of the attorney-client privilege, PMIC has withheld portions of its Activities Report reflecting communications with Mr. Stewart. PMIC has not produced a privilege log, or identified in any other matter, the documents exchanged with Mr. Stewart. Since PMIC has no legitimate basis to withhold the information sought by defendants, where it has placed at issue the grounds on which it determined to rescind the insurance policy it issued to Mr. Lodigiani, the Court should compel PMIC to provide the requested deposition testimony and documents and should permit defendants to take the depositions of Mr. Doyle and Mr. Stewart.

## OPERATIVE FACTS

PMIC issued a liability insurance policy to Leonard Lodigiani and has brought this lawsuit in an attempt to avoid liability under that policy for claims against Mr. Lodigiani arising out of plumbing work he performed at 20-24 Bridge Street in South Hadley. The property was owned by C&K and a portion was leased to Adnan Yildirim. After the plumbing work was completed, a fire broke out. PMIC's rescission claim is based solely on the assertion that in the course of applying for the policy, Mr. Lodigiani negligently or intentionally misrepresented himself as an individual operating a sole proprietorship. Exhibit A, Complaint ¶¶ 25-26. PMIC

contends that Mr. Lodigiani's business was a partnership, despite the absence of a partnership agreement or any other indicia of a legally cognizable partnership.

When PMIC received notice of claims by C&K and Adnan Yildirim for damages caused by the fire, PMIC retained Joseph Doyle to protect the interests of Mr. Lodigiani. Mr. Doyle appeared with Mr. Lodigiani when James Trudeau, an outside insurance adjuster retained by PMIC, took a recorded statement of Mr. Lodigiani. Mr. Kagels testified that PMIC relied on the information provided to him by Mr. Doyle following the recorded statement to support its decision to rescind the policy. *See* Exhibit B, Deposition of Raymond Kagels, 34:14-18. Putting aside the unfair and deceptive conduct on the part of PMIC in relying upon information provided by defense counsel to support its claim to rescind the policy, at the outset of the interrogation, the following colloquy took place:[1]

| | | |
|---|---|---|
| JT: | OK, please state your full name and your age | |
| LL: | Leonard Lodigiani, my age is 85 | |
| JT: | 85 or 84? | |
| LL: | 84 | |
| JT: | OK, what do you do for a living Mr. Lodigiani? | |
| LL: | I do plumbing work | |
| JT: | OK, now the relationship between yourself and Mr. Brantly? | |
| LL: | We're partners | |
| JT: | OK, I'm going to pause this tape….. The taking of this statement is being done with Attorney Joseph Doyle, go ahead | |
| JD: | Leo, do you mind, Leo is what they call you correct? | |
| LL: | Yes | |
| JD: | You have a sole proprietorship right, Leo? | |
| LL: | Yes | |
| JD: | And….but for this particular job on Bridge Street, you agreed to do it as partners with Evans Brantly? | |
| LL: | That's correct | |

Exhibit C, Transcript of Recorded Statement of Leonard Lodigiani, February 28, 2013, pp.1-2.

As the 30(b)(6) designee on the subject of the basis for its PMIC's decision to rescind the policy, Mr. Kagels testified as follows:

---

[1] Mr. Trudeau is identified as "JT," Attorney Doyle is identified as "JD," and Mr. Lodigiani is identified as "LL."

3

Q. After you obtained Mr. Trudeau' report or information from him -- if it was less than the formality that would be described as a report – did you have any information about Mr. Lodigiani's relationship with Evins Brantley?

A. I don't know specific dates when I received Mr. Trudeau's reports. But I can say this: I did not learn of the relationship with Mr. Brantley until I spoke to Mr. Doyle in the middle of March 9 of 2013.

Q. And what did you learn about Mr. Lodigiani's relationship with Mr. Brantley in the middle of March?

A. Essentially, that they were operating as partners.

Q. And what does that mean to you -- or what did that mean to you, they were operating as partners?

A. When I heard that, it struck me that there could can be a coverage issue. I had seen nothing from the underwriting file to suggest that we insured a partnership.

Q. When you say they were operating as partners, does that mean -- did you understand that to mean or did you form in your mind an understanding that there was a partnership?

A. Correct.

Q. Okay. I mean, you understand that partners doesn't necessarily -- can be used colloquially without involving a partnership; right?

A. Well, I -- no. I didn't get into that level of legal detail. When I was told they were operating as partners, I assumed there was a partnership.

