UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION

Preferred Mutual Insurance )
                          )      **13cv30138-MGM**
vs                        )
                          )
Leonard C. Lodigiani, et al)
_____)

**Transcript of Trial** Held Before
The Honorable Mark G. Mastroianni,
United States District Court Judge and a Jury,
on **April 7, 2015.**

<u>APPEARANCES</u>:

For the plaintiff Preffered Mutual:  John B. Stewart,
Suite 301, 20 Maple Street, Springfield, MA 01103.

For the defendant Leonard Lodigiani: David H.
Burstein,1331 East Columbus, Ave., Springfield, MA 01105.

For the defendant Evins C. Brantley:  Anthony R. Zelle
101 Federal Street, Boston, MA 02110

For the defendant Adnan Yildirim: John A. Girouard, 446
Main Street, 12th Floor, Worcester, MA 01608.

Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
300 State Street, Room 303D
Springfield, MA 01105
Tel: (413)731-0086  Fax: (413)737-7333
alice.moran@verizon.net

INDEX

**April 7, 2015**

<u>Witness Name</u>:                                              <u>Page:</u>

**James Trudeau**

Direct examination by Mr. Stewart                    51

Cross-examinatin by Mr. Girouard                     68


**Leo Lodigiani**

Direct examination by Mr. Stewart                    79

Cross-examination by Mr. Burstein                   120

Cross-examination by Mr. Zelle                      166

Cross-examination by Mr. Girouard                   169

Redirect examination by Mr. Stewart                 171


**Michael Griffin**

Direct examination by Mr. Stewart                   193

Cross-examination by Mr. Zelle                      208

Cross-examination by Mr. Girouard                   222

Cross-examination by Mr. Burstein                   230

Plaintiff's Exhibits:                                          Page

12    Transcript of Mr. Lodigiani's recorded statement    59

13    Transcript of Mr. Brantley's recorded statement     59

4 for ID   Audiotape of recorded statements             61

2     Workers' comp. application                         92

3     Business owner online submission                   99

5     July 22, 2013 letter                              115

2 for ID   Rescission check                             118

1     Liability policy                                  191

8     South Hadley Bridge Street permits                191

14    EUO testimony                                     191


Defendants' Exhibits:                                         Page


9     First plumbing agreement                          150

10    Second plumbing agreement                         150

11    January 30, 2013 invoice                          170

7     Mr. Stewart's 3/27/13 letter to Mr. Lodigiani     192



Opening statement by Mr. Stewart                         13

Opening statement by Mr. Burstein                        23

Opening statement by Mr. Zelle                           34

Opening statement by Mr. Girouard                        45

1    **(Court commenced at 9:14.)**

2         THE COURT:   Good morning, everyone.

3         What I want to do is talk to you about again is just

4    have a brief conversation about whether or not we should

5    or I should give some type of pre-charge to the jury.

6    Again my concern is the charge is so short and the trial

7    and issues are so concise that it might not make a lot of

8    sense.

9         However, I don't have any have final instructions

10   written, but if I gave -- I want to know what the parties'

11   position would be if I told the jury the following:  "In

12   this case the plaintiff, Preferred Mutual, as you have

13   heard, is alleging that when Mr. Lodigiani, a plumber,

14   applied for insurance he knowingly made misrepresentations

15   about his business indicating he did not conduct his

16   business as either a partnership or a joint venture.  The

17   defendants jointly deny that allegation.

18        "However, it is the plaintiff's burden to establish

19   their claim and to establish a right to rescind or void a

20   contract, you should know that a misrepresentation is a

21   statement of something as fact that is untrue and which

22   the person making the statement knows is not true.

23        "The misrepresentation must have been made with the

24   intent to deceive or have increased the risk of loss for

25   the plaintiff.  That can occur in a number of ways,

1    including by the plaintiff charging a lower premium for

2    the insurance policy.

3        "Relative to the terms partnership or joint venture,

4    a partnership is an association of two or more persons to

5    carry on as co-owners of a business for profit, and joint

6    venture is an expressed or implied agreement between two

7    or more people for a common purpose, such that each member

8    has an equal right to direct and control the operations of

9    the enterprise.  As I have said, Preferred Mutual bears

10   the burden of proof."

11       That is an abbreviated, not much, but an abbreviated

12   version of some of the principles.

13       Would that instruction or something substantially

14   similar, since I was basically putting it together as I

15   went along, satisfy the parties?

16       I'll start with the plaintiff.

17            MR. STEWART:  Judge, everything sounds fine, 99

18   percent.  The only one concern I have is at the beginning

19   there was a mention of the fact that the misrepresentation

20   needs to be knowing.  I don't think that's part of the

21   statute.  I think that we can -- look, the statute set up

22   that you can either do it --

23            THE COURT:  In a sense that the person making it

24   knows that it's not true.

25            MR. STEWART:  I don't think that that's a

1    requirement.  I think the way the statute is set up, there
2    are either two ways you can satisfy it.  One of the ways
3    is exactly what you're talking about, intent to deceive.
4    The other way is that if -- in the second way state of
5    mind is completely immaterial.  What is material is that
6    it's material to an underwriter, so that's my position on
7    that.

8        I'm willing to have Your Honor make a judgment but
9    that's my submission.  We're going on the part of the
10   statute where it increases the risk of loss, it's material
11   to an underwriter; that we need not show state of mind.

12            THE COURT:  You agree that it's either with the
13   intent to deceive or --

14            MR. STEWART:  The or part.

15            THE COURT:  You're going under the or part, but
16   you agree that there's an intent to deceive as an
17   alternative.

18            MR. STEWART:  That would be one alternative way
19   of proving under the statute, we're not going there.
20   Obviously this is a knowing statement.

21            THE COURT:  Right.  So your only concern is
22   whether or not the misrepresentation has to be knowing to
23   be true at the time the person initially makes the
24   representation.

25            MR. STEWART:  All these insurance applications

1     say you are making these representations to the best of

2     your knowledge so I'm not too worried about -- you know,

3     it wasn't a casual statement or a non-deliberate

4     statement.  It wasn't a mistake.

5            THE COURT:  It may be a distinction you're

6     making that doesn't have, quite frankly, a lot of

7     realistic import.

8            MR. STEWART:  I'm just concerned that saying the

9     word knowing means that he has a particular state of mind

10     when he's speaking this and trying to put one over on

11     somebody, that's not what we're saying.

12            THE COURT:  All right.

13            MR. ZELLE:  Knowing is a very nuanced concept.

14     It is a requirement as set forth as long ago as 1853 in

15     the *Daniels vs Hudson River* case because it is about state

16     of mind, and there is an obligation on the part of the

17     insurance company here to show that Mr. Lodigiani

18     believed, maybe he hadn't thought about it, but believed

19     that he was operating his business as a partnership.

20         If Mr. Lodigiani believed he was not operating a

21     partnership, how could this be a misrepresentation?  It's

22     a misrepresentation if it's not untrue in his mind that --

23            THE COURT:  But I don't want to break down into

24     argument about the law right now.  Just as to the

25     instruction, what do you think about the instruction as a

1    whole, and particularly what's your position as to whether
2    or not Mr. Lodigiani would have to have known that it was
3    untrue for it to be a misrepresentation?
4              MR. ZELLE:  He must know it's untrue.
5              THE COURT:  How about the rest of the
6    pre-instruction?
7              MR. ZELLE:  But not necessarily at the time.  He
8    could be retrospectively, wow, I was wrong.  I am a
9    partnership.  So it need not be untrue, knowingly to be
10   untrue at the time he was making it, but if he
11   subsequently comes to realize, wow, you know, I am a
12   partnership but it has to have some bearing on the state
13   of mind.
14        The only other point -- and I'm fine with the rest of
15   the pre-charge, but I thought you said with equal right to
16   control when you described joint venture, is that right?
17             THE COURT:  "Such that each member has an equal
18   right to direct and control the operation."
19             MR. ZELLE:  The rest is okay with me.
20             MR. BURSTEIN:  Your Honor, my only concern is
21   with the first definition of partnership before you get
22   into joint venture, you talk about strictly the sharing of
23   profits, whereas the common law in Massachusetts goes
24   further and it has similar things to what you mentioned
25   under joint venture.

1          THE COURT:  You're right, it does.

2          MR. BURSTEIN:  Which includes joint control,

3     joint sharing of liability.

4          THE COURT:  It does.  I was trying to abbreviate

5     because it's a pre-instruction.  I said a partnership is

6     an association of two or more persons but you're right it

7     does have other elements.

8          MR. BURSTEIN:  And that is the statute

9     definition, but again there's common law that expounds

10    upon that and I would ask that those items be mentioned

11    under partnership too to not mislead the jury on that

12    issue.

13         THE COURT:  All right.

14         MR. GIROUARD:  I was going to ask for the other

15    elements on the common law.

16         THE COURT:  For partnership?

17         MR. GIROUARD:  Absolutely.  Other than that, I'm

18    fine with the charge.

19         THE COURT:  All right.  I'm interested to know

20    your position of who hasn't commented on the issue of

21    whether or not the misrepresentation has to be known to be

22    not true at the time it's made.

23         MR. GIROUARD:  I think --

24         THE COURT:  And I'm looking, quite frankly, from

25    the defendants' preliminary jury instructions that were

1    proposed, that's one of the lines.

2            MR. GIROUARD:  And that was what I was going to

3    point to.  I think aside from that, I'm in agreement with

4    Attorney Zelle.

5            THE COURT:  All right.  I am going to take a

6    look at some model jury instructions I have relative to

7    that first provision, your point, Mr. Stewart.  I will

8    give you a couple of minutes to keep working.  Do you need

9    the tech person up here to help you with this?

10           MR. STEWART:  I've got my first witness, Judge.

11           THE COURT:  I mean to get whatever you need, the

12   audio technical?

13           MR. STEWART:  I do.  This is after openings,

14   so.

15           THE COURT:  After?

16           MR. STEWART:  After.

17           THE COURT:  All right.  Make sure Tom is

18   available.

19           THE CLERK:  I already e-mailed him.

20           THE COURT:  Can I ask, is this working today?

21           MR. BURSTEIN:  It does.  He has to hold it up.

22           MR. LODIGIANI:  Right here it's not working;

23   right here it does.

24           THE COURT:  Your arm is going to get sore.  If

25   it gets too burdensome, we are having our technical guy

1  come up.  We'll take a break and have him take a look at

2  it.  I can't have you really sitting there like that the

3  whole time.

4          THE CLERK:  All rise.

5  **(A recess was taken at 9:27 until 9:37.)**

6          THE COURT:  Good morning, ladies and gentlemen.

7  I just have to ask you, were you able to follow my

8  instructions not to discuss the case with anyone,

9  investigate the case, go on the Internet?  Were you able

10 to comply with all my instructions?

11         THE JURY:  (Indicating.)

12         THE COURT:  The jury remains fair and impartial.

13 Before we hear the opening statements, I'm going to

14 give you a very brief what's called pre-instruction on the

15 law.  It's the general legal principles that will apply in

16 this case.

17 You will get a much more complete and final

18 instruction.  The final instructions will be the law that

19 you will follow in the case.  This is to guide you and you

20 will see when you hear the final instructions that this

21 instruction is abbreviated so I want you to know that.

22 The terms that I will talk about and explain will

23 have more detailed definitions at the end of the case for

24 you to apply the law in your deliberations.  All right.

25 "As you have heard, in this case the plaintiff,

1    Preferred Mutual, is alleging that when Mr. Lodigiani, a

2    plumber, applied for insurance he made misrepresentations

3    about his business indicating he did not conduct his

4    business as either a partnership or a joint venture.

5         "Now, the defendant, Mr. Lodigiani, and the other

6    defendants, deny that allegation and it is the plaintiff's

7    burden of proof to show that, but there's some terms that

8    are used generally.

9         "Now again, generally, a misrepresentation is the

10   statement of something as fact that is known to be untrue.

11   The misrepresentation must have been made with an intent

12   to deceive or have increased the risk of loss for the

13   plaintiff insurance company such as by lowering the

14   premium being charged.

15        "You heard the term partnership, and a partnership is

16   an association of two or more persons to carry on as

17   co-owners of a business for profit.

18        "To establish a partnership there must be an

19   agreement indicating an intention to associate as a

20   partnership.  Number two, the sharing of profits and

21   loses, and, Number 3, participation by the parties in

22   control and management of the partnership business.

23        "Now a joint venture is an association with two or

24   more people which is characterized by an expressed or

25   implied agreement for a common purpose, such that each

1   member of the joint venture has an equal right to direct

2   and control the operation of the enterprise."

3        Now as I said, please keep in context that this was a

4   general pre-instruction.  The final instruction will be

5   given at the conclusion of the case.

6        The trial now is ready to proceed by way of opening

7   statements.  Are the parties prepared for opening

8   statements?

9            MR. STEWART:  Thank you, Judge.

10           THE COURT:  All right.

11  **OPENING STATEMENT BY MR. STEWART**

12           MR. STEWART:  Folks, as you know, my name is

13  John Stewart.  I represent Preferred Mutual Insurance

14  Company in this case, and let me just talk to you about a

15  few things at the beginning.

16       Think of this as coming events, and when you start

17  hearing these little pieces of the puzzle come together,

18  you will be able to perhaps follow this story along a

19  little bit better having heard my brief overview.

20       This is a case about a gentleman who applied for two

21  different types of insurance.  First, he applied for

22  workers' comp. insurance and he met with an agent and he

23  told the agent about his business, and then there was a

24  later point in time, about six weeks later, this is back

25  in the fall of 2012, when Mr. Lodigiani went to the

1  insurance agent and applied for a liability insurance

2  policy.

3      At that time there was written paperwork that had to

4  be filled out and submitted to the insurance company, and

5  on that paperwork, at least as to Preferred Mutual

6  Insurance Company, the paperwork that Mr. Lodigiani

7  approved in transmission to Preferred Mutual's

8  underwriting department stated that he was in a sole

9  enterprise.  It was a one-owner business.  It wasn't any

10  type of joint venture.  It wasn't any type of partnership.

11      So that was what Preferred Mutual thought it was

12  insuring when it issued a policy, and the policy is quite

13  clear on the declaration pages and the pages that are

14  custom to every insurance policy that had the actual name,

15  they're not just forms, they're custom to this matter.  It

16  says they're insuring a single entity, Mr. Lodigiani doing

17  business as L.B. Plumbing.  That's what Preferred Mutual

18  thought they were insuring.  They charged a premium for a

19  one-owner business and nothing much more happened until

20  there was a fire about a month or some later.

21      On January 28, 2013 there's a fire in South Hadley.

22  It turns out the fire is at a place where Mr. Lodigiani is

23  working.  He's doing plumbing work there.  He had a

24  contract.  He had an agreement with the owner of the

25  property that was reached in October and that's actually

1    what caused all this insurance buying.

2         One of the conditions of getting the South Hadley

3    Public Works allowing a permit to be issued is they wanted

4    to see proof of insurance.  So that's why on October 26th

5    Mr. Lodigiani got a workers' comp. policy and he actually

6    applied for the permits and you will see the permits and

7    the date on them.  It's November 12th that the permits

8    were actually applied for, and then the actual liability

9    policy that you're going to hear about from Preferred

10   Mutual was like December 18th.

11        What happened is Mr. Lodigiani actually had liability

12   insurance before all of this but that liability insurance

13   policy expired with a different company on December 1st

14   and he needed to have liability insurance for this job at

15   South Hadley.

16        Now briefly, folks, this job in South Hadley had kind

17   of a storied history and let me just give you a little

18   tiny bit of what you're going to be hearing.  There's a

19   property -- and you folks might have an idea of the

20   geography but this is right over the bridge in South

21   Hadley from Holyoke.  The location we're talking about is

22   called 24 Bridge Street.  There used to be a Domino's

23   franchise there a long time ago and then a little

24   breakfast place.

25        The construction that Mr. Lodigiani was involved in

1    is the build-out for a new pizza place that one of the

2    defendants hired him to do.  Actually it wasn't quite like

3    that.  The owner hired a man named Charles Brantley who

4    got permits to do the work and then it turns out that

5    Charles Brantley -- the South Hadley inspector came by and

6    couldn't find Charles Brantley anywhere and those permits

7    were revoked.  It turns out that Charles Brantley actually

8    lives in South Carolina.

9        In any event, there was a need to get a licensed

10   plumber on the job.  There was a gentleman named Evins

11   Brantley who turns out to be the father of -- I'm sorry,

12   Charles Brantley, the guy that lives in South Carolina,

13   this is his father.  It turns out he's 80 years old and he

14   knows Mr. Lodigiani.

15       Actually it was Evins Brantley, the older gentleman,

16   he's about 80 years old, that was on the job when the

17   permits were revoked.  He ended up calling his old friend

18   Mr. Lodigiani.  These gentlemen had known each other for

19   30 years or something and Mr. Lodigiani and Mr. Brantley,

20   Evins Brantley, came to an agreement.  They were going to

21   do this job as partners and split the profits and you will

22   hear evidence about that.  Now, this partnership was

23   nothing that Preferred Mutual ever heard about.

24       In any event, so there's a fire in January.  There's

25   an investigation of the fire.  What happens is insurance

1    companies investigate fires.  Preferred Mutual talked to

2    their insured, were you there?  Who else was there?  That

3    kind of thing.  The things that you would usually do in an

4    investigation.  There were site inspections.

5        Preferred Mutual hired an investigator, not somebody

6    that -- let me tell you about Preferred Mutual.  It's been

7    around since 1896.  It's out in the New York state, kind

8    of halfway between Utica, it's south of Utica and it's

9    north of Oneonta.  It's out in the middle of nowhere, a

10   town of 1,500 people.

11       In any event, Preferred Mutual they don't have

12   somebody drive out from New Berlin, New York to

13   investigate this loss.  They hired somebody local, a fire

14   investigator, and they hired a gentleman named James

15   Trudeau who's going to be the first witness.

16       Mr. Trudeau investigated the loss.  He went out to

17   the scene, got all these permits, tried to figure out what

18   the story was, who was there.

19       In any event, it turns out they're going to take a

20   recorded statement of Preferred Mutual's insured, Mr.

21   Lodigiani, and they're also going to take the recorded

22   statement of Mr. Brantley.

23       All of these gentlemen pack in a car and drive to

24   Quincy, which is where the lawyer that Preferred Mutual

25   hired where his office was, and they sat in a conference

room and turned on a tape recorder and the question was,

what's your name? Mr. Lodigiani. How old are you? You

know we're taking this statement and you're to give

answers to the best of your knowledge? Yes.

Mr. Trudeau asked him a very open-ended question:

Tell me what your relationship was with Mr. Brantley and

he said, "we're partners." At that point Preferred Mutual

got a report of that. They kept investigating. They took

a more formal statement called an examination under oath

and Mr. Lodigiani was represented by a lawyer at that

proceeding, and basically Mr. Lodigiani gave a lot of

detail, more than just the label "partners." He said that

they split the profits; that they both were involved in

supervision, and that when it came to expenses, that they

were sharing jointly in expenses.

So, for instance, the cost of the Preferred Mutual

insurance policy, Mr. Brantley when they split up the

money, he was going to be paying for half of that. And

when it came to the workers' comp. policy, Mr. Brantley

was also going to be paying half of that.

So basically you're going to be deciding two things

in this case. I think I've kind of covered what we -- the

beginning of the evidence about partnership, and you're

going to be deciding whether there was a partnership and

if there was a partnership, whether the submission that it

1  was a solo venture, a one-owner business, whether there

2  was a misrepresentation so that's one piece of this.

3      The other piece of it is going to be how did that

4  affect -- did it affect at all Preferred Mutual's

5  underwriting?  And would it have made any difference if he

6  said he was a two-owner business?

7      If Mr. Lodigiani had gone in and said I'm in a joint

8  venture, I've got this job, and I usually am a d/b/a sole

9  person but this one particular job I'm doing with a

10  partner, and the answer is yes, that Preferred Mutual

11  would have looked at that.  They charge -- and you'll hear

12  testimony that every insurance company that writes this

13  line of business charges basically double for a two-owner

14  business.  They charge per person.

15      So there's basically a minimum payroll, that's the

16  way they do it, of $28,600 for every owner and then

17  there's some multiplier and they come up with a premium, I

18  don't know how many hundreds of dollars, thousands of

19  dollars, I think it's about a thousand dollars, something

20  like that, but you don't pay obviously $28,000 in premium.

21  You're paying a percentage against that.

22      It's like your tax bill on your house.  If your house

23  is worth $400,000, you pay a small multiplier in taxes and

24  there's a small multiplier on your premium for this type

25  of business.

1    So that's going to be basically the evidence you're

2  going to hear.  You're going to hear from Mr. Trudeau.  He

3  will tell you about the investigation.  You're going to

4  hear from Mr. Lodigiani.  He's going to tell you about the

5  partnership and him telling you about the partnership.

6    You're also going to hear by way of -- it's actually

7  going to come in through Mr. Trudeau that Mr. Brantley

8  himself gave a recorded statement and he also confirmed

9  that he was in partnership.  He was partners with Mr.

10 Lodigiani for this job that they were splitting profits

11 on.

12    Of course, at the end of the case the judge will give

13 you instructions on the law of the significance of what

14 splitting profits may mean, and we'll leave that for later

15 on.  But you're also going to hear from Mr. Kagels, the

16 gentleman sitting with me at counsel's table, and he's

17 going to talk about the investigation process and when

18 Preferred Mutual started hearing things and what they did

19 in response to that and ultimately coming to the decision

20 to rescind the policy.

21    You're going to be hearing from a gentleman named

22 Michael Griffin that works in the underwriting department.

23 He's one of the head supervisors there and this was under

24 his jurisdiction.  That he was the one that made the

25 decision that this was material to Preferred Mutual

1    underwriting.  That if it had been told that this was a

2    two-owner enterprise, that this was a partnership or a

3    joint venture and not just a solo person, that the premium

4    would have been different and that it was material to an

5    underwriter.

6         So in a nutshell, that's what you're going to hear.

7    You're going to hear about the partnership; you're going

8    to hear that it's material; you're going to hear that

9    there was a misrepresentation.  Hopefully it won't take

10   too long and I appreciate your patience.  Thank you.

11             THE COURT:  Thank you, Attorney Stewart.

12        Who will be going first for opening?

13             MR. ZELLE:  Mr. Burstein will go first.

14             THE COURT:  Very well.  Thank you.  Whenever

15   you're ready.

16             MR. BURSTEIN:  I think we are having problems

17   with the headphones.

18             THE COURT:  Can you come to sidebar and we'll

19   work through that.

20   (Sidebar conference.)

21             THE COURT:  I think co-counsel is telling you --

22   Can you ask him?  Can you just keep checking to make sure

23   that he can hear?

24             MR. BURSTEIN:  Okay.

25             MR. ZELLE:  He can right now.  He said he can.

1          THE COURT:  Was he able to hear the opening?

2          MR. ZELLE:  He did.  The problem is when we say

3    to him sitting next to him can you hear, he can't hear us

4    because he's got the things in his ear.

5          THE COURT:  That's a good point and you're not

6    talking in the microphone.

7          MR. ZELLE:  If I whisper, he can't hear because

8    he's got his ears plugged.

9          THE COURT:  Just come to sidebar.

10         MR. ZELLE:  I think it's working now and we'll

11   signal the Court if we see it's not.

12         THE COURT:  I'll ask as you're sitting next to

13   him if you think he's not hearing during the course of the

14   trial to just let us know.

15         MR. GIROUARD:  Okay.

16         MR. BURSTEIN:  Thank you.

17         MR. ZELLE:  Can you just let the jury know all

18   this rigamarole?

19         THE COURT:  Okay.

20   (Sidebar conference.)

21         THE COURT:  Just so you know what's going on,

22   technical issues.  We couldn't get the projector to work,

23   couldn't get the microphone to turn on.  It's a very

24   simple matter, Mr. Lodigiani has an amplifier in his ears

25   to help him hear.  We're having a hard time keeping that

1  working.  That's all that was going on, and I apologize

2  for the interruption where one of our technical staff came

3  through and you saw him, that's what's going on.  All

4  right.

5       MR. BURSTEIN:  Thank you, Your Honor.

6  **OPENING STATEMENT BY MR. BURSTEIN**

7       MR. BURSTEIN:  Good morning, ladies and

8  gentlemen.  As I told you previously, my name is David

9  Burstein and I represent the defendant Leonard Lodigiani

10 who goes by Leo Lodigiani, and he was the plumber in this

11 case that you just heard some information about.

12      Now just procedurally so you understand what's

13 happening, because the plaintiff insurance company has the

14 burden of proof in this case, they get to argue first when

15 they do their opening and then the defendants are going to

16 get to give you their opening statements, then you're

17 going to hear the evidence and you will be instructed, and

18 then there will be closing arguments and again, because

19 the plaintiff has the burden of proof, they get to argue

20 last.

21      So again I'm just going to ask you to keep open minds

22 and listen carefully to all of the evidence and all of the

23 arguments in this case before you make any decisions

24 because you're going to hear different perspectives from

25 the different parties on what really happened.

I don't think the facts are very complex and I don't disagree with a lot of the facts as Attorney Stewart presented them to you.  So I'm going to kind of start with the middle of what happened and go through the end and then jump back to the beginning.

So really the most significant event probably in this case was the fire.  You will hear evidence this was a significant fire that occurred at the Bridge Street location, which is a multi-tenant building, which happened on January 28, 2013.

As a result of that fire, people suffered damage to their building.  The owner of that building was C&K Limited Partnership.  They owned the whole building, and then part of that building was being leased by Mr. Yildirim who was building out a new restaurant at that location.  He's the gentleman who hired Mr. Lodigiani to do the plumbing work at that location.

Just to be clear, you're going to see some contracts. He hired Mr. Lodigiani individually.  There was no mention -- he's going to tell you there was no mention of a partnership.  Okay.

When you see the signature on the contract, it's not going to indicate a partnership.  It's going to be signed Leonard C. Lodigiani or L.C. Lodigiani, because that's how he's done business.

1    You're going to hear extensive evidence, mostly from

2    Mr. Lodigiani, but you're also going to hear evidence from

3    other people that dealt with them and you're going to be

4    able to judge his actions with other people, not just what

5    he said but what he did.  Okay.

6    He has been a sole proprietor, he's been in business

7    for himself.  He's going to tell you that he's never filed

8    a partnership tax return; that he's never filed any

9    partnership paperwork with the Secretary of State, and

10   that with respect to any time anywhere near the incident

11   of this fire he had not made any agreement with anyone to

12   be in a legal partnership.

13   Now people use the term partnership on a day-to-day

14   basis sometimes for different meanings than what the legal

15   definition of a partnership is, and you're going to get

16   much further instructions from the judge at the end of

17   this case about what constitutes a legal partnership but

18   you've heard a little bit about it already.

19   So there is some sharing of profits involved

20   normally, and you're going to hear that there was some

21   sharing of profits in this case.  I'm going to tell you a

22   little bit more about that in a minute, but you're also

23   going to hear that involved sharing losses.

24   No Attorney Stewart represented in his opening that

25   the parties had agreed to share losses or to share

1    expenses or losses in this case, and I would disagree with

2    that characterization.

3         You're going to hear evidence that the agreement was

4    that Mr. Lodigiani would pay Evins Brantley 50 percent of

5    the net profits from the job, but Mr. Lodigiani had

6    expenses.  He was required by this job to go out and buy

7    workers' comp. insurance.  Mr. Brantley didn't give him

8    half of the money to do that.

9         He had to go buy liability insurance to make sure he

10   was covered.  He didn't get half the money to do that.  He

11   had to go take out permits to do the job because he's the

12   master plumber.  You're going to hear evidence that he's a

13   master plumber and what that means.  He didn't get half of

14   the money from Mr. Brantley to do that, and he's never

15   gotten half of those monies for anything.

16        You're going to hear evidence that he's never been

17   paid for this job.  He's never gotten reimbursed any of

18   those monies by Mr. Brantley.

19        Now after the fire a number of things happened.  I'm

20   not going to go into too much detail because you're to

21   hear a lot of evidence about what happened after the fire,

22   but after the fire, as has been pointed out, because there

23   was a liability or a business owner's policy that provided

24   liability coverage issued by the insurance company, the

25   plaintiff in this case, that they took various actions

1    which some of them are normal and some of them seem to be

2    a little strange, and I want you to just pay attention as

3    you hear evidence about what procedures they undertook

4    after this loss.

5         Okay.  I'm going to try to tie it altogether when I

6    come back before you in the closing argument but just pay

7    attention to things that don't sound that they're normal.

8    Okay.

9         So they hire an independent adjuster and that

10   adjuster took various actions you're going to hear.

11   You're going to hear from him I believe first, and part of

12   what he did was he went out and met with Mr. Lodigiani at

13   the scene of the fire, along with an attorney, Attorney

14   Doyle, and I believe another attorney, Attorney Perkins,

15   from the same firm, and those attorneys were hired by

16   Preferred Mutual to represent Mr. Lodigiani's interest.

17   Those lawyers are supposed to be acting for Mr. Lodigiani

18   even though they're being paid by Preferred Mutual.

19        So they go out.  They walk through the scene of the

20   fire and they ask questions.  At some point later in time,

21   about a month later, they ask Mr. Lodigiani and Mr.

22   Brantley and I believe one of the other workers to drive

23   all the way out to Quincy to Attorney Doyle's office to

24   take another statement.  Attorney Doyle is there and

25   Mr. Trudeau is there.

1      Mr. Doyle meets with Mr. Lodigiani before that

2   statement is taken.  They have a discussion.  You're going

3   to hear about that, pay attention to that.  Okay.  And

4   then the statement is taken by the adjuster, and then at

5   some point during the very, very beginning of the

6   statement the adjuster stops asking questions and the

7   attorney jumps in and starts asking questions.  Pay

8   attention to that and the explanations of why that

9   happens.

10      Apparently that statement is not enough.  They ask

11  Mr. Lodigiani after hiring another lawyer, that's going to

12  get into the coverage issues, to come back and give an

13  examination under oath, and that's not enough when they

14  ask him to come back again a month after that and give

15  another statement under oath.  Okay.

16      During all this time all that is happening you're

17  going to hear about what actions are being taken behind

18  the scenes by the insurance company, by the adjuster

19  that's been assigned to the file at the company, and by

20  that adjuster's interactions with other people at the

21  company and interactions with the attorney that's been

22  hired to represent Mr. Lodigiani's interest.  Okay.

23      I'm going to ask you to pay attention to all those

24  things, and I think they're going to make sense when the

25  case is over so just pay attention as you hear those types

1   of things.

2       I'm going to take you back to the beginning.  Okay.

3   So back at the beginning, Mr. Brantley, Evins Brantley --

4   there's two Brantleys involved in this -- Evins Brantley,

5   the father, is involved with working on a project for

6   Mr. Yildirim who's developing this restaurant.

7       Apparently you're going to hear evidence that

8   apparently they knew each other because Evins Brantley had

9   done some work for him in the past, and for this

10  particular job you're going to hear that they needed to

11  bring in a master plumber because there would be more than

12  one plumber working on the job.

13      You'll hear some evidence that when it comes to

14  plumbing, if one plumber is going to be supervising

15  another plumber or other plumbers, that the person doing

16  the supervision has to be a master plumber in

17  Massachusetts.  Okay.  Mr. Lodigiani is a master plumber

18  and Evins Brantley is not, he's what's called a journeyman

19  plumber.  Charles Brantley, the son, was a master plumber

20  as well.

21      So at the point where this job started and you're

22  going to see an original contract, which is kind of like a

23  handwritten scribble of the work that's contemplated to be

24  done at the job, that was done -- that contract was

25  created between originally the owner of the restaurant,

1    Mr. Yildirim, and Charles Brantley.

2         You're going to see that contract written down and I

3    believe it's dated in September of 2012.  At that point in

4    time when that contract is signed or written, I don't even

5    know if it was signed, but when it was written and the

6    work was contemplated at this location, just keep in mind

7    that you're going to hear evidence that Mr. Lodigiani

8    knows nothing about this job at that point in time.

9    You're going to consider that as to whether or not Mr.

10   Lodigiani is a partner with Mr. Evins Brantley at that

11   point in time.

12        You're going to hear evidence that he didn't even

13   know about this job; that he knew nothing about this job

14   until at some point later in time Charles Brantley was

15   told that he could not be the master plumber on this job

16   anymore, and Evins Brantley calls up his friend Leo

17   Lodigiani who he knows is a master plumber because they've

18   worked together on and off for 40 years and says I've got

19   a job.  I'd like you to come meet with the owner and see

20   if you want to take the job, to be the supervisor, to run

21   the project, to be the master plumber, and Mr. Lodigiani

22   goes and meets with the owner Mr. Yildirim.