Q. You made an assumption when Mr. Doyle -- well, what exactly did Mr. Doyle tell you?

A. He told me that -- well, first of all, I didn't know that Jim Trudeau had taken statements yet. He told me that there were statements taken and that in them, Mr. Lodigiani indicated that he and Mr. Brantley were partners.

Q. So you made the assumption, based on Mr. Doyle's statement to you that he heard Mr. Lodigiani refer to his relationship with Mr. Brantley as partners that there was a partnership that; that was the agreement between them by which they were operating a business. Is that what you're saying?

MR. STEWART: Object to the form of the question. Go ahead.

THE WITNESS: I didn't make the assumption. That's what I was told.

Q. Well, what did you understand partnership to mean?

A. That they were working this job together.

Q. You understand that there's a difference between working together and a partnership -- a legal partnership; right?

Q: I didn't have all of the details of what that meant at that time. I did learn more later.

Q. Okay. But if you could answer my question, Mr. Kagels.

4

> A. All right.
>
> Q. You understand there's a difference between working together and a partnership; right?
>
> A. There could be, sure.
>
> Q. Is there anything in the claims department that defines what a partnership is, as you were using that term to – in developing your coverage assessment?
>
> A. No.
>
> Q. Did you speak with a lawyer about that?
>
> A. Not at that point.
>
> Q. So what was it that informed your determination at this point, albeit a preliminary determination, that there was a partnership?
>
> A. I want to correct my prior answer. I had spoken to Joe Doyle. That's where I got the information. So I did speak to a lawyer.
>
> Q. Right. But you didn't speak to him about what constitutes a partnership --
>
> A. No.
>
> Q. -- as that term is used in the Preferred Mutual underwriting or claims --
>
> A. No.
>
> Q. -- handling materials; right?
>
> A. No. That's correct.
>
> A. So what did you do to inform yourself what partnership meant in the context of this coverage issue that had arisen, in your mind?
>
> MR. STEWART: Object to the form of the question. Go ahead.
>
> THE WITNESS: Some time after that, once I received the statements, had more information, it was determined that we would hire counsel to review the coverage issue. And that is when we hired Mr. Stewart.

Ex. B, 41:22-46:14.

Mr. Kagels testified that as of March 18, 2013, when he concluded that Mr. Lodigiani with operating as a partnership, all he had in mind was: "my discussion with Mr. Doyle and the statements [provided by Mr. Lodigiani in response to Mr. Doyle's questions]. Ex. B, 68:3-9. Mr. Kagels also testified that PMIC, believing that there may be a coverage issue, *i.e.* that it could avoid coverage and that it could be beneficial to further exploit Mr. Lodigiani's reliance upon PMIC to protect him, "referred the file to Mr. Stewart to give us legal advice on whether or not -

- what effect this [the information provided by Mr. Doyle] would have. And we took an EUO [examination under oath] of Mr. Lofigiani." Exhibit B, pp. 52:23-53:1. According to Mr. Kagels, he did not read the examination under oath transcripts but received a report from Mr. Stewart, and relied upon the advice of Mr. Stewart to reach the determination that the relationship between Mr. Lodigiani and Mr. Brantley was a partnership. Exhibit B, pp. 70:3-71:7. Mr. Kagels testified as follows:

> Q. Are you telling me that Preferred Mutual relied on the advice of Counsel to reach its determination that the relationship between … Mr. Lodigiani and Mr. Brantley was a partnership?
>
> A. That's part of what goes into that decision, yes.
>
> Q. What did Counsel tell you?
>
> MR. STEWART: Objection. He's not answering that.
>
> \* \* \*
>
> Q. In making the determination that Mr. Lodigiani's relationship with Mr. Brantley was a partnership, did you rely on information from a lawyer?
>
> \* \* \*
>
> A. Yes, I relied on information from Joe Doyle that he gave me and – which seemed to be confirmed by the statements that he provided to me.
>
> \* \* \*
>
> Q. At any point in making the determination that the relationship between Mr. Lodigiani and Mr. Brantley was a partnership, did Preferred Mutual rely on the advice of Counsel?
>
> A. Yes.
>
> Q. Tell me what the advice was.
>
> MR. STEWART: You're not going to get that.