23        Mr. Yildirim shows him the scope of the work.  They

24   agree on how it's going to be handled; that Mr. Lodigiani

25   is going to bill strictly for the time spent by the men on

1    the job of $65 an hour, and Mr. Yildirim asks Mr.

2    Lodigiani to sign the contract or to sign the scope of the

3    work and he signs his name.

4         There's no talk about him being a partner, and then

5    when an inspector comes out and says that additional work

6    needs to be done on the job, they sign a second contract

7    or a second scope of work.

8         Again that's dated September but Mr. Lodigiani --

9    you're going to hear testimony from both Mr. Yildirim and

10   Mr. Lodigiani that it wasn't signed in September.  It was

11   created in September when Mr. Brantley was still on the

12   job.  When Mr. Lodigiani is brought in later and he's

13   asked to just sign off on it that he's going to do that

14   scope of work and he signs that as well.  Again no

15   indication of a partnership, no discussion of a

16   partnership, no contemplation of a partnership at that

17   point between the owner and Mr. Lodigiani.

18        Mr. Lodigiani is going to run that project as the

19   master plumber.  He's going to get the permits.  He's

20   going to control the labor.  He's going to be responsible

21   for paying the guys.

22        You're going to hear evidence that he's the one who

23   takes the owner to the supply house to go buy supplies

24   because they're asking the owner to buy the supplies as

25   they go.  That Mr. Evins Brantley doesn't do any of that,

1     and that when changes need to be made to the scope of the

2     work or how things are getting done or what the time

3     frames are, that Mr. Lodigiani is the only one involved in

4     that.  Again, it's control of the job.  He is the one who

5     controlled the job and not Evins Brantley.

6          Now you're going to hear more evidence again or more

7     instructions from the judge at the end of the case about

8     the different things that are involved in a partnership

9     and it's not just control and it's not just sharing of

10    profits, but there's other things that go with it and

11    they're more complex legal concepts because the laws of

12    agency and partnership work very closely together.

13         So in Massachusetts, as in many places, you're going

14    to hear that there's legal things that happen when people

15    agree to be partners.  One of those things is that they're

16    both agents of the partnership, and that means that either

17    partner can bind the other one to legal contracts.  Okay.

18    Basically anything that any of the partners do in the

19    scope of the work that's contemplated by the partnership

20    binds the other partner legally.  You're going to hear

21    some evidence about that during the trial and you're going

22    to hear some instructions about that I hope at the end of

23    the trial.

24         You're also going to hear about another concept

25    because if both people if they agree to be partners are

1  agents of this partnership, that they share liability.

2  There's something called vicarious liability where they

3  share liability for the project.  So if one partner does

4  anything wrong, all the partners are responsible.  Okay.

5  You're going to hear testimony, both by Mr. Lodigiani and

6  Mr. Brantley that that was never contemplated.  Okay.

7      The only thing that was contemplated between these

8  two individuals was that they were going to work together

9  at this project, that Mr. Lodigiani was going to be the

10  master plumber, that Mr. Brantley was going to be the

11  journeyman plumber working with him as they had worked

12  together side by side on many projects, and they were

13  going to have helpers there who are not licensed plumbers

14  to just basically do some of the heavy lifting and to be

15  assistants, and you'll hear evidence about all of that.

16      You're also going to hear some detailed testimony by

17  both Mr. Lodigiani and others about the things that he

18  never did.  Okay.  So that the most important of those is

19  that he never made any misrepresentation to the insurance

20  company when he applied for the policies that he applied

21  for.

22      THE COURT:  Excuse me, Attorney Burstein, one

23  minute.

24      MR. BURSTEIN:  I believe I'll be taking some of

25  Attorney Girouard's time as well.

1          THE COURT:   There was no sharing.

2          MR. BURSTEIN:   Okay.   Thank you, Your Honor.

3      So, I'm sorry, you're going to hear evidence that Mr.

4   Lodigiani believed that he was operating as an individual

5   when he applied for those policies; that he never made any

6   misrepresentations when he applied for those policies;

7   that to this day he believes and I believe it's a fact

8   that he's been operating as an individual, and so you're

9   going to hear a lot of evidence about the whole

10  application process.   Again keep in mind that Mr.

11  Lodigiani believes that he's been operating as an

12  individual master plumber throughout this whole

13  proceeding.

14      So again listen to all the evidence and I'll be back

15  again to talk to you at the end of the case.   Thank you

16  very much.

17          THE COURT:   Thank you very much.

18      Whenever you're ready.

19  **OPENING STATEMENT BY MR. ZELLE**

20          MR. ZELLE:   Thank you, Your Honor, and let me

21  start by thanking you for serving as jurors.   What you're

22  doing is very important to my client.   You are going to be

23  asked to decide who's right and who's wrong, that's what

24  it's going to boil down to, and it's very important to my

25  client and what you're doing is a very important civic

responsibility.

We're here today, as Mr. Burstein said, because there was a fire. It was in January of 2013 that destroyed my client's building. Preferred Mutual claims that it doesn't have to provide insurance to Mr. Lodigiani for the damage that my client believes was caused by Mr. Lodigiani.

Basically it's a case about an insurance company trying to take away the policy from the policyholder. You've heard the legal term for that is rescission, and the insurance company, as you heard Mr. Stewart say, will try to convince you why it is entitled to rescind the insurance policy. We don't think that will be persuasive.

I'm going to show you a couple of documents right now. These will be yours to review when you deliberate which I think are very important in terms of deciding whether Preferred Mutual, the insurance company, can rescind the insurance policy.

As you heard Mr. Stewart say, before Mr. Lodigiani applied for his liability policy from Preferred Mutual, he applied for a workers' compensation policy from another company. It was the same insurance agent. You have not heard this name before except when Judge Mastroianni said it, but her name is Margaret Grundstrom. She goes by Peggy. She works for the FieldEddy Insurance Agency.

Ms. Grundstrom met with Mr. Lodigiani in October of 2012 and asked him questions. He came in and he said I need a workers' compensation policy, and in that case she will explain to you that she went line by line question by question through this application and read them, read the questions to Mr. Lodigiani and checked off his answers.

Right in front of him she had the form, she checked off the answers. I'm putting my finger right under question number 8 and it says legal status. As you can see, there are several choices. Sole proprietorship is the first one, that is how she understood Mr. Lodigiani described his business. He said it's my business. I'm not incorporated; I'm a sole proprietor. I work as Leonard Lodigiani; sometimes I use the name L.B. Plumbing.

You'll see also partnership is there, corporation, trust, limited partnership, LLC stands for limited liability. These are all the different types of means by which an individual can do business. The legal status is what you will be asked to determine, what was Mr. Lodigiani's legal status.

Now I'm going to show you another document, it's Exhibit 3, and this is the Preferred Mutual application. You'll see it's a business owner's online submission, and it was a very different process than the process by which Mr. Lodigiani applied for the workers' compensation

1    policy.

2        Ms. Grundstrom did not sit with Mr. Lodigiani and go

3    through the Preferred Mutual policy question by question.

4    Quite to the contrary, both Mr. Lodigiani and

5    Ms. Grundstrom will tell you that in December Mr.

6    Lodigiani came into the FieldEddy office and said my

7    liability insurance policy is expired.  My job is

8    continuing; I need a new policy.  She asked him has

9    anything changed?  He said, no.  It was a very short

10   conversation, no more than 15, 20 minutes at the tops.

11       Ms. Grundstrom determined that Preferred Mutual would

12   be the best fit for Mr. Lodigiani.  After Mr. Lodigiani

13   left, she filled out this application.  Ms. Grundstrom was

14   the agent for Preferred Mutual so it was just as if

15   Preferred Mutual was filling out the application itself

16   and was doing it based on information that Ms. Grundstrom

17   had previously gleaned when she filled out the workers'

18   compensation application.

19       What is critical about this application is not just

20   the fact that Mr. Lodigiani had nothing to do with its

21   application.  What's more critical is the fact that

22   nowhere on this application is there a question that asks

23   for the legal status of Mr. Lodigiani's business.

24       What the insurance company is doing is they are

25   claiming that where it says entity here and Ms. Grundstrom

typed online individual, that's the misrepresentation.
That is everything that Preferred Mutual is relying on as
the misrepresentation, and you will see up above she had
also entered online on this application Leonard Lodigiani
doing business as L.B. Plumbing.  The entity is an
individual.

Ms. Grundstrom will say she was never given any
explanation by Preferred Mutual what entity meant.  She
understood it to be mean how is the individual in this
case doing business.  As a corporation?  As a partnership
or whatnot?  But there was no instruction from Preferred
Mutual, and you will hear from Preferred Mutual's
witnesses.

Mr. Kagels is in the claim department.  He tell you
he never had any training as to understand the difference
between partnerships and the legal status of aa
partnership versus corporation versus an individual doing
business as.

You will hear from an underwriter, even the
underwriter who accepted this loss for Preferred Mutual
will tell you, no, we don't have any definition.  We don't
have any manuals that say what's a corporation, what's a
partnership.

What the evidence will show you is that after the
fire, Preferred Mutual decided they didn't want to have to

1    pay for it, and that is why they are here trying to

2    rescind the policy.

3         I'm going to take you now to March of 2013, this is

4    two months after the fire, it's after the site inspection

5    and it's after the recorded statement that Preferred

6    Mutual's lawyer asked questions of Mr. Lodigiani, and this

7    is somewhat nuanced so I'd ask you to bear with me, but

8    insurance companies who issue liability policies hire

9    lawyers to defend their policyholders.

10        The lawyers are charged with, first and foremost, the

11   responsibility of protecting the policyholder.

12   Secondarily, and it's a distant second, they're charged

13   with the responsibility of protecting the insurance

14   companies, but when those two conflict, the lawyer must

15   always represent the interest of the policyholder.

16        In this case the lawyer's name was Joseph Doyle.

17   Joseph Doyle provided to Preferred Mutual the information

18   on which Preferred Mutual is relying to rescind the

19   policy, and Mr. Kagels will tell you that.  The adjuster

20   will tell you the only information on which I based my

21   conclusion that this was a partnership is what Mr. Doyle

22   told me.

23        The dates I want you to have in mind are March 22nd

24   and March 23rd.  On March 22nd Mr. Doyle had a telephone

25   conversation with Mr. Kagels, and during this conversation

1    Mr. Doyle repeated something he had previously said was

2    that Mr. Lodigiani had told him, Mr. Doyle and

3    Mr. Trudeau, that he and Mr. Brantley were partners.

4         Bear in mind, as Mr. Burstein said, simply referring

5    to someone as a partner does not a partnership make.

6    That's all that Mr. Doyle had.  He told Mr. Kagels that

7    and Mr. Kagels said that makes it a partnership.

8         Mr. Kagels also relied on, and Mr. Lodigiani, my

9    client and C&K, we don't dispute this, he was planning to

10   share the profits and that's an element of partnership,

11   but what there was no agreement between Mr. Lodigiani and

12   Mr. Brantley was to share liability.

13        There was no agreement as to who would be

14   responsibile to the town if there was a problem with the

15   permit.  There was no agreement with respect to who would

16   pay for a loss if there was any property stolen or if

17   there was a fire.  That was on Mr. Lodigiani and he'll

18   tell you that.

19        In that regard, he would certainly not have even used

20   the generic term partners to prefer to Mr. Brantley, and

21   Mr. Lodigiani did not believe he was operating a

22   partnership.  He will tell you that he didn't believe that

23   because if he was operating a partnership, Mr. Lodigiani

24   had been a plumber for 40 years, he knows the plumbing

25   code back and forth.  In the plumbing code a master

plumber can operate a business as a partnership but only,

only if it's with another master plumber and Mr. Brantley,

as you heard and will hear, was not a master plumber.  He

was a journeyman and Mr. Lodigiani will tell you I

couldn't have formed a partnership with Mr. Brantley even

if I wanted to.

I want to go back to the dates, I told you that this

conversation between Mr. Doyle, and it's reflected in the

claim notes, which is Exhibit 16 here, and you will see

the note on March 22nd, and unfortunately it's blacked out

on this copy but you will see that it's a separate page,

it restates the conversation of Mr. Doyle telling Mr.

Kagels, yeah, he told me he was a partner.

The next day, on the 23rd of March, this is what Mr.

Kagels wrote --

MR. STEWART:  Judge, I don't think we have a

meeting of the minds on this.  I'm objecting to this.

THE COURT:  Sidebar.

(Sidebar conference.)

MR. STEWART:  I don't like to object during the

openings.  I understood from yesterday that this was not

going to be talked about in the openings and that there

had been no ruling on the admissibility of this.

MR. ZELLE:  Can you put on the noise?

MR. STEWART:  This is the note we were talking

1    about yesterday afternoon.

2              MR. ZELLE:  I'm not planning to use that.

3              MR. STEWART:  You're just showing it to them.

4              MR. ZELLE:  No.  What I put on was Exhibit 6.

5    It's the underwriting memo.

6              MR. STEWART:  I jumped too quickly.  I thought

7    you were putting on the note.

8              MR. ZELLE:  No.

9              THE COURT:  I don't think he did.

10             MR. STEWART:  I made a mistake, Judge.

11             THE COURT:  Okay.  Fine.  You gave me an

12   opportunity to come to sidebar.

13        As good as an opening is, it sounds an awful lot like

14   a closing argument.

15             MR. ZELLE:  I'll dial it back.

16             MR. STEWART:  I'm trying not to object.

17             MR. ZELLE:  I will try to keep an eye on it.  If

18   I say something, I will tone it down.

19             THE COURT:  I agree as a professional courtesy

20   generally attorneys do not object in an opening.  I rarely

21   interrupt but I will.  You're coming close.

22             MR. ZELLE:  I understand.

23             THE COURT:  Okay.

24             MR. STEWART:  Thank you.  Sorry about that.

25   (End of sidebar conference.)

MR. ZELLE:  What I'm showing you is marked as
Exhibit 6 and this was prepared by Mr. Kagels and this is
what he wrote on March 18th, the date is up here, "The
insured was operating as a partnership with another
80-year-old plumber."

As of March 18th the decision had been made and what
the evidence will show is after March 18th Preferred
Mutual was trying to develop more evidence to support this
conclusion.  At that point there was no more open-minded
investigation.  There were two examinations under oath
where they put Mr. Lodigiani under oath and they asked him
questions and they tried to get more information from him
to support their decision to rescind the policy.  They
were unsuccessful.

As they knew from Mr. Lodigiani's first conversation
with Mr. Doyle, he had referred to Mr. Brantley as his
partner and he was sharing profits.  There was an attempt
by Preferred Mutual to get additional other facts to
support it and they didn't, and they are here before you
to try to prove he was in a legal partnership based on
those two facts and those two facts alone.

I want to comment briefly on the question that would
have to be answered for you to find -- affirmatively for
you to find in favor of Preferred Mutual and that is,
well, did it increase the risk?  Did the alleged

1    misrepresentation increase the risk of loss?

2         You heard Mr. Stewart explain that the underwriter

3    will testify that we would have charged a higher premium

4    and they may have, but it wouldn't have changed the fact

5    that Mr. Brantley was working for Mr. Lodigiani on the

6    job.  He's identified on the application as an employee

7    and that Mr. Lodigiani was the sole owner.  That's

8    identified on the application; that there were two helpers

9    that worked under Mr. Brantley's guidance.  Mr. Lodigiani

10   was simply supervising the journeyman plumber, Mr.

11   Brantley.

12        So the question you'll have to determine if you were

13   to find in favor of Preferred Mutual is, well, the fact

14   that he, Mr. Lodigiani, was operating a partnership

15   increased the risk of loss.  In other words, the risk of a

16   fire or the risk of any other loss was increased simply

17   because of the legal status.  That evidence will be

18   completely lacking.

19        Finally, I want to finish by saying that Mr.

20   Lodigiani has been a plumber for 60 years.  He hasn't been

21   sued before.  He's never previously had to call upon an

22   insurance company to defend him.  He is here, and of

23   course my client is here, my client has the financial

24   interest to demonstrate to you that what Preferred Mutual

25   is attempting to do by rescinding the policy is to deny

1    Mr. Lodigiani the benefits that he paid for.  Thank you.

2            THE COURT:  Thank you.

3        Now I should say for the record and I should have

4    said at the time the objection that was made was

5    overruled.  All right.  Quite frankly, it was simply a

6    misunderstanding about the document being showed.  All

7    right.

8    **OPENING STATEMENT BY MR. GIROUARD**

9            MR. GIROUARD:  Sometimes I think they shuffle

10   them on purpose to throw me off my game.

11       Good morning.  I represent Adnan Yildirim.  You're

12   going to hear evidence that Adnan Yildirim in the summer

13   of 2012 entered into a lease with another fellow through a

14   corporate structure that had been set up to lease

15   commercial space in South Hadley.  Ultimately that place

16   would have the fire and that's why we are here today.

17       You're going to hear evidence from Mr. Yildirim that

18   when he set out to start to renovate that building, he

19   hired some tradesmen, and you've already heard from the

20   other attornies and I'll do my best not to repeat a whole

21   lot, but I want to share a couple key documents with you

22   that I think are the road map where we need to go in

23   looking at the case.

24       You're going to hear that he initially started

25   working with Charles Brantley to do some plumbing work,

1    and ultimately he gets a phone call from South Hadley that

2    says we're not going to issue permits for these guys and

3    he has problem.  He wants this job.  He wants the plumbing

4    work done.  He reaches out to Evins Brantley and says what

5    do we do here?  Evins Brantley said I've got a friend, Leo

6    Lodigiani, and he's a plumber.  I'll introduce you to him.

7        Mr. Yildirim will testify that there's a meeting and

8    when the meeting occurs there's a discussion about the

9    work that has already been contemplated and there was a

10   discussion earlier on in one of the prior opening

11   statements about the fact that Mr. Lodigiani looked at the

12   contract that had originally been prepared with the scope

13   of work.

14       Bear with me as I fumble with the technology here,

15   but that the meeting occurs in October of 2012 between Mr.

16   Yildirim and Mr. Lodigiani, and down at the bottom you'll

17   see there's an agreement where he signs off Leo Lodigiani,

18   9/10/2012.

19       It's critical because you've got a contract between

20   my client and an individual, one person, Leo Lodigiani.

21   That predates the date that Mr. Lodigiani then applies for

22   permits with the town of South Hadley and you will see in

23   evidence today documents to include a plumbing

24   application.  You'll see the plumbing application up here

25   and then you can see a signature and the name Mr.

1    Lodigiani.

2        As the work goes, as I'm sure you all have experience

3    if you've ever undertaking on a project renovating a

4    building, it starts out like a little onion and then all

5    of a sudden you're peeling a huge onion and so they have

6    to expand the scope of the work and there's a second

7    contract that's presented and Mr. Lodigiani -- again this

8    one is difficult to make out, but you will hear testimony

9    today that Adnan Yildirim signs it and Leonard Lodigiani

10   signs it over here.

11       Again, he's under the understanding -- he being Adnan

12   Yildirim -- that he's dealing with one man.  He was

13   introduced to a guy that has the master plumber's license

14   who's going to be responsible for the job.  He's going to

15   be in control of the job, and at the end of the day if

16   there's a problem, Mr. Yildirim's course of action, if he

17   has one, is against one person - Leo Lodigiani.

18       The parties then go along and we know from everything

19   you've heard everything there's a fire.  Long before the

20   insurance company starts working to investigate the

21   coverage and liability issue that bring us to where we are

22   today, Mr. Lodigiani presents a bill.  He delivers that to

23   my client because he wants to get paid.  He wants to get

24   paid for the time that was put on the job, the time that

25   he spent on this job and the other workers spent on the

1    job.

2         January, 30, 2013, two days after the fire, two days

3    after the fire, here's a bill, total hours.  It's on Mr.

4    Lodigiani's letterhead.

5         Remember you're going to hear evidence that Mr.

6    Lodigiani started working as a plumber when he was 14.

7    That's when he started the trade, learning the trade.

8    You're going to hear evidence for 50 years the man has

9    been a plumber.

10        You're going hear to evidence that Mr. Lodigiani has

11   never entered into a partnership agreement with anybody.

12   He's never filled out tax returns as a partner.  He's

13   never filed documents with the Commonwealth of

14   Massachusetts requesting that his business be perceived as

15   a partnership.  And after there's a fire, he bills my

16   client.  He bills it under his name and there's no

17   reference to a partnership.

18        You're going to hear evidence from Adnan Yildirim

19   that he visited this worksite, his business as this thing

20   was being built, and you going to hear evidence that he

21   made observations about what's going on at the scene.

22        You're going to hear evidence that he observed Mr.

23   Lodigiani controlling the work, directing the work, making

24   decisions about the work.  When there's an issue with

25   regards to, hey, where are we going to lay this line for

this sink drain or where are we going to put this feed for
water coming to the sink, the decisions were made between
the discussions between my client and Leo Lodigiani.  Why
is that?  Because my client had an expectation that that's
who he was doing with, that's why he hired him and that's
why he understood that was the man who was doing the job.

I anticipate that during the course of this trial
you're going also to hear that there's a separate lawsuit
and you're going to hear evidence that my client was
damaged as a result of this fire.  In that case my client
has sued somebody.  Interestingly, he hasn't sued a
partnership.  He sued Leo Lodigiani.  He's seeking to
recover the liabilities for this fire from the man he
hired, Leo Lodigiani.

If he perceived it to be a partnership, if he thought
that there was a meeting of minds between him as the
business owner and a partnership, one would think that
there would be a suit against the partnership.  There
isn't one.

Bear with me.  I'll try not to repeat anything else
so I'm crossing things off in my mind.

There's going to be a lot of testimony in this case
about the investigation and I submit to you that when
you're done looking at it you're going to find there was
an improper, insufficient, and illogical investigation

1    that has brought you here to be in a position to judge

2    whether the insurance company has the right under the law

3    in Massachusetts to make a determination that there was a

4    partnership and that there was a misrepresentation on that

5    policy.

6        I'd submit to you when you come back after talking to

7    I think six or seven witnesses that the overwhelming

8    evidence will suggest to you that the plaintiffs had

9    failed to meet the burden by a preponderance of the

10   evidence.

11       We're going to come back and ask you as the defense

12   after you do your hard work to look at the situation and

13   look at it critically and say in good conscience you look

14   at it and make a decision that there was a

15   misrepresentation at the time this man, a man who's been

16   doing this business for 50 years, a man who will testify

17   that he's never had no problems with his license, no

18   claims against him, no lawsuits, when he went into that

19   agency to sign up for that insurance policy that he made a

20   misrepresentation.  That he, in essence, lied about the

21   way he was doing business.

22       I submit to you at the end of this trial you're going

23   to come to a conclusion and I'll ask you to return a

24   verdict in favor of the defendants.  I thank you for your

25   time.

THE COURT:   Thank you.

That concludes the opening statements.  We are going to begin hearing from the witnesses.  I will again remind you of something I already told you:  The opening statements of lawyers, as well spoken and as good as these attorneys were when they presented their opening statement, was not and is not evidence.  The evidence is going to come from the witnesses and that is what you're going to be making your judgment and determination on.  Thank you.

Call your first witness.

MR. STEWART:   Yes, Your Honor.  If Your Honor please, the plaintiff calls James Trudeau.

**JAMES TRUDEAU (sworn)**

MR. STEWART:   Judge, is standing here okay?

THE COURT:   That's fine, yes.

**DIRECT EXAMINATION**

Q.   (By Mr. Stewart)  Can you introduce yourself to the jury and tell them your name?

A.   James Trudeau.

Q.   Who you are, Mr. Trudeau?

A.   I'm an independent insurance adjuster.

Q.   What's an independent insurance adjuster?

A.   We provide services for a lot of different insurance companies.

1    Q.   Okay.  What type of insurance things do you get
2    involved in?
3    A.   We get involved in homeowner claims, contract
4    liability claims, fires, water damage, and so on.
5    Q.   Okay.  What is an independent adjuster?
6              THE COURT:  Attorney Stewart, excuse me.  I
7    apologize for interrupting.  I think I'm going to ask you
8    to move to the podium only because there's a microphone
9    that's going to amplify your voice and make it easier for
10   everyone to hear.  Thank you.
11             MR. STEWART:  Thank you.
12   Q.   (By Mr. Stewart)  What's an independent adjuster?
13   A.   An independent adjuster is somebody again who
14   provides services for insurance companies who hire us to
15   do investigations or look into coverage -- not coverages
16   but damages.
17   Q.   Do you run your own business or do you work for
18   someone?
19   A.   I have my own business.
20   Q.   What's the name of your business?
21   A.   James A. Trudeau Adjustment Service.
22   Q.   How long have you been operating as a corporation?
23   A.   Umm, since 1999.
24   Q.   Okay.  And can you give us a little bit of
25   background, how much education do you have?

1  A.    I was in the Marine Corp. from '74 to '78.  During

2  that time I was a firefighter for an aircraft and I went

3  to LACC while I was in Japan and studied fire science

4  technology.

5  Q.    So when you were a young man, you went into the

6  service and learned about fires from the service?

7  A.    Yes.

8  Q.    Okay.  Do you have any background in construction?

9  A.    Yes, I do.  I'm a Massachusetts construction

10  supervisor.

11  Q.    Okay.  And part of being a construction supervisor is

12  estimating jobs?

13  A.    Yes.

14  Q.    Okay.  And is there some correlation between being a

15  contractor estimating jobs and what you do as an

16  independent insurance adjuster?

17  A.    Yes.  It's the damages portion of an investigation,

18  exactly what I was hired to do here.

19  Q.    Okay.  And have you taken some advanced training in

20  fire investigation?

21  A.    Yes, I have.

22  Q.    Okay.  Can you give the jury just the highlights of

23  that?

24  A.    I've gone to the Institute of Fire Science Technology

25  up in Rochester, New Hampshire with New England Fire

1  Science -- New England Fire Investigation Corporation.

2  I've attended many seminars and actually get involved in

3  some of the investigations.

4  Q.   Okay.  Do you consider yourself a specialist in

5  investigating insurance losses having to do with fires?

6  A.   I know what to do.

7  Q.   Okay.

8  A.   Yeah.

9  Q.   Okay.  And are you experienced in carrying out

10 investigations?

11 A.   Yes.

12 Q.   Okay.  Can you tell the jury what your typical

13 process in a property damage loss is?

14 A.   Relative to fire, water?

15 Q.   Yeah, fire.

16 A.   Okay.  A fire, we go out.  We usually will hire a

17 cause and origin investigator, and we'll work hand in hand

18 with the cause and origin investigator.  In this case we

19 did hire one because we wanted to figure out where the

20 fire started.

21 Q.   Okay.  So did you follow your usual investigation

22 practices in this case?

23 A.   Yes.

24 Q.   Okay.  So tell us what you did.  What was the first

25 notice you got of this fire and what did you do?

1    A.    I don't recall exactly the date I got notice.  I'd

2    have to look at my file, but when I first received the

3    assignment, I contacted a cause and origin person actually

4    who was experienced with electrical and we went out.  We

5    started to investigate.  There were other parties on the

6    scene and that's how we started our investigation.

7    Q.    Okay.  So there was a gentleman named Mr. Splain in

8    Falmouth or something and was he from the cause and origin

9    office?

10   A.    Yes, that was the office.  We had Barry Gannon on

11   site who is an experienced electrical cause and origin

12   investigator.

13   Q.    Okay.  There was a point in time you went out to the

14   place where the fire took place?

15   A.    Uh-huh.

16   Q.    Did you ever meet Mr. Lodigiani out there?

17   A.    I don't recall if he was out there the first time we

18   went out there or not.

19   Q.    Okay.  Did you come to have contact with Mr.

20   Lodigiani?

21   A.    At some point I believe I did, yes.

22   Q.    Okay.  Was it prior -- I understand at some point

23   there was some recorded statements you took out in Quincy,

24   Mass.  Are you with me so far?

25   A.    Yes.

1    Q.    Did you meet Mr. Lodigiani before that occasion?

2    A.    I don't recall if I did or not.

3    Q.    Okay.

4    A.    I don't believe I did.

5    Q.    Okay.  By the way, you said you were an independent

6    adjuster and you worked for insurance companies, how many

7    different insurance companies do you work for?

8    A.    About 20.

9    Q.    Okay.  Preferred Mutual being one of those 20?

10   A.    Yes.

11   Q.    So tell us about taking recorded statements, is that

12   something you do on a weekly, a daily, a monthly basis?

13   A.    Yes.  Yes, it is.

14   Q.    About how often are you involved in taking recorded

15   statements?

16   A.    At least a couple times a week.

17   Q.    Okay.  And you carry a tape recorder around with you?

18   A.    Yes.

19   Q.    Now, was there anything unusual about the recorded

20   statements that you took in this case?

21   A.    No.

22   Q.    Okay.

23   A.    No.

24   Q.    I gather the recorded statements were taken in

25   Quincy, Mass., is that right?

1    A.    That's correct.

2    Q.    And can you tell the jury whose office that was?

3    A.    That was Lecomte Emanuelson & Doyle.

4    Q.    Attorney Doyle's office?

5    A.    Yes.

6    Q.    Okay.  Had you known Mr. Doyle before that?

7    A.    I've done some work where his office was involved,

8    yes.

9    Q.    Okay.  For a number of years?

10   A.    Yes.

11   Q.    About how many years?

12   A.    I did one with Hamm Mutual several years ago when

13   Mr. Emanuelson was alive.

14   Q.    Can you tell the jury what is your process as far as

15   taking recorded statements?

16   A.    Sit down with whoever I'm taking the statement from,

17   explain to them that we're going to take the recorded

18   statement, and then when we start the statement I explain

19   or ask them if they understand the statement is being

20   recorded and we go on from there.

21   Q.    Okay.  Is there any type of talking to the person

22   that's going to give a recorded statement before you go on

23   tape?

24   A.    Umm, in this particular case I just mentioned to the

25   individuals that we were going to take a recorded

1    statement.  That was pretty much it.

2    Q.   Okay.  So in this particular case do you have a

3    memory of actually doing this?

4    A.   I do have a memory of doing it, yes.

5    Q.   Okay.  And were there multiple recorded statements

6    taken on that day?

7    A.   I believe there was three of them I think, yeah.

8    Q.   Okay.  And do you remember who had the recorded

9    statement done first?

10   A.   That one I think it might have been Mr. Lodigiani.

11   Q.   Okay.  And you've had a chance to review the typed

12   transcript of Mr. Lodigiani's recorded statement, is that

13   right?

14   A.   Yes.

15   Q.   Okay.

16   A.   It was a while ago.

17          MR. STEWART:  Judge, it's Exhibit 13.  I don't

18   know if you want me to formally offer that, but I would

19   like to have that in evidence.

20          MR. ZELLE:  No objection.

21          THE COURT:  Thank you.  Procedurally you need to

22   formally offer it.  Show it to the opposing side and ask

23   if there's an objection, just so we have a record of it

24   being introduced.

25          MR. STEWART:  Gladly.

1    Q.   (By Mr. Stewart)  All right.  Mr. Trudeau, I show you

2    Exhibits 12 and 13.  Are those fair and accurate copies of

3    the recorded statements --

4    A.   Uh-huh.

5    Q.   -- that you took?

6    A.   It appears so, yes.

7              MR. STEWART:  Judge, I'd offer Exhibit 12 which

8    is Mr. Lodigiani's and Exhibit 13 which is Mr. Brantley's.

9              THE COURT:  Any objection by any of the

10   defendants?

11             MR. ZELLE:  No, Your Honor.

12             MR. BURSTEIN:  No, Your Honor.

13             MR. GIROUARD:  No.

14             THE COURT:  Thank you.  It will be admitted.

15   **(Plaintiff's Exhibits 12 + 13 admitted.)**

16   Q.   (By Mr. Stewart)  Just follow along your screen,

17   Mr. Trudeau.

18             MR. STEWART:  If Your Honor can inquire if the

19   jury can see that okay?

20             THE COURT:  If any one of your screens go out,

21   just raise your hand and we'll take care of it.

22   Q.   (By Mr. Stewart) So if we could, Mr. Trudeau,

23   apparently you announced that you're taking the recorded

24   statement and Mr. Lodigiani said yes.  And you asked him

25   if the information he was about to give was of his own

1 free will and to the best of his knowledge and he said

2 yes.  You asked him his name and then you asked what he

3 did for work, and then if you could read the next question

4 starting with the okay?

5 A.   "Please state your full name and your age."  Is that

6 what you're talking about?

7 Q.   Yes, sir.

8 A.   Okay.  "The relationship between yourself and Mr.

9 Brantley?  We're partners."

10    MR. STEWART:  If Your Honor please, I'm going to

11 play the tape just to that point.