**ARGUMENT**

**I.   PMIC HAS WAIVED ANY PRIVILEGE OVER COMMUNICATIONS IT MAY HAVE HAD CONCERNING THE BASES FOR ITS RECISSION DECISION.**

    **A.   Massachusetts Recognizes "At Issue" Waivers of the Attorney-Client Privilege.**

6

A party in litigation has a presumptive right to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Because the attorney-client privilege runs contrary to this mandate of full disclosure of relevant information, it is ordinarily strictly construed and narrowly applied. *Colonial Gas Co. v. Aetna Cas. & Surety Co.*, 139 F.R.D. 269, 273 (D. Mass. 1991) ("[T]he privilege runs contrary to full disclosure of relevant information and is, therefore, narrowly construed."); *Commissioner of Revenue v. Comcast Corp.*, 453 Mass. 293, 304 (2009) ("[W]e have consistently held that we construe the privilege narrowly, in part to protect the competing societal interest of the full disclosure of relevant evidence."); *In re Reorganization of Elec. Mut. Liab. Ins. Co.*, 425 Mass. 419, 421 (1997) (attorney-client "privilege is ordinarily strictly construed"); *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 24 (1st Cir. 2011) ("the attorney-client privilege must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth") (internal citation omitted).

"The burden of proving that the attorney-client privilege applies to a communication rests on the party asserting the privilege." *Elec. Mut. Liab. Ins. Co.*, 425 Mass. at 421. This burden extends to all elements involved in the determination of the existence of the privilege, including that the privilege has not been waived. *Id.*

It is well settled that a party waives all applicable privileges by placing work product or privileged communications "at issue" in the litigation. *Federal Deposit Ins. Corp. v. R. W. Beck, Inc.*, 2004 WL 1474579, at *1 (D. Mass. July 1, 2004). As the seminal case describing "at issue" waivers found, the privilege is impliedly waived through the party's own actions when the party "places information protected by [the privilege] at issue through some affirmative act for his own benefit, and to allow the privilege to protect against such disclosure of such information would [be] manifestly unfair to the opposing party." *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.

Wash. 1975). The *Hearn* standard has been recognized and applied by this Court. *See Sax v. Sax*, 136 F.R.D. 542 (D. Mass. 1991) (finding waiver of the attorney-client privilege through defendant's assertion of counterclaim because agreement at issue could only have been explained to the defendant by his attorney); *Savoy v. Richard A. Carrier Trucking, Inc.*, 178 F.R.D. 346 (D. Mass. 1998) (recognizing *Hearn* factors, but finding insufficient evidence in the record as to whether plaintiff relied on advice of counsel and put that advice at issue); *Federal Deposit Ins. Corp. v. R. W. Beck, Inc.*, 2004 WL 1474579 (D. Mass. July 1, 2004) (citing *Hearn* and holding defendant in malpractice action entitled to opinions and underlying work product of counsel that provided advice to plaintiff).

### B. The Filing of the Rescission Action Constitutes an "At Issue" Waiver as to All Privileges Otherwise Applicable to PMIC'S Basis for Its Action.

Although waiver is not automatic and is subject to a balancing test, "[t]he privilege ends at the point where the defendant can show that the plaintiff's civil claim, and the probable defenses thereto, are enmeshed in important evidence that will be unavailable to the defendant if the privilege prevails. *R. W. Beck, Inc.*, 2004 WL 1474579, at *4 (quoting *Greater Newburyport Clamshell Alliance v. Public Serv. Co. of N.H.*, 838 F.2d 13, 20 (1st Cir. 1988)). By bringing this rescission action, PMIC has put at issue its knowledge of the existence of the grounds for a rescission claim, specifically, that Mr. Lodigiani was in a partnership with Mr. Brantley with respect to the Bridge Street plumbing job. By acknowledging that it relied upon communications with its counsel in reaching that conclusion, PMIC has placed these communications at issue, and, in doing so, has waived the privilege that would otherwise attach to them. *See Savoy.*, 178 F.R.D. at 350 ("[T]he advice or conduct of a party's lawyer may become the subject of litigation – and thereby impliedly waived – when that lawyer's advice or conduct is explicitly or implicitly made the basis of an offense or defense."). By allowing PMIC to rely upon these

communications and simultaneously shield them from C&K, PMIC has effectively precluded C&K from any meaningful opportunity to challenge the basis for PMIC's rescission action. The attorney-client privilege cannot be used as both a shield and a sword. *In re PolyMedica Corp. Securities Litigation*, 235 F.R.D. 28, 32 (D. Mass. 2006). To allow PMIC to assert the attorney-client privilege to prevent C&K's discovery of PMIC's knowledge forming the basis of its decision to rescind the policy would be manifestly unfair.