12    THE COURT:  Very well.

13 (Audiotape recording played.)

14    MR. STEWART:  That's as much as I'd like to play

15 at this point.  Thank you.

16    THE COURT:  Is the tape itself, Attorney

17 Stewart, being introduced as an exhibit?

18    MR. STEWART:  Gladly.

19    THE COURT:  You're going to offer that?

20    MR. STEWART:  Yes.

21    THE COURT:  All right.  Will there be any

22 objection to that tape or at least that portion of the

23 tape?  We can discuss later whether the entire tape will

24 come in.

25    MR. STEWART:  This could be marked for ID, Your

Honor.

THE COURT:  I'll mark it for ID right now.  All right.  Thank you.

MR. STEWART:  Thank you.

(**Plaintiff's Exhibit 4 marked for ID.**)

Q.  (By Mr. Stewart) So there came a point right here where you paused the tape, are you with me?

A.  Yes.

Q.  What happened then?

A.  Normally when I start a tape and there's an attorney in the room, I address the fact that there is an attorney in the room and I hadn't done it here so that's why we paused it and then we announced that Attorney Doyle was actually in the room.

Q.  Okay.  So at the top here, you didn't say that Mr. Doyle was in the room?

A.  No, it totally slipped my mind.

Q.  Okay.  So was there further questioning about the nature of the relationship between Mr. Brantley and Mr. Lodigiani?

A.  Yes, I believe there was.

Q.  And when you typed up transcripts of the statement, was there discussion about whether they were splitting profits?

A.  Yes.

1   Q.   Was there discussion about supervision, those type of

2   things?

3   A.   Uh-huh.

4   Q.   Okay.  And I'll let the statements speak for itself.

5        So let me ask you about the actual circumstances of

6   the recorded statement.  What room was this in at Mr.

7   Doyle's office?

8   A.   This was in a conference room at Lecomte Emanuelson &

9   Doyle.

10  Q.   Okay.  And I gather it was you and Mr. Doyle and a

11  tape recorder?

12  A.   And the participants that were there.

13  Q.   Was there anyone else present?  Were there other

14  gentlemen that came along on the trip present?

15  A.   They weren't present in the room during the

16  statement, no.

17  Q.   So Mr. Brantley had come in a car with Mr. Lodigiani,

18  is that correct?

19  A.   I believe they did.  I don't know though for sure.

20  Q.   They arrived at the office to your eyes together?

21  A.   Yes.

22  Q.   Okay.  And there was another gentleman whose

23  statement you took on that day?

24  A.   Yeah.  It was Willie C. or something like that, yeah.

25  Q.   So at the time this statement was taken it was --

```
 1   where were you sitting around the table?  Do you remember
 2   the arrangement?
 3   A.    I do.  I do.  At the end of a conference table
 4   Attorney Doyle was to my right.  I was at the center of
 5   the table and the people I was taking the statements from
 6   were to the left.
 7   Q.    Okay.  Did you notice anything about Mr. Lodigiani,
 8   the way he was carrying himself or his mannerisms or his
 9   effect or anything?
10   A.    No.
11   Q.    Okay.  Did you notice anything unusual about the way
12   he was carrying himself?
13   A.    No.
14   Q.    Did he appear nervous to you?
15   A.    No, he did not.
16   Q.    Okay.  About how long did it take for the statement
17   to be taken?  I'd suggest to you it's about 15 pages.
18   A.    Maybe about 20, 25, I didn't time it, so.
19   Q.    Okay.  And after the point we paused in the tape, did
20   Attorney Doyle take over some of the questioning?
21   A.    He did, yes.
22   Q.    Okay.  And I noticed at the beginning of the tape you
23   asked him is if the information he's giving is to the best
24   of his knowledge, did you repeat that at the end?
25   A.    Always.
```

1    Q.   And did you have him acknowledge on the record that

2    he knew it was being recorded?

3    A.   Yes, he did.

4    Q.   Okay.  Now, before the tape recorder was turned on,

5    was there anything significant that happened between you

6    and Mr. Lodigiani?

7    A.   No.

8    Q.   Okay.  Did Mr. Lodigiani talk on the written

9    statement -- do you remember him talking about the payment

10   arrangements with the owner?

11   A.   I think I touched on why he had taken over the site

12   and what the arrangements were, that they were splitting

13   the profits, but I wasn't sure who was actually getting

14   the payment.

15   Q.   Okay.  And you took the statement of Evins Brantley

16   as well?

17   A.   Yes.

18   Q.   Let's go over that briefly.  So this was also taken

19   on January 28th of 2013?

20   A.   Uh-huh.

21   Q.   All right.  And apparently you carried out the

22   questioning of Mr. Brantley at least at the beginning?

23   A.   Umm, I didn't mean to touch the screen.

24   Q.   That J.T., that means you?

25   A.   Yes.

1   Q.   E.B. means Mr. Brantley?

2   A.   Yes.

3   Q.   Okay.  And on page 2 you asked him how long they had

4   been working at 24 Bridge Street in South Hadley?

5   A.   Yes.

6   Q.   And did he tell you at the time they were working

7   together?

8   A.   Uh-huh.

9   Q.   And going to page 16, now we're on page 16 and you

10  were talking about Mr. Brantley's son that lived in North

11  Carolina?

12  A.   Correct.

13  Q.   Okay.  And that was someone named Charles Brantley

14  who had taken out the permits originally?

15  A.   Yes.

16  Q.   So let's go to this place here.  Apparently Mr. Doyle

17  is carrying out the questioning?

18  A.   Yes.

19  Q.   And can you read the question that Mr. Doyle asked

20  and then Mr. Brantley's answer at that time?

21  A.   "As a result of that, you went to Leo and had an

22  agreement with Leo that you and he would do the job as

23  partners under his permit, is that correct?"  The answer

24  is "yes."

25  Q.   There was another question about whether the owner

1    was aware of that arrangement?

2    A.    And the answer was "Yes."

3    Q.    Okay.  And further questioning established that Mr.

4    Brantley's journeyman's license had been suspended and at

5    the time he was doing this job he was not -- he did not

6    have a valid enforced in effect license?

7    A.    That's what he indicated.

8    Q.    So if you go on to page 17, Mr. Brantley said yes to

9    the question about whether his license was under

10   suspension, is that accurate, sir?

11   A.    Yes, sir.

12   Q.    And finally, at the end of the statement you

13   confirmed with Mr. Brantley that the information he gave

14   in this statement was of his own free will?

15   A.    Yes.

16   Q.    Okay.  To the best of his knowledge?

17   A.    And he affirmed it was correct.

18   Q.    Is that consistent with your usual protocol for

19   recorded statements, sir?

20   A.    Yes, sir.

21             MR. STEWART:  I believe that's all I have,

22   Judge.

23             THE COURT:  Is that particular document being

24   offered?

25             MR. STEWART:  I've got these two, yes, Your

Honor.

THE COURT:  So that would be a separate exhibit that you're offering?

MR. STEWART:  12 and 13.

THE COURT:  Any objection to the second?

MR. ZELLE:  I thought they had both been offered and there's no objection to 12 and 13.

THE COURT:  No objection from any counsel?

MR. GIROUARD:  No objection.

THE COURT:  Mr. Burstein, any objection?

MR. BURSTEIN:  No objection, Your Honor.  Just procedurally I thought we had agreed that all the exhibits that have been pre-marked would be admitted without objection.

THE COURT:  All right.  But it's important to make a record of the proceeding as it's underway so we know at what point in time during the trial it had been offered and any objection, or lack thereof, are put on the record.

**(Plaintiff's Exhibits 12 + 13 admitted on page 59.)**

MR. GIROUARD:  May I?

THE COURT:  Yes.

**CROSS-EXAMINATION**

Q.   (By Mr. Girouard) Good morning, Mr. Trudeau.

A.   Good morning.

Q.   You run Trudeau Adjustment Services Corporation?

A.   I own it, yes.

Q.   And that's a business that you've run for at least
ten years?

A.   Yes.

Q.   And looking at the background you handle insurance
claim investigations including personal lines and
commercial business claims?

A.   Yes.

Q.   And you handle investigations for insurance companies
first party and third-party losses?

A.   That's correct.

Q.   And I think you testified on direct that you derived
your income from working for over 20 insurance companies?

A.   The exact number I couldn't give you because there's
a lot of them.

Q.   What percentage of your income is generated from
serving insurance companies?

A.   All of my income.

Q.   So a hundred percent of your income is derived by
conducting investigations for the 20 plus or minus
insurance companies that you work for?

1    A.    That's correct.

2    Q.    Now, earlier on direct examination you were asked

3    about --

4    A.    Let me correct that.  I actually do do some stuff for

5    attorney offices as well.

6    Q.    What percentage?

7    A.    Five, maybe 10 percent.

8    Q.    So 95, 90, 95 percent of your income is generated

9    from working for insurance companies?

10   A.    Exact number I couldn't give you.

11   Q.    Best estimate 90, 95 percent?

12   A.    Yeah.

13   Q.    Now, on direct examination you were asked questions

14   about how you got involved in this case, and it's my

15   understanding that you testified you were asked to start

16   an investigation about the fire?

17   A.    Uh-huh.

18   Q.    Is that yes?

19   A.    Yes.

20   Q.    And then you were asked -- you said on direct

21   examination you were going to "look into coverage" is what

22   I wrote on my note.

23   A.    No, I didn't say I was going to look into coverage

24   with this claim.

25   Q.    Was any part of your investigation to search out

1  facts relating to coverage?

2  A.  Not -- no, not in the beginning.

3  Q.  Sir, I'd like to show you a final note that has been

4  pre-marked as Exhibit 16.  Sir, I'm calling your attention

5  to a note on page 11 of the activities report which has

6  been pre-marked as Exhibit 16 and I'm going to read it to

7  you.  The 2/1/13 12:41:58 entry:  "Okay to assign Matt

8  Perkins from Lecomte Emanuelson for the insured.  Also

9  let's M assign IA Trudeau for complete investigation."

10  A.  Uh-huh.

11  Q.  Is your testimony that your investigation activities

12  had nothing to do with coverage in this case?

13  A.  A complete investigation is essentially to find out

14  how the loss occurred, who was involved, and what the

15  damages are, and if necessary reach an agreed figure for

16  the damages.

17  Q.  And you'd agree with me that you were told by

18  Preferred Mutual to work with Perkins who is associated

19  with Attorney Doyle, agreed?

20  A.  Yes.

21  Q.  And in this document in that same page 11 of Exhibit

22  16 "Sent file to Matt Perkins.  Also checked with Trudeau.

23  No conflicts.  Sent file to him also.  He will work with

24  Perkins."  Do you see that?

25  A.  Uh-huh.

1   Q.   Is that yes?

2   A.   Yes.

3   Q.   So it was your understanding that you were going

4   there and you were going to be working with Attorney Doyle

5   and Attorney Perkins in your investigation?

6   A.   I would cooperate with them of course.

7   Q.   Now, the file was assigned to you by Mr. Kagels from

8   the insurance company?

9   A.   I believe it was, yes.

10  Q.   And you understood that when you went out to Quincy

11  to start taking the statements from the men, at that point

12  in time Mr. Doyle and Mr. Perkins were counsel to Leo

13  Lodigiani?

14  A.   I believe, yes.

15  Q.   Well, you've been in the business for 25 years,

16  right?

17  A.   Yes.

18  Q.   And you understand that when a claim is made an

19  insurance company may hire a lawyer to represent the

20  insured?

21  A.   Correct.

22  Q.   And you understood when you drove to Quincy that day

23  to take the recorded statements that you were walking into

24  the office of the lawyers, they were hired to represent

25  Mr. Lodigiani, agreed?

1    A.    Yes.

2    Q.    But in your business you go sometimes and you take a

3    statement, for example, from a plaintiff and you walk into

4    the plaintiff's lawyer's office to meet with the

5    plaintiff, right?

6    A.    Right.

7    Q.    In this case you knew you were walking into

8    Mr. Doyle's office because he was the lawyer for Leo

9    Lodigiani?

10   A.    Yes.

11   Q.    And when you do your statements in your investigation

12   in your experience, is it generally your experience that

13   when you go and you talk to a witness you will take a

14   recorded statement and sometimes there's no lawyer

15   involved?

16   A.    Correct.

17   Q.    And sometimes you will be asked to go take a

18   statement from a plaintiff who is represented and you will

19   sit down with the plaintiff and the plaintiff's lawyer and

20   say to the plaintiff's lawyer can I interview your client?

21   A.    Yes.

22   Q.    And, sir, would you agree with me that it's a very

23   small percentage of cases where you go out and you take a

24   recorded statement from an insured of an insurance company

25   who is represented by an attorney hired by that insurance

1    company?

2    A.    Sometimes we will do it.

3    Q.    Sometimes.  It's not a lot, is it?

4    A.    Actually it's a lot more than you think it is.

5    Q.    What percentage do you think that happens?

6    A.    Probably 70 percent.

7    Q.    You think you take 70 percent of statements with an

8    insured and the attorney present?

9    A.    No, with an insured.

10   Q.    Now, when you sat down with Mr. Lodigiani and you

11   took his statement, there was no point in time where Leo

12   Lodigiani said Mr. Brantley was in control of the job?

13   A.    Say that again.

14   Q.    When you took the statement that we talked about

15   earlier, nowhere in that statement did Mr. Lodigiani say

16   that Mr. Brantley was in control of this job?

17   A.    No.  He said they were partners.

18   Q.    That wasn't my question.

19         Was there any point in time where Mr. Lodigiani said

20   that Mr. Brantley was in control of the job?

21   A.    I don't believe he was asked that question.

22   Q.    So you didn't garner that evidence during your

23   statement?  It wasn't part of the investigation results?

24   A.    No.

25   Q.    You didn't ask the question?

1    A.    He said they were partners.

2    Q.    That's not my question.

3        Did you ask Mr. Lodigiani is Mr. Brantley in control

4   of the job?

5    A.    They were partners.

6    Q.    That wasn't my question.

7        THE COURT:   Mr. Trudeau, it's very important

8   that you listen to the question and you answer the

9   question.   You don't interject with information that you

10   want to say if it's not responsive to the question, so

11   listen to the question.

12        THE WITNESS:   Okay.

13    Q.    (By Mr. Girouard)   Sir, did you understand the

14   insurance company wants Leo Lodigiani to be determined to

15   be a partner with Mr. Brantley?   You get that, right?

16    A.    That's what he said in the statement.

17    Q.    You also understand that's the case that they brought

18   in this case?

19    A.    Yes, I do.

20    Q.    I'll come back to the other question I asked you.   At

21   any point in time did you ask Leo Lodigiani whether Mr.

22   Brantley was in control of the work?

23    A.    I'm not sure if I did or not.

24    Q.    You'll believe whatever was on the statement?

25    A.    Pardon me?

1    Q.    You'll believe whatever was asked on the statement.

2    A.    It's been a long time since I reviewed the statement.

3    Q.    Did you ever ask Leo Lodigiani if there was a written

4    partnership agreement?

5    A.    No, I did not.

6    Q.    Did you ever ask Leo Lodigiani if he filed

7    partnership tax returns?

8    A.    I don't recall if I asked that question.

9    Q.    Did you ever ask Leo Lodigiani if Mr. Brantley in

10   their dealings with each other had ever agreed to share

11   liability for this loss?

12   A.    I'd have to refer to the statement.

13   Q.    Why don't I give you a chance to look at it.

14         MR. GIROUARD:  Somebody has been shuffling my

15   papers again, Your Honor.

16         Counsel what number is that?

17         MR. BURSTEIN:  Twelve.

18         MR. GIROUARD:  It's not here.

19         THE COURT:  All right.

20         MR. GIROUARD:  Can I have Exhibit 12, Your

21   Honor?  May I approach?

22         THE COURT:  Sure.

23   Q.    (By Mr. Girouard) Sir, here is the recorded statement

24   transcript.  Can you show me where on the record

25   transcript you asked the question of Mr. Lodigiani if Mr.

1    Brantley had entered into a written agreement and Mr.

2    Brantley had agreed to be responsible from the standpoint

3    of liability for conduct of this alleged partnership?

4        I don't mean to take the suspense away or rush you,

5    but I submit to you that it's not there.  So would you

6    agree you didn't ask those questions?

7    A.   If you submit to me it's not there, then it

8    apparently wasn't asked.

9    Q.   You'd also agree with me that Joe Doyle, the lawyer

10   for Mr. Lodigiani, inserts himself into your investigation

11   questioning on the first page about four questions into

12   this question-and-answer session?

13   A.   Yes.

14           THE COURT:  Counsel, could you refer to the

15   exhibit that you're referring to by number?

16           MR. GIROUARD:  Right now, Your Honor, I'm

17   referring to Exhibit No. 12.

18           THE COURT:  All right.  Thank you.

19           MR. GIROUARD:  Thank you.

20       Do you want this back with the clerk because it's

21   been admitted?

22           THE COURT:  Unless you're going to use it.

23           MR. GIROUARD:  Not anymore on this question.

24           THE COURT:  Thank you.

25           MR. GIROUARD:  Thank you.

1    Q.    (By Mr. Girouard) Sir, you went out to the building

2    department and you pulled permits in this investigation?

3    A.    That was I believe done by Barry Gannon.

4    Q.    And you would agree with me -- have you ever looked

5    at the permits, the plumbing permits?

6    A.    I believe I have.

7    Q.    You saw on the plumbing permits Leo Lodigiani

8    completed the plumbing application in his name?

9    A.    Among other things, yes.

10   Q.    And that he was a master plumber?

11   A.    Yes.

12              MR. GIROUARD:  I don't have any further

13   questions.  Thank you for your time.

14              THE COURT:  Thank you.  We are going to take our

15   morning break.  All right.

16        Ladies and gentlemen, we'll take our morning break.

17   You have some coffee back in the jury deliberation room.

18   I have to give you your regular admonition, don't discuss

19   the case, begin deliberations, start to research the case

20   in any way.  All right.  Thank you.

21   **(The jury left at 11:12)**

22              THE COURT:  Twenty minutes.

23              MR. ZELLE:  Thank you.

24              MR. BURSTEIN:  Thank you, Your Honor.

25              MR. GIROUARD:  Thank you.

1    **(A recess was taken at 11:13 until 11:43.)**

2            THE COURT:  You can be seated.  All right.  Just

3    checking during the break were you all able to follow my

4    instructions not to discuss the case, follow all the other

5    instructions I gave?  Very well.

6        Thank you.  The jury remains fair and impartial.  All

7    right.

8        Mr. Trudeau, back on the witness stand.  Thank you.

9        All right.  Whenever you're ready.

10            MR. BURSTEIN:  I have no questions, Your

11    Honor.

12            THE COURT:  Very good.

13            MR. ZELLE:  I have no questions either.

14            THE COURT:  All right.  Thank you.  Well,

15    Mr. Trudeau, sorry I made you get back on the witness

16    stand but you're now excused.

17            THE WITNESS:  Thank you.

18            THE COURT:  Attorney Stewart, was there any

19    redirect?

20            MR. STEWART:  I'm ready.  I ask he be excused.

21            THE COURT:  All right.

22            MR. STEWART:  I call Mr. Lodigiani to the stand.

23            THE CLERK:  Please raise your right hand.

24

25

**LEONARD LODIGIANI (sworn)**

**DIRECT EXAMINATION**

Q.   (By Mr. Stewart) Good morning, sir.  Can you hear me okay?

A.   I can hear you.

Q.   Thank you.  Tell the jury your name.

A.   Leonard Lodigiani.

Q.   How old you, sir?

A.   What's that?

Q.   How old are you?

A.   I'm 96. (sic)

Q.   Okay.  When we took your deposition on March 30th were you 86?

A.   I was -- no, I'm 86 now.

Q.   Okay.  And you were born in 1929?

A.   That's right, January 1929.

Q.   You've been plumbing for a long time?

A.   That's right.

Q.   Okay.  You were in the service before that?

A.   Yes, sir, in the United States Marine Corp.

Q.   Okay.  Like Mr. Trudeau, right?

A.   That's right.

Q.   Now in the past before the Bridge Street, South Hadley job you knew a man named Evins Brantley?

A.   That's correct.

1    Q.    And you had known him for a while?

2    A.    That's right.

3    Q.    Okay.  And before you got involved with Bridge Street

4    in South Hadley, sometimes he would bring you a job and

5    you would work together on the job?

6    A.    Sometimes, yes.

7    Q.    Okay.  So at the time that he approached you in the

8    fall, maybe September, October of 2012 about this Bridge

9    Street South Hadley job, that was something that you had

10   worked with him together on jobs before?

11   A.    That's correct, yes.

12   Q.    Okay.  And apparently he contacted you about this

13   South Hadley job?

14   A.    Right.

15   Q.    Okay.  And did he tell you that his son Charles

16   Brantley could no longer do the job?

17   A.    That's correct.

18   Q.    Okay.  And did you know at that time that the South

19   Hadley -- the town of South Hadley had revoked the permits

20   that had been issued to Charles Brantley?

21   A.    Yes.

22   Q.    Okay.  So you knew that they needed somebody to carry

23   that job forward that had a license?

24   A.    Right.

25   Q.    Okay.  And at that time Mr. Brantley, Evins Brantley,

1    the gentleman who is more like your age, not the younger

2    son, Evins Brantley didn't have a license at that time?

3    A.    I did not know that.

4    Q.    You didn't know.  You've come to find out that since

5    that his journeyman's license had been suspended?

6    A.    It had been suspended, yes, but now it's back and he

7    got it reestablished.

8    Q.    It wasn't an issue about how good a plumber he was.

9    He just forgot to pay a bill?

10   A.    Right.

11   Q.    But at the time that he was working on this job his

12   license had been suspended?

13   A.    Suspended, right.

14   Q.    You didn't know that?

15   A.    No.

16   Q.    Okay.  So he approached you about doing the job

17   together, correct?

18   A.    He approached me about taking over the job.

19   Q.    Okay.

20   A.    From his son, yes.

21   Q.    And you gentlemen would be working together?

22   A.    Yes.

23   Q.    Now, at the time we're talking about in the fall of

24   2012 you were doing plumbing part time?

25   A.    Yes.

1   Q.   Okay.  And when you're talking about doing commercial

2   plumbing, you weren't getting up on ladders so much --

3   A.   No.

4   Q.   -- as you used to?

5   A.   No.

6   Q.   You tried to avoid getting up on ladders?

7   A.   That's right.

8   Q.   And you had a master's license issued by the Board of

9   Registration in plumbing?

10  A.   That's correct.

11  Q.   Okay.  And having a valid license is a valuable

12  thing, isn't it?

13  A.   That's right.

14  Q.   All right.  And that allows you to do jobs that folks

15  that only have a journeyman's license that they're not

16  allowed to do?

17  A.   That's right.

18  Q.   Okay.  And there are permits that you are allowed to

19  obtain from towns and other places that allows plumbing

20  that a person with a valid license, only a person with a

21  valid license can get?

22  A.   That's correct.

23  Q.   Okay.  And so do you think it was about October of

24  2012 that Mr. Brantley first contacted you?

25  A.   Probably, yeah.

```
 1    Q.   Okay.  And did you come to find out that the job that
 2    he had for you out in South Hadley involved doing plumbing
 3    at a build-out for a pizza restaurant?
 4    A.   That's right.
 5    Q.   Did you understand that there had been another pizza
 6    operator in there before sometime in the past?
 7    A.   Not at that time.
 8    Q.   You found that out after?
 9    A.   Yes.
10    Q.   Do you know there used to be an old Domino's
11    franchise there?
12    A.   I don't recall, but I knew there was a pizza joint in
13    there.
14    Q.   You knew there was a breakfast/lunch restaurant next
15    door?
16    A.   Yes.
17    Q.   But that was operating during the time you were doing
18    plumbing there?
19    A.   That's correct.
20    Q.   Okay.  They would give you sandwiches every once in
21    awhile?
22    A.   We never went in there.  The other place next door we
23    went into.
24    Q.   Do you remember them giving you lunch once or twice?
25    A.   Who's that?
```

1    Q.    The restaurant next door.

2    A.    We went there for lunch.

3    Q.    Got it.

4    A.    Yeah.

5    Q.    Got it.

6          So by the time you arrived on the scene and Mr.

7    Brantley is calling you, Mr. Brantley, Evins Brantley the

8    gentleman who is about your age, right?

9    A.    Yes.

10   Q.    He already had a relationship with the owner of the

11   pizza restaurant, is that correct?

12   A.    I don't recall.  Oh, you mean the owner of the

13   restaurant --

14   Q.    Correct.

15   A.    -- that we were going to do business with?  Well, I

16   saw him first.

17   Q.    Okay.  You didn't see him before you already talked

18   to Evins Brantley though, did you?

19   A.    No.  After I talked to Evins Brantley I went to see

20   the owner of the pizza place.

21   Q.    Okay.  And the owner of the pizza restaurant knew

22   that there was an arrangement between you and Mr.

23   Brantley, correct?

24   A.    Yes, he knew.

25   Q.    And he knew that you were splitting the profits from

1   the job?

2   A.   We were splitting the profits of the job, yes.

3   Q.   And he knew that you were partners on this job?

4   A.   We were partners on that job, yes.

5   Q.   And part of the job is doing plumbing work and then

6   keeping track of your hours and then you were going to

7   send a bill to the owner of the pizza shop, right?

8   A.   Yes.

9   Q.   And the other part of this was cleaning the place up

10  so that you could actually do the plumbing, taking debris

11  out?

12  A.   That's correct.

13  Q.   And you were keeping track of your hours that it took

14  to get debris out of there and brought to the dump?

15  A.   Yes.

16  Q.   Okay.  And those hours counted towards the amount of

17  money that you were going to be asking for from the pizza

18  owner?

19  A.   That's correct.

20  Q.   Okay.  And that eventually after some expenses were

21  paid that you were going to split with Mr. Brantley?

22  A.   That's correct.

23  Q.   Okay.  Now, there was some helpers on this job?

24  A.   Yes.

25  Q.   Okay.  And there was a gentleman named Ronald Moore?

1    A.    I don't know their name.  It was two gentlemen, yeah.

2    Q.    Well, one of them was related to Mr. Brantley?

3    A.    Yes.

4    Q.    There was a gentleman there named Willis Costin?

5    A.    Uh-huh.

6    Q.    Is that right?

7    A.    I believe so.

8    Q.    Did you know him as Willie C.?

9    A.    We knew him as Willie, that's who I knew.

10   Q.    And those gentlemen didn't have plumbing licenses,

11   right?

12   A.    No.

13   Q.    So when you needed help going up on a ladder, one of

14   those gentlemen would be involved in that?

15   A.    One would, yeah.

16   Q.    You might hold the ladder?

17   A.    Yes.  I was there all the time to see that it was

18   done right.

19   Q.    Right.  And there were times that you would stay home

20   and do some paperwork in the morning and Mr. Brantley

21   would go out and get them started?

22   A.    He would be there.  Usually I meet him there and he

23   wouldn't even be there yet.  I'd get there.

24   Q.    Do you remember testifying under oath on a previous

25   occasion that there were times that you'd stay home and do

1    paperwork and then Mr. Brantley would actually go out

2    there and start the work and you would join them?

3    A.    I don't recall that, no.

4    Q.    Okay.  In any event, this job was one where there was

5    supervision that had to be done of these unlicensed

6    people?

7    A.    Yes.

8    Q.    Is that correct?

9    A.    That's correct.

10   Q.    Okay.  And there were times that you weren't at the

11   property and work was going on though, correct?

12   A.    Not too much, no.  I was there most of the time.

13   Q.    All right.  So you've known Mr. Brantley since about

14   the 1980s?

15   A.    Earlier than that.

16   Q.    I'm sorry, sir?

17   A.    Earlier than that.

18   Q.    Well, are you aware that he first got a plumber's

19   apprentice license from the Commonwealth of Massachusetts

20   in 1986?

21   A.    1986, that's about a little before then I knew him.

22   Q.    Okay.  Maybe you started knowing him about 1984?

23   A.    Somewhere in there, yes, because I told him to get

24   it, you know.  He applied when he was working for me; he

25   applied to get his apprentice license.

1  Q.   And then do you know if he got his journeyman's

2  plumber license in 1996?

3  A.   Yes, he got it.

4  Q.   Does that sound right to you?

5  A.   Yeah.

6  Q.   So the agreement between you and Mr. Brantley is that

7  you would charge the owner what it cost and then present

8  that bill to the owner?

9  A.   Well, I made an arrangement with the owner that he

10 would buy the material and I took him to the supply house

11 to buy the material and then he would pay for the

12 material.

13 Q.   Okay.  So you were basically going to be paid for

14 your time only?

15 A.   Time.

16 Q.   The owner would pay for the materials?

17 A.   Yes.

18 Q.   Okay.  And you were not considering Willie and the

19 other gentleman Mr. Moore to be your employers?  (sic)

20 A.   Yes, he was because there was work to be done and we

21 needed somebody to do it, you know.

22 Q.   Let me go to May 1, 2013, page 40, line 16.  By the

23 way, you gave oral testimony sworn to under oath before a

24 court reporter, like the court reporter here today, on May

25 1, 2013, is that correct?

1    A.    Yes.

2    Q.    Okay.  And I'm going to page 40 of that transcript

3    starting at line 16, "And at the time before the fire,

4    were you considering Willie and Ronnie to be your

5    employers? (sic) No."  Is that accurate, sir?

6              MR. ZELLE:  Objection.  That wasn't read

7    correctly.

8              THE COURT:  I agree.  I believe you termed it

9    employers.  It seems to be employees at line 18.

10             MR. STEWART:  I'm sorry, Judge, may I proceed?

11             THE COURT:  You may.  I believe you misspoke

12   relative to one of the words.  Just read the line again

13   that you're referencing.

14   Q.    (By Mr. Stewart)  Yeah, I'm talking about page 40 of

15   the transcript of your testimony given on May 1, 2013.  I

16   asked you at that time whether you were considering Willie

17   and Ronnie your employees and you said no, is that

18   correct?

19   A.    Yes.  I said no.  That could have been when they were

20   --

21   Q.    I'm not asking you to explain at this time, sir.

22   Thank you.

23        Now there was a point in time that you applied for

24   insurance, was there not?

25   A.    Yes.

1    Q.    Okay.  And you told the insurance people that you did

2    have some employees, correct?

3    A.    Yes.

4    Q.    All right.  In fact, when you applied for a workers'

5    compensation policy you had said you had two employees?

6    A.    I figured Brantley and somebody else, you know

7    another person.

8    Q.    I'm asking you did you tell the workers' comp.

9    insurance company that you had two employees?

10   A.    I told them when I applied for the insurance that

11   there would possibly be two other people, two people that

12   we would have to have on the job.

13            MR. STEWART:  I apologize, Judge.  These used to

14   be in numerical order.

15            THE COURT:  That's fine.  Take your time.

16            MR. STEWART:  May I approach, Judge?

17            THE COURT:  Yes, you may.

18   Q.    (By Mr. Stewart)  Let me show you what's been

19   pre-marked as Exhibit 2, sir.  Do you know that to be the

20   workers' comp. policy that you applied for in October of

21   2012?

22   A.    Yes.

23            MR. ZELLE:  Objection.

24            MR. GIROUARD:  Objection.

25            MR. ZELLE:  It's not the policy, Your Honor.

1          THE COURT:  I'm sorry?

2          MR. ZELLE:  It's not the policy.  It's the

3     application.

4          MR. STEWART:  I misspoke.

5          THE COURT:  The objection is sustained.  You can

6     rephrase the question.

7     Q.   (By Mr. Stewart)  Do you know that to be the workers'

8     comp. application from October 26, 2012?

9     A.   Yeah.

10          MR. STEWART:  Okay.  Judge, I'd offer Exhibit 2.

11          THE COURT:  All right.  I belive the witness is

12     still reviewing it.

13          MR. STEWART:  Take your time, sir.

14          THE WITNESS:  Uh-huh.

15          MR. STEWART:  Thanks.

16          THE COURT:  Any objection?

17          MR. ZELLE:  No, Your Honor.

18          MR. BURSTEIN:  No, Your Honor.

19          THE COURT:  All right.  That will be allowed.

20          MR. STEWART:  I'm going to use it if I could?

21          THE COURT:  It's already pre-marked?  What

22     exhibit number is it?

23          MR. STEWART:  I'm sorry?

24          THE COURT:  The exhibit number is?

25          MR. STEWART:  Two.

1          THE COURT:  Exhibit No. 2.  All right.

2    **(Plaintiff's Exhibit 2 admitted.)**

3    Q.   (By Mr. Stewart) So let's take a look at this

4    insurance application, sir.