In *Bird v. Penn Central Co.*, 61 F.R.D. 43 (E.D. Pa. 1973), the defendants claimed that the insurer's action for rescission of an insurance policy was barred because the insurer knew or should have known of the grounds for rescission long before it filed suit. The defendants sought documents from the insurer's counsel relating to counsel's investigation and advice concerning the basis for rescission. In concluding that work product protection was not available for the documents contained in the files of the insurer's counsel, the court stated:

> Because the nature of this defense concerns knowledge, legal theories and conclusions of plaintiffs' attorneys charged with claim investigation, such 'advice of counsel' evidenced in these documents is discoverable when it is directly relevant to a possible rescission action or suggests reasons to indicate the propriety of such an action. Rule 26(b)(3) on it face protects against the discovery of these aspects of the work product. However, exceptions have been made where such information is directly at issue, and the need for its production is compelling. … Therefore, to the extent that legal opinions and observations made by counsel for plaintiffs suggest reasons to bring or not bring a suit for rescission of the insurance contract, they are to be produced.

*Id.* at 47.

PMIC contends that it is not using advice of counsel as either an element of its claim or an element of any defense, and, therefore, any legal advice PMIC obtained at any particular time concerning this rescission action is not discoverable. *See* Exhibit A, Kagels Depo. p. 72). However, the principal rationale for finding a waiver of privilege is not the invocation of advice of counsel, but the need to prevent manifest unfairness to the opposing party which, without the

9

discovery of privileged information, would be denied access to information vital to its defense. *See Bird*, 61 F.R.D. at 46 ("Since the relevant inquiry is into what plaintiffs knew or should have known concerning grounds for their rescission claim, only through discovery of information in the hands of the plaintiffs, and their agents, can defendants substantiate their defense."). Defendants cannot adequately defend themselves against PMIC's claim for rescission without this information, and PMIC should be required to disclose it. The applicable law is clear: by placing the basis to rescind the policy issued to Mr. Lodigiani at issue in this litigation, PMIC has waived any privilege that attached to communications with counsel regarding the basis to rescind. Accordingly, defendants respectfully requests that the Court order PMIC to respond to questions regarding communications with its counsel regarding the basis for PMIC's decision to rescind the policy it issued to Mr. Lodigiani, and to produce an unredacted copy of its Activity Report describing those communications.[2]

## CONCLUSION

Because PMIC has put at issue the facts on which it has based its decision to rescind the policy it issued to Mr. Lodigiani, and because it has relied upon the investigation undertaken by counsel in the advice provided by counsel to support their decision, this Court should compel PMIC to produce an un-redacted copy of its Activity Report along with all other documents reflecting communications with Mr. Doyle and Mr. Stewart. In addition, this Court should compel Raymond Kagels to respond to those questions posed to him as PMIC's 30(b)(6) witness that he refused to answer on the basis of the attorney-client and/or work product privilege and should permit defendants to take the depositions of Mr. Doyle and Mr. Stewart.

---

[2] In addition, with regard to the Activity Report, PMIC has not met its burden to demonstrate that the redacted material is privileged. Although PMIC's privilege log refers to the redacted material as subject to privilege, either attorney-client, attorney mental impressions, or information gathered in anticipation of litigation, PMIC has not provide a description as to what makes any individual entry privileged or which privilege protects an individual entry from disclosure.

| | |
|---|---|
| Defendants, | |
| C&K II, LLP, | ADNAN YILDIRIM, |
| By its attorneys, | By his Attorney, |
| | |
| /s/ Anthony R. Zelle | /s/ John A. Girouard |
| Anthony R. Zelle (BBO# 548141) | John A. Girouard (BBO# 637939) |
| Zelle McDonough & Cohen, LLP | Hassett & Donnelly, P.C. |
| 101 Federal Street, 14th floor | 446 Main Street, 12th floor |
| Boston, MA 02110 | Worcester, MA 01608 |
| Ph: 617-742-6520 | Ph: 508-791-6287 |
| Fx: 617-742-1393 | Fx: 508-791-2652 |
| tzelle@zelmcd.com | jgirouard@hassettanddonnelly.com |

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon all counsel of record via ECF on this 30th day of June, 2014.

                                                                                 /s/ Anthony R. Zelle
                                                                                    Anthony R. Zelle