5          You were applying for insurance and you wanted it

6    ASAP, is that correct?

7    A.   What's that?

8    Q.   You wanted the insurance as soon as possible?

9    A.   That's right.

10   Q.   Because you couldn't get the permit to do South

11   Hadley until you could bring the policy?

12   A.   Yeah, I had to have notification that I was insured.

13   Q.   A certificate proving that you had insurance?

14   A.   Yes.

15   Q.   Got it.  So with respect to your application for

16   insurance, sir, it asked what type of business you have,

17   is that correct?

18   A.   I can't hear you.

19   Q.   Okay.  You were asked what type of business you have,

20   correct?

21   A.   Yes.

22             MR. ZELLE:  Objection.

23             THE COURT:  Overruled.

24   Q.   (By Mr. Stewart) Now on page 2 --

25   A.   I can't hear you.

1          THE COURT:  Attorney Stewart, you need to be in

2     front of the microphone or the amplification device is not

3     going to pick up.

4          MR. STEWART:  Let me try this.

5          THE COURT:  Sure.

6     Q.   (By Mr. Stewart) Sir, on page 2 you said that you

7     were a hundred-percent owner of the business?

8     A.   Yes.

9     Q.   Okay.  And on page 3 you were asked about how many

10    employees you have?

11    A.   Yeah.

12    Q.   Okay.  So you told us a minute ago that Mr. Moore and

13    Willie C. were not employees?

14    A.   Yeah.

15    Q.   This seems to say you're claiming two employees?

16    A.   Yes, I was.

17    Q.   Okay.  And you were doing business part time?

18    A.   At the time until I took that job I had pulled -- I

19    took the job and I started doing the job and that's the

20    only job I had at the time.

21    Q.   And on page 3 you signed this on 10/26/12?

22    A.   Yeah.

23    Q.   And you signed a statement that all the things that

24    you said in the application were correct?

25    A.   That's correct.

1    Q.    Okay.  And that was as a result of sitting down with

2    an agent at the FieldEddy & Bulkley Insurance agency in

3    East Longmeadow where you live?

4    A.    That is right.

5    Q.    You had never dealt with that agency before, is that

6    correct?

7    A.    No.

8    Q.    You had actually had a liability policy through an

9    agency called Scanlan?

10    A.    That's correct.

11    Q.    And that policy ran out, it terminated?  It was a

12    one-year policy and the end of the year it was up on

13    December 1, 2012?

14    A.    Uh-huh.

15    Q.    And in order to keep the permits so the permit

16    wouldn't be revoked again, you needed to re-up on

17    liability insurance?

18    A.    Right.

19    Q.    And you went back to FieldEddy & Bulkley and applied

20    for a liability insurance policy?

21    A.    Right.

22    Q.    And you met with an agent named Margaret Grundstrom?

23    A.    Yes.

24    Q.    And you call her Peggy?

25    A.    Peggy, yeah.

1    Q.   And apparently when you first came there you came

2    during lunch time?

3    A.   I don't recall when I -- I know I went there.

4    Q.   So basically when you had to apply for the permits in

5    South Hadley in October, you showed them the Scanlan

6    policy report?

7    A.   I showed them whatever policy I had at the time.

8    Q.   And they knew that your -- the town of South Hadley

9    knew that your Scanlan policy was over on December 1?

10   A.   Uh-huh.

11   Q.   Is that true?

12   A.   I don't recall how it happened, but I realized at the

13   time that I had to reapply for insurance.

14   Q.   Right.  And that happened on or about December 18th

15   of 2012?

16   A.   Yes.

17   Q.   Okay.  And you sat down with the same agent that you

18   did the workers' comp. policy with?

19   A.   That's correct.

20   Q.   Okay.  And there was another questionnaire that

21   needed to be filled out to submit to the insurance

22   company?

23   A.   Yes.

24   Q.   Is that correct?

25   A.   That's correct.

1    Q.   Okay.  And you sat behind the table and she asked you

2 questions and you gave her answers?

3    A.   That's right.

4    Q.   Okay.  And she recorded the answers?

5    A.   Correct.

6    Q.   Okay.  Now in this case you are not making any claim

7 that Peggy made any mistakes in transmitting what you said

8 to paper, correct?

9    A.   That's correct.

10    Q.   So what is reflected on the paperwork submitted to

11 Preferred Mutual is in fidelity with what you told Peggy?

12    A.   I answered the questions.

13    Q.   Now, she didn't appear rushed or going at a pace

14 faster than you were ready to go at, correct?

15    A.   I don't recall.  I think it was just natural the way

16 she was doing it.

17    Q.   You didn't come away from that situation thinking

18 that you were rushed, did you?

19    A.   No.

20    Q.   If you had a question there was time for that,

21 correct?

22    A.   Yes.

23    Q.   And in your policy application to Preferred Mutual

24 you did not indicate that you were in a partnership,

25 correct?

1    A.    That's correct.

2    Q.    In fact, you indicated that you were in a one-owner

3    sole proprietorship?

4    A.    I always operated as a one owner.

5    Q.    Okay.  My question is you told Preferred Mutual that

6    you were a one-owner sole proprietor?

7    A.    That is right.

8    Q.    Okay.  There was a question on the application about

9    whether you were involved in any joint venture and you

10   answered that no?

11   A.    Yes.

12   Q.    Is that accurate?

13   A.    That's accurate.

14   Q.    And is it accurate to say that you did not tell

15   Preferred Mutual in your application that you were

16   involved in a partnership?

17   A.    I wasn't involved in a partnership.

18   Q.    My question is you did not tell Preferred you were

19   involved in a partnership?

20   A.    I did not tell Preferred that I was involved in a

21   partnership.

22   Q.    You did not tell Preferred that you had a partner on

23   the South Hadley job?

24   A.    I told them that I had two employees, Brantley and

25   whoever else.

1    Q.   Well, we went over that.  You didn't give names,

2    right?

3    A.   I didn't give names, no.

4    Q.   So the two employees for all Preferred Mutual knows

5    could be Ronnie Moore and Willie?

6    A.   Possibly.

7              MR. ZELLE:   Objection.

8              THE COURT:   Sustained.  The jury will disregard

9    the question.

10   Q.   (By Mr. Stewart) Just briefly, sir, when you applied

11   for insurance through FieldEddy for the liability policy

12   in December, you did not tell Preferred Mutual that you

13   had any partners, is that accurate?

14   A.   I did not tell them I had any partners.

15   Q.   Correct.  And actually you told Preferred Mutual that

16   you had a part-time employee?

17   A.   No.

18   Q.   All right.

19   A.   I don't know what I told them.

20   Q.   Well, let's go over your application if we could to

21   Preferred Mutual.

22             MR. STEWART:   Judge, this hasn't been previously

23   offered.  I'd offer Exhibit 3.  It's agreed to.

24             MR. ZELLE:   No objection.

25             MR. GIROUARD:   No objection.

1        MR. BURSTEIN:  No objection.

2        THE COURT:  Very well.  That will be Exhibit 3

3   **(Plaintiff's Exhibit 3 admitted.)**

4   Q.   (By Mr. Stewart)  You've seen this business owner

5   online submission before today?

6   A.   Uh-huh.

7   Q.   Okay.

8        THE COURT:  We are referring now to what is

9   Exhibit 3?

10        MR. STEWART:  Correct.

11   Q.   (By Mr. Stewart)  Do you want to look at it and

12   satisfy yourself?

13   A.   Okay.

14   Q.   Is that the one you've seen?

15   A.   Yeah.

16   Q.   Okay.  Now right at the beginning it says the named

17   insured is --

18   A.   I don't hear you.

19   Q.   At the beginning where I've underlined it says the

20   named insured is Leonard C. Lodigiani?

21   A.   Yes.

22   Q.   And I'd suggest d/b/a means doing business as L.B.

23   Plumbing; did I read that correctly?

24   A.   That's correct.

25   Q.   Okay.  And that is how you described your business to

1    Peggy?

2    A.    Yes.

3    Q.    And again the entity was an individual?

4    A.    That's right.

5    Q.    Okay.  That's the type of business entity you had?

6    A.    Right.

7    Q.    That you wanted to tell Preferred you were operating

8    as an individual?

9    A.    That's correct.

10   Q.    And that was something you did knowingly?

11   A.    Right.

12   Q.    Okay.  And there's another question down here, here

13   we go.  "Has the applicant been involved and active in or

14   currently active in any joint ventures?"  And what was

15   your answer, sir?

16            MR. ZELLE:  Objection.

17            THE COURT:  What's the objection?

18            MR. ZELLE:  Foundation.  I don't think it's been

19   established that he actually did put these answers in.

20            THE COURT:  That's overruled.  I think it's been

21   laid he was providing the information.  Overruled.  You

22   can go ahead.

23            MR. STEWART:  Let me lay some more foundation.

24   I'd be glad to.

25            THE COURT:  If you'd like, the objection is

1    overruled.  You can re-ask the question anyway you'd

2    like.

3              MR. STEWART:   Okay

4    Q.   (By Mr. Stewart)  The application that was submitted

5    on your behalf says that you said no to the question about

6    whether you were in any joint ventures; do you agree with

7    me on that, sir?

8    A.   Yes, I agree.

9    Q.   You previously told me that all these answers that

10   Peggy wrote down and submitted to Preferred Mutual were in

11   fidelity with what you told her?

12   A.   Yes.

13   Q.   And she didn't make any errors in recording

14   accurately what you told her?

15   A.   I don't know.

16   Q.   You don't know?  Well, you testified on a number of

17   occasions that you were positive that she made no errors.

18   Are you changing your testimony?

19   A.   I don't know what you're trying to get at.

20   Q.   Sir, I'm just trying to get an answer to my question.

21   A.   I tried to answer the questions when I saw Peggy and

22   today some things are different probably.

23   Q.   Okay.  Well, when you testified earlier, did you

24   think you had a better grasp of all the facts involved

25   here?

A.    Yes.

Q.    Okay.  So the time that you testified earlier that Peggy recorded everything accurately in complete fidelity with what you told her, you would defer to that?

A.    I would, yeah.

Q.    Thank you, sir.

And in applying for insurance you knew that Preferred Mutual was going to be relying on the answers that you gave?

A.    Yes.

Q.    Okay.  And on the last page there was some questions about number of partners, officers active in operation, and the answer was one, was it not, sir?

A.    Yeah.

Q.    Okay.  And then there was a question about number of employees.  Are you with me, sir?

A.    Yes.

Q.    And you said one part time?

MR. BURSTEIN:  Objection, Your Honor.  That's what the application says.  That's not necessarily what the witness says.

THE COURT:  Overruled.

Q.    (By Mr. Stewart) Sir, can you read what I've highlighted here?

A.    "Number of employees not including" I don't

1    understand that part there.

2    Q.    Well, is it accurate to say that you told Preferred

3    Mutual you had one part-time employee?

4    A.    One part-time employee, yes.

5    Q.    That's a little bit different than what you told the

6    workers' comp. carrier?

7    A.    Well...

8    Q.    Well, strike it.

9          Do you agree with me there's a difference between two

10   employees and one part-time employee?

11   A.    Yes.

12   Q.    Okay.  Now when is it that you first heard about any

13   fire at Bridge Street in South Hadley?

14   A.    I heard about it the night of the fire, late, you

15   know around eleven o'clock.  I don't recall who called me

16   that there was a fire there.

17   Q.    And the insurance company appointed a lawyer to

18   represent you shortly after that?

19   A.    Shortly after that, yes.

20   Q.    And you understood that that lawyer was to defend you

21   and represent you in connection with the fire?

22   A.    That's correct.

23   Q.    Okay.  And if a lawsuit was ever going to be brought,

24   this lawyer would be the one representing you in the court

25   suit?

1    A.    All's I can recall is that that lawyer was going to

2    check on the fire at Bridge Street.

3    Q.    And that lawyer ended up being a gentleman named

4    Joseph Doyle?

5    A.    That's correct.

6    Q.    And there was a point in time that Mr. Doyle actually

7    did represent you in court?

8    A.    Where?

9    Q.    Is that accurate, sir?

10   A.    He represented me where?

11   Q.    In a court suit?

12   A.    I don't recall.

13   Q.    You're unaware of that?

14   A.    No.

15   Q.    Okay.  In any event, Mr. Doyle represented you at the

16   time of the investigation?

17   A.    Yes.

18   Q.    Okay.  And did you ever meet the gentleman that was

19   here earlier, Mr. Trudeau?

20   A.    I met him when he questioned me at Mr. Doyle's

21   office.

22   Q.    You had not met him before that?

23   A.    No.

24   Q.    Okay.  And did you understand that Mr. Trudeau --

25   A.    No, I have to make a correction.  He may have been at

1    the fire the day that they came down to check it out.  I

2    was there and I believe it was Mr. Trudeau that was there

3    also.

4    Q.   Got it.  In any event, there was a point in time when

5    you gave -- you understood those gentlemen were

6    investigating the fire?

7    A.   That's correct.

8    Q.   And you gave a recorded interview?

9    A.   Right.

10   Q.   And they had a tape recorder like I had earlier and

11   they plunked it down on the table and asked you questions?

12   A.   Right.

13   Q.   Do you remember what Mr. Trudeau was talking about

14   earlier when he told the court what he remembered about

15   that?

16   A.   Yeah, I recall.

17   Q.   And he said that this occurred in a conference room;

18   does that match with your memory?

19   A.   That's correct.

20   Q.   Okay.  And Mr. Doyle was sitting in one chair and

21   Mr. Trudeau was in another chair and you were there?

22   A.   Right.

23   Q.   And there wasn't anybody else in the room?

24   A.   That's correct.

25   Q.   Okay.  And he turned the tape recorder on and asked

1    you questions?

2    A.    Right.

3    Q.    And you readily admit that you told those gentlemen

4    at that time that you were partners with Mr. Brantley,

5    Evins Brantley?

6    A.    That's correct.

7    Q.    Okay.  And then there was some questioning by Mr.

8    Doyle and he asked you, well, you have a sole

9    proprietorship but for that job you were partners with Mr.

10   Brantley; do you remember those questions?

11   A.    I remember them, yeah.

12   Q.    And did you answer yes to those?

13   A.    Yes, I did.

14   Q.    Okay.  And you understood that Mr. Doyle and

15   Mr. Trudeau had to find out who was with you at the

16   property on the day before the fire?

17   A.    What's that?  Repeat that.

18   Q.    Mr. Trudeau and Mr. Doyle needed to know who was with

19   you on the day before the fire in South Hadley?

20   A.    That's correct.

21   Q.    Who was working in your crew?

22   A.    Yes.

23   Q.    And they needed to know the role of each person that

24   was with you?

25   A.    Right.

1    Q.   Okay.  And you indicated at that time that Mr.

2    Brantley, Evins Brantley, his role was there as your

3    partner?

4    A.   Right.

5    Q.   And that this wasn't a general partnership that you

6    had registered with the Secretary of State, this was a

7    partnership just for this job?

8    A.   That's correct, just a partnership.

9    Q.   And part of the agreement for this job with Mr.

10   Brantley, Evins Brantley, was that you were going to be

11   splitting the profits at the end of the job with him?

12   A.   Yeah.  After everything was paid, yeah.

13   Q.   And the everything included in that category are

14   paying for Mr. Moore and paying for Willie Costin?

15   A.   Right.

16   Q.   And also paying for that workers' comp. policy you

17   had to take out to get this job to get these permits?

18   A.   That's correct.

19   Q.   And for the insurance you had to get to not have

20   those permits revoked again?

21   A.   You mean the liability?

22   Q.   Yes.

23   A.   Part of it.

24   Q.   Well, certainly you had -- what you selected from

25   Preferred Mutual was seven installment payments, right?

1    A.    I thought I paid them all at once.

2    Q.    Okay.  Do you have a check that shows that?

3    A.    I'd have to go and look in my files and see.

4    Q.    Okay.  In any event, it was open to you to only pay

5    the amount it cost to get the policy going, right?

6    A.    Correct.

7    Q.    And at least that amount was going to be expensed

8    against the cost of the project before you split up

9    profits?

10   A.    Possibly, yes.

11   Q.    Well, you say --

12   A.    Because the insurance, I was going to take part of

13   the profits and pay part of the liability with it, not all

14   of it because the liability was for more than that one

15   month that that job was going to last.

16   Q.    Okay.  So you're saying you would have to have paid

17   more than just the first installment because that job went

18   on for a little while?

19   A.    Yes.

20   Q.    Because you started in October and then at the end of

21   January is when the fire occurred, right?

22   A.    That's right.

23   Q.    Okay.  Actually you wouldn't have started any sooner

24   than like November 12th when you applied for the permits,

25   right?

1    A.    About in there, yes, we started the job.

2    Q.    Okay.  And earlier there was some talk about

3    contracts with the owner of the property.  Are you with

4    me?  Do you know anything about contracts that you had

5    with the owner of the property?

6    A.    Yes, we had a contract before I started.

7    Q.    And you told us that was backdated to September?

8    A.    Yes.

9    Q.    You weren't involved in September, were you?

10   A.    No.

11   Q.    Okay.  So do you remember giving testimony under oath

12   on June 21st of 2013?

13   A.    June?

14   Q.    June 21, 2013.

15   A.    I don't recall that, no.

16   Q.    All right.

17   A.    Was that in your office?

18   Q.    Yes, sir.

19   A.    Yes, sir.  Okay.  Then I remember.

20   Q.    And going to page 107, we were talking about the

21   costs that were going to be subtracted before you split

22   profits; are you with me so far, sir?

23   A.    Yeah.

24   Q.    And you were talking about the expenses, the expense

25   load before you split profits, and you were talking about

1  the liability insurance and what it cost you and that you

2  needed that insurance to get the job and you answered yes

3  and I asked is that fair and you said yes.  Did I read

4  that right?

5          MR. ZELLE:  Objection.  He wasn't reading it

6  all.  He was paraphrasing.

7          THE COURT:  Correct.

8          MR. ZELLE:  I'm not quibbling with the

9  paraphrasing but he was not reading it.

10          THE COURT:  Overruled.

11  Q.  (By Mr. Stewart) Let me try a different question,

12  sir.

13      It's fair to say on June 21st of 2013 you told me

14  that the cost of the liability insurance was going to be

15  subtracted before you split profits with Mr. Brantley?

16  A.  Yes, that's what I told you, but it didn't happen

17  that way.

18  Q.  I understand that you never split profits because you

19  never got paid?

20  A.  I didn't get anything, right.

21  Q.  But the plan was that those were going to be

22  legitimate expenses that you were going to split with Mr.

23  Brantley before you split the profits?

24  A.  That's correct.

25  Q.  Thank you.

1     Now, Mr. Doyle asked some questions at the recorded

2  statement, did he not?

3  A.  Yes.

4  Q.  And he asked you about your agreement to split

5  profits with Mr. Brantley, correct?

6  A.  He may have, yes.

7  Q.  And he asked you questions about supervision at the

8  job?

9  A.  I believe so.

10  Q.  Okay.  And you told him that you supervised the job

11  when you were there, right?

12  A.  Right.

13  Q.  And that there were times that you would be doing

14  paperwork at home and Willie C. and Ronnie Moore would

15  start work under Evins Brantley's supervision?

16        MR. BURSTEIN:  Objection, Your Honor, as to what

17  part of the statement that's being referred to.

18        MR. GIROUARD:  Objection.

19        THE COURT:  Attorney Stewart, please reference

20  what you're reading from so that opposing counsel knows.

21        MR. STEWART:  I'll withdraw the question and ask

22  a different question.

23  Q.  (By Mr. Stewart)  Sir, you've testified under oath --

24        THE COURT:  Attorney Stewart, the previous

25  question was withdrawn and so the question itself is

1    stricken.  You should disregard what the question was.

2    Q.   (By Mr. Stewart) Sir, you've testified under oath on

3    a previous occasion that there were times that you would

4    be doing paperwork at home on the South Hadley job and

5    that Evins Brantley would start the job supervising these

6    two other gentlemen?

7              MR. BURSTEIN:  Asked and answered previously.

8              THE COURT:  Overruled.

9    Q.   (By Mr. Stewart) Your answer was, sir?

10   A.   Yes, he would be supervising if I wasn't there.

11   Q.   Thank you, sir.

12        Now, you gave a recorded statement with Mr. Trudeau

13   and Mr. Doyle, right?

14   A.   That's correct.

15   Q.   And then there was a time that you gave testimony at

16   an examination under oath at the request of Preferred

17   Mutual?

18   A.   Yes.

19   Q.   To me?

20   A.   Right.

21   Q.   In my conference room?

22   A.   Right.

23   Q.   Okay.  And there was a court reporter there just like

24   the court reporter here?

25   A.   Right.

1    Q.    Is that correct?

2    A.    Correct.

3    Q.    And Mr. Burstein was there representing you?

4    A.    Yes.

5    Q.    Okay.  You understood that Preferred Mutual needed to

6    get more information in investigating the loss and in

7    investigating the circumstances of your coverage, correct?

8    A.    I believe so, yes.

9    Q.    And at that examination under oath we pulled out all

10   these applications for insurance and walked through them?

11   A.    Right.

12   Q.    And there came a point in time that Preferred Mutual

13   started sending you letters to tell you what they had

14   finally decided about coverage in your case?

15   A.    That's correct.

16   Q.    Okay.  And you received a letter that was dated July

17   22nd of 2013?

18   A.    Correct.

19   Q.    That's where Preferred Mutual told you that they had

20   after due deliberation come to the conclusion that you had

21   a partnership or a joint venture which was not reflected

22   on your insurance policy?

23   A.    Yes.

24   Q.    Okay.  And you read that letter carefully?

25   A.    Uh-huh.

1    Q.   And at the end of that letter Preferred Mutual told

2    you that if you have any other information that you would

3    like them to accept to reevaluate their coverage position,

4    that they would be willing to hear about it?

5    A.   I don't recall that.

6    Q.   Okay.  Let me show you the last paragraph.

7              MR. ZELLE:  What exhibit is that?

8              MR. STEWART:  It's not an exhibit.

9              MR. ZELLE:  What are you showing the witness?

10             THE COURT:  What is the document?

11             MR. STEWART:  This is a letter that he just told

12   us he got dated January -- July 22, 2013.

13             THE COURT:  All right.

14             MR. STEWART:  It's actually document number 38

15   in the docket.

16             THE COURT:  Just show it to the opposing side.

17             MR. STEWART:  May I approach the witness?

18             MR. ZELLE:  What I understand is being shown the

19   witness is a letter that's been pre-marked as Exhibit 5.

20             THE COURT:  It has been pre-marked?

21             MR. ZELLE:  It has.

22             THE COURT:  All right.

23             MR. STEWART:  There you go.

24             THE COURT:  So we will refer to that -- see if

25   you can find it there.

1          MR. STEWART:  Judge, to save time, can I use

2     mine for the time being?

3          THE COURT:  If you don't mind looking, I want to

4     make sure it has been pre-marked.

5     Q.   (By Mr. Stewart)  Okay.  Page 2 of Exhibit 5 and

6     again you were saying you didn't remember and I'm just

7     showing this to you to see if it jogs your memory, sir.

8          Does reading that help you to remember if Preferred

9     Mutual told you that they were making their decision based

10    on present information and inviting you to submit anything

11    further that you wanted to be considered in their coverage

12    determination?

13    A.   Yes.

14    Q.   Thank you.

15         THE COURT:  Attorney Stewart, are you offering

16    that now, Exhibit 5?

17         MR. STEWART:  Judge, I will.

18         MR. ZELLE:  No objection.

19         MR. BURSTEIN:  No objection.

20         THE COURT:  There is no objection, I will accept

21    that as an exhibit previously marked as 5.

22    **(Plaintiff's Exhibit 5 admitted.)**

23    Q.   (By Mr. Stewart) And you understood from this letter

24    that Preferred Mutual wanted to rescind your policy?

25    A.   They wanted to cancel it, right.

1    Q.    They were telling you that it is their position that

2    they had the right to rescind your policy?

3    A.    That's what they said, yes.

4              MR. STEWART:  Judge, may I be heard at sidebar

5    briefly?

6              THE COURT:  Yes.

7    (Sidebar conference.)

8              MR. STEWART:  Judge, I'd like to either offer or

9    make an offer of proof for the Preferred refund letter

10   check, and obviously it's my position that he was told

11   that Preferred Mutual was rescinding the policy.  It's

12   their position he could either fight that or cash the

13   check and he cashed the check.

14             MR. BURSTEIN:  It says that we are rescinding

15   your policy or have determined --

16             MR. STEWART:  Right, and was seeking judicial --

17             MR. BURSTEIN:  You may be seeking, but it says

18   we are rescinding your policy.

19             THE COURT:  Give me a chance to read it.

20             MR. STEWART:  Sure.

21             THE COURT:  What provision of this letter do you

22   specifically refer to that says if he cashed the check, he

23   accepted the representations in the letter?

24             MR. STEWART:  That's a little complicated

25   because at this point we didn't know about the mutual

1   rescission was illegal in Massachusetts.

2          Actually, as you know, we actually argued the issue

3   before Judge Ponsor before my brother brought it up, none

4   of us knew about it, and so what we're saying here is if

5   you do not accept the rescission --

6                THE COURT:  Keep your voice down.

7                MR. STEWART:  I'm hard of hearing.  I talk

8   loud.

9          If you do not accept the rescission of the policy,

10  it's PMIC's intention to obtain a judicial determination

11  to rescind your policy by the enclosed check.  So my

12  argument, and obviously it will either be accepted here or

13  not, that cashing the check he sort of agreed to

14  rescission.

15               THE COURT:  Sort of is not going to make it.

16  That's overruled.  I'm not going to let you go there.

17               MR. GIROUARD:  Thank you.

18               MR. STEWART:  I just want a ruling.  May I offer

19  the check as an ID exhibit?

20               THE COURT:  Absolutely.  Yes.

21  (End of sidebar conference.)

22               MR. STEWART:  That's Number 2 for ID.

23               THE COURT:  And so opposing counsel knows, 2

24  has been marked for ID.

25               MR. ZELLE:  Objection.

1          THE COURT:  ID only.

2          MR. ZELLE:  I understand, thank you.

3          MR. BURSTEIN:  Thank you, Your Honor.

4          MR. STEWART:  Thank you, Judge.

5   **(Plaintiff's Exhibit 2 marked for ID.)**

6   Q.    (By Mr. Stewart)  Now, Mr. Lodigiani, early after the

7   fire do you remember having some phone calls with a

8   gentleman from Preferred Mutual, a claim representative,

9   perhaps you might remember the name Raymond Kagels?

10  A.    No, I don't remember.

11  Q.    Okay.  Do you remember talking to anybody from

12  Preferred Mutual?

13  A.    I believe they called me to say that somebody was

14  going to take over to represent me for the fire at Bridge

15  Street.

16  Q.    Okay.  That they were going to appoint a lawyer?

17  A.    Yes.

18  Q.    Okay.  Do you remember -- Okay.  Do you remember

19  anything else?  Well, let me ask you --

20  A.    Not too much.

21  Q.    -- do you remember discussions about your activities

22  and how active you were in plumbing?

23  A.    No.

24  Q.    Do you remember talking to the Preferred Mutual

25  representative about how well you remember the details of

1    the plumbing work?

2    A.   I don't recall.

3    Q.   Okay.  Do you remember saying anything to the

4    Preferred Mutual representative about even though you're

5    in your 80s, how active and sharp you are?

6    A.   I was quite active, yes.

7          MR. STEWART:  I believe I'm content to leave it

8    there, Judge.

9          THE COURT:  All right.  Thank you.

10          MR. STEWART:  Let me do some housekeeping.

11          THE COURT:  For the parties' benefit, I'll put

12    on the record that just the last sidebar that we had I

13    reviewed Exhibit 5, a copy of Exhibit 5, as the basis for

14    making my ruling on the issue that we were at sidebar at.

15          MR. STEWART:  Thank you, Judge.

16          THE COURT:  Thank you.

17          MR. BURSTEIN:  Your Honor, given that it's

18    quarter to one and the cross-examination might be fairly

19    extensive, is it possible to break early for the lunch and

20    start after lunch break?

21          THE COURT:  No, we are going to use as much time

22    as we can.  We will go to a little after one.

23          MR. BURSTEIN:  Thank you.

24          THE COURT:  I'd ask that you start.

25          MR. BURSTEIN:  Thank you.

**CROSS-EXAMINATION**

Q.   (By Mr. Burstein) Good afternoon, Mr. Lodigiani.

A.   Good afternoon.

Q.   Can you hear me okay?

A.   Yes.

Q.   I know you've been asked a lot of questions.  I just want to back you up a little bit about your background.

A.   Yes.

Q.   Okay.  Can you tell us where you grew up?

A.   Yes.

Q.   Where did you grow up?

A.   In the Springfield area.

Q.   And where did you go to high school?

A.   To Technical High School.

Q.   And what did you do after Tech High School?

A.   I joined the Marine Corp.

Q.   How long were you in the Marine Corp., sir?

A.   I went in for three and a half years and then I was called back in for the Korean War for another year and a half.

Q.   Did you play any sports growing up, sir?

A.   Yes, I played football.

Q.   Did you play that in high school?

A.   I played that in high school and I played service ball.

1  Q.   And what happened after you got out of the Marine

2  Corp.?

3  A.   Well, in the Marine Corp. I was a plumber so I

4  applied and went to a universal plumbing and heating

5  school in Kansas City, Missouri.

6  Q.   How did you end up all the way in Kansas City,

7  Missouri?

8  A.   Because that's the only place where there was a

9  plumbing school that taught the basics of plumbing.

10  Q.   There weren't that many programs to learn plumbing at

11  that point?

12  A.   No.

13  Q.   And had you actually done plumbing work before you

14  went into the service?

15  A.   Yes, I did some.  I used to help my cousin who was a

16  plumber.

17  Q.   And how old were you when you first started being a

18  plumber's helper?

19  A.   About 14 years old.

20  Q.   So ever since you've been 14 years old, you've had

21  something to do with plumbing?

22  A.   That's correct.

23  Q.   And after you went to plumbing school, sir, did you

24  then -- where did you go then as far as geographically?

25  A.   After I got out of plumbing school, I went to work

1     for L.L. Brisquet in Springfield.

2     Q.    So you came back to this area?

3     A.    Yes.

4     Q.    At that point what had been your license at that

5     time? Did you have a license?

6     A.    At that point I had a license for Kansas City,

7     Missouri. I had the city license.

8     Q.    Okay. When you came back to Springfield, did you

9     have a license in Massachusetts?

10    A.    To start an apprentice license.

11    Q.    Okay. And what kind of things does an apprentice

12    license let you do?

13    A.    What's that?

14    Q.    What types of work do you do with an apprentice

15    license?

16    A.    Mostly -- as long as there's a master plumber, a

17    journeyman plumber, you can do everything that they're

18    doing.

19    Q.    Okay. Are there limitations on jobs that you can

20    take by yourself?

21    A.    You can't take any job by yourself as a journeyman,

22    as an apprentice.

23    Q.    Okay. And then at some point did you get a license

24    after the apprentice license?

25    A.    Yes, I got my journeyman's license.

1    Q.   Do you remember when that was approximately, what

2    year you got your journeyman's license?

3    A.   Oh, I don't recall, no.

4    Q.   Was it a long time ago?

5    A.   Quite a long time ago.

6    Q.   More than 30 years ago?

7    A.   More than 30.

8    Q.   And can you tell us a little bit about a journeyman's

9    license?  What does a journeyman's license let you do?

10    A.   A journeyman's license generally are on the job, you

11    don't have to have a master there but you can control the

12    whole job, and even working for somebody you can have an

13    apprentice working for you and you can control that work.

14    Q.   Okay.  And there's another distinction above a

15    journeyman license where you have a master's?

16    A.   That's correct.

17    Q.   What's the difference between a journeyman's license

18    and a master's license?  What's your understanding of the

19    difference?

20    A.   The difference is the masters can take out the

21    permits and do most of the paperwork that's required and

22    mostly it's more knowledge.

23    Q.   Okay.  Is it also fair to say that a journeyman

24    plumber is not supposed to run a job, that's managing

25    other plumbers on the job?

1    A.    Mostly, yeah.  Mostly you have to have a -- if you're

2    doing a larger job, you have to have a master there.

3    Q.    In fact, a journeyman could take out a license on his

4    own if he was working on a job by himself?

5    A.    That's correct.

6    Q.    But for any job where you're supervising other

7    plumbers, a master plumber would have to take out the

8    license?

9    A.    That's correct.

10   Q.    Okay.  Would a master plumber have to be on the job

11   every minute that that job is going on?

12   A.    No.

13   Q.    Is it simply the master plumber is required to

14   supervise the overall job?

15   A.    That's correct.

16   Q.    And if something goes wrong on a job where a master

17   plumber has pulled permits, whose license gets affected?

18   A.    It's the master plumber.

19   Q.    It wouldn't be any other licensed plumbers that are

20   on the job?

21   A.    No.

22   Q.    And how long have you been a master plumber, sir?

23   A.    I've been a master plumber 40 years.

24   Q.    Okay.  So you've been a master plumber for 40 years?

25   A.    Yes.

1    Q.    And what types of jobs have you gotten in the past?

2    When you first got your master plumber's license, what

3    kind of jobs were you doing at that point?

4    A.    We were doing commercial and residential, both.

5    Q.    Okay.  And for the commercial jobs, just give us an

6    idea what was involved in some of those types of jobs.

7    A.    Some of those jobs like Burger King, fire station,

8    that's about it.

9    Q.    Okay.  So some of them would have been

10   restaurant-type jobs?

11   A.    Yes.

12   Q.    And any other job or building that requires some

13   plumbing work?

14   A.    Yes.

15   Q.    You did heating work as well?

16   A.    That's correct.  We did heating.

17   Q.    And does that take a special area of expertise as

18   well?

19   A.    It does, yes.

20   Q.    And you've done both in the past?

21   A.    Yes.

22   Q.    And through the years you've been a sole proprietor,

23   meaning that you've had your own business?

24   A.    It's always been my own business, yes.

25   Q.    And for the last number of years leading up to the

1    fire in this case, you've been kind of slowing down a

2    little bit; is that fair to say?

3    A.    That's correct, yeah.

4    Q.    And is it fair to say that you were only working part

5    time?

6    A.    Yes.

7    Q.    Okay.  And what types of jobs had you done in the two

8    or three years before this project?

9    A.    Before this project, oh, the biggest was a

10   residential.  That was the biggest.

11   Q.    Okay.  There was a big residential job?

12   A.    Yes.

13   Q.    What did that entail?

14   A.    It entailed doing all the plumbing in it and we did

15   the heat too on that job.

16   Q.    Was it new construction?

17   A.    It was new construction.

18   Q.    Okay.  And so just again to give the jurors an idea

19   of what your scope of your duties were, you look at plans

20   for a new house?

21   A.    That's correct?

22   Q.    And you'd have to install the rough plumbing?

23   A.    That's correct.

24   Q.    And you'd have to call a plumbing inspector to come

25   out and look at the work?

1    A.    The plumber inspector inspects it.

2    Q.    That's before the walls get closed up?

3    A.    That's right.

4    Q.    To make sure everything is done okay?

5    A.    That's right.

6    Q.    And there will be some finish plumbing work?

7    A.    Then do finish work after.

8    Q.    Then the plumbing inspector would get called back?

9    A.    That's right.  He would get called back and finish.

10   Q.    And if there were ever any problems with the work

11   that you were doing, the plumbing inspector would point

12   those out?

13   A.    That's right.

14   Q.    And if the plumber inspector was not happy with how

15   things were going, they could pull the permit for the job?

16   A.    Yes, that's correct.

17   Q.    And were you also doing some commercial work in the

18   few years before the fire incident?

19   A.    Let's see.  Just before this, I don't recall how far

20   back the commercial work was.  We did do some commercial a

21   few years before.

22   Q.    In the last five years did you work on a large

23   project for a restaurant that was going into a plaza in

24   Framingham, Massachusetts?

25   A.    That's correct, yes.

1    Q.   Was that a large job?

2    A.   Very large.

3    Q.   That was prior to this fire?

4    A.   Prior to the fire.

5    Q.   But within a few years?

6    A.   Yes.

7    Q.   And what was the type of scope of that project?

8    A.   The plumbing with the restaurant.

9    Q.   I understand.  I was just hoping that you could give

10   the jury a little more detail about the type of work that

11   would be involved in that type of project.

12   A.   Putting in cast iron pipe in the ground and venting

13   all the plumbing, doing the water piping and the gas

14   piping.

15   Q.   Okay.  And so for a restaurant that would involve

16   probably putting in bathrooms?

17   A.   That's correct.  It would be bathrooms in there, yes.

18   Q.   And there are drain lines for different --

19   A.   Drain lines, yes.

20   Q.   Okay.  Are there grease traps that are put in?

21   A.   Grease traps in there too, yes.

22   Q.   Is that a large project as far as a plumbing project

23   goes?

24   A.   That's as large as for plumbing my size would be,

25   yes.

1   Q.   Okay.  And did you have any problems on that type of

2   a project?

3   A.   No.

4   Q.   And turning your attention to this project on Bridge

5   Street in South Hadley, can you just describe a little bit

6   what this project was going to entail?

7        I know we saw some contract notes, but if I showed

8   you those, would those refresh your recollection of what

9   you were doing on the project?

10  A.   Well, I was going to install -- there was a

11  three-compartment sink, there was a vegetable sink, a hand

12  wash sink, floor drains, a grease trap for the

13  three-compartment sink, and then another grease trap for

14  the floor drains.

15  Q.   Okay.  At the point where you were brought on this

16  project on Bridge Street, had some of the plumbing work

17  already been done?

18  A.   Some of it was done and it wasn't all correct.

19  Q.   Okay.  Some of it was done and you're saying it

20  wasn't all correct, how did you determine that?

21  A.   Because I had the inspector come from the town of

22  South Hadley and to tell them exactly what I was going to

23  do and he made some corrections.

24  Q.   Okay.  So just for timing wise, would that have been

25  before you actually started work on the project?

1    A.    That was -- I think we had one day on the project
2    when the inspector came.
3    Q.    Okay.  So that's after you applied for the permit?
4    A.    Yes, that was after I applied for the permit.
5    Q.    So the inspector came out and went over the scope of
6    what needed to be done?
7    A.    That's correct.
8    Q.    And also indicated that some of the work that had
9    been done under Charles Brantley's supervision needed to
10   be fixed?
11   A.    Changed, yes.
12   Q.    And to your knowledge had the previous work been paid
13   for if you know?
14   A.    I don't recall, but when I got with the owner we went
15   over how much he would pay.  He would pay according to
16   what I described.
17   Q.    Okay.  And just for clarification, it wasn't a flat
18   rate?
19   A.    No, it was not a flat rate.
20   Q.    You were going to be billing hourly for the time?
21   A.    Hourly and whatever it took.
22   Q.    And that was hourly for the time for all the people
23   who were under your supervision?
24   A.    Yes.
25   Q.    And again just to clarify the scope and I believe you

1    testified to this in the examinations under oath that you

2    did with Attorney Stewart, there was kind of a side deal,

3    so to speak, where Brantley was being paid directly by the

4    owner for some of the debris that was being hauled away

5    from the scene?

6    A.    That's correct.

7    Q.    All right.  Did you have anything to do with that

8    deal or that situation?

9    A.    After I took over I was going to pay the people that

10   were doing that.

11   Q.    Okay.  So I'm unclear, so the two helpers were

12   assisting with that as well?

13   A.    No.  Brantley and one person was going to help me.

14   The other guy was always there to clean up.

15   Q.    Okay.  And the clean-up guy you were billing for, is

16   that correct?

17   A.    Right.

18   Q.    What I am talking about is the hauling away of

19   debris, that was a deal that Mr. Brantley had directly

20   with the owner?

21   A.    Yes.  He had the deal to haul away the stuff.  It was

22   his truck.

23   Q.    Was it your understanding that Mr. Brantley was going

24   to be paid directly from the owner for that?

25   A.    I don't -- I didn't recall that.  You know I don't.

1    Q.   Okay.

2    A.   I didn't have that.

3    Q.   When you started this project, sir --

4    A.   Yeah.

5    Q.   -- is it fair to say that Evins Brantley had already

6    been working on the project?

7    A.   Yes.

8    Q.   He was familiar with it?

9    A.   He was familiar with it.

10   Q.   And the two helpers, had they already been working

11   with Evins Brantley on this project?

12   A.   Yes.

13   Q.   Okay.  And so when you came on to the project, you

14   were utilizing all the people who already had been there?

15   A.   That's correct.

16   Q.   Essentially just taking over the job as the master?

17   A.   Taking over the job.

18   Q.   And prior to starting the job, you learned that you

19   would need workers' comp. insurance, is that correct?

20   A.   Yes.

21   Q.   Had you had workers' compensation insurance previous

22   to this?

23   A.   No.

24   Q.   And had you ever had workers' compensation insurance?

25   A.   No, I didn't.

1    Q.    Okay.  And can you explain why someone in the

2    business for so long as a master plumber had not had

3    workers' compensation insurance?

4    A.    I mostly was working alone by myself.

5    Q.    Okay.  So most of the time you would take on projects

6    that you would be there by yourself?

7    A.    Right.  And if I did get help, I'd have a contract

8    labor.  I'd hired other plumbers, other contract labor.

9    Q.    What do you mean when you say contract labor?

10   A.    I mean, you get a licensed plumber and he's got

11   insurance and everything, you pay him for two or three

12   days' work.

13   Q.    Okay.  The gentlemen that were helpers on this job,

14   did you consider them contract labor?

15   A.    Yes, I did.

16   Q.    Okay.  And is that because you were just paying them

17   by the day for whatever they worked?

18   A.    That's right.

19   Q.    And did you consider them your employees as well?

20   A.    Really I didn't.  That's a question that's hard to

21   answer 'cause I took out workers' comp. to cover them but

22   they weren't doing plumbing.  You know, they would be

23   cleaning up.  One guy was cleaning, was helping.

24   Q.    Okay.  But they would be doing things like soldering

25   pipes sometimes?

1   A.   Yes.

2   Q.   Or going up on ladders to install things?

3   A.   Right.

4   Q.   And so was it your understanding that by applying for

5   workers' compensation and giving the answers that you gave

6   to the agent that you would be covering them under

7   workers' compensation?

8   A.   That's correct.

9   Q.   I'll just turn your attention to that for a moment.

10  I know we're changing gears a lot.

11       Okay.  How did you come to go to FieldEddy Insurance

12  for workers' comp.?

13  A.   I went to them because they had a good reputation and

14  they were in my town.

15  Q.   Okay.

16  A.   And close by.

17  Q.   Did you know any agents there or had you had any

18  dealings with them before?

19  A.   No, I never had any dealings with them before.

20  Q.   Okay.  And do you remember your first contact?  Did

21  you go in person or call them up?

22  A.   I went in person to the reception desk and they

23  referred me to Peggy.

24  Q.   You told them what you were looking for?

25  A.   Yes.

1   Q.   And at that point it was just workers' compensation

2   coverage?

3   A.   Right.

4   Q.   And that's because you had a liability insurance

5   policy that was still in effect?

6   A.   Right.  It was supposedly with Scanlan.

7   Q.   And was the agent able to meet with you the first

8   time you went into FieldEddy?

9   A.   I believe so, yes.

10   Q.   And did that agent take you to her desk or conference

11   room; do you remember exactly?

12   A.   I was in a conference room and I guess she took some

13   questions.  I answered them.

14   Q.   Did she ask you what you were looking for and why you

15   were looking for it?

16   A.   Yes.

17   Q.   Did you tell her about this job at all you were on?

18   A.   I told her I was taking over a job and I needed

19   workers' comp. for that job.

20   Q.   Okay.  And she asked you questions like how much your

21   payroll is going to be?

22   A.   She asked me, yes.

23   Q.   How many employees you were going to have?

24   A.   How many employees.

25   Q.   How your business was set up?

1    A.    Yes.

2    Q.    And whether you used subcontractors, are those the

3    types of questions that she was asking you?

4    A.    Yes.

5    Q.    And did you answer those questions honestly?

6    A.    I believe I did, yes.

7    Q.    And turning your attention particular to the question

8    that's at the heart of this case, when she asked you how

9    your legal entity was or how you were set up --

10    A.    I was set up as an individual plumber.

11    Q.    You believed that to be true?

12    A.    Yes, I believe that to be true.

13    Q.    And as we're sitting here today now after all this

14    has happened, do you still believe that that's true?

15    A.    I still believe that's true.  I always worked as

16    myself and if I needed to hire somebody, I would hire

17    them.  Like a plumber, I would hire them as they would be

18    working under -- they have insurance and they would be

19    working as a subcontractor.

20    Q.    Okay.  Let me ask you this, sir, when you answered

21    that question, had you ever filed a partnership tax return

22    in the past?

23    A.    No, I never have.

24    Q.    You file as an individual?

25    A.    Right.

1  Q.    And is there a schedule on your tax return that

2  covers an individual in business for themselves?

3  A.    Right.  Yeah.

4  Q.    That's the schedule that you would complete on your

5  tax return every year?

6  A.    That schedule, right.

7  Q.    And was there anything at that point in time when you

8  had met with Ms. Grundstrom for the workers' compensation

9  coverage that would lead you to believe that you were

10  anything but a sole proprietor or an individual doing

11  business?

12  A.    Not that I can recall.

13  Q.    Okay.  Because you had not even started this job at

14  that point, right?

15  A.    Right.  No.

16  Q.    And so you got the coverage, is it fair to say?

17  A.    Yes, I got the coverage.

18  Q.    So did you get it on the spot or did you receive a

19  phone call later that you had to bring down some money to

20  make that coverage go into effect for the workers'

21  compensation?

22  A.    I believe it was a few days after that that they

23  notified me that I had the insurance and it was going to

24  be so much and I brought them a check for the amount.

25  Q.    Okay.  And to your recollection, you can tell me if

1   you don't, did you bring a check for the whole thing or

2   pay them in installments?

3   A.   I believe I paid them for the whole thing.

4   Q.   Okay.  And at some point did they give you a

5   certificate of insurance to show that you had workers'

6   compensation coverage?

7   A.   Yes, that's correct, they did.

8   Q.   And did you need to show that in order to get the

9   permit for this job?

10  A.   That's right.

11  Q.   I'm just going to ask a couple questions.  I know

12  we're getting close.

13          THE COURT:  Yeah.

14  Q.   (By Mr. Burstein)  I want to ask about the names that

15  you did business as over the years.

16          THE COURT:  Since you're transiting to another

17  area, why don't we stop and take the lunch break.

18          MR. BURSTEIN:  Thank you.

19          THE COURT:  Ladies and gentlemen, we'll take our

20  lunch.  Remember do not begin to discuss the case with

21  each other, do any investigation or try to access any

22  information on your cell phone or the Internet in any way.

23  All right.  We will take an hour for lunch.

24  **(A recess was taken at 1:09 until 2:15.)**

25          THE COURT:  Good afternoon.  You could be

1    seated.  Was everyone able to comply with my request not

2    to begin discussing the case or begin deliberations, do

3    any investigation of the case?  All right.

4        I see all affirmative response.  The jury remains

5    fair and impartial and we are ready to pick up on the

6    cross.

7              MR. BURSTEIN:  Yes, Your Honor.

8              THE COURT:  Very well.  Start whenever you're

9    ready.

10             MR. BURSTEIN:  Thank you.

11   Q.   (By Mr. Burstein)  Good afternoon, Mr. Lodigiani.

12   A.   Good afternoon.

13   Q.   You understood that you're still under oath?

14   A.   I do.

15   Q.   Okay.  You can hear me okay?

16   A.   I can hear you.

17   Q.   Great.  Just before the break I was going to ask you

18   a question and I guess I'll reframe it.

19       It was pointed out to you in direct examination that

20   at some point you needed workers' comp. insurance and you

21   went -- and you filled out or an agent helped you fill out

22   an application for workers' comp. insurance, is that

23   correct?

24   A.   That's correct.

25   Q.   And when it says who the insured is on that

1    application for insurance, it says Leonard C. Lodigiani

2    doing business as d/b/a L.B. Plumbing, is that correct?

3    A.    That's correct.

4    Q.    Okay.  Do you understand what d/b/a stands for?

5    A.    Yes.

6    Q.    Okay.  And can you tell me what L.B. Plumbing stands

7    for, what the L.B. is?

8    A.    L.B. that's an old name I had, Leo Bones.

9    Q.    And when you -- in other parts of the application

10   sometimes it lists other things that you've done in that

11   application or you've used different names, is that

12   correct?

13   A.    That's correct.

14   Q.    And is one of those names L.C. Lodigiani?

15   A.    That's correct.

16   Q.    And have you also used the name L.C. Lodigiani

17   Plumbing and Heating?

18   A.    That's correct.

19   Q.    Sometimes do you use Leonard C. Lodigiani Plumbing

20   and Heating?

21   A.    That's correct also.

22   Q.    Sometimes do you use L.B. Plumbing and Heating?

23   A.    Yes.

24   Q.    And sometimes you just use your name with nothing

25   after it?

1   A.   That is correct.

2   Q.   Leonard C. Lodigiani?

3   A.   Right.

4   Q.   Okay.  Sometimes it's just L.C. Lodigiani like it is

5   on your letterhead?

6   A.   That's correct.

7   Q.   Why did you use so many names?

8   A.   Well, I really can't answer that.  It just occurred

9   to me that I just wrote it down.

10  Q.   Okay.  Were any of those names intended to mean that

11  you are a partnership?

12  A.   No.

13  Q.   And were any of those names used for a partnership

14  ever?

15  A.   No, never.

16  Q.   And do you recall at some point after obtaining

17  workers' compensation insurance going back to FieldEddy

18  Insurance to get liability insurance?

19  A.   I do recall.

20  Q.   Okay.  And to your knowledge, sir, did you meet with

21  the same person you had meet with initially?

22  A.   With Peggy, yes.

23  Q.   That's Peggy Grundstrom?

24  A.   Yeah.

25  Q.   And you met with her in person?

1    A.    I met with her, yes.

2    Q.    Okay.  And did she take you to a conference room

3    again?

4    A.    She did.

5    Q.    Okay.  And did she go through the whole same series

6    of questions that she had initially asked you, or did she

7    simply ask you if everything was the same?

8                MR. STEWART:    I object to the form, Judge.

9                THE COURT:    Overruled.

10   Q.    (By Mr. Burstein)  I'll ask the question again, sir.

11   A.    Yeah.

12   Q.    When she took you back to the conference room, did

13   she ask you the whole series of questions again that you

14   had answered in the workers' compensation meeting or did

15   she simply ask if everything was the same?

16   A.    I believe she asked me if everything was the same,

17   but I'm not sure of that.

18   Q.    Okay.  And was everything the same at that point in

19   time?

20   A.    Everything was the same.

21   Q.    Okay.  And did she tell you she had an insurance --

22   did she tell you on the spot or at that time that you had

23   an insurance policy or did you hear about that later in

24   time?

25   A.    Later.

1    Q.    Okay.

2    A.    I heard about it later.

3    Q.    How did you hear that she had found an insurance

4    company that was willing to provide the insurance?

5    A.    Probably the day after.

6    Q.    Did that happen in person or on the telephone?

7    A.    On the telephone.

8    Q.    Okay.  And if you recall, sir, what did you have to

9    do to make that policy go into effect?

10   A.    She wanted a payment and I paid the whole thing as I

11   went in to pick up the policy.

12   Q.    That would have been for the policy premium?

13   A.    That's correct.

14   Q.    Okay.  And you went down to the agency and did that

15   in person with Ms. Grundstrom?

16   A.    Yes, I did.

17   Q.    And again, sir, did they give you a certificate of

18   insurance showing that you had coverage after that?

19   A.    They gave me a certificate of insurance and I brought

20   it to South Hadley Town Hall to get a permit.

21   Q.    Okay.  And do you have a recollection as we sit here

22   today of whether you ever saw the actual application that

23   Ms. Grundstrom filled out at the time when you were

24   sitting with her?

25   A.    I don't recall.

1    Q.   I'm going to take you back to the meeting that you

2    had with Mr. Yildirim who was the person that hired you,

3    is that correct?

4    A.   Yes.

5    Q.   Do you remember that meeting taking place?

6    A.   Yes, I do.

7    Q.   And at that meeting you discussed the scope of the

8    project?

9    A.   Yes.

10   Q.   Okay.  As far as how much work you would be doing?

11   A.   That's it.

12   Q.   Did you discuss who was going to be in control of the

13   job?

14   A.   Yes.  I was.  I told him I would take over the job

15   and everything would be under my license.

16   Q.   Okay.  Did he ask you if you had a master plumbing

17   license?

18   A.   Yes, he did.

19   Q.   Okay.  You told him that you did?

20   A.   Right.

21   Q.   And did he explain to you that you would need the

22   various insurances that you would have to go out and get?

23   A.   That's correct.

24   Q.   And did you have any discussion with him about you

25   and Mr. Brantley being in a partnership?

1    A.   No, I had no one.

2    Q.   And did he make any indication to you that he

3    believed that you and Mr. Brantley were in a partnership?

4    A.   No, he didn't.

5    Q.   When you were working on the project in your

6    day-to-day work on this project, how many times, if you

7    recall, were you actually at the scene working?

8    A.   How many times?  I'd say all the time that the job

9    was going.

10   Q.   Okay.  If I represented that you had testified

11   earlier that it was between five and ten times that you

12   were actually at the site working prior to the fire, does

13   that sound correct?

14   A.   That sounds right, yes.

15   Q.   Do you have any recollection as we sit here today

16   exactly how many times you were at the site working?

17   A.   No, I don't have any.

18   Q.   Would there have been any full days that there were

19   people there working on the plumbing that you were not

20   there?

21   A.   I don't believe so, no.

22   Q.   And did you take any action that would have led

23   anyone else to believe that you were not the person in

24   charge of this job?

25              MR. STEWART:  Objection to the form, Your Honor.

1      THE COURT:  Sustained.  The question will be
2   disregarded.
3   Q.   (By Mr. Burstein) Did you ever represent to anyone
4   that you were not in charge of this project?
5   A.   No.
6   Q.   Now after you were hired by the owner --
7   A.   Yes.
8   Q.   -- you signed the scope of the work?
9   A.   Yes.
10  Q.   And that was dated in September, right?
11  A.   I don't know exactly the date but could have been.
12  Q.   Okay.
13      MR. BURSTEIN:  If I could have a moment, Your
14  Honor?
15      THE COURT:  Yes.
16      MR. BURSTEIN:  Your Honor, may I approach the
17  witness?
18      THE COURT:  Yes.
19      MR. BURSTEIN:  Thank you.
20  Q.   (By Mr. Burstein) I'm going to show you, Mr.
21  Lodigiani, what's been marked as -- pre-marked as Exhibits
22  No. 9 and No. 10 and ask you if you could take a look at
23  those?
24  A.   Okay.
25  Q.   Sir, have you seen those documents before?

1   A.    Yes.

2   Q.    Okay.  And you are familiar with both of those

3   Exhibits, No. 9 and 10?

4   A.    Yes.

5   Q.    And can you explain what those are?

6   A.    That's the scope of the work at Bridge Street in

7   South Hadley.

8   Q.    Okay.  And is there a difference between the first

9   one, which is Exhibit 9, and the second one, which is

10  Exhibit 10?

11  A.    Exhibit 10 is more detailed.

12  Q.    Okay.  Was that due to the plumbing inspector saying

13  there had to be additional work to be done?

14  A.    That is correct.

15  Q.    Is that your signature on those two documents?

16  A.    Yes, it is.

17  Q.    And can you tell the jury what the date is on those

18  documents starting with Exhibit 9?

19  A.    Exhibit 9 is, let me see, 9/10 -- I can't see that.

20  Q.    September 10th, sir?

21  A.    Yes, September 10th.

22  Q.    Can you read the date on Exhibit No. 10?

23  A.    Nine -- I think it's 9 -- I don't know whether that's

24  an eleven or twelve and that's the twelfth.

25  Q.    2012?

```
 1    A.    Yes.

 2              MR. BURSTEIN:  May I approach the witness?

 3              THE COURT:  Yes.

 4    Q.    (By Mr. Burstein) And the date on those documents is

 5    before you even knew about this job, is that correct?

 6    A.    Yes.

 7    Q.    Okay.  And so --

 8    A.    Well, the second one was after the inspector was

 9    there so I knew about it, the details.

10    Q.    I'll clarify my question for you.

11         The date on the document on the second one you said

12    is 9/11 or 9/12/2012?

13              THE COURT:  Just so we can keep track of the

14    record, when you're referring to a document, just refer to

15    the exhibit number so that if you introduce them, the

16    record will be clear.

17              MR. BURSTEIN:  Thank you, Your Honor.  I'm

18    referring to Exhibit No. 10 which says plumber second

19    agreement at the top.

20    Q.    (By Mr. Burstein)  You testified that was dated 9/11

21    or 9/12/2012?

22    A.    Yes.

23    Q.    You weren't on the project at that point in time, is

24    that correct?

25    A.    I went there and met the inspector.
```

1    Q.    Again, sir, just to orient you, you've testified

2    earlier that you went and applied for workers' comp.

3    insurance in October of 2012, right?

4    A.    Right.

5    Q.    And you testified that you took out a permit in

6    November of 2012?

7    A.    Right.

8    Q.    So when this document is dated September 2012, did

9    you even know about this project in September of 2012?

10   A.    No.  No.

11   Q.    Okay.  So you signed the document that had been dated

12   earlier, is that correct?

13   A.    Right.

14   Q.    And that would be true for both Exhibits 9 and 10?

15   A.    That's correct.

16   Q.    In fact, in September 2012 you didn't know anything

17   about this project, is that correct?

18   A.    No, that's right.

19          THE COURT:  As you've referenced Exhibit 9 and

20   10, have they been admitted yet?  Are you moving to admit

21   those?

22          MR. BURSTEIN:  I will move to admit those, Your

23   Honor.

24          THE COURT:  No objection?

25          MR. STEWART:  No, Judge.

1          THE COURT:  Very good.  Exhibits 9 and 10 are

2    admitted.

3    **(Defendants' Exhibits 9 + 10 admitted.)**

4          MR. BURSTEIN:  Thank you, Your Honor.

5          THE COURT:  Give them to the clerk to maintain

6    after they are admitted.

7          THE CLERK:  Thank you.

8    Q.   (By Mr. Burstein) You're friends with Mr. Brantley,

9    is that fair to say?

10   A.   That's correct.

11   Q.   You've been friends with him for over 30 years?

12   A.   Forty years.

13   Q.   Forty years.

14        And you certainly worked on plumbing projects without

15   him over those years?

16   A.   That's correct.

17   Q.   And he worked on plumbing projects without you?

18   A.   Right.

19   Q.   Is it fair to say that in September of 2012 that he

20   was working on this plumbing job without you?

21   A.   That's correct.

22   Q.   And without you even having any knowledge of the job,

23   right?

24   A.   Right.

25   Q.   And if you were partners with him, you would

1    certainly know what job that your partner was doing,

2    right?

3    A.    That's correct.

4    Q.    And when Mr. Brantley told you about -- when Evins

5    Brantley told you about this project after his son was no

6    longer on the job --

7    A.    Right.

8    Q.    -- he explained the scope of the job to you, right?

9    A.    That's correct.

10   Q.    And he suggested that you would have to meet with the

11   owner?

12   A.    That's right.

13   Q.    He set up that meeting for you?

14   A.    That's right.

15   Q.    And at some point time did you have a discussion with

16   Mr. Brantley, a detailed discussion with Mr. Brantley

17   about this project?

18   A.    We did, yes.

19   Q.    Okay.  And did you discuss about how he was going to

20   get paid for the project?

21   A.    I discussed with him that I would take the job over

22   and after everything was paid for, we would split the

23   profit.

24   Q.    That would be his pay?

25   A.    That would be his pay.

1    Q.   And in exchange for that he agreed to work at the
2    job, right?
3    A.   That's right.
4    Q.   And that he agreed that his helpers would be at the
5    job?
6    A.   That's right.
7    Q.   And did you ever come to an agreement with him,
8    either expressed or implied, that you and he would be in a
9    partnership or a joint venture with respect to this job?
10   A.   No, never.
11   Q.   Did you ever have any agreement with him that when
12   you were not on the site that he would be running or he
13   would be the one in control of the job?
14   A.   No, we didn't have that agreement but that comes
15   automatically with him having a journeyman's license.  He
16   can run the job.
17   Q.   Okay.  Who was in charge of this job once you took
18   over?
19   A.   This job was my job.
20   Q.   Okay.  And after you were hired by the owner, did Mr.
21   Brantley have any direct interactions with the owner to
22   change the scope of the project?
23   A.   I don't believe so, no.
24   Q.   Okay.  Was Mr. Brantley involved with the going and
25   purchasing of equipment or supplies with the owner or

1    anything along those lines?

2    A.   No, he wasn't.

3    Q.   Was there any discussion with Mr. Brantley about him

4    paying for half of the expenses that you were going to

5    incur upfront like the insurance experiences?

6    A.   Never.  Never.

7    Q.   Did he ever come up with any money or anything as far

8    as --

9    A.   He never had --

10         COURT REPORTER:  Excuse me, one at a time.

11    Q.   (By Mr. Burstein)  I'm sorry, sir.  It's easier if

12    you can wait until I fully ask my question and then you

13    answer, that way the reporter can take down everything.

14    A.   Okay.

15    Q.   So was there any expressed agreement with Mr.

16    Brantley that he was going to pay you upfront for half of

17    the cost or put in anything towards this project upfront?

18    A.   No, there wasn't.

19    Q.   Okay.  He was simply going to be paid half of the net

20    profits?

21    A.   At the end of the job.

22    Q.   That was for his pay?

23    A.   That was for his pay.

24    Q.   He wasn't getting an hourly wage?

25    A.   No.

1    Q.   And did you have any discussion with Mr. Brantley

2    that if something went wrong on the job, that he would be

3    responsible for liability?

4    A.   No, never.

5    Q.   If something went wrong on this job, what was your

6    understanding as to who would be responsible?

7    A.   I thought my insurance company would be responsible.

8    Q.   With respect to your agreement with the owner --

9    A.   Yes.

10   Q.   -- for this job, did you have an agreement with him

11   as to how or when you were going to get paid?

12   A.   I thought it would be at the end of the job, but I

13   did not have an agreement.

14   Q.   Would all the money come to you or would some money

15   go directly to Mr. Brantley?

16   A.   It would all come to me.

17   Q.   And that's because it was your job?

18   A.   It was my job.

19   Q.   I just want to turn your attention, sir, to after the

20   fire happened.  Okay?

21   A.   Yes.

22   Q.   You testified earlier that someone let you know that

23   there had been a fire late the night on January 28, 2013,

24   correct?

25   A.   Yes, correct.

1    Q.    And you and Mr. Brantley and the two helpers had all

2    been working at the location on that date?

3    A.    Yes, we were working that day.

4    Q.    And one or more people were using torches on that

5    date?

6    A.    Yes.

7    Q.    And you were asked at some point to gather the crew

8    and come out to the site that night?

9    A.    I was not asked to go to the site at all.  I took

10    that upon myself to go there.

11    Q.    Okay.  So when someone told you about the fire, you

12    decided to go out there?

13    A.    Yes.

14    Q.    Did other members of the crew that were working on

15    that job go out there as well?

16    A.    I didn't see anybody else there.

17    Q.    And after that night were you asked by your insurance

18    company to go back out to the site to meet people?

19    A.    I believe so.  I believe they asked me to meet with

20    whoever was going to do the site at the fire.

21    Q.    Okay.  And do you know if it was -- did you ever have

22    a chance to meet Mr. Trudeau out at the site prior to the

23    time that he took your recorded statement?

24    A.    No.  I believe I met him there at that time.  I'm not

25    sure whether it was him but I believe it was Mr. Trudeau

1    who came there.

2    Q.    Okay.  I just want to be clear about your answer.

3    A.    Yeah.

4    Q.    Did you meet Mr. Trudeau at the site of the fire

5    before you met him in Mr. Doyle's office?

6    A.    I believe I did.  I'm not sure if it was him or

7    somebody else.  I met him when -- I met him in Mr. Doyle's

8    office, that's when I first, you know, was introduced to

9    him.

10   Q.    Okay.  Is it fair to say, sir, that you met someone

11   who was hired by the insurance company to investigate the

12   fire at the scene prior to the time you met at Mr. Doyle's

13   office?

14   A.    That's correct.

15   Q.    And was Attorney Doyle present at the scene when you

16   met with the other individual from Preferred Mutual?

17   A.    What's that question?

18   Q.    Was Attorney Doyle present at the scene of the fire

19   when you met with this other individual?

20   A.    I don't believe so.

21   Q.    Okay.  That would have been just whoever the

22   investigator was?

23   A.    Right.

24   Q.    Okay.  Had you ever met with Mr. Doyle, Attorney

25   Doyle, prior to the time you went to his office to give a

1    recorded statement?

2    A.    I don't believe so.

3    Q.    And how did that recorded statement come about, sir?

4    A.    That recorded statement?

5    Q.    How did you come to end up at his office?

6    A.    I went to his office because that's where he wanted

7    to do the interview or the whatever.

8    Q.    Okay.  I guess what I'm asking you is did you receive

9    a phone call from Mr. Trudeau and a phone call from

10   Mr. Doyle or someone else from the insurance company, how

11   did you know that you had to be there on that particular

12   date?

13   A.    I believe Mr. Doyle's office called me that I had to

14   go there to meet him to take a statement.

15   Q.    Okay.  And do you have an understanding as to whether

16   they were taking other individuals' statements on that

17   same date?

18   A.    Yes.  They told me that Mr. Brantley would go and

19   whoever worked at the job to go there.

20   Q.    And did you drive together with Mr. Brantley?

21   A.    Yes, I drove with Mr. Brantley and one other person.

22   Q.    Okay.  That was one of the helpers?

23   A.    That was one of the helpers, yes.

24   Q.    You drove from Springfield or East Longmeadow out to

25   --

1    A.    Yes.

2    Q.    -- Mr. Doyle's office in Quincy?

3    A.    That's correct.

4    Q.    Again I'm just going to ask you to wait because I can

5    see that the reporter is having trouble taking down your

6    answers while I'm still asking.

7    A.    Okay.

8    Q.    Okay.  I'll try to slow down as well.

9    Do you remember what time of day you were asked to be

10    there to give that statement?

11    A.    I was asked to be there I believe by ten in the

12    morning.

13    Q.    And when you got there, did the statement start right

14    away or what happened?

15    A.    No.  We got there and I sat down and they introduced

16    and then I believe Mr. Doyle asked me some questions.

17    Q.    When Mr. Doyle asked you some questions, was that

18    before the formal process started?

19    A.    That was before the formal process started.

20    Q.    Okay.  And were there other people present during

21    that or were you meeting with him alone?

22    A.    I was meeting with him alone.

23    Q.    And if you recall, sir, was that in a conference room

24    or in his office?

25    A.    It was in a conference room.

1    Q.   And there was no one else present during that
2    discussion?
3    A.   No.  No one was there.
4    Q.   And was that before, during, or after the recorded
5    statement started?
6    A.   That was before.
7    Q.   And did you know how long that meeting lasted?
8    A.   That meeting lasted about three quarters of an hour.
9    Q.   I'm talking about the meeting that you had with Mr.
10   Doyle before the statement.
11   A.   No, that was about ten minutes.
12   Q.   Okay.  And you said Mr. Doyle asked you some
13   questions, what type of questions did he ask you?
14   A.   Well, he asked me what was my relationship with
15   Brantley and asked me how he was on the job.  He asked me
16   if he was a partner.  I said, no, he's not a partner.  He
17   was an employee or working with me.
18   Q.   Did he ask some follow-up questions about how you
19   were paying him?
20   A.   I'm not sure that he asked me that.
21   Q.   Okay.  Did he get into the area of asking you that
22   you were splitting profits?
23   A.   Yes.  He asked me how are you -- how are you going to
24   pay Brantley and I told him when the job was over, that he
25   would get half of the profits.

1    Q.    Did he ask you any other questions about how your

2    business was being run?

3    A.    Yes.  He said, well, at that time he told me, well,

4    if he's splitting the profits, that's a partnership and he

5    said that's the way it is.  You know, you're a partner

6    with him and I agreed with him.

7    Q.    Did he ask you any other questions to make that

8    determination or before he told you that?

9    A.    I don't recall any of the questions he asked at the

10   time, but.

11   Q.    What happened after that ten-minute meeting with Mr.

12   Doyle?  What happened next?

13   A.    Well, then somebody came in to start recording the

14   conversation.

15   Q.    Okay.  That would have been Mr. Trudeau?

16   A.    Yes, that was Mr. Trudeau.

17   Q.    The gentleman who testified earlier, did you

18   recognize him?

19   A.    Yeah.

20   Q.    And he was the one who took the statement from you?

21   A.    Yes.

22   Q.    And who else was present in the room while that

23   statement was being taken?

24   A.    Mr. Doyle and Mr. Trudeau.

25   Q.    Okay.  It was the two of them and you?

1    A.    Right.

2    Q.    And that statement started with Mr. Trudeau asking

3    questions of you?

4    A.    That's correct.

5    Q.    And I think you testified during direct examine that

6    shortly after the questions started the tape was paused

7    for a moment?

8    A.    I believe so.

9    Q.    Okay.  Did anything happen while the tape was paused?

10    Did you have any other discussions with anyone?

11    A.    No, I don't recall.

12    Q.    Okay.

13    A.    That was awhile ago.

14    Q.    Okay.  And then at some point in time the tape

15    recorder was turned back on?

16    A.    That's correct.

17    Q.    At that point in time was it Mr. Doyle who was then

18    asking the questions?

19    A.    God, I don't recall.

20          MR. BURSTEIN:  If I could have a moment, Your

21    Honor?

22          THE COURT:  Sure.

23    Q.    (By Mr. Burstein) Sir, I'm going to show you what's

24    been marked as Exhibit No. 12 and it's already entered

25    into evidence.  I represent to you that this is a

1    transcription of a tape-recorded statement that was taken

2    from you.

3    A.    Okay.

4    Q.    I'm going to ask you to take a look at it.  It has

5    initials to the left of each statement to indicate who was

6    talking.

7    A.    Yes.

8    Q.    And so I'm just going to have you take a look at that

9    and the pause on the tape is on page 1 and then I'm going

10   to ask you to just take a look at that.

11   A.    Yes.

12          MR. BURSTEIN:  May I approach, Your Honor?

13          THE COURT:  Yes.

14   Q.    (By Mr. Burstein)  Sir, does that document refresh

15   your recollection?

16          THE COURT:  Just one moment.  Go right ahead.

17          MR. BURSTEIN:  Thank you, Your Honor.

18   Q.    (By Mr. Burstein) Mr. Lodigiani, does that refresh

19   your recollection as to who started with the questioning

20   after the tape was paused?

21   A.    Yes.

22   Q.    Who was questioning you after the tape was paused?

23   A.    Let me see.

24   Q.    Or what are the initials?

25   A.    Initials J.T. and the other one is J.D.

1   Q.   Okay.  So if we understand that J.T. was Mr. Trudeau
2   and J.D. was Attorney Doyle, can you tell by that document
3   who started asking you questions after the tape recorder
4   was turned back on?
5   A.   Yes.
6   Q.   Who started asking you questions after the tape
7   recorder was turned back on at the very beginning?
8   A.   Mr. Trudeau.
9   Q.   Okay.  Within a question did Mr. Doyle start asking
10  you questions?
11  A.   Let's see.  Yes.
12          MR. BURSTEIN:  May I approach, Your Honor?
13          THE WITNESS:  Down here is Mr. Doyle.
14  Q.   (By Mr. Burstein) So I'm just going to read you from
15  the transcript and ask if that refreshes your memory, Mr.
16  Lodigiani.
17      It says J.T., which presumably is Mr. Trudeau, "Okay.
18  I'm going to pause this tape.  The taking of this
19  statement is being done with Attorney Joseph Doyle.  Go
20  ahead."
21      Then it says J.D., presumably Attorney Doyle, "Leo,
22  do you mind -- Leo is what they call you, correct?"
23      "Yes."
24      And then the first question, "You have a sole
25  proprietorship, right, Leo?"

A. Yes.
Q. And you answered yes?
A. Right.
Q. Did you believe that to be a false statement then?
A. No.
Q. But that was different than what Attorney Doyle had told you in the beginning before the statement was taken?
A. That's correct.
Q. And then Mr. Doyle asks you some leading questions like "And but for this particular job on Bridge Street, you agreed to do it as partners with Evins Brantley?"
A. Yes, as a partner.
Q. You say, "That's correct?"
A. Right.
Q. What did you mean by that, sir?
A. Well, after doing a lot of work I called Brantley like a partner, like doing work together.
Q. You worked with him on a lot of projects together?
A. Yes.
Q. And you worked side by side with him on projects?
A. Right.
Q. And you've done work with him in the past on projects where you've agreed to split the net profits?
A. That's correct.
Q. Whenever you're working together under your master's

1    license, who was in charge?

2    A.   I am.

3    Q.   Is he able to make decisions as to the scope of the

4    project?

5    A.   He is able to make decisions, yes.

6    Q.   But as to the scope of the work to be done?

7    A.   No, that was mine.

8    Q.   And who was the insurance under when you were working

9    together with him on any of these types of projects?

10    A.   It used to be all my insurance.

11    Q.   That's because you're responsible under your master's

12    license?

13    A.   Yes.

14    Q.   As we sit here today, sir, do you have any doubt in

15    your mind that you're anything but a sole proprietor?

16    A.   No, I don't have any doubt.

17          MR. BURSTEIN:  Thank you, sir.

18          THE COURT:  Thank you.

19          MR. BURSTEIN:  Nothing future at this time, Your

20    Honor.

21          THE COURT:  Counsel.

22          MR. ZELLE:  Thank you, Your Honor.

23

24

25

**CROSS-EXAMINATION**

Q.    (By Mr. Zelle) How are you doing, Mr. Lodigiani?

A.    What?

Q.    Are you doing all right?

A.    I'm doing fine.

Q.    Do you need a drink or anything?

A.    No.

Q.    Please let me know if you're uncomfortable or obviously if you can't hear me.

Can you tell us about the first meeting you had in October of 2012 with Peggy Grundstrom?

A.    The first meeting was when I applied for workmen's comp. and she asked me -- I told her I needed workmen's comp. for the job in South Hadley and then she asked me some questions and I answered to get the workmen's comp.

Q.    Tell us what you remember about the questions she asked you.

A.    Let's see, she asked me -- I'd have to look at it.  I don't recall.

Q.    Okay.  Let me help you and again I'm trying to not put words in your mouth, but did you discuss with her the structure, the legal structure of your business?

A.    Yes.  I told her I was a sole proprietor and that I was taking a job that required workmen's comp. because we were having some other work, some other people working for

1   me.

2   Q.   Okay.  And did she read to you from the application

3   this -- if I can grab the exhibit, please, thank you.

4        Do you see on the monitor in front of you, did she

5   read to you this question about legal status?

6   A.   Yes.

7   Q.   Do you remember her reading it actually to you and

8   then --

9   A.   Yes.

10  Q.   Please wait until I finish.

11  A.   Okay.

12  Q.   Actually reading to you the specific options there?

13  A.   Yes.

14  Q.   And when you applied a few months later for the

15  liability policy, it was issued by Preferred Mutual?

16  A.   Right.

17  Q.   Did she read any questions to you off of an

18  application?

19  A.   I don't recall her reading me anything.

20  Q.   Do you recall any specific discussion about legal

21  status?

22  A.   I just told her that I needed workmen's comp. and

23  that my insurance with Scanlan had run out and I needed

24  it.

25  Q.   I'd like to now move to the conversation that you

1   spoke with Mr. Burstein about with Mr. Doyle.

2   A.    Yes.

3   Q.    And again just tell us what you recall about that

4   ten-minute conversation in Mr. Doyle's office before you

5   gave your recorded statement.

6   A.    Well, we were on a discussion of what my relation

7   with Mr. Brantley was and I told him I was taking this job

8   where the fire occurred and he was going to be -- he was

9   an employee of mine.  I told him that after -- he got the

10  job for me, Mr. Brantley got the job for me, and then

11  after the job was completed he would share in half of the

12  profits.

13  Q.    And then what did Mr. Doyle say?

14  A.    He told me, well, that's a partnership.

15  Q.    And what did you think about that?

16  A.    Well, he was telling me so I agreed with him.

17  Q.    At that time did you have any understanding that the

18  legal organization of your business could have an impact

19  on whether or not your policy would be in effect?

20  A.    No, I did not.

21  Q.    When you spoke with Mr. Brantley back in October --

22  this is Evins Brantley?

23  A.    That is correct.

24  Q.    -- about the job, he referred you to Mr. Yildirim,

25  right?

1    A.    Right.

2    Q.    What was your understanding of why you were going to

3    be paying Mr. Brantley half of the profits?

4    A.    I was going to be paying him half the profits for the

5    labor that he was going to do and because he got the job.

6              MR. ZELLE:  I don't have anything else.  Thanks,

7    Your Honor.

8              THE COURT:  Thank you.

9              MR. GIROUARD:  Your Honor, I'll be very brief,

10   perhaps just a housekeeping matter.

11             MR. ZELLE:  You want to pull the document off?

12             MR. GIROUARD:  May I approach?  That's Exhibit

13   2.

14             THE CLERK:  Thank you.

15   **CROSS-EXAMINATION**

16   Q.    (By Mr. Girouard) I'm showing you what's been marked

17   as Exhibit 11 for identification; do you recognize that

18   document?

19   A.    Yes.

20   Q.    And, sir, is that the invoice that you sent or

21   delivered to my client Mr. Yildirim on or about January

22   30, 2013?

23   A.    That's correct.

24   Q.    And was that a bill that you submitted for the labor

25   that was performed prior to the fire?

1    A.    That's right.

2    Q.    And you submitted that to my client on a preprinted

3    letterhead that you used that identified L.C. Lodigiani

4    Master Plumber?

5    A.    That's correct.

6    Q.    And you delivered that because you were in charge of

7    the job?

8    A.    Right.

9    Q.    You were billing for the job?

10   A.    Right.

11   Q.    It was your job?

12   A.    It was my job.

13   Q.    You were responsible for the job?

14   A.    I was.

15   Q.    There was no partnership?

16   A.    No partnership.

17          MR. GIROUARD:  I'd ask Exhibit 11 be entered

18   into evidence.

19          THE COURT:  No objection?

20          MR. STEWART:  No objection.

21          THE COURT:  Thank you.

22          MR. GIROUARD:  No further questions.

23          THE COURT:  That will be admitted.

24   **(Defendant Exhibit 11 was admitted.)**

25

**REDIRECT EXAMINATION**

Q.    (By Mr. Stewart)  Now Mr. Zelle was asking you just a
moment ago about things that happened before you went on
to record the statement.

A.    Right.

Q.    Now, you've testified under oath at a previous
occasion that you do not recall anything happening at Mr.
Doyle's office before the recorded statement.  Now I
believe you also testified this morning that nothing
happened at Mr. Doyle's office before the recorded
statement.  Can you help me out there?

            MR. ZELLE:  Objection.

            MR. GIROUARD:  Objection.

            THE COURT:  Sustained.  The jury will disregard
the question.  Please rephrase.

            MR. STEWART:  Thank you, Judge.

Q.    (By Mr. Stewart) Sir, it's true, is it not, that you
have stated under oath on a previous occasion that you do
not recall anything happening at Mr. Doyle's office before
the recorded statement?

A.    I don't recall whether it was before or after they
stopped the tape.  There was so much to try to remember
there.

Q.    Well, it kind of makes a difference, doesn't it,
because you're saying that Mr. Doyle told you --

1    A.    That's right.

2    Q.    -- that he listened to what you were saying and said,

3    gee, that's a partnership?

4    A.    That's right.

5    Q.    However, if you look at the recorded statement, the

6    first time that anybody mentioned anything about partners

7    was when you said Evins Brantley "we're partners?"

8    A.    I said that -- let me answer that.

9              THE COURT:   Is there an objection?

10             MR. ZELLE:   Yes.

11             THE COURT:   Sustained.  The jury will disregard

12   that.

13        Attorney Stewart, please ask questions.  Do not make

14   statements to the witness.

15             MR. STEWART:   Thank you, Judge.

16   Q.    (By Mr. Stewart) Okay.  Let me go to folks, page 64,

17   the April 1, 2015, that's the deposition last Monday.

18             MR. ZELLE:   Objection.

19             MR. STEWART:   Page 64.

20             MR. ZELLE:   I'm not sure this is an exhibit.

21   This is a deposition transcript.  I'm not sure it should

22   be published to the jury.

23             THE COURT:   What's the purpose?

24             MR. STEWART:   To impeach him, Judge.

25             THE COURT:   That will be allowed.

1    Q.   (By Mr. Stewart) This was questions by me last

2    Monday?

3    A.   I can't --

4    Q.   Do you remember that, sir?

5    A.   I can't hear you.

6    Q.   Sorry.  I forgot to bring this over.  We okay now?

7    A.   Yes.

8    Q.   So here we go.

9         Let's talk about the day you gave the statement to

10   Mr. Trudeau.  Are you with me so far?

11        You said yes -- I'm having difficulty finding the

12   right place.

13        "Before that statement began, did anything else

14   happen before the statement?"

15        And your testimony at that point was "I do not recall

16   right now?"

17   A.   Yeah.

18   Q.   Okay.

19             MR. ZELLE:  Your Honor, I think for completeness

20   you need to go to line 20, Judge.

21             THE COURT:  You can cover that.

22             MR. ZELLE:  Okay.

23             THE COURT:  The objection is overruled.

24   Q.   (By Mr. Stewart) So let's skip to something else,

25   could we, Mr. Lodigiani?

```
1   A.   I can't hear you.

2   Q.   You said that --

3   A.   I can't hear you.

4   Q.   I'm sorry.  You applied for the workers' comp.

5   policy?

6   A.   Right.

7   Q.   Then later on you applied for the liability policy?

8   A.   That's right.

9   Q.   You told Peggy everything is the same?

10  A.   Well, it's the continuation of what I had with the

11  Scanlan policy.

12  Q.   You said everything is the same?

13  A.   Right.

14  Q.   And what you meant is between the information you

15  gave her on the workers' comp. policy and the information

16  was the same at the time of the application for the

17  Preferred Mutual liability policy, correct?

18  A.   I believe I wanted everything was the same as the

19  policy that I had before.

20  Q.   Yeah.  Well, in the workers' comp. policy you said

21  you had two employees?

22  A.   Workmen's comp., yes.

23  Q.   By the time you had the liability policy, you had one

24  part-time employee?

25  A.   The liability?
```

1   Q.   Yes, sir.

2   A.   Yeah.

3   Q.   So can you agree with me that's not the same?

4   A.   Well, the one is Mr. Brantley and the other two were

5   the liability was just the workmen's comp.

6   Q.   Sir, my question is, you said there were two

7   employees at the time of the workers' comp. and you said

8   you had one part-time employee at the time of the

9   liability policy; are you with me so far?

10  A.   Well, I may have made a misstatement.

11              MR. ZELLE:   Objection.

12              THE COURT:   Overruled.

13  Q.   (By Mr. Stewart)  Do you agree with me that two

14  employees were disclosed on the workers' comp. policy?

15  A.   Yes.

16  Q.   Do you agree with me that one part-time employee was

17  disclosed on the liability policy?

18  A.   Yes.

19  Q.   Do you agree that those aren't the same?

20  A.   They're not the same, no.

21  Q.   There's a difference between those two?

22  A.   Right.

23  Q.   Okay.  Now, you testified a little while ago that you

24  felt the South Hadley job was your job?

25  A.   Correct.

1    Q.   Okay.  At other times you've said that you were

2    sharing the job with Mr. Brantley?

3    A.   The monetary part I was sharing with Brantley.

4    Q.   Well, you couldn't be sharing on the permit because

5    he couldn't apply for the permit, right?

6    A.   He couldn't apply for the permit.

7    Q.   But you told people that you were doing the job

8    together?

9    A.   Well, he got me the job, that's all.  I was doing the

10   job and he was my next -- like working with me.

11   Q.   Sir, I know but you told people that you were doing

12   the job together, correct?

13   A.   We were doing the job together, right.

14   Q.   Thank you.

15        And you testified that you thought that any

16   liabilities would be covered by insurance, correct?

17   A.   Right.

18   Q.   You're aware there are plenty of other liabilities

19   that aren't covered by insurance?

20   A.   I don't know.

21             MR. ZELLE:  Objection.

22             THE WITNESS:  I'm not an expert on it.

23             THE COURT:  I don't know the relevance.  If you

24   can circle around and show relevance.

25             MR. STEWART:  Let me try to lay a foundation and

1   go about it a different way.

2   Q.   (By Mr. Stewart)  Sir, you knew that there was

3   something a little different about Mr. Brantley?  You say

4   he's your employee today, right?

5   A.   Yes.

6   Q.   But employees they get paid every Friday, right?

7   A.   Not necessarily.

8            MR. GIROUARD:  Objection.

9            THE COURT:  Overruled.

10  Q.   (By Mr. Stewart)  You don't -- you're aware that

11  there are wage and hour laws that apply to paying people

12  for the time they work at least minimum wage?

13  A.   That's correct.

14  Q.   And you got to pay them every week; you can't wait

15  until the end of the job?

16  A.   That I didn't know.  I never realized that.

17  Q.   You didn't realize that?

18  A.   No.

19  Q.   Okay.  So you didn't realize that what you were

20  trying to call Mr. Brantley might not be legal?

21           MR. ZELLE:  Objection.

22           THE WITNESS:  Oh, come on now.

23           MR. ZELLE:  I'll withdraw the objection.

24           THE WITNESS:  Jesus.

25           THE COURT:  All right.

1          THE WITNESS:  It was always legal to do work and

2    pay him after the job.

3    Q.  (By Mr. Stewart) Okay.  And -- strike that.

4        Willie Costin, he wasn't a regular employee either,

5    right?

6    A.   No.

7    Q.   Okay.  And there might be liabilities from the way

8    that you deal with these employees that might not be

9    covered by a liability insurance policy?

10   A.   Well, they were Mr. Brantley's people that he brought

11   on the job.

12   Q.   So he would be responsible for that?

13   A.   I was responsible because I took out the workmen's

14   comp. that was required for the job.

15   Q.   I understand.  But when you have employees, you got

16   to pay their half or the employer half of Social Security,

17   don't you?

18   A.   Yes.

19   Q.   You got to pay unemployment?

20   A.   If they were his and they were paid as they go, what

21   do they call it?  Self-employed.  Anyway they were

22   Brantley's people.

23   Q.   But you can imagine there might be some liability if

24   somebody came looking with payroll taxes for those

25   employees, right?

1          MR. ZELLE:  Objection.

2          THE WITNESS:  I don't know.

3          THE COURT:  That's sustained.

4      Attorney Stewart, I don't know the relevance.  I'll

5  invite you to sidebar if you want to try to lay a

6  foundation where you're going with this.

7          MR. STEWART:  I guess -- well, let me talk to

8  you at sidebar, Judge.

9          THE COURT:  All right.

10  (Sidebar conference.)

11          THE COURT:  Can you tell me where you think

12  you're going?

13          MR. STEWART:  This gentleman keeps on saying

14  that they have liability on the part of both partners.

15  I'm trying to show that these guys shared some

16  obligations.  He said everything will be covered by

17  insurance and I'm getting to things not covered by

18  insurance.  Insurance isn't going to pay your payroll

19  taxes if you don't pay them.

20          THE COURT:  Well, there has been several

21  questions about liability and sharing of liabilities,

22  sharing of expenses, sharing of duties and managerial

23  parts of this job, and I think you're correct, I think

24  that's opened the door for Attorney Stewart to inquire as

25  to Mr. Lodigiani's knowledge of within the business and

trade liabilities in general, employees come and go, how

they're paid, I think that's fair.

MR. ZELLE:  I don't disagree with that.  My

concern is that it's confusing I think to be asking about

wage and hour laws in the form of the question.

I don't have a problem if he's asking either in a

general sense or very specifically did you have liability

for Mr. Brantley's employees.  That's fine.  He can go

there but it's the specificity of the question.

THE COURT:  I agree.  It is getting a little

confusing.  However, I think it's a fair area to be able

to probe about, look, if there's liability and employer

legal regulations with regard to how you treat and pay

employees, did Mr. Brantley know about them and did you

know about them.  I think it's fair area and you can

pursue it.

MR. ZELLE:  That's fine.

(End of sidebar conference.)

Q.   (By Mr. Stewart)  Sir, can you hear me okay?

A.   Yes.

Q.   Can you agree with me you were not doing tax

withholding for your employees at the South Hadley job?

A.   No, I wasn't.

Q.   And you were not remitting the employer's share of

Social Security on the employees at the South Hadley job,

1    correct?

2    A.    No, I wasn't.

3    Q.    And you were not making withholdings for unemployment

4    and sending that to the State for the employees at the

5    South Hadley job?

6    A.    No.

7    Q.    Right?

8    A.    Right.

9    Q.    And you could imagine that there's a potential that

10   there might be some liability for some of those issues?

11              MR. ZELLE:  Objection.

12              THE COURT:  Overruled.

13              MR. ZELLE:  Liability on whose part?  That's all

14   I'm looking for.

15              THE COURT:  All right.  Good point.  I will

16   sustain it on that point and just ask you to clarify.

17              MR. STEWART:  Okay.

18   Q.    (By Mr. Stewart)  Sir, if we substitute

19   responsibility for the word liability, can you answer that

20   question?

21              MR. ZELLE:  Objection.

22              MR. GIROUARD:  Objection.

23              THE COURT:  Could you rephrase?

24              MR. STEWART:  Gladly.  I was trying to take a

25   shortcut and I'm not going to do that.

1    Q.   (By Mr. Stewart)  Sir, we talked about various

2    potential tax remittances --

3    A.   Right.

4    Q.   -- that may have been appropriate if people were

5    employees --

6    A.   Right.

7    Q.   -- at the South Hadley job site for those payments to

8    be paid to the government; are you with me so far?

9    A.   Yes.

10   Q.   Okay.  And you understood that there could be some

11   potential responsibility on your behalf for a claim of

12   those responsibilities?

13   A.   I wasn't aware that it was my responsibility 'cause

14   they were -- Mr. Brantley hired them.

15   Q.   Okay.  So you're thinking that Mr. Brantley would

16   share some responsibility for those types of remittances?

17   A.   Right.

18            MR. ZELLE:  Objection to share.

19            THE COURT:  Overruled.

20   Q.   (By Mr. Stewart)  Can you repeat your answer?

21   A.   What's that?

22            THE COURT:  Repeat the question if you'd like.

23            MR. STEWART:  By any chance, can I have the

24   court reporter read it?

25            THE COURT:  If the court reporter can access it,

1   I will ask her if she can read it.

2   (Question read back.)

3            THE WITNESS:  Yes.

4   Q.   (By Mr. Stewart)  Now on a previous occasion -- we

5   are now on the subject of your discussions with Peggy

6   Grundstrom, the agent at FieldEddy.

7   A.   Yeah.

8   Q.   And on a previous occasion you testified, did you

9   not, that you do not recall a discussion with her about

10  how your business was organized, about how -- the question

11  about how your business was organized should be answered?

12           MR. BURSTEIN:  Objection, Your Honor, just as to

13  which occasion we are talking about.

14           THE COURT:  Could you clarify?

15           MR. STEWART:  Sure.  I stumbled.

16  Q.   (By Mr. Stewart) You do not recall a discussion with

17  Peggy Grundstrom discussing how you should answer the

18  question that asked, how is your business organized?

19           MR. BURSTEIN:  Objection, Your Honor, because

20  there were two different policies that were in play.

21           THE COURT:  The clarification you requested was

22  to which specific date, in other words which policy.

23           MR. STEWART:  Sure.

24  Q.   (By Mr. Stewart) The workers' comp. policy.

25  A.   Workmen's policy, yes.

1   Q.   You don't recall that?

2   A.   Not too much.

3   Q.   Remember the workers' comp. policy was the one that

4   had all the different boxes?

5   A.   Yes.

6   Q.   Partnership?

7   A.   Right.

8   Q.   Right?  Okay.

9        So you don't recall the discussion with her about

10  which box you should fit into?

11  A.   Well, I always filled in that I was the sole owner of

12  the work that was being doing.

13  Q.   Here's where I'm going, sir.  I thought I heard you

14  when Mr. Burstein was testifying (sic) say you did

15  remember and I think you may have said on a previous

16  occasion that you don't remember, so I'm just trying to

17  figure out do you remember or not?

18            MR. GIROUARD:  I object to the form of the

19  question.

20            THE COURT:  As to the form of the question the

21  objection is sustained.  You're to disregard the question.

22  Try to rephrase please.

23  Q.   (By Mr. Stewart) Let me try again.

24       You testified on a previous occasion that you don't

25  remember discussing with Peggy Grundstrom how to answer

1    that question about how your policy -- I'm sorry, how your
2    business was organized, correct?
3    A.   I probably -- I don't recall how she asked that
4    question.
5    Q.   And you don't recall even discussing what box you
6    should be put into?
7    A.   Well, she asked me what kind of a business and I told
8    her it was a sole partnership. (sic)
9    Q.   And on a previous occasion you said you didn't
10   discuss that, is that correct?
11   A.   Well, I filled out the forms so I had to discuss it.
12   Q.   Right.  However, you testified under oath a week ago
13   --
14   A.   Yeah.
15   Q.   -- that you didn't have any discussions with her
16   about how to answer that question?
17          MR. BURSTEIN:  Objection, Your Honor.  We're
18   still not referencing to which policy we are talking
19   about, that's a different answer.
20          MR. STEWART:  I'm asking about testimony he gave
21   a week ago.
22          THE COURT:  I agree.  Overruled.
23          THE WITNESS:  A week ago?
24   Q.   (By Mr. Stewart) Remember last Monday you testified
25   up at Tower Square Court and a reporter was there taking

1    down everything you said?

2    A.    Yes.

3    Q.    You said at that point, did you not, that you don't

4    remember Peggy Grundstrom discussing with you which box

5    was appropriate for your business, correct?

6    A.    I may have, yes.

7    Q.    Okay.  And let me just make double sure, sir, the

8    answers on the liability policy application were accurate

9    to what you told Peggy Grundstrom?

10   A.    Yes.

11   Q.    You are not claiming there are any differences

12   between what you told Peggy Grundstrom and what was

13   submitted to Preferred Mutual in your written application,

14   correct?

15   A.    Correct.

16   Q.    There is nothing that Peggy Grundstrom did that was

17   inappropriate in taking your answers and submitting them

18   to Preferred Mutual?

19            MR. ZELLE:  Objection.

20            MR. GIROUARD:  Objection.

21            THE COURT:  That's sustained.  Can I see the

22   parties, please?

23   (Sidebar conference.)

24            THE COURT:  I'm just getting a little lost as to

25   where we are.  This is in the deposition a week ago?

1          MR. STEWART:  Yes, Your Honor.  I'm just

2    battening this down.  I got one more question before I

3    move on.

4          THE COURT:  What is the objection?

5          MR. GIROUARD:  I don't even remember the

6    question.  I'm sorry.  As it flowed across my ears, it

7    didn't seem like an appropriate question.

8          MR. ZELLE:  My objection is that he's saying a

9    week ago you said this but there's no context.  We don't

10   know what Mr. Stewart is referring to by way of deposition

11   so we can't really assess it because there were two

12   applications.

13       In the course of this examination Mr. Stewart is

14   referring to the deposition of Mr. Lodigiani on April 1st.

15   He's asking questions about conversations between

16   Mr. Lodigiani and Ms. Grundstrom but we can't tell based

17   on the questions which meeting Mr. Stewart is asking about

18   or which meeting Mr. Lodigiani --

19          THE COURT:  The workers' comp. or the liability

20   meeting.

21          MR. ZELLE:  Right.

22          MR. GIROUARD:  The other point is that this line

23   of questions about the fidelity of what he has said and

24   what's on the application has been gone over now three

25   separate times.  There's a point with an 85-year-old

1    witness that's flogging a dead horse at this point.

2              MR. BURSTEIN:  He was not asked during cross.

3    The cross did not get into that at all.

4              THE COURT:  Well, I think the cross scratched

5    the surface enough to allow this.  I think these questions

6    are permissible.  I do think you need to keep them in

7    context.  In other words, maybe put up on the screen and

8    then talk about whether you're dealing with the comp.

9    policy or the liability policy so we knew that Ms.

10   Grundstrom and this witness are talking about the same

11   policy.  Thank you.

12   (End of sidebar conference.)

13   Q.   (By Mr. Stewart) Mr. Lodigiani, with respect to the

14   liability policy application, is it your position that

15   Ms. Grundstrom did not make any mistakes in recording what

16   you told her in submitting that application to Preferred

17   Mutual?

18   A.   I don't believe she made a mistake, no.

19   Q.   And you testified a little while ago that your

20   explanation for telling Mr. Trudeau that Mr. Brantley was

21   your partner was that it was your job and you at other

22   times said you were -- strike that.

23        Oh, okay.  I found it.  Sorry.

24        The same question:  You told Mr. Trudeau about Mr.

25   Brantley, you were partners.  Are we in the same place,

1  sir?

2  A.  Right.

3  Q.  A little while ago Mr. Burstein asked you to explain

4  that and you said you called him a partner because we do a

5  lot of projects together?

6  A.  As a partner, yes.

7  Q.  Okay.  And you gave an earlier -- at an earlier time

8  testifying under oath you gave a different explanation for

9  why you were partners, correct?

10  A.  I don't believe so.

11  Q.  Okay.  How about on June 21, 2013, the second session

12  of your examination under oath?

13        MR. ZELLE:  Page, please.

14        MR. STEWART:  Gladly.  I'll take up your

15  suggestion.

16  Q.  (By Mr. Stewart)  Let's look at that page.  All

17  right.  We are going to go to page 82, line 17.  Here we

18  go.  "So when Mr. Trudeau asks you what the relationship

19  between you and Mr. Brantley was and you said we're

20  partners, what did you mean by that?"

21  A.  I can't hear you.

22  Q.  Sorry.  We okay now?

23  A.  Yeah.

24  Q.  So can you look at the screen, sir?

25  A.  Yes.

1    Q.   The explanation you gave to Mr. Trudeau for saying

2    "we're partners", was "I took the job to help him out, you

3    know.  That's what I did."

4    A.   Yes.

5    Q.   That's a different explanation, isn't it?

6              MR. ZELLE:  Objection.

7              MR. STEWART:  I withdraw that, Judge.

8              THE COURT:  The objection is withdrawn.

9              MR. STEWART:  I'm set.  Thank you.

10             THE COURT:  Anything?

11             MR. BURSTEIN:  Nothing further, Your Honor.

12             MR. GIROUARD:  No.

13             MR. ZELLE:  No.

14             THE COURT:  All right.  Very well.

15        Sir, you can step down.  Thank you.

16             MR. STEWART:  Judge, I would like to offer some

17   documents in evidence that I believe there's no objection

18   to.

19        Judge, I would ask Your Honor's lead to offer the

20   policy, Exhibit No. 1.

21             THE COURT:  All right.  Exhibit No. 1, which

22   policy?

23             MR. ZELLE:  The Preferred Mutual policy.

24             MR. STEWART:  I'm sorry, the liability policy,

25   Judge.

1       THE COURT:  The liability policy.  All right.
2   Exhibit No. 1 is admitted without objection.
3           MR. ZELLE:  No objection.
4           THE COURT:  That's the liability policy. It will
5   be admitted.
6   **(Plaintiff's Exhibit 1 admitted.)**
7           MR. STEWART:  The permits from the South Hadley
8   Bridge Street job, Exhibit 8.
9           THE COURT:  No objection I see.
10          MR. BURSTEIN:  No objection, Your Honor.
11          THE COURT:  You said Exhibit 8?
12          MR. STEWART:  Yes.
13          THE COURT:  That was Exhibit 8.
14  **(Plaintiff's Exhibit 8 admitted.)**
15          MR. STEWART:  And the transcript of the EUO
16  testimony, Exhibit 14.
17          MR. ZELLE:  No objection.
18          THE COURT:  No objection from opposing counsel,
19  that will also be admitted.
20          THE CLERK:  That's 14.
21          THE COURT:  So the last exhibit was 14.  All
22  right.
23  **(Plaintiff's Exhibit 14 admitted.)**
24          MR. ZELLE:  We would offer, Your Honor, at this
25  point as well what's pre-marked as Exhibit 7, the letter

from Mr. Stewart to Mr. Lodigiani dated March 27, 2013
requesting the examination under oath.

THE COURT:  All right.  That is what exhibit number?

MR. ZELLE:  That's Exhibit 7.

THE COURT:  No objection?

MR. STEWART:  No.

THE COURT:  Very well.  That will also be admitted.

**(Defendants' Exhibit 7 admitted.)**

MR. STEWART:  Judge, I call my next witness, Mr. Griffin, Michael Griffin.

THE COURT:  All right.

Let me take the opportunity to ask the jury this:  My plan is to go until a little after four.  Does anyone need a break?  It's no problem if we take a five- or ten-minute break.

Everyone good?  All right.

THE CLERK:  Would you raise your right hand please?

Thank you.  You may be seated.

**Michael Griffin (sworn)**

**DIRECT EXAMINATION**

Q.   (By Mr. Stewart) Can you introduce yourself to the
jury?

A.   Yes, Michael Griffin.  I work for Preferred Mutual
Insurance Company.  I'm the commercial lines territorial
underwriting manager for the states of Massachusetts, New
Hampshire, and New Jersey.

Q.   How long have you held that position?

A.   Since 2010.  Prior to that I was a production
underwriter in the State of Massachusetts for commercial
insurance, so I've been a manager for five years.

Q.   All right.  Where do you live, sir?

A.   Just south of Utica, New York in a town called New
Hartford, New York which is about 35 miles from our home
office.

Q.   Okay.  And tell these folks where Preferred Mutual
is?

A.   Just joking about them, Preferred Mutual is probably
in the middle of Amish country and farmland.  It's
probably 35 minutes south of Utica and 15 minutes or so
from the Cooperstown area.

Q.   If you're coming out from Oneonta, it's something
like 18 miles?

A.   Yeah, I'd say about 20 minutes.

1    Q.    And no major highways go there?

2    A.    It's 20 miles in about 18 minutes.

3    Q.    And how big a town is New Berlin, New York?

4    A.    You mentioned earlier that it was about 1500, but I

5    think that might be on the high side.  It's a pretty small

6    town.

7    Q.    So Preferred Mutual, they're south of Utica.  What is

8    a mutual company?  Can you tell the jury about that?

9    A.    Right.  We are a mutual company so basically we don't

10   have to answer to any shareholders.  We are not a stock

11   company.  So basically we define ourselves as a company

12   that is in business to service policyholders, number one,

13   and, number two, to provide employment for people to

14   service those policyholders.

15   Q.    And when was Preferred Mutual begun?

16   A.    Founded?

17   Q.    I mean, when you call the number and they say since?

18   A.    1896.  They've been doing this for a long time.

19   Q.    And how long have you worked for Preferred Mutual?

20   A.    I started out of college in 2004 as a commercial

21   lines underwriting trainee.

22   Q.    Okay.  So you've spent your entire career after

23   college there?

24   A.    Yes, sir.

25   Q.    Tell me, what kind of degree did you get in college?

A.   I went Utica College.  At the time it was affiliated
with Syracuse University and I obtained a business degree
with a computer science concentration, so business
management.

Q.   So you know a little bit about some of these computer
systems at Preferred?

A.   Yeah.  I was kind of doing it because my brother was
a computer engineer so he kind of made me get into
computers.

Q.   Okay.  Now is there a line of business that produces
a policy called a business owner's policy?

A.   Yes.

Q.   What kind of people get a business -- or what's that
for?

A.   Excuse me?

Q.   What's the class of business or who are the people
that get that?

A.   A business owner's policy?

Q.   Yes.

A.   So a business owner's policy is a commercial policy
and it's designed as kind of a fast track way to secure
liability and property insurance.  Basically in the
commercial insurance world, a lot of your more
understandable or commoditized types of risks, such as say
a beautician or florist or small artisan contractors like

painters or plumbers or electricians, it's basically a way
to quickly develop a commercial policy and provide
insurance in a packaged state with your liability, your
property and your safety, tools, or equipment.

So the traditional approach to commercial insurance
was, you know, a commercial package which would be, you
know, you submit for your liability and the company would
rate for it and then you would submit for what property
protection you need and the company would rate for it or
any miscellaneous equipment that you have, but the
industry went to a more quicker and easier way of rating
insurance policies probably for those risks that don't
have unique characteristics, and you can make assumptions
in the industry that, you know, one beautician is not
significantly different from another.

Q.   So for like a plumber that had some tools and a home
office, would a business owner's policy be a pretty good
fit?

A.   Correct.  We would insure a lot of small artisan
contractors and we define small business by premium sizes
of 25,000 or less and payrolls of 300,000 or less or so.

Q.   Okay.  Let's talk about the application process as it
goes to underwriting.  I understand you're not an agent
but you have some understanding about what goes on in the
agent's office in getting an online submission to

1    Preferred Mutual?

2              MR. ZELLE:  Objection.

3              THE COURT:  Basis?

4              MR ZELLE:  It was a compound question.  I'm not

5    sure which one he's asking.

6              THE COURT:  I'll overrule it.  Go ahead.

7    Q.    (By Mr. Stewart)  Tell us how it works.

8    A.    Okay.  So we have independent agents that represent

9    Preferred Mutual and basically we offer online quoting

10   systems that our agencies have access to.

11        Keep in mind that Preferred Mutual is not a direct

12   writer.  We are a company that is represented by

13   independent agencies.  So in the case you're talking

14   about, FieldEddy Agency was one of our agencies that

15   represented us.  They have access to our system online

16   where they will go in and they will fill out and complete

17   a quote proposal for potential risk, and they will also

18   complete an application for that risk which is then -- it

19   gives them an indication of what the premium is going to

20   be and then it's submitted to our company of underwriters.

21   We have a department of underwriters that then reviews

22   submissions to make sure that they're a desirable risk.

23   Q.    Okay.  So there's a preliminary way that an agent can

24   put information in and get it to Preferred to generate a

25   quote?

1    A.   Correct.

2    Q.   If the quote is given to the prospective insured and

3    is accepted, is there a whole other process to actually

4    get the policy?

5    A.   Right.  So you can get a quote indication by just --

6    it's kind of a way for our agents to shop the business and

7    look at the various markets and get an indication for a

8    potential insured of what the price is.

9        Once then they decide to go with Preferred Mutual, so

10    if they chose Preferred Mutual, then they would need to go

11    in and complete the online application and submit that.

12            MR. STEWART:  May I approach, Judge?

13            THE COURT:  Yes.

14    Q.   (By Mr. Stewart) Sir, I show you what has been marked

15    as Exhibit 3.  What do you know that to be?

16    A.   So this is a business owner's online submission.  We

17    call it a BOP policy, a business owner's policy, and that

18    is what this it and it's from --

19    Q.   Let me take that back from you.  I'll put it on the

20    overhead so everybody will be looking at the same thing at

21    the same time.

22        So is this the next -- okay.

23        In the process you have the quote, the accepted

24    quote, I want to buy a policy, and is the next thing that

25    happens is an application?

1    A.    Yes.  You cannot submit this until you complete an

2    application and we cannot consider any policy bound until

3    an application is completed, and that's an online

4    application in this instance.

5    Q.    Okay.  And this particular online -- would a fair

6    thing to call this be the application?

7    A.    Umm, this online submission includes the application.

8    Sometimes there's proposals that are just abbreviated that

9    don't have the full application, and in this instance I

10   believe the application is attached.

11   Q.    So this is like an application plus?

12   A.    If you'd like to use that term, yes.

13   Q.    There's more to it than just the straight

14   application, is that fair?

15   A.    Yes.

16   Q.    Okay.  And this particular thing that we are looking

17   at, it has a quote number so that it can correlate with

18   the number that's already been given to the policyholder,

19   right?

20   A.    Yeah, a quote number is separate from an actual

21   policy number.

22   Q.    Okay.  So can you tell the jury who the named insured

23   is on this online submission?

24   A.    The named insured that was submitted was Leonard C.

25   Lodigiani, d/b/a L.B. Plumbing.

1    Q.    And in the application there are questions and I'm

2    now on the second page about the entity and this

3    particular one says individual.  Is the type of entity

4    that is being applied -- that Preferred is being told is

5    applying, is that something that is significant to the

6    underwriting department?

7    A.    Well, sure.  I mean, it depends.  Your type of entity

8    is something that we ask on all submissions and in this

9    case Peggy, I'm assuming, she input it in.  She selected

10   that this is an individual entity.

11   Q.    Okay.  So why is it significant to underwriting

12   whether somebody is an individual as opposed to any other

13   thing that could be put there?

14   A.    Well, because some of the options are corporation,

15   LLC, one of the options is a joint venture, one of the

16   options is a partnership, and in this particular case

17   they're saying individual so obviously that would make a

18   difference as to the extent of our exposure or liability.

19         You know, if you're an individual, you're one person.

20   Then we go through and understand the way the policy is

21   rated and look at the named insured to make sure that that

22   made sense.

23         If you were a partner or a joint venture, you know,

24   then that would clue us in as to there's more than just

25   this sole person involved and there's more exposure than

1    just an individual for example and that's why the type of

2    entity is important to know.

3    Q.    Is there a pricing difference between individuals and

4    the other choices?

5    A.    Yes.  So in this particular case in the State of

6    Massachusetts an individual for the plumbing operation,

7    which they applied for, gets charged a premium basis of

8    payroll and the annual payroll of 28,600 and that is per

9    thousand.

10        So basically it's 28,600 in payroll and it's divided

11   by a thousand and then multiplied by a rate that we use

12   and that's kind of the way that you rate these policies.

13   So it's a per thousand unit and for an individual we

14   charge $28,600.

15   Q.    You charge a different rate for a partnership?

16   A.    Right.  So according to the ISO manual which we

17   follow, ISO-based company -- I don't know if you'd like me

18   to get into that?

19   Q.    We will get into that.

20   A.    Okay.  But basically, yes, for a partnership we would

21   charge $28,600 times the number of owners and/or partners

22   is the way they define it.

23   Q.    So just to move this along, if there's one owner it's

24   28,6; if there are two owners, it's 56 or whatever the

25   math is?

1    A.    Right.

2    Q.    Okay.  By the way, when the agent -- are you

3    knowledgeable about how that box is filled in at the

4    agency about the individual?

5    A.    Yes.  The entity?

6    Q.    Tell us about how that's done.

7    A.    So on the online submission when you go to the entity

8    selection, there's an asterisk.  You see the asterisk next

9    to the field and that means that that field is required.

10   So if they did not complete that, it would tell them when

11   they tried to submit it that you need to fill out the

12   entity, and in order to choose the entity we have a

13   drop-down menu which has all of the potential options for

14   you to pick from.

15   Q.    So those of us who fill out forms online, there's

16   like boxes with a row of choices?

17   A.    Exactly.

18   Q.    And if you click on individual, does it come out

19   looking like what we see here?

20   A.    Yes, exactly.

21   Q.    So somebody had to manually key stroke to individual

22   to get this to come out that way?

23   A.    They didn't manually key stroke it.  They selected

24   individual from a list and it put it there.

25   Q.    Okay.  So maybe a mouse click or something?

1    A.    Right.

2    Q.    Now there's a question on this application about -- I

3    didn't line that up very well -- has the applicant been

4    active in any joint ventures?  If, yes, explain in the

5    remarks and this particular application says no.  Is that

6    correct?

7    A.    That's correct.

8    Q.    So as far as Preferred Mutual knew, according to this

9    application, there was no active joint venture going on

10   with respect to Mr. Lodigiani, is that accurate?

11   A.    Correct.

12   Q.    Okay.  So let me just try this again.  With respect

13   to a two-owner business, is it Preferred Mutual's position

14   in the underwriting department that a two-owner business

15   has more of a risk than an one-owner business?

16   A.    Absolutely.

17   Q.    Can you tell us why?

18   A.    Yeah, because obviously if you're one owner, there's

19   only one person that, you know, potentially has the

20   exposure sort of the liabilities against them.

21          When you have more than one owner or you have

22   partners, the ISO rate charges as if they are owners the

23   same payroll because, you know, it's double the exposure

24   of potential liability against them.  When there's two

25   people, there's two prior operations and you just have

1  double the amount of potential exposure.

2  Q.    Now listen, we need to go back to tell the jury what

3  ISO is?

4  A.    The Insurance Services Office I believe is ISO and

5  ISO is a rate-making organization that many insurance

6  companies in the industry follow for when they establish

7  rates and coverage forms.

8      So, you know, when we say we're an ISO-based company,

9  that means that we use the fundamental ISO forms.  We file

10  them and we rate-make based on those forms and filings,

11  but we also have the ability to -- every company can file

12  company exception pages which are then kind of tailoring

13  the ISO rules and rates.  Most companies will be

14  fundamentally ISO based but then they will have a file for

15  their own variations of rating or company exceptions to

16  kind of taylor coverage so that we're not all the same

17  market.

18  Q.    So is ISO is part of that uniformity within the

19  industry?  Is the purpose of it to have some uniformity

20  within the industry?

21  A.    Yeah, I would say.  I mean, I think the big thing

22  about insurance is data.  Your ability to properly gage

23  what premiums to charge for various exposures comes from

24  historical data and ISO has an adequate amount of data to

25  know basically to give you a guideline for what premiums

1    to charge for various exposures.

2    Q.   And are you familiar with Exhibit 1, the policy?

3    A.   Yes.

4    Q.   Okay.  And apparently it's supposed to be certified

5    by Michael Griffin, CL territorial underwriting manager,

6    that's you?

7    A.   That would be me.

8    Q.   However it's signed by somebody else?

9    A.   It's signed by my counterpart who is the New York

10   territorial manager, yes.

11   Q.   The front page of the policy it -- the name insured

12   is Leonard Lodigiani, d/b/a L.B. Plumbing, correct?

13   A.   That's correct.

14   Q.   Okay.  And then we go to the business declarations

15   and again the name insured is Leonard Lodigiani, d/b/a

16   L.B. Plumbing?

17   A.   Leonard C. Lodigiani, yes.

18   Q.   If we skip to page 39 of 47 -- by the way, at the

19   bottom it talks about ISO properties.  Can you tell us if

20   everybody that uses ISO forms are all the same?

21   A.   I'm not going to say that they're the same, no.  I'm

22   going to say that this particular one where your thumb is,

23   if you'll just remove your thumb there on the bottom left

24   portion of that page, it's showing you what version or

25   what edition we are using, but depending on your company

1    filings or how relevant your company is, companies choose
2    to file different versions.  But this is an ISO-based
3    coverage form that you're looking at.
4    Q.    So this is a business BOP Version 3?
5    A.    Yes, January.
6    Q.    Last updated January '06?
7    A.    Correct.
8    Q.    Okay.  So like a homeowner's policy might be HO-3,
9    this is a BP-3?
10   A.    Exactly.
11   Q.    All right.  So let's go back to, like I say, on page
12   37, and let me bring this to your attention, sir.
13         There's a clause about who is an insured and the last
14   part of that, could you read that for the jury?
15   A.    "No, person or organization is an insured with
16   respect to the conduct of any current or past partnership,
17   joint venture, or limited liability company that is not
18   shown as a named insured in the declarations."
19   Q.    And in the declarations the named insured is Leonard
20   Lodigiani d/b/a?
21   A.    Leonard C. Lodigiani, d/b/a L.B. Plumbing.
22   Q.    So Preferred Mutual the policy that it issued was not
23   to any joint venture and not to any partnership?
24   A.    Exactly.
25   Q.    And if you had been told -- if Preferred Mutual

underwriting had been told that Mr. Lodigiani was in a
two-person partnership or a two-person joint venture,
would the premium be the same as he was charged in this
case?

A.   No.

Q.   How much would the minimum premium be?

A.   So the minimum premium would be 28,600 times two
because there are two partners, and then I saw that there
was a mention of payroll of $10,000 for an employee so
that would be added to that as well.

Q.   Okay.  And he would have paid premium on that
additional 28,000?

A.   Correct.  It would essentially be -- well, not quite
double the exposure but double the amount of premium would
have been charged.

Q.   Is that considered material to an underwriter?  Is
that something that affects the rating?

A.   How much you charge is material, yes.  In
underwriting it's all about pricing the risks
appropriately for exposure.  I mean, you wouldn't be in
business if you weren't able to adequately price what
exposures you have.

Q.   Thank you, sir.

          THE COURT:  Thank you.  Cross.

          MR. ZELLE:  Thank you, Your Honor.

**CROSS-EXAMINATION**

Q.   (By Mr. Zelle) Let me start, Mr. Griffin, with where your lawyer left off.  "No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture, or limited liability company that is not shown as a named insurer in the declarations." Have I read that correctly?

A.   Correct.

Q.   Now, if an insured, a policyholder, of Preferred Mutual is a partner in a partnership but is sued for individual conduct as a natural person, not for his conduct as an actor in a partnership, that exclusion wouldn't apply, would it?

A.   If an individual was sued as an individual and not in a partnership, potentially that might not.

Q.   I'd like to have you clarify for the jury something. You were talking about premium rating and we were using numbers of 28,600 and another 10,000, that's divided by a thousand?

A.   Correct.

Q.   And it's multiplied by a factor which is a decimal, right?  So that the premium in the case of Mr. Lodigiani's policy, his individual policy was $12,000, right?

A.   Correct.  I don't see it in front of me but about $12,000.

1    Q.    Would you feel more comfortable if I showed you?

2    A.    Yeah, I'd like to look at it.

3    Q.    Sure.  Absolutely.  1,256?

4    A.    Okay.

5    Q.    And you're suggesting that if the premium were rated

6    based on a two-person partnership, it would be how much

7    more?

8    A.    It's going to probably be roughly 7 or $800 more.

9    Q.    Now, the application -- you had nothing to do with

10   reviewing this application when it was submitted by

11   FieldEddy, is that right?

12   A.    Correct.

13   Q.    You've seen it since, correct?

14   A.    Uh-huh.

15   Q.    Just use a yes or no --

16   A.    I'm sorry, yes.

17   Q.    -- for our reporter here.

18         The application is not signed, is it?

19   A.    The application is not signed.

20   Q.    And you indicated some familiarity with how an agency

21   who are the agents for Preferred Mutual work, right?

22   A.    Right.

23   Q.    And they submit the -- initially online they put in

24   information to obtain a quote, I think you used the word

25   shop, so then they could shop around the Preferred Mutual

1    quote with other companies so they can give their

2    applicant, in this case Mr. Lodigiani, the best price?

3    A.    A quote indication, yes.

4    Q.    Okay.  So the quote indication as you understand it

5    in this case, and I know you weren't personally involved,

6    it was submitted and the quote was generated at $1,256,

7    and apparently I think it's fair to say that was agreed to

8    because a policy and an application was submitted?

9    A.    Right.

10    Q.    And in the application -- I'll grab that if I may.

11                MR. ZELLE:  To move this along, I got a copy.

12    Is that all right if I use that?

13                THE COURT:  Sure.

14                MR. ZELLE:  Thank you.

15                THE COURT:  What exhibit number?

16                MR. ZELLE:  This is Exhibit No. 3, Your Honor.

17    You'll see it's not a color stamp but it does reflect the

18    exhibit.

19    Q.    (By Mr. Zelle)  I'm going to show you -- this is on

20    the second page, and you indicated where that entity is

21    asterisk that when you look at it online there's a

22    drop-down menu?

23    A.    Correct.

24    Q.    And you indicated I think somebody clicked on the

25    drop-down individual, right?

1  A.   Correct.

2  Q.   You know that was Ms. Grundstrom, right?

3  A.   I'm making the assumption since she was the one that

4  was listed as submitting the application.

5  Q.   But you know it was not Mr. Lodigiani, right?

6  A.   That is correct.

7  Q.   Because the applicant doesn't actually have access to

8  the online submission form, the agent does?

9  A.   That's correct.

10 Q.   And you understand in this case that Ms. Grundstrom

11 -- or Mr. Lodigiani was not looking over Ms. Grundstrom's

12 shoulder when she was filling out the online submission?

13 A.   I don't know that.

14 Q.   We can ask Ms. Grundstrom.

15     Now I'd like to show you this.  This is the third

16 page.  It's the page that has the signature line for the

17 applicant, and where this is done online what's your

18 understanding of how an applicant actually signs it?  How

19 does that work?

20 A.   Right.  So we have a couple of things.  We have a

21 disclaimer that when you submit an application -- or

22 excuse me, when you submit a policy that's being bound, it

23 let's you know that it's the agency's responsibility to

24 maintain a signed copy of the policy in their office, and

25 we also have an agency company contract or agreement which

1  states in terms of its record retention that all agencies

2  maintain signed copies of bound policies in their office.

3  Q.   What you've described is your -- I shouldn't say

4  your, Preferred Mutual's arrangement with the agency,

5  correct?

6  A.   Correct.  It's for all agents to maintain signed

7  copies.

8  Q.   And in this case whether FieldEddy obtained a signed

9  copy or not, you don't know?

10  A.   I've not seen one so I can't comment on that.

11  Q.   Do you know whether Preferred Mutual ever sought to

12  get a signed copy?

13  A.   I can only say, yes, because we usually typically

14  look for a sign application especially if there's claim

15  occurrence but I don't know for a fact.

16  Q.   All right.  Can you please read for the jury the

17  second paragraph above the blank signature line?

18  A.   "In Massachusetts," that one?

19  Q.   Yes.

20  A.   "In Massachusetts, Nebraska, Oregon and Vermont, any

21  person who knowingly and with intent to defraud any

22  insurance company or another person files an application

23  for insurance or statement of claim containing any

24  materially false information or conceals for the purpose

25  of misleading information concerning any fact material

1    thereto, may be committing a fraudulent insurance act,

2    which is a crime and may be subject -- may subject the

3    person to criminal and civil penalties."

4    Q.   Now, Preferred Mutual is not suggesting, are they,

5    that Mr. Lodigiani committed a fraudulent insurance act,

6    are they?

7    A.   No, we're -- I'm not suggesting that that's the case.

8    Q.   You're suggesting that there was, as I understand it,

9    Preferred Mutual, there was a mistake; is that what you're

10    suggesting?

11    A.   I'm just suggesting that the information that we knew

12    of at the time of binding and the information we found out

13    through investigation are different, there's a

14    discrepancy.

15    Q.   And the discrepancy can be either intentional or a

16    mistake; there aren't any other options, are there?

17    A.   I'm not accusing anyone at this time, that's really

18    not my responsibility.

19          MR. ZELLE:  I will be able to finish up in five,

20    ten minutes.  If we can, that would be great.

21          THE COURT:  Okay.

22    Q.   (By Mr. Zelle)  Now, you were not involved in any way

23    in the investigation of the claim being made here that Mr.

24    Lodigiani made a misrepresentation in his application, is

25    that correct?

1    A.    I was not involved in an investigation.  We have a

2    claims team that does that.  However, I was made aware of

3    the results of their investigation.

4    Q.    And Mr. Kagels was the individual on the claims team

5    that was responsible for the investigation, correct?

6    A.    I would say so, yes.

7    Q.    And in March of 2013, Mr. Kagels told you that he had

8    determined that Mr. Lodigiani was operating his business

9    as a partnership, is that right?

10   A.    Yep.

11   Q.    Let me show you --

12          MR. ZELLE:  I will offer it as an exhibit.  It's

13   been pre-marked as No. 6.  It is entitled Underwriting

14   Memo.  I'll publish it this way.

15          THE COURT:  All right.

16   Q.    (By Mr. Zelle) Let me first direct your attention to

17   the date at the top.  Do you see that is March 18, 2013?

18   A.    Let's see.  Okay.  At the top, yes.

19   Q.    And you see that this is a matter that was assigned

20   to Raymond S. Kagels?

21   A.    Yes.

22   Q.    It refers to Mr. Lodigiani's policy, correct?

23   A.    Correct.

24   Q.    And Mr. Kagels writes:  "Insured was operating as a

25   partnership with another ex-plumber, who brought day

1   workers to the job for the insured to supervise.  They are

2   being blamed (probably wrongfully) for burning down the

3   building.  We insure an individual, not a partnership,

4   though this appears to be a one-job situation."  Did I

5   read that correctly?

6   A.    You did read that correctly.

7   Q.    And did you ever ask Mr. Kagels what that conclusion

8   was based upon?

9   A.    No.  In fact, I did not remember seeing this

10  particular document.  The information received in the

11  discussion was a phone call that I had with the claims

12  team and myself regarding it.  I didn't see this

13  particular sheet.

14  Q.    Okay.  It is titled Underwriting Memo, correct?

15  A.    Correct.

16  Q.    And did you understand or do you understand that this

17  is a document prepared by who you referred to as the

18  claims team but I'll refer specifically to Mr. Kagels, a

19  document prepared by Mr. Kagels for the underwriters?

20  A.    Likely so, which if I did see it I'm just not

21  recollecting.

22  Q.    And just going back, you not only did not ask Mr.

23  Kagels who was -- when you refer to a claim team, that's

24  Mr. Kagels and I presume someone else?

25  A.    Mr. Kagels and I believe his supervisor David Bogden

1    and Sean Campbell who is the claims manager, liability

2    claims manager who were all on the call.

3    Q.    Was there anyone else on the call?

4    A.    Mr. Kagels.  We may have had Mr. Stewart.  He may

5    have been on the call as well but I can't confirm that.

6    Q.    Okay.  During the course of that conversation was

7    there any discussion about the reasons that again you

8    referred to the claim team concluded that Mr. Lodigiani

9    was operating as a partnership?

10   A.    Yes.  I remember it was probably Ray suggesting -- it

11   was either Ray or Dave but I'm assuming Ray since he

12   handled the claim that Mr. Lodigiani was acting in a joint

13   venture or partnership, and his question to me was -- you

14   know, basically I believe he mentioned something about

15   splitting the profits from a job and that the job was

16   taking out, was taking out as a joint venture and he had

17   asked me if because of that, you know, what does that mean

18   from an underwriting perspective and what was our

19   understanding of the risk and that's what started this

20   whole process of ending with a rescission.

21   Q.    Now from the underwriting perspective there's a lot

22   more to determining whether a business is a partnership

23   than splitting profits, right?

24   A.    You know, I'm not sure that there's a lot more

25   involved in it because, you know, basically if you say

1   you're partners, we assume that there's more than one

2   person responsible from a liability standpoint potentially

3   and so we automatically charge, you know, double the

4   payroll.

5       The term partner, partnership, for example, or joint

6   venture is kind of loosely used in the industry and it's

7   not -- I believe it's not even an ISO defined term and so

8   it's kind of up to interpretation of our underwriters.

9   Q.   You said something that I think is remarkable.  You

10  said you assumed that because they were sharing the

11  profits they were a partnership, and I have a question.  I

12  think you said this in your direct in answer to a question

13  on your direct examination, and that is that the reason

14  that Preferred Mutual increases the premium isn't to have

15  anything to do with the sharing of profits.  It has to do

16  with, as you said, increasing the liability exposure; am I

17  paraphrasing this correctly?

18  A.   You are, but I would say that it's not exclusive of

19  each other.  I mean, I think both things would be critical

20  in making a determination for an underwriter if something

21  is a partnership.

22  Q.   That also is significant -- I believe you said it's

23  critical to the underwriter to know both things, that

24  simply knowing that they're sharing profits isn't enough.

25  It is critical to the underwriter, is it not, that there

1   is also shared liability?

2   A.   I'm not willing to say that concretely because, you

3   know, I don't know how to define what critical is.  I said

4   critical but critical on what circumstances?  Critical in

5   that we would charge a certain rate or we go to a further

6   extent to underwrite it and do more research on the

7   particular risk.  You know, it's a loosely used term in

8   the industry so it would be up to interpretation of the

9   underwriter.

10   Q.   Just for clarity, partnership you're saying is a

11   loosely used term, but critical is that a loosely used

12   term as well because I can define it to how I mean it if

13   you'd like?

14   A.   Yeah.  I mean, maybe I misspoke by saying critical,

15   but I mean I think both of those -- both of those factors

16   help determine if an underwriter is going to consider

17   rating this as a partnership or rating this an individual

18   policy.

19   Q.   Would you agree with me that you needed as an

20   underwriter more information than Mr. Kagels provided you

21   to determine whether Mr. Lodigiani's policy should be

22   rated as a partnership versus an individual?

23   A.   No, I won't agree with that.

24   Q.   That's because you can't agree because he told you,

25   Mr. Kagels, they determined it's a partnership and you

1  accepted that.  I believe the term you used is you assumed
2  that?
3  A.   Right.  When he told me that they were partners and
4  this was a partnership -- I believe he also used the term
5  joint venture, which from an underwriting perspective is
6  the same thing, that's enough for me to understand that,
7  well, then we should have rated this as a partnership and
8  not an individual because there's more involved.
9  Q.   You had nothing to do with the coverage of this
10  claim.  You just were involved in terms of the rescission
11  piece?
12  A.   They came to us and asked us was that grounds for a
13  rescission and did we believe it materially changed the
14  risk and the answer, of course, was yes, and then claims
15  -- I believe Ray was the one that sent the rescission
16  letter out.  We assisted him getting the return premium
17  check as well.
18  Q.   Now, you have testified that if Mr. Lodigiani was
19  operating as a partnership, a conclusion that Mr. Kagels
20  reached, Preferred Mutual would have charged a higher
21  premium?  That's the conclusion you reached, right?
22  A.   That's not the only conclusion.  I mean, yes, we
23  would have charged a higher premium, but, you know, it's
24  more than just, oh, we would have charged a higher premium
25  and everything is fine.

1    Q.   I understand.

2    A.   I mean, yes, we would charge a higher premium but

3    there's more involved now because it's clearly different

4    than an individual with a single entity name and it opens

5    the door for more questions and more exposure.

6    Q.   Let's just stick with what you said in direct, that

7    if it were a partnership there would have been a higher

8    premium?

9    A.   Correct.

10   Q.   And if there's a higher premium, that's more money

11   coming into Preferred Mutual, right?

12   A.   That's correct.

13   Q.   That's intended to offset the greater risk, correct?

14   A.   That's correct.

15   Q.   Now, the risk in this particular case with respect to

16   Mr. Lodigiani, you understand that Mr. Lodigiani was

17   working on a job with an individual named Mr. Brantley,

18   right?

19   A.   Yes, I do know.

20   Q.   And you understand that Mr. Brantley was -- and this

21   is up for the jury to decide -- either his employee or his

22   partner, right?

23   A.   Correct.

24   Q.   So if both Mr. Brantley and Mr. Lodigiani are on the

25   job, how is the risk of a loss increased simply by whether

1    or not they call the business a partnership versus a sole

2    proprietorship?

3    A.    Because from a underwriting standpoint if you have a

4    partnership, you know, the buck stops -- sorry, for my

5    language -- but the buck stops with more than one person.

6    You have two people with interests in a particular

7    business or entity, that's why.

8    Q.    And therefore will you agree with me if the buck

9    stopped with Mr. Lodigiani, if Mr. Brantley did not have

10   liability as a partner for the work that Mr. Brantley did

11   on the job at Bridge Street, it wouldn't be a partnership?

12   A.    For this particular instance it's possible, but that

13   doesn't mean there wasn't more exposure for other

14   potential liability.

15   Q.    When you say other potential, you're talking about

16   other jobs?

17   A.    No.    I mean, if there's two partners, then they're

18   both exposing themselves.    They're both responsible for a

19   plethora of liability, that's why we charge more premium.

20   Q.    I understand.    So if there were other jobs and Mr.

21   Brantley had jobs and Mr. Lodigiani had jobs and they did

22   jobs together and they were partners, they both would be

23   responsible for what the other one did on any job?

24   A.    I can't comment on why Mr. Brantley wasn't named in

25   this or whatever you're discussing and he was not the one

1    being sought after for this, but I will say that he does

2    carry more exposure if we can consider him a joint venture

3    or partnership and therefore needs to be charged

4    appropriately.  It's only fair for us to make sure that we

5    got the right information to charge a policy correctly.

6              MR. ZELLE:  Nothing further, Your Honor.

7              THE COURT:  Anything?

8              MR. GIROUARD:  I have a couple quick questions.

9    **CROSS-EXAMINATION**

10   Q.   (By Mr. Girouard) Sir, you just testified --

11             THE COURT:  Can you give me an estimate?

12             MR. GIROUARD:  Five minutes.

13             THE COURT:  I know I told you four o'clock, but

14   does anyone have a problem?  You're not looking too

15   thrilled.  Okay.

16             MR. GIROUARD:  I will note this witness came

17   from New York.  I don't know.

18             THE COURT:  That's a good point.  We will try to

19   keep moving.  Okay.

20             MR. GIROUARD:  Real quick.

21   Q.   (By Mr. Girouard)  Correct me if I'm wrong, you just

22   testified that the term partnership is not defined

23   anywhere in the business owner's policy in this case?

24   A.   In our policy I'm not aware of a definition of

25   partnership.

1  Q.   And similarly joint venture is not defined anywhere

2  in the policy?

3  A.   It's not an insurance definition if that's what

4  you're asking.

5  Q.   You testified a moment ago about the ISO documents

6  that you guys use in your industry, right?  Is it the ISO

7  manuals?

8  A.   ISO based.

9  Q.   And in the ISO manual partner is not defined there

10  either?

11  A.   To my knowledge, I don't think there's a definition

12  of partner.

13  Q.   Have you ever heard of I-R-M-I?

14  A.   IRMI, yes?

15  Q.   What is IRMI?

16  A.   As far as -- I think of them like the encyclopedia in

17  the insurance world.

18  Q.   Do they have terms of art in the insurance industry

19  that are generally commonly used by you folks in this

20  business?

21  A.   I think that's safe to say, yes.

22  Q.   I'm going to show you a definition of partner pulled

23  from an IRMI.

24          MR. STEWART:  Your Honor, I'm objecting.

25          THE COURT:  All right.

1     MR. GIROUARD:  It's cross-examination.  I'm

2  asking him a question.

3     THE COURT:  Take that off the project and come

4  to sidebar to talk about it.

5  (Sidebar conference.)

6     MR. STEWART:  My problem is that there hasn't

7  been an agreement that this has any relevance.  I mean,

8  the fact that there -- there's a legal definition, and I

9  would like more foundation before we show this on the

10  overhead.

11     MR. GIROUARD:  Your Honor, my understanding is

12  the IRMI is a document that is used as a common source of

13  definitions in the insurance industry.  When the ISO forms

14  don't have a definition it's common, and I think he will

15  admit this in the next two questions, that that's the

16  go-to source to get definitions.

17     THE COURT:  I agree with the objection, so you

18  can lay a foundation.

19     MR. GIROUARD:  Okay.  Sure.

20     MR. STEWART:  It would be great if we could get

21  this guy back to New York.

22     MR. GIROUARD:  I'm mindful of that and that's

23  why I was trying to truncate.  I understand Attorney

24  Stewart's concern.

25     THE COURT:  It looks like an important point and

1    it's very dramatically done with a cell phone.

2           MR. GIROUARD:  Sometimes you got to do these

3    things on the fly.

4    (End of sidebar conference.)

5    Q.   (By Mr. Girouard) I was trying to move things along

6    quickly because the jury has worked hard today and I know

7    there's a chance you could get back to New York and so I

8    want to get back to this and lay this properly.

9           The IRMI document we just talked about, you would

10   agree with me this document that when terms are not

11   necessarily apparent in either a policy or in the ISO

12   document, that's a go-to document that you folks use to

13   get an understanding of terms in your industry?

14   A.   I mean, "You folks," I'm not going to say I do that.

15   I would agree with you that's a reference to go to for

16   definitions.

17   Q.   I'm sorry, I didn't understand the last part of your

18   sentence.

19          It is a document that people in underwriting could go

20   to as a resource to get definitions that are not defined

21   clearly in a policy or in the application documents?

22   A.   Correct.

23          MR. GIROUARD:  Your Honor, may I present that

24   document back up?

25          THE COURT:  With that foundation, yes.

1          MR. GIROUARD:  Thank you, Your Honor.

2     Q.   (By Mr. Girouard)  Now we have the technology

3     problems.  I've got to find it.  One moment.

4          So we agree that ISO doesn't define the term, agree,

5     partner or partnership?

6     A.   To my understanding they have not.

7     Q.   And the IRMI has a partnership definition and I want

8     to read it to you.  "A member of a partnership or firm:

9     One, who is united with others to form a partnership in

10    business and who participates fully in the profits,

11    losses, and management of the partnership and is

12    personally liable for its debts."  See where I just read

13    that?

14    A.   Yes.

15    Q.   Sir, do you have -- you were called by Mr. Kagels and

16    they presented to you the idea that there's a partnership

17    here, correct?

18    A.   That's what he said.

19    Q.   And they told you the basis of that during the phone

20    conversation was the sharing of profits, right?

21    A.   That's one of the things that I heard him saying.

22    Q.   And did you hear anything else?

23    A.   Well, that's what I was telling this other gentleman

24    here that I'm not sure exactly what else he told me, but

25    we came to that conclusion that we should have rated this

1  policy differently.

2  Q.   During your deposition in the past you were asked if

3  you were presented simply the fact of sharing the profits,

4  you indicated in the past that's not enough information to

5  prove to you that there was a partnership?

6  A.   Can you read what I said?

7  Q.   Sure.  I'll present it to you.

8       So the question:  "The situation is that it's not an

9  employee, it's the prior person on the job, the other

10  contractor who gave up the job which Mr. Lodigiani took

11  over," there was an objection, and then you said, "yeah,

12  if the party was the person prior to Mr. Lodigiani taking

13  over, right, that's who he is sharing and then he shared

14  profits with them?  Yes."  You answered "that's not enough

15  information to prove to me that there is a partnership."

16  A.   Yeah, I would probably look at -- you know, if they

17  were saying they were splitting profits, then I would

18  probably ask, like I said earlier, I'm looking for more,

19  you know, more information.  Well, then why is he rated as

20  an individual if he's a partner?  And why, you know --

21  there's more to this than just saying, well, he split the

22  profits so we should have charged him more.  I mean, I

23  think as an underwriter I think you need to know a little

24  bit more than that.

25  Q.   And you were ultimately the person that made the

1  decision at Preferred Mutual to rescind the policy, would

2  you agree?

3  A.   I did.

4  Q.   And at the time you made the decision to rescind the

5  policy, all you had at that time was a phone call from Mr.

6  Kagels, a representation that they had determined --

7  someone else had determined that there was a partnership,

8  and the note or the one fact note of they were sharing

9  profits?  That's all you had?

10  A.   And they were working on the job together in a joint

11  capacity as well.  I mean, that's what this whole --

12  that's what led to this.

13  Q.   And you had nothing to suggest they had agreed to

14  share liability exposure, right?

15  A.   Well, can you repeat that?

16  Q.   We talked about that definition, partnership -- by

17  the way, your insurance company presented no definition of

18  partnership anywhere, agreed?

19  A.   We do not have a definition.  It's a loosely used

20  term and I would say it is because of the different

21  states' definition and how the courts decide a partnership

22  is on paper.

23  Q.   And I showed you a definition from a common trade

24  resource, right?  You saw that?

25  A.   I did.

1    Q.    And that included a key element of an agreement to

2    share the liability between two parties?

3    A.    Yeah, but I don't know why you're suggesting that

4    I'm saying that there wouldn't be any increased liability

5    if there's two people acting in a joint capacity, that's

6    why I'm confused here.

7    Q.    Where you're confused I think, if I may suggest, is

8    that you put him in the box of partnership and what I'm

9    doing is trying to take him back out of the partnership

10   for the question which is you have no evidence that these

11   two men had a meeting of the minds that they were going to

12   share liability?  At the end of day if there was a

13   judgment against them, that both of them were going to be

14   responsible for that job?

15   A.    There's implied liability.  I'm not sure that they

16   have a meeting to say who's sharing liability.

17   Q.    You think it's an implied relationship, that's what

18   you're saying?

19   A.    I think if there's two people acting in a joint

20   capacity, then there's an implied liability which is why

21   we charge what we do.

22   Q.    And if it's implied, that could be rebutted by clear

23   testimony and statements by the two men that said there

24   was no agreement, would you agree?

25   A.    That's for you to determine.

1   Q.   And for the jury to determine, right?

2   A.   Yes.

3           MR. GIROUARD:  Thank you.

4           MR. BURSTEIN:  Very briefly, Your Honor.

5           THE COURT:  I've heard that before.

6           THE WITNESS:  I have no problem staying over.  I

7   can go look at the Hall of Fame.

8   (Laughter)

9           MR. BURSTEIN:  I promise to try to be quick.

10   Thank you, sir.

11   **CROSS-EXAMINATION**

12   Q.  (By Mr. Burstein) Just a few questions.  You

13   testified earlier today that a significant -- there would

14   be a significant difference in the premium charged for

15   this policy if the company knew it was a partnership, is

16   that correct?

17   A.   Yes, significant is a relative term to what he was

18   paying.

19   Q.   So one partner versus two, it might be double?

20   A.   Correct.

21   Q.   And that's because if there's two partners, you

22   presume another $28,600 would be the salary base for the

23   other partners, is that correct?

24   A.   That's how they define rate for a partnership.

25   Q.   In fact, this type of policy is wage based?

1    A.    It's based on payroll.

2    Q.    So if you had -- a partnership is not always going to

3    be a higher premium than a sole proprietor, is that fair

4    to say?

5    A.    Yes, a partnership will always be rated higher than a

6    sole proprietor because a sole proprietor gets charged

7    28,600 regardless as well.

8    Q.    So just to see if I'm following along --

9    A.    Okay.

10   Q.    -- if you had a sole proprietor who had a hundred

11   employees and a million-dollar payroll, right --

12   A.    I see.

13   Q.    -- versus a partnership that had two employees and

14   two partners and a 20,000 payroll, that sole proprietor

15   could actually be a higher premium?

16   A.    Right, because he's got more labor so we're charging

17   more money for more exposure.

18   Q.    And in that situation even though there's only one

19   individual that owns the company, what you just said is

20   there's more exposure, right?

21   A.    Yeah, because they're doing more work.

22   Q.    So the exposure is payroll based not necessarily

23   based on the entity or the number of partners, is that

24   fair to say?

25   A.    That is fair to say in some capacity, yes.

1    Q.   Okay.  Just to be clear, you're the one that made the

2    decision at the insurance company in this situation to

3    rescind the policy, is that correct?

4    A.   Yes, sir.

5    Q.   And when you testified at your deposition, when you

6    were given the information or you were asked the question

7    if Mr. Lodigiani had taken over this project from another

8    master plumber and you came to know that he was sharing

9    the profits of this job with another plumber that had

10   previously been on the job, if that was enough information

11   for you to determine if this was a partnership, you said

12   no it wasn't enough information; is that your

13   recollection?

14   A.   Yes, I read it there.  You know, in context I'm not

15   sure but I read it.  That's what I said, yes.

16   Q.   But in actuality that's the only information you had

17   been presented with by other members at Preferred Mutual

18   at the time you made the decision to rescind?

19   A.   Well, the sharing of profits is one factor.  Again,

20   it does not necessarily mean that, you know, that's the

21   only thing involved here.  That's kind of the point I was

22   making that, yeah, it's good to know that they're sharing

23   profits but also, you know, if you're working in a joint

24   capacity, there's more to accepting whether something is a

25   partnership or not or a joint venture or not by

1    understanding a little bit of the details of the
2    situation.
3         They're working together on a job; they got insurance
4    to do a job together as partners.  When you tell me that
5    as an underwriter, I'm under the impression that there's
6    more exposure here because there's two people that are
7    potentially responsible for the entity.
8    Q.   Okay.  But at the point where you made the decision
9    to rescind this policy on behalf of the company, you
10   didn't know any more information other than that Mr.
11   Lodigiani was alleged to have been sharing profits and
12   someone in a different department had made a decision that
13   he was operating as a partnership?
14   A.   It's working jointly on a particular job but I'm not
15   sure of the exact details.
16   Q.   But working together with someone on a job would be
17   true if he had employees working on the job alongside him?
18   A.   Right.  But if they're saying he's a partner, then
19   it's not an employee.  It's a partnership.  From insurance
20   -- from the way we do insurance, to me that's distinctly
21   different.
22   Q.   You say "they're" saying, who are you referring to?
23   A.   I'm talking about the investigation from our claims
24   team.
25             MR. BURSTEIN:  I have no further questions.

1      MR. STEWART:  No questions, Judge.  May the

2   witness be excused?

3      MR. ZELLE:  Let me just offer Exhibit 6.  I'm

4   not sure if I formally offered it.

5      THE COURT:  All right.  Exhibit 6.

6      THE CLERK:  No, that was introduced.

7      THE COURT:  Exhibit 6 was previously introduced.

8      MR. ZELLE:  Okay.

9      THE COURT:  I think you have the original one.

10   So that's in evidence already.  All right.

11      You can step down, sir.

12      THE WITNESS:  Thank you.

13      THE COURT:  All right.  We are going to conclude

14   for the day.  All right.

15      Ladies and gentlemen of the jury, we are done for

16   today.  We'll see you tomorrow morning.  My instructions

17   are that you not discuss the case, begin deliberations,

18   research the case in any way, shape, or form.  All right.

19   Thank you.

20   **(The jury left at 4:32.)**

21      THE COURT:  All right.  How we doing for

22   tomorrow?

23      MR. STEWART:  May I address the Court on kind of

24   a collateral matter?  Mr. Doyle, I'm not going to call

25   him.  I'm close to resting after I call Mr. Kagels.

1      Mr. Doyle is here under subpoena today.  We've got
2  two problems.  The immediate problem is he's got a trial
3  and he's required to be in Lawrence tomorrow.  I don't
4  know what Your Honor is inclined to do, but he can't be
5  here unless you issue an order purporting to require him
6  to be here because he's under an order of a state court
7  judge to be in Lawrence tomorrow so we've got a problem.

8              THE COURT:  Has the trial started?

9              MR. DOYLE:  No, Your Honor.  It was called for
10 trial Monday in the assignment session in Essex Superior
11 Court in Salem.  At that time both parties answered ready.

12     I explained to the court that I had received a
13 subpoena from Mr. Stewart to be here today.  As a result,
14 the court sent the case to the Lawrence Superior Court to
15 Judge Wall's session with instructions to appear tomorrow
16 morning at nine a.m.

17     Anticipating that this was a problem during today, my
18 office had been in touch with the assistant district in
19 this matter who has indicated that she will appear
20 tomorrow and oppose any continuance of the trial of that
21 matter.

22             THE COURT:  What's the nature of the case?

23             MR. DOYLE:  It's a criminal case.  My client's
24 name is Gerraro.  He is not in custody.

25             THE COURT:  The charge is?

1        MR. DOYLE:  The charge is assault and battery

2    causing serious bodily injury, and the incident occurred

3    in September of 2013.

4        THE COURT:  Are you under -- did the defense

5    issue a subpoena as well?

6        MR. GIROUARD:  Yes, we did, but I believe I just

7    heard he is under subpoena today by Attorney Stewart, so,

8    yes, we have him and a decision with regards to whether we

9    call him in our case has not been made.

10        THE COURT:  Your subpoena is just day to day?

11        MR. GIROUARD:  It is.  And we talked that we

12    would work with him schedule wise, but obviously I can't

13    make that decision on the fly.

14        THE COURT:  Right.  So you're not calling him at

15    all in your case?

16        MR. STEWART:  I have decided on the strength of

17    Mr. Trudeau I don't need him.

18        THE COURT:  That's fine.  So do you think you

19    will rest tomorrow?

20        MR. STEWART:  I'm going to call Mr. Kagels and

21    rest.

22        THE COURT:  All right.

23        MR. STEWART:  I've got Mr. Brantley under

24    subpoena but I'm inclined to not call him.

25        THE COURT:  So you have one witness tomorrow

1    which should take maybe the morning.

2            MR. STEWART:  I'm actually not going to be that

3    long on the direct of Mr. Kagels but I suspect, like

4    Mr. Lodigiani, the direct is going to take longer -- I

5    mean, the cross is going to take longer than the direct.

6            THE COURT:  Certainly you'll be done by lunch

7    break with your one witness.

8        So I hate to press and it's not my business to press

9    you as to whether or not you're calling a witness, but I'm

10   prepared to issue an order that Attorney Doyle be

11   available here tomorrow, but it's only if you're going to

12   tell me that you're going to call him.  I'm not going to

13   interfere with his trial in state court unless you are

14   calling him as a witness.

15           MR. ZELLE:  I cannot tell you until I hear from

16   Mr. Kagels.

17           THE COURT:  Well, I'm not inclined to interfere

18   with a state court proceeding that's scheduled to go

19   unless you know you're going to call him as a witness.

20   The alternative is if he starts a trial tomorrow, I'm not

21   going to interfere with a state court process.  I will

22   order him to be available as soon thereafter but that may

23   mean we will have to keep the jury into a day next week.

24           MR. ZELLE:  How long is the trial?

25           MR. DOYLE:  At least four days, Your Honor.

1          MR. STEWART:  Judge, I've got another trial

2  starting next Wednesday so, you know, I don't have -- I

3  flexibility Monday and Tuesday.

4          THE COURT:  All right.  I'm going to give you --

5  you can step down, sir.  Go visit the Hall of Fame.

6  (Laughter.)

7          THE COURT:  I'm going to give the lawyers a

8  minute.  I know I'm putting you in kind of an untenable

9  situation.

10         MR. GIROUARD:  The problem, Your Honor, is that

11  in a perfect world we always look at how we can get

12  evidence and we all want to get evidence in ways that

13  streamline things and --

14         THE COURT:  But I don't want to be involved in

15  your tactics and your trial strategy.  I understand it

16  all. I've been there.  All I'm telling you is I am not

17  going to interfere with a state court proceeding.  I will

18  if you're telling me you're going to call him.

19         MR. ZELLE:  Here's why it's such a difficult

20  commitment.  I can call him and put him on for 15 minutes

21  but, you know, that's to comply with what the Court is

22  demanding.  Even though I don't need him, I can put him on

23  and that's just not fair to anyone.  It's a difficult

24  situation.

25         THE COURT:  It's at least fair to establish with

1  some certainty with which I am going to affect a state

2  court situation.

3          MR. GIROUARD:  It's a difficult position.

4          MR. ZELLE:  I will say we'll call him knowing

5  that I may be calling him for far less significant reasons

6  than I need to, but I will call him.

7          THE COURT:  All right.  I will have an order

8  issued and I'll try to contact Judge Wall to explain to

9  him this situation.

10          MR. DOYLE:  Thank you, Your Honor.  Could the

11  Court make arrangements to have the order e-mailed to my

12  office, that way I can make arrangements for my associate

13  to take it.

14          THE COURT:  I will ask you just to confer with

15  our clerk Ms. Healy.

16          MR. DOYLE:  And Judge Wall is Joshua Wall, Essex

17  Superior Court sitting in Lawrence.

18          THE COURT:  I know Judge Wall.

19          MR. ZELLE:  Let me advise particularly Mr. Doyle

20  but speak to the Court, I'm going to work very diligently

21  this evening and if my comfort level is that I don't need

22  Mr. Doyle and it gets to the point that I decide that, I

23  will let Mr. Doyle know and I will let the Court know.  I

24  mean, you will already issued the letter but at least then

25  --

THE COURT:  I understand, and I have great
respect for all counsel involved in this case.  If you
make a good-faith determination that you don't need him
anymore, then I will let you reverse your course.

I'm sure you appreciate by me interfering with a
state court proceeding I need at least some certainty that
I'm doing it for a reason and right now --

MR. ZELLE:  I can give you that in absolute good
faith.

MR. STEWART:  Judge, I need to say two
additional things:  One is you remember we had a
conference last Monday.  At that time after that
conference I told these gentlemen -- I could see this
coming -- I said, perhaps we should make an arrangement to
take Mr. Doyle's testimony by videotape.  I got no
agreement on that.  I don't know where you figure that in,
but I'm wishing that we had done that.  You know, they had
an opportunity I guess is my point is.

Number two, Mr. Doyle was served with a subpoena
yesterday at 9:30 issued by Mr. Girouard commanding him to
be here yesterday at nine o'clock, which I'm not sure how
that worked, but the real problem was there's a list of
documents that he's supposed to bring that is well beyond
anything that -- I mean, we could probably spend a day
trying to figure out which of those documents are

1    appropriate for Mr. Girouard.

2           THE COURT:  Is the document request reasonable

3    that Attorney Doyle needs to comply with?

4           MR. GIROUARD:  Well, what we asked for is --

5    well, the issue of what happened as far as the interaction

6    between Mr. Doyle and Mr. Lodigiani is one of the issues

7    in this case that's obviously been telegraphed.  So with

8    the subpoena that was sent and the date is no surprise, it

9    was the first day of trial, it was a day-to-day subpoena

10   so I don't know what the issue there is, but the request

11   was for billing documents and reports that he made.

12      Those documents have never been produced, and in

13   light of the waiver it became an issue and that's why the

14   supplemental subpoena to have him appear with documents.

15   I don't think it lists -- my recollection is it was one

16   paragraph that talked about billing documents, notes, and

17   correspondence regarding the interaction between Mr. Doyle

18   and Mr. Lodigiani on the waiver issue.

19          THE COURT:  All right.  Attorney Doyle, are you

20   able to comply with the document portion of this subpoena?

21          MR. DOYLE:  I have documents with me that I

22   attempted to comply with that, yes.

23          THE COURT:  All right.  Very well.

24          MR. GIROUARD:  And it was a good-faith

25   compliance?

1           THE COURT:  I'm sure Attorney Doyle, as well as

2     all of you and myself as a trial attorney, understands the

3     subpoena process and the uncertainty in which these

4     subpoenas are issued.

5           Attorney Doyle, if you think I need to do anything

6     more to protect you at least and your client for tomorrow,

7     you let me know, but I think my issuing the order and

8     attempting to make contact with Judge Wall will at least

9     protect you in that court.

10           MR. DOYLE:  Yes, Your Honor.  I would be

11     satisfied with that.  Thank you.

12           MR. ZELLE:  If I could request the Court wait

13     five minutes?  I mean, I'm not planning to run out.  Let

14     me go back through what was said today and I will let --

15     maybe I want to think about it more because I know

16     Mr. Doyle, I don't want to drag him out here.  I certainly

17     empathize with his position, I think we all do.  If Your

18     Honor can just wait five, ten minutes for a final

19     answer.

20           THE COURT:  That's fine.

21           MR. ZELLE:  Thank you.

22     **(Court recessed at 4:41 until 4:57.)**

23           THE COURT:  Okay.

24           MR. GIROUARD:  Your Honor, if I may?  So we

25     understand procedurally that I have issued a subpoena to

1    compel Mr. Doyle to appear through the length of the trial

2    and that on Monday I caused to be served a second subpoena

3    requesting that he appear with documents.

4        In an effort to accommodate what is obviously a

5    problem from a scheduling point and your desire to not

6    issue an order if you don't have to to interfere with a

7    criminal trial, I had suggested that we can look at the

8    documents that you brought and if the documents that you

9    brought are documents that could get us to where we need

10   to be, along with the testimony of Mr. Kagels, we will say

11   fine, go on your way and try your case in Essex.

12       We reviewed billing documents.  The only thing we

13   asked for in this colloquy with counsel is they present us

14   billing documents that we proposed, if we can admit the

15   billing documents with the redaction of the dollar figures

16   that he received, simply what he did and the time he spent

17   and the dates that he did it, then we're satisfied going

18   forward with those documents and then being able to

19   cross-examine Mr. Kagels.

20       It appears to me that if he's here under subpoena

21   with the documents, it's no different than if I had

22   compelled the keeper of the Baystate Medical Center to

23   appear with documents.

24       If those documents are relevant and admissible,

25   there's no proper claim of privilege, which I would

1   suggest in this instance that's been a waiver of the

2   attorney-client privilege on issues between Doyle and

3   Lodigiani, the billing records that he submitted for

4   payment in the ordinary course of business at PMIC, I

5   don't see any basis to keep the records out.

6       They appear to be relevant to the theory we are

7   advancing relative to how Mr. Lodigiani was treated and

8   what he got for advice and what communications occurred.

9       So we're proposing a solution that frees you of

10  issuing the order that you are reluctant to issue.  On our

11  level is giving up something because we are foregoing the

12  decision to have Mr. Doyle appear and proceed forward in

13  the most expeditious way giving us at least some ability

14  to put on a defense case, we request that if the Court is

15  inclined to take look at the billing records, we're

16  requesting that those be accepted as business records

17  received by PMIC and they be admissible once we go forward

18  if the foundation is laid through Mr. Kagels' testimony.

19          MR. STEWART:  If I may be heard, Judge?  First

20  of all, these are business records of Mr. Doyle's law

21  firm.  They are not business records of PMIC.  There are

22  things in there that require explanation, some of them are

23  billing Mr. Doyle's partner.  I don't know that even Mr.

24  Doyle knows precisely what those billing entries are for.

25      I can see a lot of argument.  There's one that says

1    "great conflicts issue," who knows what they're going to

2    argue that refers to?  I think it's very prejudicial with

3    these bills.  I'd suggest that there are many analytical

4    leaps between the relevance of what that has to do with

5    the issues that we're trying here.  However, it is kind of

6    inflammatory or prejudicial to see, you know, regarding

7    conflicts issues that, you know, just has a bad smell to

8    it having the document in.

9         There's no authenticity objection, but there is an

10   objection to the fact that they're subpoenaing some

11   records and then they're going to try to make arguments on

12   them based on very little information.  I don't know, it

13   just seems unfair to me, Judge.

14        THE COURT:  So your primary objection would be a

15   relevance objection to the billing?

16        MR. STEWART:  Yeah, I mean, "great conflicts

17   issue," what the heck does that mean and how does it have

18   anything to do with the rescission action and the coverage

19   for the insurance policy?

20        I can see them trying to say Mr. Doyle had a conflict

21   representing Mr. Lodigiani.  Well maybe, but we don't know

22   from the records.  I mean, we just have a bare entry.  If

23   they want to call him, I think that's fine, but they're

24   introducing some mischief into the case that I think is

25   going to be very difficult.  You know, the solution that

1    they've asked for is unfair to me is what I'm suggesting.

2              THE COURT:  It's their job.

3              MR. GIROUARD:  Thank you.  It strikes me where

4    someone objects, what's the objection?  It really hurts,

5    that's what this sounds like to me.  It strikes me that

6    the entries that we're looking at includes some key

7    elements to the case.

8              THE COURT:  But Attorney Stewart shouldn't give

9    up tactically his ability to explain things with a live

10   witness.

11             MR. GIROUARD:  Your Honor, if I could, again

12   going back to Baystate Medical Center, if I issued a

13   keeper of records subpoena to Baystate Medical Center and

14   I asked for the billing records for medical treatment

15   rendered and the plaintiff has said there was never any

16   treatment on those dates and I've got billing records that

17   suggest that there was treatment on that date, that's all

18   you need the piece of evidence for and it would be

19   admissible.

20        In this instance one of the issues that we're driving

21   at is this man has made an allegation in his testimony,

22   Mr. Lodigiani, that he wasn't given counsel regarding what

23   the partnership was and what other approaches he could

24   have taken to analyzing the situation.

25        If you look at the billing records, there is a

1   conversation on March 22nd that we've zeroed in on in

2   Kagels' notes that talk about he's talking to Mr. Doyle

3   and there's a conversation.  If you look at the billing

4   records, there's a .2 time spent talking with Leo

5   Lodigiani before the recorded statement.  There's no

6   client meeting billed other than the .2.

7           It seems to me that we are able to take that raw

8   evidence and then be able to argue by inference to the

9   jury that this is exactly what we're talking about.  There

10  was one fact, the sharing of profits, and that's what they

11  seized upon and then they labeled it a partnership and

12  that's where we end up down this road to where we are

13  today.  That dovetails with this theory.

14          We have proposed a pragmatic response.  Mr. Kagels

15  paid these bills so I would imagine he has some

16  understanding before he wrote the check -- I presume he

17  paid them.  He authorized them, that's usually the way it

18  worked so he's going to be able to answer those questions

19  about what's your understanding about what you're paying

20  for here?  What are these dates about?  We can dovetail

21  them into the timeline.  It's a relevant analysis for this

22  jury to be able to conduct.

23              THE COURT:  All right.  I'm not going to force

24  the plaintiff to accept or enter into any agreement.

25  Quite frankly, I think it's safer to have Attorney Doyle

1    here potentially if unexpected issues come up to have the

2    witness here.

3         I think although there's an intrusion, the intrusion

4    is minimal now still before the state court proceeding has

5    started.  So although I'm reluctant to delay a state court

6    proceeding here, now is the safest time to do it so I'm

7    going to issue the order for you to be here tomorrow.

8         MR. ZELLE:  I just want to be clear.  I may not

9    ask him anything more than that one page.

10         THE COURT:  I understand.  You've made that

11    clear and I've articulated why I need to have certain

12    representations on the record to take the action that I'm

13    going to take, and perhaps you'll be back to Essex in the

14    afternoon to start lunch, I have no idea.

15         MR. DOYLE:  I will be here at nine, Your

16    Honor.

17         THE COURT:  Thank you.  All right.

18         MR. DOYLE:  Thank you for your help.

19         MR. STEWART:  Thank you for staying overtime,

20    Judge.

21         THE COURT:  They don't pay me overtime.  I'm not

22    on the clock anymore.

23    **(Court recessed at 5:05.)**

24

25

1                C E R T I F I C A T E

2

3

4      I, Alice Moran, RMR, RPR, CSR, Official Court

5 Reporter for the United States District Court for the

6 District of Massachusetts, do hereby certify that the

7 foregoing transcript constitutes, to the best of my skill

8 and ability, a true and accurate transcription of my

9 stenotype notes taken in the above-entitled matter.

10

11

12 Date:  June 12, 2015

13

14 /s/ Alice Moran

15 _____
   Alice Moran
16 Offical Court Reporter

17

18

19            Alice Moran, CSR, RPR, RMR
             Official Court Reporter
20          300 State Street, Room 303D
            Springfield, MA 01105
21             413-731-0086
           alice.moran@verizon.net
22

23

24

25