1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
2                    WESTERN SECTION

3

4

Preffered Mutual Insurance )
5                                )          **13cv30138-MGM**
   vs                           )
6                                )
   Leonard C. Lodigiani, et al)
7   _____)

8

9                  **Transcript of Trial** Held Before
              The Honorable Mark G. Mastroianni,
10      United States District Court Judge and a Jury,
                   on **April 8, 2015.**

11

12

13   <u>APPEARANCES</u>:

14

   For the plaintiff Preferred Mutual:  John B. Stewart,
15   Suite 301, 20 Maple Street, Springfield, MA 01103.

16

17   For the defendant Leonard Lodigiani: David H.
   Burstein,1331 East Columbus, Ave., Springfield, MA 01105.
18
   For the defendant Evins C. Brantley:  Anthony R. Zelle
19   101 Federal Street, Boston, MA 02110

20   For the defendant Adnan Yildirim: John A. Girouard, 446
   Main Street, 12th Floor, Worcester, MA 01608.
21

22                  Alice Moran, CSR, RPR, RMR
                 Official Federal Court Reporter
23                300 State Street, Room 303D
                      Springfield, MA 01105
24            Tel: (413)731-0086  Fax: (413)737-7333
                    alice.moran@verizon.net
25

1          INDEX

2        **April 8, 2015**

3

4

5    Witness Name:                                    Page:

6

7

    **RAYMOND KAGELS**

8

9    Direct examination by Mr. Stewart                   7

10   Cross-examination by Mr. Zelle                     39

11   Cross-examination by Mr. Burstein                  85

12   Redirect examination by Mr. Stewart                96

13

14   **MARGARET GRUNDSTROM**

15

16   Direct examination by Mr. Zelle                   102

17   Cross-examination by Mr. Girouard                 127

18   Cross-examination by Mr. Stewart                  131

19   Redirect examination by Mr. Zelle                 139

20   Recross-examination by Mr. Stewart                141

21

22   **ADNAN YILDIRIM**

23

24   Direct examination by Mr. Girouard                142

25   Cross-examination by Mr. Stewart                  152

**EVINS BRANTLEY**

Direct examination by Mr. Burstein                    165

Cross-examination by Mr. Stewart                      181

Redirect examination by Mr. Burstein                  186




Plaintiff's Exhibits:                                 Page

**4 for ID**  2/28/13 audiotape of recorded statements     185




Defendants' Exhibits:                                 Page

**16**    Claim notes                                      46

**3 for ID**  A page from the claim notes                  57

**16A**  A page from the claim notes                       84

**(Court commenced at 9:17.)**

        THE COURT:  Good morning.  Yesterday while in the middle of the trial while --

**(The jury entered at 9:18.)**

        THE COURT:  Good morning.

    Come to sidebar.

    Good morning, ladies and gentlemen.  Yes, you could be seated.  All right.  Good morning.

(Sidebar conference.)

        MR. ZELLE:  Do you automatically put the noise on?

        THE COURT:  She's getting it.

        MR. ZELLE:  During Mr. Griffin's examination he was testifying about joint venture.  He was only involved in rescission because he testified he did not have anything to do with coverage issues.

    I'm not looking for an instruction at this point.  I just want to raise this with you so that during Mr. Kagels' testimony, Mr. Stewart is careful that we didn't get in that position because if it comes up in Kagels again that the joint venture issue was something that was considered in the rescission, I might want an instruction at that point.

        THE COURT:  All right.  So I don't really know why you're bringing that to my attention.

1          MR. ZELLE:  To basically caution Mr. Stewart

2     that Mr. Kagels should not testify in a manner that

3     suggests that the joint venture was a basis for

4     rescission.

5          If you recall in the pretrial memo, I believe we

6     provided you with the testimony from Mr. Kagels'

7     deposition where he said it was only based on

8     partnership.

9          THE COURT:  All right.  What do you say?

10          MR. STEWART:  Judge, the letter from Mr. Kagels

11     that -- actually the rescission letter that was offered in

12     evidence and accepted in evidence yesterday makes clear

13     that the rescission is based on two different grounds.  It

14     actually mentions the partnership exclusion.

15          THE COURT:  It does.

16          MR. STEWART:  So I think it's in the case.

17          MR. ZELLE:  Well, I guess it's Mr. Stewart's

18     choice because if he introduces evidence from Mr. Kagels

19     that he relied on joint venture facts to support the

20     rescission, I'll stick his deposition in his face and say

21     you just told us in your deposition...

22          If he wants to go there, fine.  I tried to preclude

23     the whole issue because I don't think it really is fair to

24     be going back contradicting what you said in the

25     deposition.  I mean, that's why we have limine motions.  I

1  have recourse, but --

2          THE COURT:  I hear what you're saying, but it

3  sounds like a tactical matter.  If Mr. Stewart makes a

4  decision he wants go this way, he might open the door for

5  some ability to impeach.  I think that's just a trial.

6          MR. ZELLE:  Okay.  We will go that route.

7          THE COURT:  Okay.

8  (End of sidebar conference.)

9          THE COURT:  Good morning again.  Has everyone on

10  the jury been able to comply with my instruction not to

11  begin deliberations or research anything on the Internet,

12  searches on the case?  All right.  Very good.  Thank you.

13     Affirmative responses from all, the jury remains fair

14  and impartial.

15     Call your next witness please.

16          MR. STEWART:  Thank you, Judge.  I call Mr.

17  Kagels.

18          THE CLERK:  Would you raise your right hand,

19  please?

20  **RAYMOND KAGELS (Sworn)**

21          THE CLERK:  State your name and spell your last

22  name for the record.

23          THE WITNESS:  Raymond Kagels, K-a-g-e-l-s.

24          THE CLERK:  You may be seated.

25

**DIRECT EXAMINATION**

Q.   (By Mr. Stewart)  Good morning, Mr. Kagels.  Can you
reintroduce yourself to the jury?

A.   My name is Raymond Kagels.  I work for Preferred
Mutual Insurance Company.

Q.   What's your position at Preferred Mutual?

A.   I'm a liability claims specialist.

Q.   Okay.  How long have you been in that position?

A.   Eight years.

Q.   Would you give the jury an idea of your educational
background before coming to Preferred?

A.   Well, I graduated high school in 1966.  I attended
Brown University and graduated there in 1972.

Q.   What was your course of study at Brown?

A.   My major was religious studies.

Q.   Okay.  Did you have a minor concentration?

A.   I didn't declare a minor.  If I had, it would be
archeology.

Q.   So what happened after you graduated from Brown?

A.   I went to work for Royal Insurance in Providence,
Rhode Island.

Q.   What type of insurance company was Royal?

A.   It was a causality insurance company.

Q.   In those days was it a pretty big insurer?

A.   A very, very big insurer.  Worldwide it was probably

1    the biggest insurer in the world.

2    Q.    Okay.  So what were you doing at Royal?

3    A.    All types of claims.  We had just a four-person

4    office there so we had to handle everything and the only

5    thing we didn't handle was security bonds.

6    Q.    Were you sent for any training before that job at

7    Royal?

8    A.    No, not before Royal, other than my education.

9    Q.    Okay.  So your education was after your position?

10   A.    Yes.

11   Q.    And how long did you remain in that position at

12   Royal?

13   A.    I was there for about four or five years.  I went to

14   White Plains, New York as a supervisor and ultimately to

15   Boston as an assistant manager.

16   Q.    Okay.  What was your next position after that?

17   A.    After that I worked as a broker for about 24, 25

18   years.

19   Q.    Okay.  And what did you -- you were still in the

20   insurance world?

21   A.    Yes.

22   Q.    Okay.  What was your job as a broker?

23   A.    I was a structured settlement broker for a company

24   called Gallagher Settlements originally.  It went through

25   a few changes while I was there, but essentially it was

1   the same job and we basically sold annuities to fund

2   long-term settlements.

3   Q.   And did that bring you into proximity with claims,

4   larger type claims?

5   A.   Oh, yes, yeah.

6   Q.   Okay.  So were there any similarities between what

7   you were doing at claims and then what you were doing at

8   Gallagher?

9   A.   Somewhat similar although I played a different role.

10  I was a broker in those situations, but I would still

11  attend settlement conference and mediations, trials

12  sometimes, that sort of thing.

13  Q.   You would be evaluating claims to a certain extent?

14  A.   I would assist in evaluating claims.

15  Q.   Okay.  And did you have any role working with

16  attorneys on settlements?

17  A.   Oh, yes.

18  Q.   Okay.  So let's get to your present position at

19  Preferred Mutual.

20       Tell us basically what you do on a day-to-day basis

21  and what type of supervision you have, that kind of thing?

22  A.   I work in the liability claim department, which would

23  involve bodily injury claims and property claims of

24  various types on a liability policy.

25  Q.   Okay.  Just so that the jury understands, what's the

difference between like a first-party claim and a

third-party liability claim?

A.    The first-party claim would be with our insurers.  If

there were a fire for instance, the property department

would go out and evaluate the damages, confirm coverage,

and pay the claim to our insured.

A third party is where there's a liability policy and

we are dealing with third parties, dealing with other

parties, not our insureds but people making claims against

them.

Q.    Okay.  Just so the jury understands, the first-party

claim is where your own policyholder has bought insurance

and they get paid for their claim directly from Preferred?

A.    Yes.

Q.    And a liability claim, that depends on the liability

of the policyholder and the money in that case would

actually go to a third party?

A.    Correct.

Q.    Okay.  So it sounds like most of your work is on the

third-party type of liability cases, is that correct?

A.    All of my work.

Q.    Okay.  Can you give the jury an idea of what your

caseload is like?  How many claim files you are handling

at a given time?

A.    Somewhere in the range right now of 150 to 170.

1   Q.   And are you aware of the industry standards and where

2   that falls in the range?

3   A.   That's pretty much the standard.

4   Q.   Okay.  Now what type of reporting or supervision do

5   you have?

6   A.   I report to a manager who is in charge of one of our

7   liability teams.  We have two liability teams at Preferred

8   Mutual.  I report to a fellow by the name of David Bogden.

9   He reports to Sean Campbell who's our overall claim

10  manager of the whole claim department, including first

11  party and third party, and then it goes up the chain from

12  there into senior management of the company.

13  Q.   And are there protocols and policies about the

14  reporting of when it escalates up the chain?

15  A.   Yes.

16  Q.   Okay.  And does part of that revolve around the

17  potential dollars involved?

18  A.   Part of it, yes.

19  Q.   Okay.  Well, can you give the jury an idea of what

20  type of recordkeeping you make regarding your activities

21  on a claim?

22  A.   Generally we put notes in the files.  They're

23  electronic notes in our computers.

24  Q.   And what is the level of detail or what are you

25  trying to capture in those notes?

1 A. In the notes generally just a basic summary.  I often

2 get accused of writing too much because other people have

3 to read those notes, but I try to be thorough with those.

4 Q. Okay.  And who is it that reads these notes?

5 A. It would be my manager.

6 Q. Okay.

7 A. Or people above him, anybody.  Even the president of

8 the company can read them if he wants to.

9 Q. So Preferred Mutual management can go in and look at

10 your notes?

11 A. Yes.

12 Q. Okay.  So let's get to this case and then we'll fill

13 in some background.

14  Was there a certain point in time that you were

15 assigned a fire loss in South Hadley sometime after

16 January 28th of 2013?

17 A. Yes.

18 Q. About how long after this fire did you get the --

19 were you brought into that?

20 A. I believe I was assigned on January 31st.

21 Q. Okay.  Was that the same day or the next -- how soon

22 after notice came to Preferred Mutual did it land on your

23 desk?

24 A. I believe it was the same day.

25 Q. Okay.  And generally, what did you do?

A.    Well, the first thing I would do is take a look at
coverage.  I would look at the underwriting file.  I would
copy the deck sheet from the policy into my claims file so
I would have that information to refer to in the future.

I would confirm, first of all, that the policy was in
force, see who we insured, and then I would look at the
claim file and be sure that the policy was in force on the
date of the incident, that's another thing on coverage.

Once I'm satisfied with that, I would take a look at
the claim file and additional information that's provided.
In that particular case there were some newspaper accounts
that had come into the file.  Now I'm not certain who put
them there but newspaper accounts of the fire did come in.
I took a brief look at those, and then I would contact our
insured and get basic information so I can basically set
up the file and decide what to do from there.

Q.    Okay.  If I can stop you there, I know there's more
to that but I want to ask you about a few things.

When you say the first thing you do is look for
coverage, are you looking for a similarity between the
person that reported the claim and who was the insured on
your policy?

A.    Not necessarily.  Sometimes claims are reported to us
by agents, sometimes they're reported by people making
claims against our insureds where our insured has not

1   reported it.

2   Q.   You're looking at the effective dates of coverage of

3   the policy?

4   A.   Right.  I want to know when a policy was --

5   particularly to be sure it's in force on the day of the

6   incident that it was reported to us.

7   Q.   Okay.  So I think you said one of the first things

8   you do is to try to contact your insured?

9   A.   Yes.

10  Q.   Okay.  Did you do that in this case?

11  A.   Yes.

12  Q.   Were you able to reach Mr. Lodigiani?

13  A.   Yes, I was.

14  Q.   Okay.  Do you have a recollection of what occurred on

15  that call?

16  A.   Yes.

17  Q.   Could you tell the jury.

18  A.   Mr. Lodigiani indicated to me that he was being

19  blamed for this fire that occurred that destroyed the

20  building he was working in, and he was pretty concerned

21  about that.  He was adamant that he did not cause the

22  fire.  We talked about it a little bit and it was clear to

23  me that he was concerned that he was the one being

24  targeted.

25  Q.   Okay.  As a result of that conversation, did you do

1    anything?

2    A.    Yes.

3    Q.    What did you do?

4    A.    I contacted my manager and I told him that I felt

5    because of the seriousness of the fire and the allegations

6    that were being brought that we needed to hire an

7    independent adjuster.  Secondly, we needed to hire a cause

8    and origin expert to determine where the fire started and

9    how it started if possible.

10        There was a lot of damage to the building but the

11   walls were still standing and it is possible for our cause

12   and origin experts to go in and delve into those things.

13        The third thing was I told him I felt that we needed

14   to hire an attorney to represent Mr. Lodigiani.  There

15   were two reasons for that:  One was to protect him from

16   all the people who were coming after him looking for

17   information and he was very concerned about that too, so I

18   thought that was the best way to do that.

19        When we have a serious fire like that, I like to have

20   an attorney involved in the very beginning.  I like to

21   have him go out and see the scene, be there during the

22   investigation.  It gives him a better idea of the whole

23   situation from the very start than just, you know, six

24   months later getting a report from a cause and origin

25   expert or our adjuster and trying to piece things

1 together. It's better if he's right there at the time.

2 Q.  Let me ask you this, and I'm just basically asking

3 for your understanding, sir, or your thinking on this,

4 when a person like Mr. Lodigiani now has an attorney, are

5 other people allowed to contact him directly and speak to

6 him?

7 A.  Well, they're not supposed to.  His attorney should

8 be contacted before they speak to him.

9 Q.  Okay.  So before you hire an attorney, if somebody

10 says I talked to Mr. Lodigiani and he admitted he was

11 totally at fault, after he has an attorney, people -- he

12 wouldn't be open to those types of claims because people

13 shouldn't be talking to him?

14 A.  That's right.

15 Q.  Is that right?  Okay.

16 Was that one of the reasons why you hired counsel for

17 him?

18 A.  Yes.

19 Q.  Okay.  So I think you've told us that you hire a

20 cause and origin expert, is that done as a matter of -- is

21 that usually done in a claim like this?

22 A.  In a major fire, yes.

23 Q.  Okay.  Is hiring an independent adjuster something

24 that you do as a matter of course in a fire like this?

25 A.  Right, yes.

1    Q.   Okay.  And hiring an attorney can you tell us the

2    frequency that you would be doing that in a case like

3    this?

4    A.   In a case like this, I would generally always do it,

5    a case with very severe damage because there's a big

6    exposure to our company and to our insured so we would

7    want that kind of protection in place for our insured.

8    Q.   Okay.  So Mr. Bogden accepted your recommendations?

9    A.   Yes.

10    Q.   And can you tell us who was hired?

11    A.   For the attorney I hired Joe Doyle and Matt Perkins

12    from Lecomte Emanuelson in Quincy.  For the adjuster I

13    hired Jim Trudeau who testified here earlier, and for the

14    cause and origin it was a fellow by the name of Rick

15    Splain.

16    Q.   Okay.  And if you could tell us do you have some

17    experience with all of those people before this?

18    A.   Yes.

19    Q.   Did Preferred Mutual consider Mr. Doyle one of their

20    top fire attorneys at that time?

21           MR. ZELLE:  Objection.

22           THE COURT:  Sustained.

23    Q.   (By Mr. Stewart) Can you characterize your thoughts

24    as to Mr. Doyle's expertise at the time you gave him this

25    assignment?

1    A.   Yes.  I thought he did a very good for us and I did

2    use him particularly in these fire cases.

3    Q.   Was the cause and origin company somebody that you

4    had worked with before?

5    A.   I had worked with them before.  I didn't know them

6    extremely well but I had always heard they did a good job

7    for us before I came with the company, and since I've been

8    with the company I've used them a few times and been happy

9    with them.

10    Q.   Okay.  I gather that Mr. Splain's office was out in

11    Falmouth?

12    A.   Yes.

13    Q.   And there are several people beside Mr. Splain

14    himself there, is that correct?

15    A.   I really don't know.

16    Q.   Okay.

17    A.   He's the one I dealt with.

18    Q.   Did Mr. Trudeau get involved in coordination of the

19    that aspect at a certain point?

20    A.   I believe he did, yes.

21    Q.   Okay.  So what did you do next on the South Hadley

22    liability claim that was presented to you?

23    A.   Well, after contacting Mr. Lodigiani the first time,

24    like I said, I hired these people to assist in the

25    investigation and to coordinate the investigation.

1    I should correct myself in the last answer because it

2    was really Joe Doyle who coordinated the investigation.  I

3    said Jim Trudeau did.  Jim coordinated certain things

4    having to do with the investigation itself that he did

5    beside what Joe did, but Joe was more or less in charge of

6    it.  They reported to him.

7    Q.   Were future deadline or future contact dates to

8    triage the file set up?

9    A.   I believe when it was assigned to me, the manager who

10   assigned it was not my manager, she was just doing the

11   assignments that day, she set it up for a triage.

12   Q.   Can you tell the jury what a triage is?

13   A.   A triage is where most, if not all, of the people in

14   our liability claims department would get on the phone

15   together and review a file.  We do one at a time so

16   there's one set for that day and it's what we know about

17   it is presented, and we'll talk about things like other

18   avenues of investigation that others may suggest be done.

19   We'll talk about reserves, that's money that's set aside

20   for that particular claim, that sort of thing.

21   Q.   Okay.  Did you begin hearing about site inspections

22   at a certain point?

23   A.   Yes.  We received a letter from the Stutman Law Firm,

24   I believe they're in New Jersey, representing one of the

25   parties, and they were trying to set up -- put everybody

1    on notice to set up an inspection, a property inspection

2    of the site for sometime within a week or so I believe it

3    was, and that also triggered our need to get our experts

4    in line and that came in about two hours after the initial

5    claim report came from Mr. Lodigiani's agent.

6    Q.    Okay.  So was there some compulsion to move quickly

7    to get your cause and origin and lawyer and Mr.

8    Lodigiani's lawyer and the independent investigator going

9    on this?

10   A.    Absolutely.  I mean, this happens in every major

11   fire.  One of the parties will decide to get -- and

12   usually it's the party that has the biggest exposure in

13   the fire loss, they want to put everybody on notice to

14   come out.  A lot of times the contractors that were

15   working on the job who might not be involved but just so

16   everybody has a chance to come in and do their inspection,

17   do their investigation and nobody gets left out of that.

18   Q.    Okay.  Can you describe for the jury what the role of

19   an independent investigator is for Preferred Mutual with

20   respect to a matter like this?

21   A.    Essentially he would do a lot more investigation than

22   just the fire scene.  For instance, in this particular

23   case we noticed or I noticed in one of the photographs in

24   one of the news articles that there was a gas station

25   across the street.

1     A lot of gas stations have surveillance cameras so we

2     wanted to see if they had any surveillance camera that

3     might show anything that happened.  You have to get that

4     evidence fairly quickly because those cameras, within a

5     few weeks, override what they've taken.  So we did

6     investigate  that.

7         We also do a neighborhood search sometimes to see if

8     there are other witnesses that can tell us anything about

9     what happened, and I believe we did get some information

10    from a fellow working there at the bodyshop behind this

11    place that burnt and those sorts of things.  We also take

12    statements in some cases if we want them or if the

13    attorney who is coordinating the investigation wants

14    them.

15    Q.   Okay.  So let me just ask you the ground -- the

16    on-the-ground investigation Preferred Mutual does not do

17    that with employees, is that accurate?

18    A.   Well, we could.  I mean, in this case we didn't.  No.

19    Q.   Okay.  And so it's a matter of hiring an independent

20    adjuster that is actually out here in this territory?

21    A.   That, plus I'm looking for somebody who has shown

22    himself to have very good expertise in the area he's going

23    to be dealing with.

24    Q.   Okay.  And I gather you have an high opinion of

25    Mr. Trudeau?

1    A.    I do.

2    Q.    Okay.  So did you begin getting some reports from

3    Mr. Doyle and Mr. Trudeau?

4    A.    I got some verbal reports early on from Mr. Trudeau

5    just keeping me advised of what was going on.  There was a

6    second inspection that was set up and I made some

7    suggestions to him about things to look into, like that

8    gas station and see if there were surveillance cameras.

9         You know, he would come back to me and, you know, he

10   did that at the time of the second inspection.  And, yes,

11   he gave me some reports.  I talked to Joe Doyle I believe

12   it was around the middle of March.  Basically I was asking

13   him to give me his thoughts on how the defense of, you

14   know, Mr. Lodigiani was shaping up, how things were coming

15   along.

16   Q.    Was there any discussion of potential other causes of

17   the fire or potential other people that were involved in

18   the setting of the fire?

19              MR. ZELLE:  Objection.

20              THE COURT:  Sustained.

21   Q.    (By Mr. Stewart) At some point Mr. Doyle did some

22   reporting to you that had a significance to your ear

23   sounded like coverage issues, are you with me?

24   A.    Yes.

25   Q.    Okay.  When did that happen?

A.    It was sometime around the middle of March.  We had a

conversation mostly about the specifics of how the defense

was shaping up.  In the course of that conversation, he

mentioned to me that Mr. Lodigiani had told him he had a

partner.

Q.    Okay.  And what, if anything -- strike that.

When you heard that, what went through your mind?

A.    I didn't recall seeing anything from the underwriting

file that suggested that we insured a partnership so I

wanted to look into that.

Q.    And as a result of that what, if anything, did you

do?

A.    Well, I first took a look at the deck sheet that I

had in my claim file and it indicated that we insured an

individual.  Sometimes that information is not exactly

what's on the application so I have to look at the

application itself and then see what was told to the

underwriters when the policy was applied for.  The

application said the same thing, that he was applying for

coverage as an individual.

Q.    Let me stop you.  I'm putting before you Exhibit 1,

the second page, is that what you're describing as the

declaration page?

A.    Yes.

Q.    And --

THE COURT: Is there an issue?

MR. ZELLE: Could we have that up on the screen?

MR. STEWART: Gladly.

MR. ZELLE: Thank you.

THE CLERK: I'm not getting any power to it.

MR. STEWART: I can probably move forward with some other things, Your Honor.

THE COURT: All right. You want to come back to this?

MR. STEWART: Yes, we can move through.

THE COURT: Once we pay the power bill.

(Laughter)

Q. (By Mr. Stewart) So if I can proceed as I was doing a minute ago, can you tell us what the named insured is?

A. Leonard C. Lodigiani d/b/a L.B. Plumbing.

Q. Okay. And that's something that you looked at?

A. Yes.

Q. Okay. And did that tell you anything about whether you insured a partnership?

A. It doesn't say anything about a partnership.

Q. Okay. So did that cause you to look at something else?

A. Yes, I looked at the application in the underwriting file.

Q. Exhibit 3?

1    THE COURT:  We have it working now if and when
2  you want to use it.  Everything is good.
3    MR. STEWART:  All right.
4  Q.  (By Mr. Stewart)  So when you're looking at the named
5  insured a minute ago, was that what you were referring to,
6  Mr. Kagels?
7  A.  Yes.
8  Q.  So now we go to the application, Exhibit 3, is this
9  what you looked at?
10  A.  I did look at that.
11  Q.  Okay.  And again you were looking at whether you
12  insured a partnership or an individual?
13  A.  Correct.
14  Q.  Okay.  Were there other parts of the application that
15  you looked at?
16  A.  Well, I looked at the fact that -- I noted that the
17  fact that it wasn't signed.  This was an online submission
18  so it wouldn't be signed.
19    I did at some point contact the agent.  Now I'm not
20  sure if it was right at this specific time or not.  It was
21  some time around then because I wanted to see the actual
22  application and I was told by one of the underwriters that
23  the agent was required to keep a copy of the actual signed
24  application in their files and that might have happened
25  you know a month or so later, two months later.  But at

1    some point I did ask the agent for a copy of the original

2    application.

3    Q.    Let me see -- can you look at the part that I

4    circled?

5    A.    Yes.

6    Q.    And you noticed there wasn't a signature there?

7    A.    Right.

8    Q.    So did you do something to find out if the agent had

9    a signed copy?

10   A.    Yes.

11   Q.    And how did you do that?

12   A.    Well, I believe I spoke to Peggy.  I don't know her

13   last name, but I spoke to her and she was kind of

14   dumfounded that it wasn't there, it wasn't in her file.

15   That's as far as I could go with that.

16   Q.    Okay.  And is this somebody at the FieldEddy

17   Insurance Agency?

18   A.    Yes.

19   Q.    Now not having a signed application in the file, did

20   that cause you to do anything?

21   A.    Well, it wasn't available so there wasn't much more I

22   could do with that, unless they found it.

23   Q.    Okay.  What happened next?  Strike that.

24         I gather at this point you're now -- strike that.

25         How would you characterize the hearing about a

1  partnership, did that become an issue?

2  A.   It became an issue once I saw the application and

3  realized that there was no question about this because we

4  didn't insure a partnership.

5  Q.   Is there an established type of business protocol of

6  what you're supposed to do when you have an issue like

7  that?

8  A.   Well, the first thing I would have to do is send a

9  note to the underwriters, it's done electronically, just

10  to indicate that there may be an issue that would affect

11  their underwriting.

12       Secondly, I would go to my manager and I'd report

13  what I had found to my manager and he would give me

14  direction from there what to do.

15  Q.   Okay.  So looking at Exhibit 6, is this the

16  underwriting memo that you sent?

17            MR. ZELLE:   I didn't hear an answer, Your Honor.

18            THE WITNESS:  Yes, it is.

19  Q.   (By Mr. Stewart)  Is one of the purposes of sending

20  an underwriting memo, from claims sending an underwriting

21  memo to a different department underwriting -- strike

22  that.

23       What are the purposes of that?

24  A.   Well, if we find something in the course of handling

25  a claim or developing information that we feel could

1    affect the underwriting of the file, and I'm not talking

2    about the past underwriting, you know, future effects on

3    underwriting when a policy came up for renewal or that

4    sort of thing that they need to know about, then we let

5    them know.

6    Q.    Okay.  So this is something that underwriting would

7    have in their file at the time of renewal?

8    A.    Yes.

9    Q.    So when a policy -- for instance, the business owner

10   policy of Mr. Lodigiani ran from December 18, 2012 to

11   December 18, 2013, when it was up for renewal this

12   underwriting memo would be in the file and somebody might

13   take a hard look at this?

14            MR. ZELLE:  Objection, that somebody might take

15   a hard look at this calls for speculation.

16            THE COURT:  I think technically you're correct.

17   I'll overrule it and let you have it.

18            THE WITNESS:  Yeah, that could happen, but

19   certainly they have it much earlier than that and they

20   might decide there's something else they needed to do.

21   Q.    (By Mr. Stewart) So this is kind of to put

22   underwriting on notice?

23   A.    Right.

24   Q.    At some point did you commence what could be

25   characterized as a coverage investigation?

1    A.   Yes.

2    Q.   Okay.  Can you tell us how that came about and then

3    what occurred?

4    A.   That was my initial report to my manager that there's

5    an issue here, there could be an issue and we need to look

6    into it.  He directed me to assign counsel to take an

7    examination under oath of Mr. Lodigiani.

8    Q.   Okay.

9    A.   And also I sent a reservation of rights letter to

10    him.

11    Q.   Did you consider coverage an issue at that time?

12    A.   It was an issue.  It certainly wasn't determined what

13    the outcome of the issue was but it was an issue at that

14    point, yes.

15    Q.   Okay.  Did you consider that an issue that needed to

16    be resolved?

17    A.   Well, yes, of course.

18    Q.   Okay.  And I gather the steps that you took to

19    resolve that are the ones you just talked about?

20    A.   Right.

21    Q.   Okay.  And you understand that there were

22    examinations under oath that were taken of Mr. Lodigiani?

23    A.   Right.

24    Q.   And you received reporting on what occurred at those

25    statements under oath?

1    A.    Yes.

2    Q.    Okay.  And did you receive some other additional

3    information pertinent to the coverage issue as these

4    months went by?

5    A.    Yes.  I realized after the first examination under

6    oath that we didn't have statements from or a statement

7    from Mr. Lodigiani, and I contacted Mr. Trudeau I believe

8    it was and asked him why we didn't have any and he

9    informed me that he had in fact taken statements from Mr.

10   Lodigiani, Mr. Brantley, and also Ronald Moore and for

11   some reason they just didn't make their way to my file.

12   So I wasn't aware of them, we weren't aware of them.

13   Q.    So at some point you were able to get those recorded

14   statements, which are now I think Exhibits 12 and 13, into

15   your file?

16   A.    Yes.

17   Q.    Okay.  And was there any significance to you of the

18   fact that Mr. Lodigiani said "we're partners" and Mr.

19   Brantley said that they were partners?

20   A.    Yes.

21          MR. ZELLE:  Objection.  I'm just missing the

22   time frame here.  Is this after he received the

23   statements, the physical copies?

24          THE COURT:  Let's hold on.

25          MR. STEWART:  I would be glad to rephrase.

1    Q.   (By Mr. Stewart)   Mr. Kagels, about when did you

2    receive the statements?

3    A.   It was sometime in May.

4    Q.   Okay.  And when you received the statements, did you

5    read them?

6    A.   Yes.

7    Q.   Did you notice that Mr. Brantley said that he was

8    partners with Mr. Lodigiani?

9    A.   Yes.

10   Q.   Did you notice Mr. Lodigiani said he was partners

11   with Mr. Brantley?

12   A.   Yes.

13   Q.   Did that have any significance to you?

14   A.   Yes.

15   Q.   Can you tell the jury what you thought?

16   A.   Well, I thought, first of all, that we needed to take

17   a second examination under oath because counsel was not

18   aware of the statements, I was not aware of the statements

19   at the time of the first one and so we had to get an

20   explanation now for this particular statement, these

21   statements that were made from Mr. Lodigiani.

22   Q.   Okay.  And was one of the objectives of the statement

23   under oath to determine -- in the circumstance of not

24   being able to find a signed application, was one of the

25   objectives of the examination under oath to see if Mr.

1   Lodigiani was going to own the representations in the

2   policy -- in the application?

3   A.    Yes.

4   Q.    Okay.  And was that issue resolved?

5   A.    That was resolved.

6   Q.    Okay.  And just based on your state of mind how was

7   that resolved.

8   A.    That was resolved by basically asking him if the

9   examination under oath going through each question were

10  the answers that were recorded in the online application

11  correct, were they the true answers.

12  Q.    Okay.  At that point did the significance of having a

13  signed application in the file, was it significant after

14  that to your investigation?

15  A.    It was not after that, No.

16  Q.    Okay.  So what happened after the second examination

17  under oath with respect to you and the claims office and

18  decision making?

19  A.    Well, we first got an opinion from counsel, you, and

20  as to, you know, the legal side of that question we had a

21  conference call that involved myself, my manager David

22  Bogden, his manager Sean Campbell, and our corporate -- I

23  should say claims counsel who was an attorney that we had

24  hired, he worked for Preferred Mutual and would assist us

25  in these kinds of questions and a lot of other things.

1   So the decision was then made in the claims

2   department that we really had to bring in -- at that point

3   we had to bring underwriting into the equation, into the

4   discussion because it would be up to them to decide

5   whether they wanted to rescind the policy or not.  We

6   couldn't make that decision.  We just had to pass on the

7   information we had to them.

8   Q.  At some point during this decision-making process

9   were there inquiries made of underwriting about the

10  significance of Mr. Lodigiani representing that his

11  company was a one-owner company?

12  A.  I did go to one of the underwriters, Garret

13  Scoonover, and asked him if Mr. Lodigiani had told us

14  about the partnership, would it have made a difference in

15  the premium.

16              MR. ZELLE:  I'm just anticipating the next

17  question.

18              THE COURT:  Okay.  Go ahead.

19  Q.  (By Mr. Stewart) And as a result of that

20  conversation, did the investigation into coverage

21  continue?

22  A.  Yes.

23  Q.  Okay.  And ultimately did you have some discussions

24  with the gentleman that was here yesterday, Mr. Griffin --

25  A.  Yes.

1    Q.    -- of the significance of Mr. Lodigiani representing

2    his company as a one-owner business?

3    A.    Yes.

4    Q.    Did you learn anything about whether that made a

5    difference in the pricing of the policy?

6    A.    I already knew that from Mr. Scoonover.

7    Q.    So with those elements -- well, strike that.

8          Are there other considerations and facts that you

9    obtained on the road leading to your coverage -- strike

10   that, to your coverage decision?

11   A.    I'm sorry, could you rephrase that?

12   Q.    I messed the question up.

13         In coming to your decision regarding coverage were

14   there other things that I haven't brought out of you yet

15   before the time you got to a decision?

16                MR. ZELLE:  Objection.

17                THE COURT:  Overruled.  Go ahead.

18                THE WITNESS:  Well, first, I have to say that it

19   wasn't my decision.  It was an underwriting department

20   decision.  I only could pass along information in

21   situations where it's strictly coverage and not

22   rescission.  That is still beyond my authority and I would

23   have to have managers get involved in that.  I'm not quite

24   sure what you're getting at in terms of other things.

25   Q.    (By Mr. Stewart)  It was a poor question.

1    So let me just understand there was a phone call or a

2    conference where you were reporting information and those

3    people were making the decision, is that more like it?

4    A.    They were -- well, those people in the conference

5    call with our claim counsel involved, we basically

6    reviewed the information that we knew and made the

7    determination we had to at that point bring underwriting

8    into the conversation.   There was again no decision to

9    rescind at that point.   They had to make that decision.

10   Q.    Okay.   If you would tell the jury what it was that

11   you reported on your side of that conference as the

12   significant facts that your investigation had uncovered

13   relative to coverage?

14   A.    I don't know that I made any specific report to them.

15   The information was all in the file.   People have an

16   opportunity to read the examination under oath if they

17   want to.   They have the opportunity to read your summary

18   of that, so everybody pretty much had the information in

19   front of them as we had that discussion.

20   Q.    Okay.   So this was just an occasion to bring the

21   issue to a head and make a decision?

22   A.    Try to move it towards a decision, yes.

23   Q.    And was a decision made?

24   A.    The only decision made in that meeting that I'm aware

25   of was to get underwriting involved.

1  Q.   Okay.   What happened next as far as this coverage

2  process?

3  A.   I think within a week we had a discussion and I'm

4  pretty sure claim counsel was not involved in that, but

5  the rest of us were and Mike Griffin.

6  Q.   And when Mike Griffin got involved, what happened

7  next?

8  A.   Well, underwriting made the decision to rescind the

9  policy.   I don't know whether it was during that

10  conversation or within a few days thereafter, but the

11  decision was made at that point.   It was in July of 2013 I

12  believe.

13  Q.   Okay.   Can you tell us your understanding of what

14  department within the insurance company makes the

15  decisions on rescission?

16  A.   The underwriting department.

17  Q.   Okay.   And you're in the claims department?

18  A.   Correct.

19  Q.   Okay.   Now as a result of this decision that was made

20  in underwriting, did you do anything?

21  A.   I had to prepare a letter to go to our insured and

22  with that letter we would send a check for the returned

23  premium.

24  Q.   Okay.   And is the letter you're referring to the one

25  that we marked as Exhibit 5?

1   A.   Yes.

2   Q.   All right.  And you signed this on page 3?

3   A.   Yes.

4   Q.   And does this articulate Preferred Mutual's position

5   as to coverage on Mr. Lodigiani's policy for the South

6   Hadley fire loss?

7   A.   Yes, it does.

8   Q.   Okay.  And did your letter brought forward what you

9   felt the facts that were uncovered during your

10  investigation?

11  A.   Yes.

12  Q.   And the significance of those -- that there would

13  have been a greater premium?

14  A.   Yes.

15  Q.   And that it's Preferred Mutual's position it's

16  entitled to rescind Mr. Lodigiani's policy?

17  A.   Yes.

18  Q.   Now on page 2 you included a discussion of the

19  examinations under oath that were taken?

20  A.   Yes.

21  Q.   Okay.  And that Preferred Mutual was under the

22  impression that the preferred course would be to file a

23  lawsuit asking the court to make a determination

24  regarding coverage?

25  A.   Correct.

1    Q.   Okay.  And you invited Mr. Lodigiani to submit

2    anything additional that he felt was pertinent and you

3    would be glad to reconsider?

4    A.   Correct.

5    Q.   Okay.  Did you receive anything?

6    A.   I don't recall receiving anything from him or his

7    attorney.

8    Q.   Okay.  By the way, I gather Mr. Burstein was copied

9    on this letter?

10   A.   Yes, he was.

11   Q.   Now, at a certain point in time -- well, strike that.

12        You were handling the coverage question -- after you

13   became involved in the coverage question, was there a

14   point in time that the file was split?

15   A.   Yes.

16   Q.   Okay.  So you're not involved in the liability aspect

17   of Preferred Mutual's liability on this?

18   A.   No, not any longer.  I was when I was first assigned,

19   but once we decided there was an issue of coverage as well

20   as liability, that's our policy, we set up another file

21   for the liability side.  I continued with the coverage

22   side.

23             MR. STEWART:  I think I'm set, Mr. Kagels.

24             THE COURT:  Thank you, Attorney Stewart.

25

**CROSS-EXAMINATION**

Q.    (By Mr. Zelle) Good morning, Mr. Kagels.

A.    Good morning.

Q.    We have met.  I'm Tony Zelle.  I represent C&K

building owner.

A.    Are.

Q.    Let's start where Mr. Stewart left off, the letter.

I'm going to just reassemble these things so I know where

everything is.

     So I'm going to show you and the jury Exhibit 5 here,

this is the letter that was sent to Mr. Lodigiani

informing him that Preferred Mutual had decided to rescind

his policy, correct?

A.    Correct.

Q.    And you signed this letter, correct?

A.    Yes.

Q.    You didn't write the letter though, did you?

A.    I believe Mr. Stewart originally wrote a draft and we

talked about it and he revised it probably and finalized

it.

Q.    And the reason I inferred that you didn't write it is

because the paragraph that Mr. Stewart pointed out

"Massachusetts courts have stated the proper course,"

that's not something that you as a claims professional

have that expertise, right?

1    A.    I might put in that a letter but in this case he

2    wrote it.

3    Q.    Now, you made reference to your claim notes and I'm

4    going to offer those claim notes as Exhibit 16 I believe.

5              THE COURT:  Attorney Stewart, is there any

6    objection to the claims notes?

7         Why don't you show it to Attorney Stewart?

8              MR. STEWART:  Is there a particular part?

9              MR. ZELLE:  I'm going to put in the whole notes.

10             MR. STEWART:  Judge, I think I'd like to be

11   heard.  Oh, you can use the top part of that.

12             MR. ZELLE:  Okay.

13             THE COURT:  So relative to what he wants to move

14   in, there is no objection?

15             MR. STEWART:  Well, no, I've got problems with

16   this.  If he wants to use the top part of that one note, I

17   don't have a problem with that.

18             MR. ZELLE:  I would like to put in the notes.

19             THE COURT:  So sidebar on the objection.

20   (Sidebar conference.)

21             THE COURT:  Show me.

22             MR. ZELLE:  The notes -- all of the claim notes

23   here are as we received them, and you can see the last

24   redaction, I was going to ask the witness to explain that

25   the redactions deal with the liability side so that it's

1    clear to the jury what it is that's redacted.

2              THE COURT:  All right.  And what's the relevance

3    of the entire document?

4              MR. ZELLE:  He's basically walked through the

5    claims handling process and I want to use the notes to

6    show where he is not exactly accurate in terms of his

7    timeline.

8              THE COURT:  In other words, your good-faith

9    proffer is that these notes contradict what his testimony

10   is?

11             MR. ZELLE:  Yes.

12             THE COURT:  So you would use this to impeach

13   him?

14             MR. ZELLE:  Yes.  I'd also use it for the

15   substance of what's offered in some respect, for example,

16   the conversation with Mr. Doyle.

17             THE COURT:  Why don't we go through these before

18   you introduce them.  Just use them as impeachment by going

19   piece by piece and at the conclusion of your examination

20   maybe at that point the foundation will be laid to

21   introduce the whole thing.

22             MR. GIROUARD:  Your Honor, there's also a

23   separate basis for introduction.  They are business

24   records of the company.  They're made in the context of

25   handling of the claim in the ordinary course of business,

1    and my recollection from reviewing the notes is they all

2    pre-date the commencement of the litigation so it strikes

3    me that they're independently admissible on that basis.

4            MR. BURSTEIN:  With the exception of the last

5    one which I know we took up separately, the unredacted

6    note from March, these notes are on our joint pretrial

7    memorandum as an agreed exhibit in this trial.

8            THE COURT:  Is that so?

9            MR. STEWART:  Judge, we went through whether

10   they could -- here's my real problem.  These are going to

11   the jury and they're going to see all the blackouts.  I

12   suppose if Your Honor gave them some type of cautionary

13   instruction that they're not to take any adverse inference

14   from all the blackouts.

15           THE COURT:  I don't have the pretrial report in

16   front of me, but this was agreed to?

17           MR. STEWART:  My real problem is I need an

18   instruction about not drawing an inference.

19           THE COURT:  You're right, you're right about

20   that instruction.

21           MR. STEWART:  Just not to draw undue attention

22   to this.

23           MR. GIROUARD:  I think the defense would

24   stipulate to that.

25           MR. ZELLE:  I was actually going to let the

1    witness explain that.  I can show it to him and ask him to

2    explain that the liability --

3              THE COURT:  You can him after I give that

4    instruction.  I think it needs to come from me.

5    (End of sidebar conference.)

6    Q.   (By Mr. Zelle) Let me show you, Mr. Kagels, what's

7    been marked at this point for identification an exhibit.

8    Can you identify for the jury what that is?

9    A.   These are some of the file notes.

10   Q.   And if you'll start at the last page, because it's in

11   reverse chronological order, can you tell us whether that

12   first note reflects the initial intake of this matter to

13   Preferred Mutual?

14   A.   Yes, it does.

15   Q.   Okay.  And if you look at the last note -- no,

16   actually the last note on the first page because they're

17   in reverse chronological order, what's the date of that

18   note?

19   A.   3/20/14.

20   Q.   As I understand you said that you were quite diligent

21   about recording your activity in the claim notes, is that

22   right?

23   A.   I try to be, yes.

24   Q.   And at this point up until the last date of March 20,

25   2014, you were dealing with both the coverage issues and

1    the liability issues and your notes reflect your thoughts

2    and your work on both of those issues, correct?

3    A.    No, that's not correct.

4    Q.    Well, I'd like to ask you the liability of Mr.

5    Lodigiani is not something that is at issue in this case?

6    A.    Yes.

7    Q.    And have you made an effort with respect to your

8    claim notes to excise -- to redact those notes that relate

9    to the liability part of the case?

10   A.    That was -- whatever the redactions were done by our

11   attorney, I don't know each and every one.

12   Q.    What I'd like you to do is take as much time you want

13   to make sure that there isn't anything dealing with the

14   liability part of this case that is on the notes that I'm

15   going to offer to the jury.

16   A.    It might take a while.

17   Q.    That's okay.  I think it's important.

18            MR. STEWART:  I'm not objecting, Your Honor.  I

19   would just like to be heard regarding an instruction.

20   (Sidebar conference)

21            THE COURT:  All right.  Have you reviewed all

22   that so you know there's nothing -- you know everything

23   was taken out on liability?

24            MR. STEWART:  Yes.

25            THE COURT:  We don't need to go --

| | |
|---|---|
| 1 | MR. ZELLE:  I would like to lay a foundation. |
| 2 | THE COURT:  So if the witness is going to need |
| 3 | some significant time, so if -- I'm going to request the |
| 4 | parties if you're satisfied that everything has been |
| 5 | redacted, we don't need to have the witness tell us |
| 6 | that. |
| 7 | MR. STEWART:  Here's what I -- I'm sorry it |
| 8 | didn't occur to me when we were up here before.  What I |
| 9 | would like, Judge, is I'd like Your Honor to instruct that |
| 10 | you have reviewed all the notes without redaction and |
| 11 | approved of these redactions, and that the redactions are |
| 12 | totally appropriate and not draw any adverse inference. |
| 13 | THE COURT:  I will. |
| 14 | MR. GIROUARD:  That's fine. |
| 15 | MR. BURSTEIN:  That's fine. |
| 16 | THE COURT:  But the point is can we skip the ten |
| 17 | minutes of this witness looking through this? |
| 18 | MR. ZELLE:  Absolutely. |
| 19 | THE COURT:  Let's do that. |
| 20 | (End of sidebar conference.) |
| 21 | THE COURT:  Mr. Kagels, could you -- we are |
| 22 | going to move in a different direction.  Could you return |
| 23 | those notes to the attorney. |
| 24 | MR. ZELLE:  I will offer this as an exhibit, |
| 25 | Your Honor. |

1          THE COURT:  All right.  And for the record, are

2     you withdrawing your last question asking the witness to

3     review them himself for liability?

4          MR. ZELLE:  Yes, Your Honor.

5          THE COURT:  That will be allowed as exhibit?

6          MR. ZELLE:  Sixteen.

7     **(Defendants' Exhibit 16 admitted.)**

8          THE COURT:  Now, ladies and gentlemen, when you

9     see Exhibit 16, I don't have the monitor up here, but you

10    will see that there's a significant number on some pages

11    of redactions or things are blacked out and other lines

12    are left open where you can read them.

13        Now I want you to know that you should not consider

14    the redacted portions in any way, shape, or form.  You

15    shouldn't hold or think about what those redactions mean.

16    You shouldn't hold it against a certain party or you

17    shouldn't consider this in a favorable way for a certain

18    party, and you shouldn't speculate at all as to what is

19    crossed out.

20        You should know that these notes, both redacted and

21    unredacted notes, have been reviewed by the court and have

22    been reviewed by the parties.  There is nothing being

23    withheld from you that is pertinent to anything at issue

24    in this case.

25        Remember how I told you objections are made and ruled

1    upon based upon the rules of evidence and what you should
2    hear and what's relevant for this case.  All right.  I
3    don't want you to speculate in any way for or against the
4    party as to these redactions.
5        Are the parties satisfied with the instruction?
6            MR. GIROUARD:  Yes, Your Honor.
7            MR. BURSTEIN:  Yes.
8            MR. STEWART:  Yes.
9            THE COURT:  Yes.
10   Q.   (By Mr. Zelle) Now, I'd like to clarify something,
11   Mr. Kagels.  You said in your direct examination that you
12   had not seen the transcribed recorded statements that Mr.
13   Trudeau took from Mr. Lodigiani and Mr. Brantley until
14   May, is that right?
15   A.   That's right I believe, yeah.
16   Q.   You were aware that the recorded statements had been
17   taken shortly after they were taken?
18   A.   I don't believe I was.
19   Q.   I'm going to show you a note.  It's dated March 22nd
20   of 2013, and you'll see -- let me put it up so we can all
21   see it.  I'm sorry about that.
22        It says, "I spoke to" -- it indicates URSK, that's
23   Raymond S. Kagels?
24   A.   Yes.
25   Q.   And you wrote "I spoke to Joe Doyle earlier today,"

1    correct?

2    A.    Correct.

3    Q.    And as of that date had Mr. Doyle told you that Mr.

4    Lodigiani and Mr. Brantley were partners?

5    A.    I believe he told me that, yes.

6    Q.    I think we can confirm that because if we look at

7    Exhibit 6, it's dated March 18th?

8    A.    Yes.

9    Q.    And you wrote "insured was operating as a

10   partnership?"

11   A.    Correct.

12   Q.    And you didn't get that information from Mr. Trudeau,

13   did you?

14   A.    No.

15   Q.    If Mr. Trudeau had taken the statements, you say you

16   weren't aware of the recorded statements having been

17   taken?

18   A.    Yes.

19   Q.    So Mr. Doyle told you that Mr. Lodigiani and Mr.

20   Brantley were partners.  At that point, however, you had

21   already hired Mr. Trudeau to take the recorded statements,

22   right?

23   A.    Yes.

24   Q.    And in your mind you didn't believe that Mr. Trudeau

25   had taken them yet?

1    A.    I didn't know.

2    Q.    Okay.  I'm assuming that if you knew, you would have

3    asked for the transcripts?

4    A.    Of course.

5    Q.    Now, when you spoke with Mr. Doyle and he told you

6    that Mr. Lodigiani and Mr. Brantley were partners, did you

7    ask him how he got that information?

8    A.    I assumed they had told him.

9    Q.    And that brought to your attention immediately that

10   there was a potential coverage issue, right?

11   A.    It was something I had to look into, yes.

12   Q.    But you didn't split the file at time, did you?

13   A.    I'm not sure when I split it.

14   Q.    Would it help you to look at your notes to see -- and

15   again, I'm not asking -- let put it this way.  The

16   redactions relate to the liability investigation, right?

17   A.    I believe so.

18   Q.    Right.  And if I show you that there are many entries

19   that you've made after March of 2012 that are redacted,

20   would that refresh your recollection that you were at that

21   point dealing both with the coverage side and the

22   liability side?

23   A.    I need to take a look at the notes.

24   Q.    Sure.

25   A.    Most of the notes after 3/22/13 do involve the

1  rescission issue so I don't know why the redactions were

2  done.  I'm not looking at the specific redactions so I

3  don't know, but at that point somewhere in that time

4  frame, between March and May, the only way I could really

5  answer that is to look at the other file and I don't look

6  at the other file to see when that was set up.

7  Q.  If I told you, Mr. Kagels, that the things that are

8  redacted had to do with the liability investigation, would

9  you agree that where it is your initials where there's a

10  redaction, you were dealing with the liability issues?

11  A.  I don't think you can assume that.  I don't know why

12  they were redacted each one.

13  Q.  Can you think of any other reason why they would be

14  redacted?

15  A.  I don't know.

16  Q.  Now, the recorded statement, this is Exhibit 12, of

17  Mr. Lodigiani, that was taking on 2/28/13.  Do you see

18  that?

19  A.  Yes.

20  Q.  All right.  And you'll see J.T. that you understood

21  when you ultimately did see that refers to Mr. Trudeau?

22  A.  Yes.

23  Q.  And you see J.D., right?

24  A.  Yes.

25  Q.  And you will see that J.D. is continuing to ask

1    questions, right?

2    A.    Correct.

3    Q.    There's a lot of J.D.s here.

4          That's not standard protocol, is it, where the

5    defense lawyer that you've hired as you've said to protect

6    the interest of Mr. Lodigiani is asking the questions in

7    the examination under oath?  That's not standard protocol,

8    is it?

9    A.    This is not an examination under oath.

10   Q.    I'm sorry.  In a recorded statement.

11   A.    In a recorded statement I have seen that before with

12   attorneys and also with plaintiff attorneys who are in the

13   room.

14   Q.    Can you answer my question?

15   A.    Okay.  I'm sorry.

16   Q.    I'm referring to standard protocol?

17   A.    Standard protocol, I don't know that there is a

18   protocol about that.

19   Q.    Let me explain what I mean.  How many hundreds or

20   thousands of recorded statements have you requested to

21   have been taken in the course of your 30-year history as a

22   claims examiner?

23   A.    Well, I haven't been a claims examiner for 30 years,

24   first of all, and I already went through that, but there

25   were many.  I mean, I can't tell how many thousands or how

1   many hundreds.

2   Q.   So in your experience when I say standard protocol,

3   let me not use that term.  It happens that defense lawyers

4   ask questions, is that more common than not?

5   A.   Oh, no, it's uncommon I would say.

6   Q.   Okay.  And how common is it for the defense lawyer

7   not only to ask questions but then to obtain and provide

8   you with the information that your company relies upon to

9   deny coverage and rescind the policy?

10  A.   I'm sorry, could you rephrase that?

11  Q.   Let me break it down.

12       You hired Mr. Doyle to protect Mr. Lodigiani?

13  A.   Right.

14  Q.   That is common?

15  A.   That is common.

16  Q.   Mr. Doyle did the questioning in the recorded

17  statement, right?

18  A.   Right.

19  Q.   You said that's --

20  A.   He did some questioning, yes.

21  Q.   You said that's not as common, right?

22  A.   I said it is uncommon.

23  Q.   It is uncommon.

24       And now I'm asking you had you ever before been

25  involved with a claim where the defense lawyer you hired

1    to protect your policyholder provided you with the

2    information that Preferred Mutual relies upon to rescind

3    an insurance policy?

4    A.    I don't recall that.  I couldn't begin to recall

5    that.  Has it ever happened?  It could have happened.

6    Sure.

7    Q.    It happened here, right?

8    A.    Well, it started with the investigation certainly. We

9    got information and the attorney was obligated to provide

10    us with information certainly.

11    Q.    Well, you say it started, and as of March 18th you

12    had spoken with Mr. Doyle?

13    A.    Right.

14    Q.    You hadn't seen the recorded statement, correct?

15    A.    Correct.

16    Q.    But you concluded the insured was operating as a

17    partnership, right?

18    A.    It's not a conclusion.  It was a fact.  I was passing

19    it along.

20    Q.    Well, you didn't write the insured may be operating

21    as an partnership, did you?

22    A.    No.

23    Q.    Did Mr. Doyle not tell you -- let me withdraw that

24    question.

25         Did Mr. Doyle tell you that in addition to referring

1   to Mr. Brantley as his partner and he also, Mr. Lodigiani,

2   described the operation of his business as a sole

3   proprietorship?

4   A.   I don't know that we got into that.  I don't recall.

5   Q.   So that's why I suspect in your mind you thought it

6   was a fact that Mr. Lodigiani and Mr. Brantley were

7   partners because you didn't know that it was also a

8   statement by Mr. Lodigiani that his business was a sole

9   proprietorship?

10  A.   Well, I knew that from the application.  It was a

11  fact that Mr. Doyle told me that they were partners; that

12  Mr. Lodigiani told him he had a partner.

13  Q.   You know what an open question is versus a leading

14  question, right?

15  A.   I guess so.

16  Q.   Okay.  This is a leading question, right?

17  A.   I would think so.

18  Q.   And the question that Mr. Doyle asked to Mr.

19  Lodigiani was "For this particular project on Bridge

20  Street, you agreed to do it as partners with Mr.

21  Brantley," would you call that an open question or a

22  leading question?

23  A.   I don't know how I would characterize that.  I don't

24  get into that particularly.

25  Q.   Did you hire Mr. Doyle to help Preferred Mutual dig

1    up information so that it could rescind the policy?

2    A.    Absolutely not.

3    Q.    Did you hire Mr. Stewart to do that?

4    A.    We hired Mr. Stewart to take an examination under

5    oath to get more facts for us.

6    Q.    But you just told me you already had a fact, you used

7    the term "fact" to describe that Mr. Lodigiani was

8    operating a partnership.  In your mind it was a fact at

9    that time, you didn't need any more investigation, did

10   you?

11   A.    I didn't say that was a fact.  I said it was a fact

12   that Mr. Doyle told me that.

13   Q.    That's not what you wrote on Exhibit 6.  I believe

14   you said, and you can certainly correct your testimony if

15   you want, I believe you said that you wrote insured was

16   operating as a partnership because it was a fact?

17   A.    I wrote the underwriter told me we were advised there

18   was a partnership here.

19   Q.    Didn't you engage Mr. Stewart to take the

20   examinations under oath simply to build more evidence for

21   the decision to rescind that you already made?

22   A.    To build more evidence to make a decision, not a

23   decision to rescind that was not in the cards in the

24   beginning.  We had to find out more to see if we had a

25   case to rescind.

1    Q.    Let me show you a claim note dated February 8, and

2    specifically I'd like to draw your attention to this line

3    here.  J.D. stands for Joseph Doyle?

4    A.    Yes.

5    Q.    "Is going to bring the insured in for an interview in

6    his office."  Did I read that correctly?

7    A.    Correct.

8    Q.    And you will see that's on February 8, 2013, right?

9    A.    Yes.

10   Q.    And you were here I believe when Mr. Lodigiani

11   testified about the interview he had in Mr. Doyle's office

12   with Mr. Doyle?

13   A.    Yes.

14   Q.    And did Mr. Doyle explain to you that interview he

15   had with Mr. Lodigiani?

16   A.    In the same detail you mean that Mr. Lodigiani talked

17   about?

18   Q.    Let me ask you this.  How did Mr. Doyle explain to

19   you the interview that he had with Mr. Lodigiani?

20   A.    Well, basically we were having a discussion about how

21   Mr. Lodigiani's defense was shaping up.  We talked mostly

22   about the case, the investigation and that sort of thing.

23   It was in the midst of that conversation that he mentioned

24   that Mr. Lodigiani had a partner.  So we didn't go into

25   any great detail on how the interview was conducted.

1    Q.   During the conversation that you had with Mr. Doyle

2    on March 22nd, at that point you told him that you were

3    looking into coverage and that you were going to take the

4    insured's examination under oath, right?

5    A.   I believe so.  I can't see the dates on this.

6           MR. ZELLE:  If I could approach the witness,

7    Your Honor?

8           THE COURT:  Yes.

9           MR. ZELLE:  And perhaps maybe I can mark at this

10    point for identification a page from the claim notes?

11           MR. STEWART:  Judge, I'd like to be heard on

12    part of that that I have an objection to.

13           THE COURT:  You can mark it for ID and I will

14    hear you on it.

15           THE CLERK:  ID-3.

16    **(Defendants' Exhibit 3 marked for identification.)**

17           THE COURT:  Attorney Stewart, do you need to be

18    heard on this now on what's marked for identification?

19           MR. STEWART:  I have no problem with it being

20    marked.

21           THE COURT:  All right.

22    Q.   (By Mr. Zelle)  I'm going to show you what's been

23    marked for identification as Exhibit 3.  I'm sorry I've

24    got to lean over and follow along with you because I don't

25    have an extra copy.

1          Thank you very much.

2          All right.  On March 22nd, the claim note that's been

3     marked as an exhibit indicates that you spoke with Mr.

4     Doyle on that date, March 22nd, and my question is at that

5     point did you give him the heads-up that you were looking

6     into coverage and were going to take the examination under

7     oath of the insured?

8     A.    Yes.

9     Q.    And at that point you were unaware that there had

10    been a recorded statement?

11    A.    That's correct.

12    Q.    And so why didn't just take a recorded statement?

13    A.    I didn't know what the situation was but we needed

14    more information than, you know, an attorney could get

15    through an examination under oath.

16    Q.    Why can't you get the same information through a

17    recorded statement?

18    A.    That was just what I was told to do.  That's what my

19    instructions were.

20    Q.    Okay.

21    A.    I didn't make that decision.

22    Q.    All right.  And you asked Mr. Doyle -- did you tell

23    Mr. Doyle that you were going to hire somebody else to

24    take the examination under oath?

25    A.    Well, I told him we were going to take the

examination under oath.  I don't think we got into who was
going to do it.

Q.   Well, did you make it clear that he wasn't going to
do it?

A.   I made it clear that he could not represent the
insured at that examination under oath.

Q.   Okay.  And did you make it clear that he could not
take a position that was adverse to the insured?

A.   I just made it clear that he could not represent the
insured.  That's not what he was hired for.

Q.   I thought he was hired to --

A.   He was hired to handle the insured, represent the
insured in the defense of the claim being made against
him.  He has no involvement in coverage issues.

Q.   What I'm trying to draw out is that you hired Mr.
Doyle to protect Mr. Lodigiani?

A.   In terms of a defense of the underlying case,
correct.

Q.   You didn't expect Mr. Doyle to hang him out, that is
Mr. Lodigiani, in terms of coverage, right?

          MR. STEWART:  Objection, Your Honor.

          THE COURT:  Sustained.

          MR. ZELLE:  I'll withdraw the question or
rephrase.

          THE COURT:  The question will be stricken.

1   Q.   (By Mr. Zelle)  You didn't expect that Mr. Doyle

2   would assist Preferred Mutual in developing information on

3   which Preferred Mutual would base its attempt to rescind

4   the policy?

5   A.   I'm sorry, could you rephrase that?  You asked if I

6   expected?

7   Q.   Well, I want to make it real clear.  Tell the jury

8   why you hired Mr. Doyle?

9   A.   I hired Mr. Doyle to protect Mr. Lodigiani with

10  regard to the people who were accusing him of causing the

11  fire.

12  Q.   Okay.  That's what we referred to as the liability

13  case?

14  A.   Right.

15  Q.   Did you tell him keep your nose out of the coverage

16  case?

17  A.   Well, at the point I hired him there was no courage

18  case.

19  Q.   At the point at March 22, 2013 you were looking into

20  coverage, right?

21  A.   I told him we were looking into coverage.

22  Q.   Did you tell him to keep his nose out of the coverage

23  case?

24  A.   I didn't have to tell him that.  He knew that.

25           MR. ZELLE:  I move to strike, Your Honor.

1              THE COURT:  No.

2     Q.    (By Mr. Zelle)  How do you know what he knew?

3     A.    His obligation was not to get involved in coverage

4     issues.  That happens with any attorney we hire to

5     represent somebody, they don't get involved in coverage.

6     Q.    So you're assuming that Mr. Doyle knew what his

7     coverage -- what his obligation was and that he adhered to

8     his obligation to keep his nose out of the coverage case?

9     A.    Well, again a coverage case was just beginning at

10    that point.  He understood he couldn't take the position

11    on coverage, like any attorney does who is defending

12    somebody for us.

13    Q.    Are you speculating?

14    A.    No.  That's what they're required to do.

15    Q.    But Mr. Doyle didn't tell you that, right?

16    A.    Not specifically.

17    Q.    So you're assuming he knew how to act as an attorney?

18    A.    Well, I've dealt with him many times.  Yes, he knows

19    how to act as an attorney.

20    Q.    And you asked -- after assuming that Mr. Doyle would

21    keep his nose out of the coverage case, you asked him how

22    far should we go into the events during the EUO,

23    examination under oath, how far should we go into the

24    events, whether we should restrict our questions to

25    coverage issues or go into all the information the insured

1    can provide?

2    A.    Correct.

3    Q.    Why are you asking him if he's not supposed to be

4    involved in the examination under oath?

5    A.    Well, I'm not asking him about coverage.  I'm asking

6    him if he wants us to preserve testimony regarding the

7    underlying case in the course of the EUO.

8    Q.    And in the course of the conversation you had with

9    Mr. Doyle on the 23rd, did he tell you we should get

10   everything on record that we can?

11   A.    You mean the 22th?

12   Q.    I'm sorry, I misspoke.

13   A.    Yes.

14   Q.    And after that discussion, you then advised him he

15   cannot represent the insured in the examination under

16   oath?

17   A.    Yes, I told him that.  I assumed he already knew it

18   but I told him that, yes.

19   Q.    You told him that after you said we're looking into

20   coverage, how far should we go?

21   A.    How far should we go on the underlying claims, the

22   claims against Mr. Lodigiani and did he want any of that

23   preserved and he said, yes, get everything you can

24   considering his advanced age.

25   Q.    So let me take a quick step back.  When you wrote the

1   underwriting memo reflecting what you referred to as the

2   fact that the insured was operating a partnership, all you

3   had in terms of information was a statement from Mr. Doyle

4   that Mr. Lodigiani described Mr. Brantley as his partner?

5   A.   That's correct.

6   Q.   You had nothing else?

7   A.   Nothing else.

8   Q.   So at that point you didn't even have the information

9   that Mr. Lodigiani was planning to share profits?

10  A.   No, I didn't have that information.

11  Q.   And you stated in the underwriting memo the fact that

12  Mr. Lodigiani was operating a partnership without knowing

13  that there was no written or even oral partnership

14  agreement?

15  A.   The note speaks for itself.  I mean, it says what it

16  says.

17  Q.   I'm asking -- let me ask it this way.

18       You didn't try to find out either from Mr. Lodigiani

19  by calling him yourself or through Mr. Trudeau who was

20  your independent investigator whether there was any

21  agreement, written or oral?

22  A.   No, I didn't.

23  Q.   And you didn't try to find out again before you told

24  underwriting he was operating as a partnership whether

25  there was anything on record with the Secretary of State's

1    Office indicating a partnership?

2    A.    No, I didn't.  I didn't look into the Secretary of

3    State's Office I don't believe.  I might have but I don't

4    think I did.

5    Q.    You didn't look into -- well, let me stop.  That's

6    something that in your habitual practice you would look at

7    records in the Secretary of State's Office?

8    A.    Occasionally.

9    Q.    But you didn't in this case?

10   A.    I don't believe I did.

11   Q.    You stated it was a fact that he was operating as a

12   partnership?

13   A.    I had been told he had a partner, yes.

14   Q.    I'm glad you made that distinction because you

15   recognize that for the purposes of rescinding a policy, a

16   partnership is a legal entity, right?

17   A.    I don't -- I mean, I understand basically what a

18   partnership is, yeah.

19   Q.    And you understand that in colloquial discussion

20   people use partners to refer to all sorts of relations,

21   right?

22   A.    Certainly.

23   Q.    But again you jumped to the conclusion that when Mr.

24   Lodigiani described to Mr. Doyle that Mr. Brantley was his

25   partner, that it satisfied all of the elements of a legal

1  partnership?

2  A.  No, I was not making a conclusion there.  I didn't

3  make any distinction between partner and partnership, to

4  me they were the same thing.

5  Q.  Now as of March 20, 2013 Mr. Lodigiani had given a

6  recorded statement, right?

7  A.  March?  I'm sorry, what was the date again?

8  Q.  As of March -- Mr. Lodigiani's recorded statement was

9  given on February 28th?

10  A.  Correct.

11  Q.  So as of the time that you stated in this

12  underwriting memo the fact that he was operating as a

13  partnership, the recorded statement had been taken?

14  A.  Yes.

15  Q.  Why didn't you get it?

16  A.  I don't know.  It didn't come to me.  Normally that

17  would come to me either from the attorney or the adjuster,

18  but in this case the adjuster was reporting to the

19  attorney so it didn't come to me.

20  Q.  When you expect documents or reports to come to you

21  as a claims professional and you don't get them, it is

22  your responsibility to reach out and say where's the

23  recorded statement?

24  A.  Well, I did write to Joe Doyle on the 13th of March I

25  believe it was and asked him to update me on the status of

1    the investigation, which he did.

2    Q.   Can you answer my question?

3    A.   I'm sorry.

4    Q.   My question is as a claims professional when you're

5    expecting a recorded statement and you hadn't received a

6    transcript of the recorded statement, it's your

7    responsibility as a claims professional to ask Mr. Trudeau

8    where's the recorded statement?

9    A.   I would if enough time goes, but I don't look at the

10   file every day obviously.

11   Q.   I just want you -- again if you can't answer this yes

12   or no just tell me, but is it your responsibility or not

13   to reach out when information that you're expecting to

14   have been obtained by your investigator hasn't been

15   provided?

16   A.   Not necessarily.

17   Q.   I'm going to show you the examination under oath --

18   excuse me.

19        Now as I understand it you pursued the examination

20   under oath to get more information to support the fact you

21   stated in your underwriting memo that Mr. Lodigiani was

22   operating as a partnership, is that correct?

23   A.   We wanted to get more information on that, correct.

24   Q.   So that when we got to court as we are today you'd

25   have more evidence, right?

A.    No.  We wanted to get the facts down straight so that
we could make a decision.  A decision had not been made.

Q.    Now I'm going to show you this.  This is the
examination under oath of Mr. Lodigiani.  It was taken May
1, 2013, and it was taken by Mr. Stewart, correct?

A.    Correct.

Q.    And on page 42 I'd like to direct you to this
question, this series of questions.  This is Mr. Stewart
asking the questions.  He asked Mr. Lodigiani -- and let
me represent to you -- actually I won't, I will show you
on the prior page what we're talking about here.

      Mr. Stewart asks, "What did you consider Mr. Brantley
to be?"

      And Mr. Lodigiani answers, "I considered him, you
know, a friend and I was helping him out."

      And Mr. Stewart asks, "Okay.  If you had to put him
in a category between an employee or an independent
contractor or partner or any of those other legal
cubbyholes" --

      Mr. Lodigiani answers, "Legally he was an employee."

      Mr. Stewart asks, "Okay."

      Mr. Lodigiani goes on and Mr. Lodigiani says, "And
that's stated in the plumbing book.  We can't have a
partner with a partner -- with a master plumber and a
plumber.  You can't have that.  He's got to be an

1    employee.  The master plumber is always in charge of
2    everything."
3         Did I read that correctly?
4    A.    Yes.
5    Q.    And did you consider that and disregard it when
6    making the decision to rescind the policy?
7    A.    We did consider it.  Again, I didn't make the
8    decision so, but we did consider the fact that he was
9    saying at that point that Mr. Brantley was an employee,
10   sure.
11   Q.    And he makes reference to the plumbing code, right?
12   A.    He does.
13   Q.    And you're the claims professional and did you look
14   at the plumbing code to find out what that had to do with
15   partnerships?
16   A.    Personally, no.  Mr. Stewart commented on that I
17   believe to us.
18   Q.    You understand as a claims professional there's fair
19   insurance practices and you can't abdicate responsibility
20   to the lawyer.  You've got to make determinations
21   yourself, right?
22   A.    We rely on lawyers all the time.
23   Q.    I understand, but that doesn't mean you can abdicate
24   responsibility, right?
25   A.    I'm not trying to abdicate responsibility.

1    Q.   All right.  In this case you delegated responsibility

2    to Mr. Stewart to determine what does this mean when Mr.

3    Lodigiani is referring to a plumbing code that prohibits a

4    partnership between a master plumber and someone else who

5    isn't a master plumber?

6    A.   It did not happen that way.  I did not read the

7    transcript itself.  I read a summary of it.

8    Q.   Did you ever go back to underwriting after March of

9    2013 and say I may have been a little bit hasty stating as

10   fact that the insured was operating as a partnership,

11   maybe it needs some more investigation.

12   A.   The investigation was ongoing and underwriting was

13   involved.  I did talk to Garret Scoonover.  I talked

14   eventually to Mike Griffin.

15   Q.   Mr. Griffin testified yesterday, right?

16   A.   Yes.

17   Q.   You heard him say that you came to him with the fact

18   that Mr. Lodigiani was operating as a partnership and that

19   you asked him what is the affect on underwriting; is that

20   a fair paraphrasing of what he said?

21   A.   Again, you keep calling it a fact.  It was our

22   understanding that he was acting as a partner.

23   Q.   I'm certainly not looking to quibble about that.  I

24   was asking you about what you said to Mr. Griffin.  You

25   said to Mr. Griffin he's operating as a partnership,

1    right?

2    A.    We looked at all the information we had.  I don't

3    know that I made that statement in the conversation he was

4    involved in in July, but everybody had all the information

5    in front of them.

6    Q.    Mr. Griffin testified that he didn't investigate

7    these various issues, certainly the issue that the

8    plumbing code prohibits partnerships, the sharing of

9    liability.  He said he relied simply on your statement

10   that it was a partnership?

11   A.    Well, he relied on our investigation.  I'm sure it

12   wasn't a simple statement.

13   Q.    All right.

14   A.    He didn't make a decision based on that note of March

15   22nd if that's what you're asking.

16   Q.    That helps.  Thank you.

17        He relied on your investigation and you told me you

18   didn't follow up on the testimony by Mr. Lodigiani that a

19   partnership is simply not permitted by the plumbing code.

20   That wasn't part of your investigation?

21   A.    That was part of -- that was commented on I believe

22   by our counsel.  Did I follow up with the plumbing code?

23   No.

24             MR. ZELLE:  Yeah.  Sidebar please, Your Honor.

25             THE COURT:  All right.

1    (Sidebar conference.)

2         MR. ZELLE:  We have on the record a

3    representation by Mr. Stewart that Preferred Mutual is not

4    relying on the advice of counsel in making the decision.

5         I was prohibited from calling -- I was before the

6    Court on a motion to compel and I asked this Court for the

7    opportunity to take Mr. Stewart's deposition, and I think

8    it was based on the representation that Preferred Mutual

9    was not going to rely upon the advice of counsel that the

10   Court determined that the defendants couldn't pursue that.

11   I don't want to pursue it.  I don't want to open that

12   door.  I would rather just have some sort of an

13   instruction and then have Mr. Stewart explain to Mr.

14   Kagels you can't do that.

15        MR. STEWART:  Judge, I think this is being

16   mischaracterized what really went on there.  Your Honor

17   ruled that this claim has nothing to do with

18   attorney-client privilege.  This claim has nothing to do

19   with advice of counsel.

20        Preferred Mutual is trying to convince this jury that

21   this man was in a partnership.  The decision making of

22   Preferred Mutual is not an element of any claim or any

23   defense.  So I understand that he's trying to cross and

24   that's what you do in a breach of contract case, when did

25   you decide the contract was breached, all this kind of

1    business.  He's entitled to that, but, you know, we have

2    not made this a claim in this case.  There's no defense

3    that relates to this.  I think --

4         THE COURT:  The issue of how the decision was

5    made?

6         MR. STEWART:  That is not an element of a

7    misrepresentation -- of a rescission case.  You know, he

8    can probe that, but like I say attorney-client privilege

9    is not part of this case.  It's not like we -- now it is

10   in the 93A case but it is not here.

11        THE COURT:  Your cross-examination is sounding

12   more like a 93A claim than we are in the case which we're

13   actually doing.

14        MR. BURSTEIN:  Could I be heard?

15        THE COURT:  Sure.

16        MR. BURSTEIN:  I believe Attorney Stewart opened

17   the door by the introduction and commentary on the July

18   22nd rescission letter especially pointing out within that

19   letter that this says if you have any other information

20   that you want to bring forward, let us know.  We will

21   consider it.  We're going to consider everything.

22    Mr. Lodigiani had already testified about the

23   plumbing code issue, about other things, and now they're

24   trying to say, well, we didn't look at those things.  We

25   are just relying on summaries of counsel and they don't

1    want to get into what they relied on in making that

2    decision and it is relevant to this case.

3              THE COURT:  I'm not sure it's relevant to the

4    claim at issue here.  I agree with you it was raised by

5    Mr. Stewart in his inquiry of the letter, which made it

6    fair game for cross-examination which you've beaten the

7    stuffing out on that particular issue.  I'm not saying in

8    an ineffective way.

9              MR. ZELLE:  I understand.

10             THE COURT:  But I'm not sure you need to keep

11   going on this.

12             MR. ZELLE:  That's fine.

13             THE COURT:  Attorney Stewart is correct that

14   it's not an element of what he needs to prove, but he did

15   raise it and you cross-examined on it and I think we can

16   move on.

17             MR. ZELLE:  That's fine.

18   (End of sidebar conference.)

19   Q.   (By Mr. Zelle) Let me just wrap up this line of

20   questioning.

21       Mr. Kagels, you personally did not pay any attention

22   to Mr. Lodigiani's explanation in the examination under

23   oath that you couldn't have a partnership because it was

24   prohibited by the plumbing code?

25   A.   We considered it, yeah.

1    Q.    You personally I'm asking --

2    A.    We considered it.  The company considered it.

3    Q.    Okay.  I'm asking you, not about the company, about

4    you personally.

5    A.    Okay.

6    Q.    Did you personally consider it?

7    A.    Yes.

8    Q.    Okay.  Now, before making the statement that the

9    insured was operating as a partnership, did you consult

10   any claims material, any reference or reference desk

11   references or things that you have online that explained

12   what a partnership is in terms of Preferred Mutual's

13   underwriting?

14   A.    No.

15   Q.    Did you ever look at any documentation or look for

16   any documentation, including electronic, that explained

17   how a claims professional should investigate a claim where

18   the subject is whether or not a policyholder is a sole

19   proprietorship or a partnership?

20   A.    I don't believe so.

21   Q.    Did you speak with anyone in underwriting about what

22   specific questions should be asked, what specific

23   information should be sought to help you and the

24   underwriters determine whether there is a partnership

25   versus a sole proprietorship?

1    A.    Did I ask the underwriters?  No.

2    Q.    Now before you wrote the underwriting memo, you knew

3    that a partnership required shared liability on the part

4    of the partners, right?

5    A.    Correct.

6    Q.    And what did you do to determine whether Mr.

7    Lodigiani and Mr. Brantley had shared liability?

8    A.    He said they were partners.

9    Q.    And so you didn't do anything further?

10   A.    The shared liability is imposed by law and I don't

11   think I need to do anything further than that.

12   Q.    You're not a lawyer, are you?

13   A.    No.

14   Q.    And that's somewhat of a circular argument.  You're

15   saying, well, I assumed that there was a partnership

16   because Mr. Lodigiani said there were partners and because

17   I'm assuming they're a partnership, I can assume they

18   share liability.  Isn't that circular reasoning?

19   A.    If they were partners and he said they were, they

20   would share liability imposed by law is my understanding.

21   Q.    Did you determine that at any point during the course

22   of your investigation that Mr. Brantley had his own

23   insurance?

24   A.    No.

25   Q.    Isn't that fact indicative that there wasn't shared

 1    liability, at least not shared liability insofar as
 2    Preferred Mutual was going to be responsible under its
 3    policy for Mr. Brantley?
 4    A.    It's not indicative of anything.  I didn't know he
 5    had his own insurance.  I've heard -- this question is the
 6    first time I've heard this.
 7    Q.    Okay.  I'm going to ask you to assume that fact and
 8    represent to the court that it will adduced through Mr.
 9    Brantley.
10    A.    Okay.
11    Q.    So assuming that fact, that's very important to
12    determining whether there's shared liability, right?
13    A.    I don't know.
14           MR. ZELLE  Your Honor, the next section I have
15    might be 15, 20 minutes.  It's going to be dealing with
16    the application.  Shall we take a break?
17           THE COURT:  Yes.  Thank you for bringing that to
18    my attention.  This will be a good time to take our break.
19        All right.  Ladies and gentlemen, it's going to be
20    about 20 minutes.  Please do not discuss the case, begin
21    deliberations, or start researching or investigating the
22    case in any way.
23    **(The jury left at 11:07.)**
24           THE COURT:  All right.
25           MR. ZELLE:  Thank you.

1    **(A recess was taken until 11:38.)**

2              THE COURT:  Ladies and gentlemen, during the

3    break were you able to follow my instructions not to begin

4    deliberations, discuss the case?  Thank you.

5         Affirmative responses, the jury remains fair and

6    impartial.

7              So as soon as you're ready.

8              MR. ZELLE:  Thank you, Your Honor.

9    Q.    (By Mr. Zelle)  Mr. Kagels, I'm just showing you the

10   policy, the cover page for a minute to orient you that

11   FieldEddy was Preferred Mutual's representative, correct?

12   A.    They were our agent.

13   Q.    They were your agent in connection with obtaining and

14   submitting and ultimately issuing the policy, is that

15   right?

16   A.    They did not issue the policy.  We issued the policy.

17   Q.    Okay.  I should say in producing.

18   A.    Yes, but -- yes.

19   Q.    And early on in the course of your investigation you

20   indicated that you contacted the agency FieldEddy and I'm

21   not sure if you said you spoke to Ms. Grundstrom directly?

22   A.    I believe it was Peggy, yeah.

23   Q.    Okay.  And I'd like to show then your deposition.

24   Let me just ask this, what was the substance of your

25   conversation with her?

1   A.   I believe the first conversation I was just inquiring

2   about the original application, not the online one, but

3   they were supposed to have it in their file.

4   Q.   Okay.  And you explained that you ultimately did not

5   -- that is, Preferred Mutual -- ultimately did not get

6   from the agency a signed copy of the policy?

7   A.   We did not.

8   Q.   Was there anything else that you discussed with

9   Ms. Grundstrom prior to making the determination that

10   there was a partnership?

11   A.   Well, there was another call where I asked for the

12   declaration page of the workers' comp. policy and I know

13   that one is reflected in my notes, but that I believe are

14   the only two conversations that we had.

15   Q.   And did you actually get the workers' comp. policy?

16   A.   Just the declaration page.

17   Q.   You didn't see the workers' comp. application?

18   A.   Well, I don't -- I may have.

19   Q.   Let me show that to you just to perhaps refresh your

20   recollection.  It's so tiny.  Let me show it to you.

21       Does that refresh your recollection as to whether or

22   not --

23   A.   Yes.

24   Q.   Did you see that?

25   A.   I have seen that.

1    Q.   Okay.  And you'll see that like the Preferred Mutual

2    application it seeks information concerning the legal

3    structure of the applicant, right?

4    A.   Yes.

5    Q.   Okay.  Let me take that back.  And then you see that

6    with the -- well, on this workers' comp. policy the box is

7    checked for sole proprietorship?

8    A.   Yes.

9    Q.   And Mr. Griffin described how on the drop-down menu

10    for the Preferred Mutual policy there's a category of

11    individual, right?

12    A.   On the online one, yes.

13    Q.   And that's instead of sole proprietorship, right?

14    A.   Right.

15    Q.   And prior to making the determination that Mr.

16    Lodigiani was operating his business as a partnership, did

17    you have any conversations with Ms. Grundstrom about the

18    application process, her interview, and meetings with Mr.

19    Lodigiani?

20    A.   I may have.  I don't recall.

21    Q.   I can refresh your recollection on that.  I'm going

22    to show you your deposition.  This is page 15 -- excuse

23    me, 16.  If you look starting at line 10 I asked, "Who was

24    it at the agency -- who was it you dealt with at the

25    FieldEddy agency?"

1    You said, "Primarily a woman named peggy.  I don't

2  know her last name."  We all now know that's Grundstrom,

3  right?

4  A.    I believe so.

5  Q.    I asked you, "Can you tell me generally the substance

6  of the communications you had with Peggy at FieldEddy?"

7    You said, "After I became aware of the fact that

8  there was a partnership involved, I did speak with her.  I

9  inquired about that because it was my understanding that

10  the policy was written on an individual, and not -- on an

11  individual, not on a partnership."

12    And then you said, "And the only thing I can recall

13  from looking at the notes was I made a request for a copy

14  of the application for workers' compensation coverage."

15    So I just wanted to be clear, Mr. Kagels, that you

16  didn't have any conversations with Ms. Grundstrom about

17  the application process specifically about what Mr.

18  Lodigiani may have said to her?

19  A.    I don't believe I did, no.

20  Q.    And it was Ms. Grundstrom who actually inputted the

21  information onto the application that was then considered

22  by Preferred Mutual before the policy was issued?

23  A.    I can assume that, but I don't know for certain.

24  Q.    Now, Mr. Lodigiani you have said referred to his

25  business -- to Mr. Brantley as his partner, right?

1    A.    Correct.

2    Q.    You never heard that from Mr. Lodigiani directly?

3    You heard it from Mr. Doyle, right?

4    A.    Correct.

5    Q.    And did you at any time read that in the recorded

6    statement?

7    A.    In the transcript of his recorded statement, yes.

8    Q.    Okay.  And did you -- I think you told us you didn't

9    actually read the examinations under oath?

10   A.    I don't believe I did.

11   Q.    All right.  Will you agree with me that Mr.

12   Lodigiani, to your knowledge, never referred to his

13   business as a partnership?

14   A.    Well, he told us he had a partner.

15   Q.    I'm going to show you again your deposition.  This is

16   on page 120 and it begins on line 20.

17        I asked you, "Well, he never said it was a

18   partnership.  He said they were partners, right?"

19        And you responded, "Well, I'm not making that

20   distinction and I understand you are."

21        And I asked, "Well, I mean, I'm just quoting the

22   statement given to Mr. Trudeau that Mr. Lodigiani never

23   refers to the relationship as a partnership.  He does

24   however call Mr. Brantley his partner, right?"

25        And your answer was, "I think you're parsing words.

1    I think it's the same thing."  Right?

2    A.    Correct.

3    Q.    And so your determination that Mr. Lodigiani was

4    operating a partnership is based on your personal

5    understanding of the way Mr. Lodigiani used the word

6    partners?

7    A.    I believe that's fair to say, yes.

8              MR. ZELLE:  Nothing further, Your Honor.

9              THE COURT:  Thank you.

10             MR. ZELLE:  One more thing.  We will offer

11   what's previously been marked for identification as 3 to

12   be admitted in full.

13             MR. STEWART:  Judge, I'd like to be heard on

14   that.

15             THE COURT:  All right.

16   (Sidebar conference.)

17             MR. STEWART:  I have a problem with the

18   highlighted part, Judge.

19             THE COURT:  What's your basis for offering the

20   full piece?

21             MR. ZELLE:  The relevant basis is that he relied

22   on, we will argue -- he testified he relied on Mr. Doyle

23   for determining that it was a partnership.

24             THE COURT:  But on this last part --

25             MR. ZELLE:  I'm not too concerned if that were

1    redacted, except I mean "he cannot represent the insured"

2    I assume you want that, but I mean the cognitive business

3    I don't think it's appropriate.

4              MR. STEWART:  I don't think anything after

5    advanced age would be helpful here.

6              MR. GIROUARD:  I think with regards to this

7    sentence here "he cannot represent the insured in the EUO"

8    dovetails with the theory of some of the issues in the

9    defense and we request that be admitted.

10        I get Attorney Stewart's concerns regarding the

11   cognitive issues so I would be satisfied if you redact the

12   three lines above the last line.

13             THE COURT:  It's going to be admitted subject to

14   redaction.

15             MR. ZELLE:  I have redacted it.

16             THE COURT:  I'm going to redact everything that

17   Attorney Stewart has yellow highlighting except for "he

18   cannot represent the insured in the EUO," that will stay

19   in.

20             MR. GIROUARD:  Thank you.

21             MR. STEWART:  If I could be heard?  I think Mr.

22   Kagels is telling Mr. Doyle that.  Mr. Lodigiani was told

23   that separately, but I don't know how this advances the

24   ball quite frankly.

25             THE COURT:  Well, there's been both direct and

1    cross-examination of this witness about that, what was

2    told to Doyle, what Doyle's parameters were so it's

3    relevant to that line and it will come in.

4              MR. STEWART:  I'll withdraw my objection to

5    that.

6              THE COURT:  Okay.  So you can redact it as I

7    just indicated.  You'll just have to check that before it

8    goes to the jury.

9              MR. ZELLE:  I can do it.

10   (End of sidebar conference.)

11             THE COURT:  So are you offering -- has that been

12   offered?

13             MR. ZELLE:  Yes, Your Honor.

14             THE COURT:  It's exhibit?

15             MR. ZELLE:  Why don't we make that 16A.

16             THE COURT:  Was it pre-marked?

17             MR. ZELLE:  It was not but it's part of 16.

18             THE COURT:  All right.  So it's going to be 16A.

19   It had been previously marked what for identification?

20             MR. ZELLE:  Three.

21             THE COURT:  It was previously marked 3 for

22   identification and it is now Exhibit 16A.  It was

23   introduced in a redacted form.

24             MR. ZELLE:  Thank you, Judge.

25   **(Defendants' Exhibit 16A admitted.)**

1        MR. BURSTEIN:  May I proceed, Your Honor?

2        THE COURT:  Yes.

3        MR. BURSTEIN:  Thank you.

4    **CROSS-EXAMINATION**

5    Q.   (By Mr. Burstein) Good morning, Mr. Kagels.

6    A.   Good morning.

7    Q.   I'll try to keep this brief.

8    A.   Okay.

9    Q.   Towards the beginning --

10       THE COURT:  Mr. Kagels, don't believe lawyers

11   when they tell you that.

12                    (Laughter)

13   Q.   (By Mr. Burstein) Sir, at the beginning of the

14   cross-examination by Attorney Zelle you testified a little

15   bit about your experience with Attorney Doyle?

16   A.   Yes.

17   Q.   You've used him and hired him in cases in the past to

18   represent insureds?

19   A.   Yes.

20   Q.   Has that been both on the coverage side and on the

21   liability side?

22   A.   Yes.

23   Q.   So he has experience in both aspects of representing

24   insureds?

25   A.   Certainly.

1    Q.   So he's certainly aware that at -- do you know if

2    he's aware at some point in time conflicts can arise

3    between the coverage issues and the liability issues?

4    A.   Well, he's been an attorney for a long time.  I would

5    assume he knows that.

6    Q.   In fact, you testified earlier you felt comfortable

7    that he had good knowledge of the law in that area, right?

8    A.   I would assume so.

9    Q.   And when you hired Attorney Doyle to represent Mr.

10   Lodigiani, the company is paying the bill, right?

11   A.   Yes.

12   Q.   What's your understanding as to who Mr. Doyle

13   represents?

14   A.   He represents the insured.

15   Q.   Okay.  And does he also represent the company?

16   A.   He has reporting duties to the company.  Does he

17   represent the company?  Certainly not if there's a

18   conflict.

19   Q.   Okay.  If there's any kind of a conflict, his primary

20   duty would be to represent his client Mr. Lodigiani, is

21   that correct?

22   A.   I agree with that.

23   Q.   Okay.  And you testified again earlier that there was

24   a recorded statement taken from Mr. Lodigiani by

25   Mr. Trudeau?

1   A.   Right.

2   Q.   And at some point in time you've had a chance to take

3   a look at that, right --

4   A.   Yes.

5   Q.   -- the transcript of that statement?

6   A.   Correct.

7   Q.   And were you able to determine from the transcript of

8   that statement if Mr. Doyle started asking questions

9   fairly early on --

10  A.   Yes, he did.

11  Q.   -- in that statement?

12  A.   He did.

13  Q.   Okay.  You testified earlier that sometimes an

14  attorney will question their insured during a recorded

15  statement but it's rare?

16  A.   Their client, yes.

17  Q.   Okay.  And normally that would be at the end to kind

18  of rehabilitate their client, right?

19  A.   No, not necessarily.

20  Q.   So you've seen situations where an attorney that's

21  representing an insured would actually jump in and start

22  doing the questions towards the beginning of the

23  statement?

24  A.   I can't that I've seen that specifically, no.  I've

25  seen a lot of attorneys who represent the person making

1  the claim have done that right in the beginning just to

2  introduce themselves.

3  Q.   And would it be appropriate for an attorney who is

4  representing an insured to bring out information at the

5  beginning of a statement that could be adverse to their

6  own client?

7  A.   I can't make a determination of what's appropriate

8  for an attorney to do.  He has to make that determination

9  himself.

10  Q.   Okay. But you've testified that you have lot of

11  experience dealing with attorneys and you're pretty

12  familiar with what they're supposed to do and not do,

13  right?

14  A.   Well, I understand their represent their clients, if

15  that's what you mean.

16  Q.   Okay.  So at some point you testified that you had a

17  conversation with Attorney Doyle that he told you that Mr.

18  Lodigiani was operating as a partnership, right?

19  A.   He told me he had a partner.

20  Q.   Okay.  And you said that there's no distinction in

21  your mind?

22  A.   In my mind there wasn't, no.

23  Q.   So when you wrote your notes, you wrote down Mr.

24  Lodigiani is operating in a partnership?

25  A.   Correct.

1    Q.    Based on only the statement from Mr. Doyle, right?

2    A.    Correct.

3    Q.    At that point in time when you had that conversation

4    with Mr. Doyle, do you remember when that was?

5    A.    I believe it was around March 17th of 2013 but it's

6    in my notes.  It might have been the 18th.  I'm not sure.

7    Q.    Okay.  And at this point in time you know that that's

8    after the recorded statement was taken by Mr. Doyle and

9    Mr. Trudeau of Mr. Lodigiani?

10   A.    Correct.

11   Q.    At that point in time should Mr. Doyle have known

12   that there was a potential conflict that existed with him

13   continuing to represent Mr. Lodigiani in this matter?

14   A.    I don't know that he would have seen that as a

15   conflict.  He was just reporting what he knew.

16   Q.    So if he knew information that could result in

17   coverage being rescinded on the policy and he was going to

18   continue to look into coverage issues, you don't see any

19   conflict between that situation and the situation where

20   he's continuing to supposedly zealously represent Mr.

21   Lodigiani on the liability claim?

22   A.    I don't know whether he recognized it as a coverage

23   issue.

24   Q.    In your opinion should he have recognized it as a

25   coverage issue?

1  A.   I don't know what he should have recognized it as.

2  Q.   Did you actually have a conversation with him about

3  it being a coverage issue?

4  A.   Not until the 22nd I believe it was, and then I told

5  him that we were going to conduct an EUO and a coverage

6  investigation.

7  Q.   Certainly at that point in time he knew, right, that

8  there was a conflict?

9  A.   At that point, sure.

10 Q.   And yet he continued to represent Mr. Lodigiani up

11 until a matter of about a week ago, right?

12 A.   He did as far as I know.

13 Q.   And that was at the expense of your company, right?

14 That was at your request?

15 A.   Initially I had assigned him but once the file was

16 split, I didn't see it.

17 Q.   So you don't know if he was still involved or not?

18 A.   I believe he's not involved now.

19 Q.   But you testified earlier that you relied on his

20 advice even after Attorney Stewart was hired to conduct

21 the examination under oath to go after everything?

22 A.   Yes.  I asked him if he wanted us to go into other

23 areas in the EUO and he said yes.

24 Q.   So even though he's supposed to be zealously

25 representing his client, my client now, Mr. Lodigiani, he

1    is telling you essentially to have Mr. Stewart go after

2    everything?

3             THE COURT:  Can I see the parties at sidebar?

4    (Sidebar conference.)

5             THE COURT:  All right.  I know there's been no

6    objection but this is not the 93A case.  This is not about

7    a malpractice case against Attorney Doyle.  This issue

8    between Doyle and what he did or what he should have done

9    and the whole issue of this witness really being qualified

10   to talk about conflicts of interest, again I've let it go

11   very far because there's been no objection, but, you know,

12   I'm asking you where do you think it's going where I could

13   let this continue, otherwise it's going to stop.

14            MR. BURSTEIN:  Again I just believe it's

15   relevant to his frame of mind in coming to the

16   determination on whether or not to refer this as a

17   recission case, and my next line of questioning is going

18   to get into what steps did he take to verify things that

19   he heard back from counsel with Attorney Doyle and current

20   counsel.

21            THE COURT:  The verification would be the next

22   part, I'll let you go to the verification and skip to

23   that.

24            MR. BURSTEIN:  Yes, sir.

25   (End of sidebar conference.)

1    Q.   (By Mr. Burstein) I want to show you, sir, what's

2    been marked as Exhibit 16 and I think you've referred to

3    it as the case notes --

4    A.   Yes.

5    Q.   -- part of which are redacted.

6         I'm going to refer you to a note from May 2, 2013.

7    Do you see that note with the date?

8    A.   I don't see the date but if you circle it, I can.

9    Okay.

10   Q.   I have to move it over so you can see the text.

11   A.   That's all right.

12   Q.   It says, "We have EUO report from CA."  What does CA

13   stand for?

14   A.   Our coverage attorney, Mr. Stewart.

15   Q.   That would be the examination under oath?

16   A.   Yes.

17   Q.   And I'm assuming that would have been just the first

18   part of the examination under oath because it was

19   continued to a later date?

20   A.   That was -- yeah, that would have been the first one,

21   yeah.

22   Q.   Okay.  And it says, "Insured took the position he was

23   a master plumber and would not be allowed to have a

24   journeyman as a partner," do you know where that

25   information came from?

1    A.    I believe I heard since then it's from the plumbing

2    code.

3    Q.    Okay.  But you wrote this note, right?  You write

4    these notes?

5    A.    Yes.

6    Q.    How did you come to learn that information?  Had you

7    read the examination under oath?

8    A.    No.  Mr. Stewart sent us a report.

9    Q.    Okay.  And did you take any action to find out if

10   there was any legitimacy to that claim that was supposedly

11   claimed by Mr. Lodigiani that he couldn't be a partner

12   with another journeyman plumber?

13   A.    Well, there were other things in the statement that

14   reflected on that.  That wasn't the only statement that he

15   made, so we considered everything.

16   Q.    Okay.  But that's not my question, sir.

17   A.    Okay.

18   Q.    Did you take any action after receiving that

19   information to find out if there was such a rule or

20   regulation in the plumbing statutes or the statutes of the

21   Commonwealth of Massachusetts that that was true?  That

22   his representation was true?

23   A.    I don't know if I took any specific steps at that

24   point.  I had since learned about the code, sure.

25   Q.    Okay.  So as we sit here today, you know that that

1  information is correct what Mr. Lodigiani was

2  representing?

3           MR. STEWART:  Objection, Your Honor.

4           THE COURT:  The objection is?

5           MR. STEWART:  Judge, it's asking for a legal

6  conclusion.

7           THE COURT:  Sustained.

8  Q.   (By Mr. Burstein) Sir, have you had a chance between

9  the time you learned that Mr. Lodigiani made that

10 representation and today to actually look at the statute

11 that you've said you now know you're aware of?

12 A.   I have not read the statute, no.

13 Q.   Okay.  And to your knowledge has anyone else at

14 Preferred Mutual actually taken a look at that statute

15 between the time you learned of Mr. Lodigiani's bringing

16 that to the attention during the examination under oath

17 and today?

18 A.   I couldn't answer that.  We had claim counsel.  He

19 may have.  I don't know.

20 Q.   Okay.  To your recollection did you ever receive any

21 type of report that would indicate whether such a statute

22 existed or what it encompassed?

23 A.   Oh, yes.

24 Q.   Okay.  Do you have an independent recollection of

25 what the determination was -- you don't have to tell me

1    what it was, but did you get some type of an opinion on

2    the relevance of that in making your determination to

3    rescind the policy?

4    A.    We did get an opinion on that and we have took the

5    second examination under oath.

6    Q.    Did the second examination under oath lead you to a

7    different conclusion just with respect to that one issue

8    on whether that statute was relevant to your

9    determination?

10   A.    I don't recall that.

11   Q.    And is it your testimony today that as we sit here

12   you've never read the examination under oath of Mr.

13   Lodigiani?

14   A.    I don't believe I have.

15            MR. BURSTEIN:  I have no further questions, Your

16   Honor.

17            THE COURT:  Thank you.

18            MR. GIROUARD:  Your Honor, I have no questions

19   of the witness.

20            THE COURT:  Thank you.  Any redirect?

21            MR. STEWART:  Just briefly, Judge.

22            THE COURT:  All right.

23

24

25

**REDIRECT EXAMINATION**

Q.   (By Mr. Stewart) Now, there was some questions asked about your receiving information from Mr. Doyle I believe it was on March 18th, thereabouts, of 2013?

A.   Uh-huh.

Q.   And I gather he was at that time reporting to you that there was an issue -- or strike that.

     What exactly do you remember him reporting to you?

A.   We were talking about the defense of the case, how it was shaping up.  He felt it was shaping up very well and that he had a very defensible case, and in the course of that conversation he mentioned that Mr. Lodigiani had a partner.

Q.   Okay.  As a liability claim representative, is the significance of who is at the worksite with your insured, was that something that had any relevance to the underlying liability claim?

A.   Sure.  We want to know the relationships of all the people who were there.

Q.   Okay.  And why would that be important?

A.   Well, there may be co-defendants that would be involved.  Is there a general contractor?  Is the owner the person who pulled the permit?  Is he acting as the general contractor?  Did he hire a general contractor?  All these different parties who were there may have

1    involvement.

2    There may have been an electrician who was there who

3    might have started the fire, we don't know at that point.

4    It's just we want to find out in the course of our

5    investigation everybody who was involved.

6    Q.    Okay.  And particularly with the people that were

7    working with your insured, would you want to know what

8    their relationship was to the insured?

9    A.    Sure.

10   Q.    Okay.  So when you were told by Mr. Doyle that this

11   man Mr. Lodigiani had a partner, what were your options

12   and particularly is that something that you would just

13   ignore?

14   A.    I couldn't ignore it.  I have to report to the

15   company information I know and record it in the claim

16   notes.  That's very important.

17   Options, ignoring it is not an option.  We have to

18   look into it, and I got direction from my manager on what

19   he wanted done next to look into it.

20   Another option would be to simply, if I were going to

21   go that route, to simply deny coverage at that point and

22   leave Mr. Lodigiani on his own.

23   We could -- another option for us is a reservation of

24   rights letter and tell him we've gotten this information

25   and we are looking into it, which I did send him.

1    Another option would be ultimately rescinding the
2  policy.  That's not something we take lightly.  It's a
3  very serious matter and we have to go through a very clear
4  process to get to that point.  We don't take that lightly.
5    I've had probably five or six cases in my time with
6  Preferred Mutual we considered rescission and this is the
7  only one that I've been involved in where we did rescind
8  the policy.
9  Q.  Okay.  So at about 3/22 was that about when you sent
10  the reservation of rights letter?
11  A.  I don't remember the exact date, but it was around
12  then, yeah.
13  Q.  And you didn't make a decision at that time to
14  decline coverage, is that accurate?
15  A.  No, absolutely not.
16  Q.  Did you feel that a fair investigation, a thorough
17  investigation, a further investigation was required?
18  A.  It was absolutely necessary, yeah.
19  Q.  Okay.  And that's what took you through the end of
20  July before a decision was made?
21  A.  The decision was made earlier in July.
22  Q.  Okay.
23  A.  And that's when I had to draft the letter and I
24  eventually sent it with my signature.
25  Q.  There was some conversation about -- strike that.

1      There was some testimony elicited from you earlier

2   about whether you called Peggy at the agency to inquire

3   about Mr. Lodigiani's answering of underwriting questions

4   process; do you remember that?

5   A.    Yes.

6   Q.    Okay.  And was that issue about whether -- and I

7   gather this came up because the agent couldn't find a

8   signed application, is that why this came up?

9   A.    I'm not certain.

10  Q.    Okay.  In any event, did the examination under oath

11  answers clear up any issue about whether Mr. Lodigiani

12  owned the answers that were in his liability application

13  to Preferred Mutual?

14  A.    As I understand it, he acknowledged that they were

15  all his answers, yes.

16              MR. STEWART:  That's all, Judge.

17              THE COURT:  Thank you.

18              MR. ZELLE:  Nothing further, Your Honor.

19              MR. BURSTEIN:  (Indicating.)

20              THE COURT:  Thank you, sir.  You can step down.

21              MR. STEWART:  Judge, I have -- that's the

22  plaintiff's case.

23              THE COURT:  Very well.  The plaintiff rests.

24              MR. ZELLE:  Could we have a sidebar?

25  (Sidebar conference.)

1           MR. GIROUARD:  I have a motion for judgment as a

2      matter of law.  Based upon the evidence that the plaintiff

3      submitted in this case it's at the point the plaintiff,

4      bearing the burden of proof, the evidence fails as a

5      matter of law to establish by a preponderance of the

6      evidence that they had a right to rescind the case on

7      Count 1 or on Count 2 that there's a joint venture.  I

8      respectfully request the Court enter judgment in favor of

9      the defense.

10          THE COURT:  All right.

11          MR. ZELLE:  The defendant C&K joins in.

12          MR. BURSTEIN:  We join the motion.

13          THE COURT:  Okay.

14          MR. STEWART:  Judge, it's my position that we

15     have proven all the elements of our *prima facia* case.  We

16     have proven -- I guess I'm saying we have met our burden

17     of production.  Whether this jury is persuaded or not we

18     won't know for a while, but we have offered proof to meet

19     the burden of production as to a false statement.  There

20     was some question whether that needed to be knowingly and

21     we have satisfied that element, even though I don't think

22     we need to by way of Mr. Lodigiani's testimony.

23          We have satisfied the elements to prove a partnership

24     by direct evidence and by inference.  There was some

25     question about weather these partners agreed to shared

liability and I think by the answer yes to one of my

questions with Mr. Lodigiani yesterday afternoon, that

element was fairly satisfied. I think I can get there by

inference but we did have direct evidence on that. We do

have the splitting of the profits. We know under the

statute that's *prima facia* evidence of a partnership and

so I think I've got the partnership thing.

THE COURT: The motion is denied.

MR. GIROUARD: Thank you.

MR. STEWART: Thank you.

(End of sidebar conference.)

THE COURT: Okay. Ladies and gentlemen, at the

point the plaintiff rests. That means their case is

finished, their direct case. Now it shifts and the

defendant can -- the defense can choose if they want to to

put on their witnesses. All right.

MR. ZELLE: We will, Your Honor. We will begin

with Margaret Grundstrom. Let me introduce Russell Denver

who is Ms. Grundstrom's personal attorney.

THE COURT: Thank you.

THE CLERK: Can you raise your right hand for me

please?

**Margaret Grundstrom (sworn)**

THE CLERK: Can you state your name for the

record?

1      THE WITNESS:  Margaret Grundstrom.

2      THE CLERK:  Can you spell your last name for the

3   record?

4      THE WITNESS:  G-r-u-n-d-s-t-r-o-m.

5      THE CLERK:  Thank you.  You may be seated.

6   **DIRECT EXAMINATION**

7   Q.   (By Mr. Zelle) Good afternoon, Ms. Grundstrom.

8   A.   Hello.

9   Q.   We have met before.  I'm Tony Zelle and I took your

10  deposition and this process will be very similar.  I'm

11  just going to ask some questions and this time going to

12  speak to the jury, if you will.

13  A.   I will.

14  Q.   Will you just tell the jury what you do for a living?

15  A.   I'm an account manager at HUB Insurance formerly

16  FieldEddy.

17  Q.   And did HUB acquire FieldEddy Insurance?

18  A.   Yes.

19  Q.   How big was FieldEddy back in 2012?

20  A.   How big?

21  Q.   Yes.  You had two offices as I understand.

22  A.   We had more than two offices.

23  Q.   Okay.

24  A.   One of the offices does strictly personal lines and

25  there's two offices that do all lines, commercial.

1    Q.    Which office are you in?

2    A.    East Longmeadow.

3    Q.    Have you been at the East Longmeadow office for a

4    while?

5    A.    Yes.

6    Q.    How long?

7    A.    Well, since the day we moved in.  I've been with

8    FieldEddy for 27 years and a number of years back we moved

9    from Springfield to East Longmeadow.

10   Q.    What's your present position at HUB?

11   A.    I have a dual role, so to speak.  I am an account

12   manager for a limited number of accounts.  I also do

13   quality control.

14   Q.    And tell us, if I can, just how you've moved up.

15   Obviously account manager and quality control are pretty

16   high on the echelon of an insurance agency work, tell us

17   how you worked your way up.

18   A.    Well, I came to FieldEddy with ten years of

19   experience at Palmer Goodell, which was also a good-sized

20   agency.  I did claims there for five years.  I did account

21   manager work in commercial lines for another five years.

22   At that time I left there to go to FieldEddy and I started

23   there as a commercial line account manager.  I did that

24   until just the past year and a half perhaps.

25   Q.    Can you tell the jury how insurance companies help

1    people in businesses get insurance policies?

2    A.    Well, they come to us looking for coverage, either

3    they don't have it at all or they've got a policy

4    currently and perhaps they don't like the pricing or, you

5    know, they're looking for some alternatives and so they

6    come to FieldEddy and the account managers or a producer

7    will speak with them and determine what it is that they

8    need, quote the insurance for them, and if we sell the

9    policy, then we continue to service it.

10   Q.    And when a potential -- well, when a customer comes

11   in, a potential policyholder comes in, how do you

12   determine what would work best for them in terms of

13   insurance coverage?

14   A.    Well, generally there's some little preliminary

15   conversation what it is exactly you're looking for.  Are

16   you looking for all types of insurance for your business,

17   or are you looking for one select type of policy, and in

18   this case the first time I met Mr. Lodigiani he was

19   looking for workers' compensation.

20   Q.    You anticipated exactly where I was going.  I am

21   done with the preliminaries and we'll talk about Mr.

22   Lodigiani now.

23       When was it that he first came in and introduced

24   himself?

25   A.    I believe it was October 2012.

1    Q.    Okay.  And at that time what was your title there at

2    FieldEddy?

3    A.    Commercial lines account manager.

4    Q.    And how was it that you met with Mr. Lodigiani?

5    A.    I believe he came in somewhere around the lunch hour

6    because we have an alphabetical split at our agency, and

7    he actually fell into my partner's split but she was at

8    lunch so I was asked, because he was in the office, I was

9    asked to please come out and speak with him and I did.

10   Q.    Had you known it was going to land you on the witness

11   stand, I'm sure you would have gone out to lunch yourself.

12                       (Laughter)

13   Q.    I'm sorry.

14         And if you will then explain for the jury did you

15   meet with Mr. Lodigiani in a conference room or your

16   office?

17   A.    We used the conference room.

18   Q.    Tell us about the conversation that you had with Mr.

19   Lodigiani.

20   A.    He came in and said he was looking for workers'

21   compensation, and I did ask him whether he had coverage

22   currently and he said no.  I asked him, you know, had he

23   been canceled, many times that is what happens.  Someone

24   will cancel for one reason or another and I need to know

25   those things because I need to reflect that in the

1    application and he said no.

2        He said he didn't have any coverage, and then I

3    inquired what the reason was for that and he indicated to

4    me that he didn't have any employees and I believe it was

5    something like that, a long time ago, maybe 20 years.

6    Q.   That he had any?

7    A.   That he had any.  And, of course, the law says if you

8    don't have any employees and you are in business for

9    yourself, that you don't need to have a policy.  So that

10   made perfect sense to me.

11   Q.   Everybody is a lawyer when they come into court.

12                       (Laughter)

13   Q.   (By Mr. Zelle)  I'm sure you're right, the law does

14   say that.

15   A.   I'm sorry.

16   Q.   When you asked Mr. Lodigiani what kinds of insurance

17   he was looking for and he said workers' compensation, did

18   you ask him what about other insurance?  That's part of

19   the sales pitch, right?

20   A.   Yes, I believe I did, but I can't -- I don't recall

21   that part of the conversation.

22   Q.   But you do recall --

23   A.   But, yes, of course, that's one of the things that we

24   ask.

25   Q.   He said he just needed workers' comp.

1    So how did you go about then working with Mr.
2    Lodigiani to get the information that you needed to submit
3    an application?
4    A.    I asked him what the business name was and I believe
5    that he had said it was L.B. Plumbing and so I asked is
6    that a corporation.
7         Oftentimes when people give me the name of their
8    business, they don't always put incorporated at the end or
9    LLC at the end, and so we did have a conversation about
10   the type of business entity and it was determined by the
11   conversation that he was a sole proprietor, an individual
12   if you will.
13   Q.    If you can break down, as best you can, what that --
14   you said it was determined by the conversation, what that
15   conversation was, you know, how it was that you said, yes,
16   this is an individual d/b/a.
17   A.    I believe I asked, are you a corporation and he said
18   no.  Are you an LLC and he said no.  And then I don't know
19   -- I don't remember if it was me or it was he that said
20   I'm an individual, a sole proprietor.  I don't remember.
21   I might have asked him and he said yes.
22   Q.    Okay.
23   A.    But I can't be sure.
24   Q.    How long did you spend with Mr. Lodigiani gathering
25   general information before you sat down and filled out the

1    application?

2    A.    I'm thinking -- I don't know.  It couldn't have been

3    to that point, it couldn't have been more than 15 minutes

4    probably before I actually went and got the application.

5    Q.    And we know from the application, and I'll show that

6    to you right now, that was an application for the

7    Massachusetts workers' compensation assigned risk pool.

8    Can you tell the jury what that is and why it is that you

9    submitted an application for the assigned risk pool?

10   A.    At that point I didn't make the determination that

11   that's where it would end up, but I was thinking that that

12   probably would be the case because we at our agency have

13   many, many companies that we can quote with.

14         When it comes to certain types of policies, for

15   example, the workers' comp., the companies like to see

16   support.  In other words, they want to see a packaged

17   policy or some other type of business to go along with it.

18   If they don't, it doesn't mean that they won't write it.

19   In some cases they will, but in many cases they will not.

20   If you can't find a carrier who's willing to write it

21   voluntarily, then you need to go to the pool and

22   Massachusetts has their own workers' comp. pool and we go

23   right to them and they will get their coverage.  The

24   bureau ultimately will tell me what company it's been

25   assigned to so everybody gets their fair share.

1    Q.    Sure.  So you used some technical terms and I just

2    want to parse this out little bit.  When you say

3    companies, you're talking about insurance companies?

4    A.    Yes, of course.

5    Q.    And you said that your agency FieldEddy represents

6    lots of insurance companies?

7    A.    Yes.

8    Q.    And that affords you as the agency to get for

9    customers the policy that fits the best and gives the most

10   coverage for the premium dollar?

11   A.    Correct.

12   Q.    And with respect to workers' compensation, I think

13   you were suggesting that most companies don't want to

14   write it alone, they want to package it with a liability

15   or property or other business coverages?

16   A.    Yes.

17   Q.    Okay.  And so you ultimately came to the conclusion

18   that an application should be submitted for the pool.  Did

19   you try to get a policy from a company?

20   A.    I did try, but at that point I knew that while he was

21   there -- if ultimately he was going to go to the Cypress

22   pool, and I had not made that determination at that point,

23   not to a certainty, but I knew I would have to have him

24   complete and sign that application for me.  It works a

25   little differently.

1    I also knew with that application in hand I could go
2    back to my desk and research other markets and I would
3    have basically the information that I would need to do
4    their workers' comp. application.  Okay.  So I was just
5    thinking ahead thinking this is where it's going to go so
6    I want to be prepared so I did leave and go back to my
7    desk and pulled out that application.
8    Q.   So I'm zeroing in here on the application to a
9    section that says to list the dates of discussion of two
10   insurance companies, it goes on and I'm going to
11   paraphrase, that wouldn't write it as a standalone.
12   A.   Correct.
13   Q.   And my understanding from what you've told us is that
14   you took this information from Mr. Lodigiani -- the other
15   information on the application, then you tried to get
16   coverage from Travelers and Peerless and they said no, but
17   you had all the information so that you didn't have to go
18   back to Mr. Lodigiani again and ask for more information;
19   is that a fair summary?
20   A.   That is.
21   Q.   Now, I'm going to direct your attention to the box we
22   have highlighted here, line 8, where it says legal status
23   and you told us how it was you came to the conclusion that
24   Mr. Lodigiani was operating a sole proprietorship in the
25   course of your discussion with him before you actually

1    started filling things out, is that right?

2    A.   That's correct.

3    Q.   Now, when you actually filled this out, you were

4    going through the application with him asking the

5    questions and checking the boxes, is that right?

6    A.   That's correct.

7    Q.   And when you asked about the legal status, did you

8    explain to him what that meant or what you understood

9    legal status to mean?

10   A.   I don't recall explaining what legal status was, no.

11   Q.   That's fine.

12        Did you believe that you communicated to him in the

13   course of the earlier conversation about incorporation, an

14   individual, LLC, that you were on the same page?

15   A.   Yes, he seemed to understand.

16   Q.   And so you didn't at that point feel that you needed

17   to say now technically legally this is... you didn't go

18   into any of that?

19   A.   No.

20   Q.   When you submitted the application, what happened

21   next?

22   A.   Well, when I determined that he had to go with the

23   pool, I would have explained to him that we don't have

24   binding authority.  With many of our companies we have

25   binding authority and what that means is, you know, I can

1    give him a quote.  I can actually take his money and give

2    him if he needs it at that point either a binder or a

3    certificate or something to that nature that from that

4    point on he has coverage.  Okay.  You can't do that with

5    the pool applications.

6         You have to submit -- well, at least at that time you

7    had to submit the check and the paperwork, the original

8    paperwork to the bureau.  Within a day or two, a couple of

9    days, they would issue what they call a notice of

10   assignment and what that does is it will give you the

11   effective date of the coverage.  It would never be the

12   date that he came in.  With the pool it was 24 hours after

13   the workers' compensation bureau received that

14   application.  That would determine the binding date, the

15   effective date if you will.

16        They need payment in full to do that.  He did give me

17   a check, and then when I get this notice assignment in the

18   mail, not only does it give me the effective date, but it

19   states the company that they have placed that coverage

20   with.

21   Q.   So I am inferring this but once it goes to the pool,

22   the check is the same regardless of which company issues

23   the policy?

24   A.   Correct, because it's not made out to a company.

25   It's actually made out to the workers' comp.

1    Q.    Board?

2    A.    Yeah, bureau.

3    Q.    I understand.

4         After you were informed that the risk was accepted by

5    -- do we know which company it was?

6    A.    I don't remember now.

7    Q.    Once you were informed of the company that accepted

8    the risk and of the effective date, what did you do?

9    A.    I gave him a certificate to show that he had

10   coverage.

11   Q.    Did you call him and invite him to pick it up or how

12   did that work?

13   A.    I can't remember.  Typically I either mail it to the

14   certificate holder with a copy to the insured.  Sometimes

15   I'll be asked to e-mail or to fax it, and frankly I don't

16   remember.

17   Q.    All right.  Let me ask in terms of going back to the

18   application, were you ever provided with any reference

19   manuals or any training at any time in the course of your

20   work as an insurance agent as to technical legal

21   definitions of these various entities?

22   A.    I don't recall that.

23   Q.    Okay.  So basically when you get the information as

24   you did from Mr. Lodigiani and he said he was an

25   individual, he said he was a sole proprietorship, you

1    asked him are you a corporation, are you a partnership,

2    that's what you're going on?  It's up to your discretion

3    to check the box literally?

4    A.    Yes.  I mean, I assume in all cases I guess that the

5    client -- if the client tells me he's a corporation or if

6    he tells me he's an LLC or a sole proprietor, I assume

7    that he knows and understands that.

8    Q.    Okay.  When you took the workers' comp. application

9    or prepared it with Mr. Lodigiani, you asked him how many

10    employees he had, right?

11    A.    He hadn't had employees prior to that time which is

12    why he didn't need the coverage I believe, but he was

13    either going to or had hired one or maybe two part-time

14    employees.

15    Q.    I'm going to show you just what's on the application

16    as it's filled out and this is your handwriting?

17    A.    Yes, it is.

18    Q.    So you indicated number of employees two.  You got

19    that through your discussions with Mr. Lodigiani?

20    A.    Yes.

21    Q.    Did you ask him who they were?

22    A.    No.

23    Q.    Did you ask him whether any of the people he was

24    working with were partners?

25    A.    No.

1    Q.    So he, as you understood it, told you that there were

2    two people who were working with him and as employees?

3    A.    Employees.

4    Q.    That's why you wrote down two employees?

5    A.    Yes.

6    Q.    Now, did you get any information from Mr. Lodigiani

7    when you met with him about the job he was going to be

8    doing with employees?

9    A.    No.  The only reference I think we had to work was

10   are you doing residential plumbing or commercial plumbing.

11   Q.    Okay.

12   A.    And I believe he indicated that he was doing some

13   commercial but most of his work was probably residential.

14   Q.    So this application was submitted in October, October

15   26, 2012; do you see that?

16   A.    Yes, I do.

17   Q.    And about six weeks later, six, seven weeks later Mr.

18   Lodigiani and you had another meeting, is that right?

19   A.    We spoke.  I don't remember whether he came into the

20   office again or whether he called me on the phone.  I just

21   don't remember that but we did speak.

22   Q.    Okay.  Let me back up before we jump ahead to this.

23   Had you had any other conversation with him where he was

24   asking for certificates or anything like that?

25   A.    Well, after I wrote the policy it really wasn't in my

1  alphabetical split as I had mentioned, and so what I would

2  then do is I turned it over and coded it to Rose Mary who

3  was my partner at the time.

4      I believe that she spoke to him at one point, but

5  most of the time when he requested a certificate, it

6  seemed to come back to me.  I don't know whether he asked

7  for me by name.  I'm assuming that's probably what

8  happened and that's okay.  You know, we work together, so.

9  Q.   I understand you're just continuing to tell me how

10  much you don't want to be here but that's all right.

11                    (Laughter.)

12  Q.   (By Mr. Zelle) When he called you or met, whichever

13  it was, in December what did he ask you about?

14  A.   He was looking for a quote for general liability.

15  Q.   And can you explain the difference between a general

16  liability policy and a business owner's policy that we

17  have heard in the course of this trial is also called a

18  BOP?

19  A.   Yes.  You can get a standalone general liability

20  policy but we like to write a BOP, a business owner

21  policy, if we can that includes property coverage as well

22  as the general liability you're going to get in that

23  standalone general liability policy.  Okay.

24  Q.   And let me just probe a little bit further, the

25  liability policy protects the policyholder against claims

1    brought by third parties against him.  The property part

2    of the policy protects him if there's damage to his

3    property, his tools, his equipment, things like that?

4    A.    Correct.

5    Q.    Okay.  And did you explain why in your view a

6    business owner's policy would be a better insurance

7    product for Mr. Lodigiani?

8    A.    Generally speaking, they're very competitive in

9    pricing.  It's a nice product.  It gives you all types of

10    coverage and you can put option endorsements in, but it

11    comes, the standard business owner policy, comes with a

12    lot of nice features and generally it's no more than a

13    standalone GO policy.

14         You can get credit supply and there are things you

15    can do to get that premium down and that's just a very

16    competitive market, and unlike the workers' comp.,

17    everybody wants to write those types of policies.

18    Q.    Okay.  So it's a more competitive market and better

19    for your customer?

20    A.    Yes.

21    Q.    So tell us what you can about the conversation you

22    had with Mr. Lodigiani relative to obtaining the business

23    owner policy.

24    A.    Okay.  I had most of the information, not all, but

25    most of the information I needed.  We took some time to

1    talk about it because he was receptive to my quoting of a

2    business owner policy so I had to ask a few basic

3    questions about the property side of it.

4         But going back to the general liability, that too is

5    based on payroll so I would have needed to know if there

6    were any changes in terms of -- so I could determine what

7    the payroll would be to used.  I knew the classification.

8    It was still plumbing, but I would need to confirm the

9    payroll.

10   Q.   So when you asked about changes, you were saying has

11   the business changed?  In your mind you're saying are

12   there more employees, more jobs, is there a different

13   payroll?

14   A.   Correct.  It had only been six or seven weeks

15   between, it wasn't like a year or two had passed.

16   Q.   And when you asked Mr. Lodigiani have there been any

17   changes, did you express to him that specifically you were

18   looking for are there more jobs, more people, is there a

19   bigger payroll?

20   A.   It wasn't jobs so much, no, but it was payroll.

21   Q.   Okay.

22   A.   The payroll is what concerned me.

23   Q.   And what did Mr. Lodigiani say?

24   A.   No.

25   Q.   And you indicated also I believe that you had most of

1    the information that you needed for the liability part of

2    the application from your file that you had put together

3    when you prepared the workers' comp. application?

4    A.    Yes.

5    Q.    Was there anything else in particular that you recall

6    asking Mr. Lodigiani before preparing the business owner's

7    application?

8    A.    I don't recall.

9    Q.    Okay.  So after this conversation what was the next

10   thing you did to move the process forward?

11   A.    Well, at that point in time I had a couple of markets

12   in mind.

13   Q.    I'm so sorry to interrupt.  When you say markets I

14   know what you mean but I'm not sure they do, you mean

15   insurance companies?

16   A.    Insurance companies, I'm sorry.  I forget.

17        I had a couple of insurance companies in mind, but

18   until I went back to my desk and sat down and pulled up

19   the computer and got into the -- each company has their

20   own website so I have to go in each time and put in the

21   information and, you know, get a quote.  But I was leaning

22   towards Preferred Mutual because I believe that we had one

23   or maybe two more plumbers in my book of business and I

24   believe that they were with Preferred.  So I thought,

25   well, this is a good place to start.

1    Q.    I'm glad you brought up your book of business.  Is

2    trade contractors or sometimes you refer to them as

3    artisan contractors, is that a significant part of

4    FieldEddy's book?

5    A.    Yes.

6    Q.    So I'm sorry to interrupt but I digress.  Let's go

7    on.  So you went back to your office and you were looking

8    for different insurance companies and you had Preferred

9    Mutual in mind and you went to their website?

10   A.    Yes.

11   Q.    And what happened next?

12   A.    I quoted it and --

13   Q.    Can you tell us what that means?

14   A.    Okay.  I have to go through the system page by page

15   plug in the information that I have obtained beginning

16   with name, address, entity type, location, type of

17   business, for example, plumbing.

18        They ask for the payroll, they ask for the number of

19   years.  Well, they don't care so much about the actual

20   number of years.  You can work with that, but what they

21   don't really want is they're not looking for the plumber

22   who's brand knew, never had his own business.  Okay.  They

23   want to see some experience, generally it's three years

24   and of course he certainly qualified.

25   Q.    A few times over.

1    A.    So I had determined that this was a really good fit

2    and I got the pricing.

3    Q.    Can you just tell us how you -- you submitted the

4    information?

5    A.    Yes.

6    Q.    And then how is it that you received back from

7    Preferred Mutual in this case the pricing?

8    A.    For many of the companies with -- well, certainly

9    many types of different artisans, they will allow you to

10   get the quote immediately and actually give you binding

11   authority, which means I can write there say I'm going to

12   issue this policy.

13        In some cases, depending upon the information you

14   have provided in this website, they will come back and say

15   this needs underwriting approval.  You have to stop here.

16   You have to get that approval and it comes back either by

17   e-mail or sometimes a phone call, whatever, and then you

18   can go forward.  I don't remember in this case if it

19   needed underwriter approval or not.  I don't seem to

20   recall that but that's just a guess.

21   Q.    I can actually I think show you your --

22   A.    I can't remember.

23   Q.    I can show you your file and maybe that will help

24   you.  I'm just going to show you this.  I'm not going to

25   offer it.

1      Just take your time and take a look.  I'm sure

2   that's familiar to you.  Let me know if that helps refresh

3   your recollection as to whether you needed underwriting

4   approval on this matter.

5   A.    I'm not sure that this would even have the answer to

6   that.

7   Q.    Oh, well.  That's fine then.  I don't think it's that

8   significant.  We can move on.

9   A.    Sure.  It's a little button that pops up at the

10  bottom of the screen I think and it will say -- it won't

11  allow you to go any further or allow you to bind the

12  coverage.  It will just say it needs approval, but I don't

13  think that happened.

14  Q.    Okay.  I'm just trying to get both in my mind and

15  hopefully in the mind of the jury as well exactly what's

16  going on as you're sitting and you're putting the

17  information in and then either a quote comes back or, you

18  know, I guess I don't even know, but it would be by way of

19  e-mail or just pops up on the screen?

20  A.    The quote itself?

21  Q.    Yes.

22  A.    Okay.  I believe it gives you the quote but then it

23  doesn't let you bind, and I have to say this because we

24  have, I said it before, we have so many different

25  companies, not every website is the same.  You know, it

1  basically is the same information but it could be in

2  different locations.  It could be presented differently on

3  the screen.  So when I say I can't remember, it's because

4  I don't always use Preferred.

5  Q.  Sure.  I understand.

6  A.  They're all different.  But regardless, it did let me

7  bind the coverage, whether it was that moment or later.

8  Q.  We do know what happened.  You were given binding

9  authority and Preferred Mutual issued the policy?

10  A.  Correct.

11  Q.  What did you do once you were informed that the risk

12  was accepted by Preferred Mutual with respect to Mr.

13  Lodigiani?

14  A.  I would have collected payment.  There's always a

15  minimum that's due, a minimum deposit, and they have the

16  option to pay more or in full.

17  Q.  Okay.  Do you recall whether there was payment in

18  full here?

19  A.  I can't be sure.  I think so, but I can't be sure.

20  Q.  Did all of this and what I mean by that, is your

21  speaking with Mr. Lodigiani, your submitting the

22  application, your getting the binding approval happen in

23  one chunk of time, or was it something that you spoke with

24  Mr. Lodigiani and then came back to it and it happened

25  over a sequence of time?

1  A.   We are talking about the general liability and I
2  don't believe that it was a done deal right then and there
3  because I think he had left before I went back to my desk
4  to quote.
5       I generally have -- first of all, he lived in East
6  Longmeadow so he didn't have a great distance to travel,
7  and I felt that it would give me more time to sit down and
8  if I had to compare different companies and so forth, it
9  would allow me time to do this.  Unlike the workers' comp.
10  is that we kind of did most of the process the first time,
11  but so I don't remember but I think he left and then I
12  don't know if he mailed me the check or came in again with
13  the check.  Unfortunately I don't remember that.
14  Q.   It's not a problem.
15       Did you have anymore discussion with Mr. Lodigiani in
16  the course of the process of obtaining the policy from
17  Preferred Mutual than you've told us?
18  A.   I don't remember.
19  Q.   Okay.  There's just one other thing that I'd like to
20  cover and that is there was a fire that involved the
21  property where Mr. Lodigiani was working.  You're aware of
22  that?
23  A.   Yes.
24  Q.   And did you or FieldEddy provide notice of that fire
25  to Preferred Mutual?

1    A.    I don't remember if they called or somebody called us

2    and we connected them to the company directly.  There are

3    claim numbers and the trend these days is to have the

4    client call the company directly, although we will take it

5    if we have them on the phone.  Again, I don't know if it

6    was me or if was Rose Mary or somebody else.

7    Q.    So in terms of the reporting of the fire or of any

8    claim, you don't have any specific recollection of any

9    involvement with that?

10   A.    I recall that I had received a phone call after the

11   claim had been reported.

12   Q.    Okay.

13   A.    But I don't, no, but --

14   Q.    I'm sorry.  Go ahead, please.

15   A.    Sorry.  I don't remember if -- I don't remember the

16   actual taken of the claim from the client.  I don't

17   remember that.

18   Q.    So now let's go to what you do recall about getting a

19   phone call about the claim.  Can you tell us when that

20   was?

21   A.    I don't remember exactly.  It's in my notes.  I don't

22   remember if it was -- I don't remember how soon after the

23   fire I got that call.

24   Q.    Okay.  What do you remember about the call?

25   A.    It was a gentleman who was working on this case and I

1    don't even remember his name without checking the file,

2    but somebody did call and I was asked a few questions and

3    then I recall getting a letter.

4    Q.   Okay.

5    A.   But that's all.

6    Q.   Just to make it clear, I think we all are assuming

7    this but the call came from a gentleman at Preferred

8    Mutual, is that right?

9    A.   I believe it was or the representative of Preferred

10   Mutual.

11   Q.   Okay.  And then you said the next thing you recall is

12   receiving a letter?

13   A.   Yes.

14   Q.   What was that?

15   A.   Indicating that there was a reservation of rights

16   letter in which they're not making any promises.  You

17   know, they're looking into it and it indicated that there

18   was something of concern and they were going to --

19   Q.   Investigate?

20   A.   -- investigate and speak with Mr. Lodigiani.

21   Q.   Okay.  And did you have any discussion up until that

22   point, at the point of reservations right letter, with

23   anyone at Preferred Mutual about the process by which you

24   obtained information and submitted the application?

25   A.   I don't recall that.

Q.   Okay.  Do you recall that I took your deposition last

year?  I don't remember the specific date, but prior to

the time that I took your deposition had you had any

conversations with anyone either at Preferred Mutual or

working with Preferred Mutual about the process by which

you obtain information and submitted the application?

A.   No.  I do recall at some point being asked did I have

a signed application in which I thought I would have had

one but I couldn't find it and so I told them when it

became apparent, but I don't recall that the conversation

-- I think that's what you're getting at -- as to how I

took that application, I don't think that question was

ever asked to me.

          MR. ZELLE:   Thank you very much.  I'm all

finished.

          THE COURT:   Thank you.

**CROSS-EXAMINATION**

Q.   (By Mr. Girouard) Nice to see you again.

A.   Nice to see you.

Q.   I'm going to be very brief.

     You just testified that you've been employed with

FieldEddy for 25 years?

A.   Yes.

Q.   What is the corporate structure or business type of

FieldEddy as of October of 2012?  Is it a corporation, an

1  LLC, limited liability partnership?

2  A.   I believe it was a corporation.

3  Q.   And you're an employee of FieldEddy?

4  A.   Yes.

5  Q.   And earlier you were talking about the first time you

6  met Mr. Lodigiani when he came in and as I recall your

7  testimony you said that when he came in, he announced his

8  name and then you have a list of how the people as they

9  come in are divvied up amongst the workers at the company?

10  A.   Yes.

11  Q.   It's an alphabetical list?

12  A.   Yes.

13  Q.   You had half the alphabet and Rose Marie had the

14  other half?

15  A.   Yes.

16  Q.   How long have you worked with Rose Marie?

17  A.   It had to be more than five years at that time.

18  Q.   And do you have any relationship with her outside of

19  work, other than a basic social relationship?

20  A.   No.

21  Q.   So you work with her as an employee of FieldEddy and

22  you might socialize with her outside of work?

23  A.   I haven't but, yes.

24  Q.   You're not in business with her?

25  A.   No.  No.

1    Q.    And correct me if I'm wrong, when you were describing

2    this process of the alphabetical list, and if I get it

3    wrong you tell if I've got it wrong, you said that the

4    division of labor was divvied up with your partner Rose

5    Marie?

6    A.    Oh.

7    Q.    Did you say that?

8    A.    I did.  I did.

9    Q.    So you used the term "partnership" or "partner" I

10   should say to describe the co-worker at your place of

11   employment where you're a corporate employee?

12   A.    Yes.

13   Q.    And you were deposed in this case back on May 22,

14   2014; do you remember that?

15   A.    Yes, I do.

16   Q.    You don't have a dog in this fight.  You're just here

17   as a witness, right?

18   A.    Oh, yes.

19   Q.    You're not a party?

20   A.    Oh, no.

21   Q.    You came and you swore to tell truth and you did that

22   back when you did your deposition?

23   A.    That's correct.

24   Q.    And back in May of 2014 when you were asked to come

25   in and asked some questions you were also asked some

1    questions about this division of labor and there were some

2    inquiry, "We have an alphabetical split in our office.  We

3    have a division of middle market accounts and small

4    business accounts.  I work in small business and there's

5    an alphabetical split.  My part of the alphabet starts

6    with M."  Do you remember that?

7    A.    Yes.

8    Q.    And then I think it was Attorney Zelle that said

9    "Okay."  And you then said, "I would never have handled it

10   this way if he hadn't come in when my partner was at

11   lunch."

12         Back in May of 2014 when you're just called in as a

13   witness in this case, you described the relationship with

14   your coworker as a partner?

15   A.    Correct.

16              MR. GIROUARD:  Thank you.  I have no further

17   questions.

18              THE COURT:  All right.

19              MR. BURSTEIN:  No questions, Your Honor.

20              THE COURT:  Thank you.

21              MR. STEWART:  If I may, Judge?

22              THE COURT:  Sure.

23

24

25

**CROSS-EXAMINATION**

Q.   (By Mr. Stewart) Good afternoon, Ms. Grundstrom.

A.   Hello.

        THE COURT:  Attorney Stewart, I'm not going to
limit you obviously in any way, but maybe ten minutes or
so until we take the break so space it out.

        MR. STEWART:  I think I can do that.

        THE COURT:  You don't have to finish but just to
let you know.

        MR. STEWART:  Let's give it a whirl.

Q.   (By Mr. Stewart)  Ma'am, part of your job is the QC
manager, is that quality control?

A.   Correct.

Q.   So there's some compliance things at the FieldEddy
agency that you try to make sure are in compliance?

A.   Correct.

Q.   And you are aware, are you not, that Mr. Lodigiani
has stated that he doesn't claim that you made any errors
in this case.  Are you aware of that?

A.   No, not had that conversation.

Q.   So apparently you can't find the signed application
at this point?

A.   I cannot, not for the general liability, no.

Q.   However, are you aware that Mr. Lodigiani has told
this jury that the answers that you recorded are in

1    complete fidelity with what he told you?

2    A.    I heard something when we first walked in but that's

3    the first time I realized that.

4    Q.    So in any event, let's talk about when you filled out

5    the liability policy, I just want to understand when

6    you're at the screen inputting -- key stroking in, mouse

7    clicking, when it comes to the entity, when you click on

8    that is there kind of a menu that you select the right

9    answer; is that your experience?

10   A.    Sometimes there is and sometimes it's just, you know,

11   blank.  It just asks for the business entity.  Other times

12   there's a list of options and I don't recall.

13   Q.    It sounds like you have a lot different companies

14   that you're filling out applications for and you may not

15   have a specific memory of there being a drop-down screen

16   on the Preferred Mutual app, is that accurate?

17   A.    That is accurate.

18   Q.    Now do all companies have a similar type of

19   submission systems?

20   A.    Most of them do.  Most of the voluntary companies

21   that I work with, yes.

22   Q.    Okay.  So Mr. Lodigiani came into your office and you

23   think it was probably the lunch hour because you only

24   usually deal with people from M to Z and him being an L,

25   that's usually the A to L person, right?

1    A.    That's correct.

2    Q.    But you made an exception rather than keep him

3    waiting for the A to L person who was out to lunch, you

4    spoke with him in the conference room?

5    A.    Yes.

6    Q.    Okay.  Now, at that time he told you that he had a

7    job and he needed workers' comp. as part of the

8    requirements for that job?

9    A.    Yes.

10   Q.    He didn't give you any further insight into the

11   particulars of that job, correct?

12   A.    No, he didn't.

13   Q.    Okay.  And when you are an agent taking an

14   application, there's a certain reliance that you have on

15   the perspective policyholder, the policy applicant, to

16   tell you what you need to know to complete the application

17   and submit it to the company, is that correct?

18   A.    Yes.

19   Q.    Okay.  And you don't commission an investigation on

20   your own to find out facts about whether what somebody is

21   telling you is true or not true, is that correct?

22   A.    Correct.

23   Q.    Okay.  In fact, you deal with a lot of insurance

24   companies that write BOP and CGL type of policies, is that

25   correct?

1    A.    Yes.

2    Q.    Would you give the jury an idea about numerically how

3    many different companies, a couple of dozen do you think?

4    A.    Oh, yes.

5    Q.    Maybe even more than that?

6    A.    In a small business we -- well, how do I say it?

7    There are a lot of companies that we would only use

8    occasionally for the very unusual type or hard to place

9    market, but for me in my unit it's pretty -- you know,

10   it's probably narrowed down to maybe even 12 or 14 --

11   Q.    Okay.

12   A.    -- that we would customarily use.  Not to say that we

13   can't further if we need to.  If there's a need, we can go

14   beyond that realm and go in the other markets.

15   Q.    I'm just talking about the admitted market.  I'm not

16   talking about the excess surplus lines.  Are you with me?

17   A.    Yes.

18   Q.    So these are companies that are licensed to do

19   business in Massachusetts, right?

20   A.    Yes.

21   Q.    And you've have binding authority on behalf of these

22   companies?

23   A.    For most of them, yes.

24   Q.    Okay.  Now of those companies, do any of them define

25   partnership for you?

1   A.   I have never seen that done.

2   Q.   Do any of them define joint venture for you?

3   A.   No.

4   Q.   Okay.  Now, I gather Mr. Lodigiani came into your

5   office on 10/26/12 and did the application for workers'

6   comp. and then there was a need for a second liability

7   policy application.  Are you with me?

8   A.   Yes.

9   Q.   Okay.  And that came at about December 18th of 2012;

10   does that sound right to you?

11   A.   Yes, it does.

12   Q.   Okay.  And you can't recall the gritty details about

13   how that came about, but you know you communicated with

14   him somehow?

15   A.   Yes.

16   Q.   Okay.  Now on the workers' comp. application it lists

17   two employees, is that correct?

18   A.   Yes.

19   Q.   Okay.  And on the liability policy it lists one

20   part-time employee; do you agree with that?

21   A.   I don't remember.  I know the payroll was the same,

22   the 10,000 was the same.

23   Q.   All right.  If you could look up on the screen -- and

24   just for the record this is Exhibit 2 and we're into the

25   third page, and here we have number of employees.  Do you

1   see that, Ms. Grundstrom?

2   A.    Yes, I do.

3   Q.    And then on the next page we have Mr. Lodigiani's

4   signature; do you see that?

5   A.    I do.

6   Q.    Okay.  So do you agree with me that on the workers'

7   comp. application, Exhibit 2, Mr. Lodigiani said he had

8   two employees?

9   A.    Yes.

10  Q.    Okay.  Ms. Grundstrom, let me show you the

11  application for liability insurance.  Is there anything in

12  there that I'm not able to find at this point about how

13  many employees Mr. Lodigiani has?

14  A.    Oh, there it is.  I had one.

15  Q.    Does it say anything about whether that person is

16  full time or part time?

17  A.    Part time.

18  Q.    Okay.  Can you show me where that is?

19  A.    Right here. (Indicating)

20  Q.    Thank you.  Have I circled the part we were looking

21  at a moment ago?

22  A.    Yes.

23  Q.    Now there's a difference between having one part-time

24  employee and two full-time employees, is there not?

25  A.    The other says two full time so that would have been

1   my error because he clearly said he had two part-time

2   employees.

3   Q.   And there's a difference between the amount of

4   minimum premium for a one-owner company as opposed to a

5   two-owner company, is there not?

6   A.   Yes.  When you're doing general liability for this

7   class of business, plumber, the class is based on payroll.

8   That's how you determine the pricing for that.  It's based

9   on payroll.

10       When there's one owner involved, it's a set amount

11  that you have to use for him and I believe it was 28,600.

12  To that figure you add the estimated payroll for all

13  employees, whether they be one or two, whether they're

14  full time or part time, you tack that amount on to the

15  28,6.  That's how I came up with the 38,600 that I charged

16  him for because he was a sole proprietor.  So that would

17  be the 28,6, the 10,000, whether it was one or two

18  employees it's still a 10,000 payroll so I added those two

19  together.

20  Q.   Right.  So if it was a two-owner company with 10,000

21  and employees, what would be the minimum premium that

22  somebody would have to pay on that?

23  A.   It's 28,6 times two plus the 10,000.

24  Q.   Got it.  So it would be somewhat roughly double what

25  the premium was?

1   A.   Almost, yeah.

2   Q.   And just so we're clear, when you are taking an

3   application for a liability policy, you follow a set of

4   protocols that you've developed over many years?

5   A.   Yes.

6   Q.   And you do that business custom and habit the same

7   way every time?

8   A.   Pretty much.

9   Q.   Okay.  And part of that is you ask what type of

10   organization are you to the policy applicant, right?

11   A.   Yes.

12   Q.   And then you will ask, are you an individual?  Are

13   you an LLC?  Are you a partnership?  And you get the

14   answer from the perspective insured on all those

15   questions, is that correct?

16   A.   Yes.

17   Q.   And it's true, is it not, that Mr. Lodigiani,

18   although he told you that he had this job that he was

19   getting the insurance for, he didn't tell you he was doing

20   the job with another man and planning to split the

21   profits, is that fair?

22   A.   Yeah.  No, we never had that conversation.

23   Q.   He never told you that?

24   A.   He never told me.

25           MR. STEWART:  Thank you, ma'am.

1          THE COURT:  All right.  Is this a good time to
2     break?
3          MR. ZELLE:  Maybe two minutes.  It's just two
4     questions.
5          THE COURT:  All right.
6     **REDIRECT EXAMINATION**
7     Q.   (By Mr. Zelle) The first one, Ms. Grundstrom, is did
8     you ask Mr. Lodigiani if he was sharing profits?
9     A.   No.
10    Q.   Okay.  The next question and I'm going to show you
11    the exhibit here, this is on Exhibit 3, the Preferred
12    Mutual application, and I think I might be able to clarify
13    something.
14         You indicated where it says one-part time employee
15    that might have been an error on your part.  You
16    understand there were two?
17    A.   Yes.
18    Q.   I'm going to suggest that if you look down where it
19    says list the percentage of work subcontracted to others
20    and you have two, and is that possible that you weren't
21    referring to two persons but that there were two people
22    who were working as independent contractors or
23    subcontractors for Mr. Lodigiani?
24    A.   Just repeat that again.  I want to be sure I get that
25    right.

1    Q.    Sure.  Let me start by putting it this way.  The two

2    -- that's a mistake.  It wasn't two persons, right?

3    A.    I will always ask the client -- I'm sure I asked him

4    do you sub any of your work out because that too can

5    affect the cost of the policy.  Okay.  And I believe the

6    answer was no.

7          Sometimes -- I mean, I always make it clear that it

8    doesn't mean that you can't -- I mean if the opportunity

9    came along farther on down the road, he could certainly

10   use subcontractors.  We have policies that are audited at

11   the other end and so those kinds of things are picked up

12   on an audit.

13         My primary reason to know that is because if the

14   percentage of subbing is too great, then he might not be

15   eligible for the product that I'm quoting him.  Okay.  I

16   need to know that.  So sometimes I'll just put in based on

17   my conversation a very small amount on the chance that he

18   does sub.

19   Q.    Okay.  Do you have a recollection that Mr. Lodigiani

20   said that he had one person working for him and then the

21   person who was working -- the one employee working with

22   him and then that that employee had a couple people

23   working for him?

24   A.    I don't recall.

25              MR. ZELLE:  All right.  Nothing further.

1             MR. STEWART:  One question, Judge.

2             THE COURT:  That's it.  I'm going to limit it.

3 We can come back after lunch.

4             MR. STEWART:  I'd like to get Ms. Grundstrom

5 back to work.

6 **RECROSS-EXAMINATION**

7 Q.   (By Mr. Stewart)  Again back to the application, the

8 liability application, Exhibit 3, "Number of partners,

9 officers active in operations?  One."  Is that based on

10 what Mr. Lodigiani told you?

11 A.   That's him, that's his one owner.

12 Q.   Got it.  And you submitted this application at Mr.

13 Lodigiani's request in applying for a policy from

14 Preferred Mutual?

15 A.   Yes.

16             MR. STEWART:  Thank you.

17             THE COURT:  All right.  Thank you, ma'am.

18             THE WITNESS:  Thank you.

19             THE COURT:  All right.  We will be taking a

20 lunch break.  Please do not discuss the case with each

21 other, begin your deliberations, or engage in any type of

22 research or investigation about the case.  Thank you.

23 **(The jury left at 1:15 until 2:27.)**

24             THE COURT:  Thank you.  Was the jury able to

25 follow my instructions during the lunch break and not

1    begin to discuss the case your deliberations?

2        All right.  Affirmative responses, the jury remains

3    fair and impartial.

4        All right.

5            MR. GIROUARD:  The defense calls Adnan Yildirim.

6            THE COURT:  All right.

7            THE CLERK:  Raise your right hand.

8    **ADNAN YILDIRIM (Sworn)**

9            THE CLERK:  State your name for the record.

10           THE WITNESS:  Adnan Yildirim.

11           THE CLERK:  Spell your last name.

12           THE WITNESS:  Y-i-l-d-i-r-i-m.

13           THE CLERK:  Thank you.  You may be seated.

14   **DIRECT EXAMINATION**

15   Q.   (By Mr. Girouard) Sir, you just said your name.

16   Could you tell the jury your name again?

17   A.   Adnan Yildirim.

18   Q.   Mr. Yildirim, where do you live?

19   A.   Springfield.

20   Q.   And how long have you lived in Massachusetts?

21   A.   Fourteen years.

22   Q.   Where were you born?

23   A.   Turkey.

24   Q.   Are you a U.S. citizen?

25   A.   Yes, I am.  I became one two weeks ago today.

```
 1    Q.    Congratulations.

 2          What do you do for a living?

 3    A.    I have a restaurant.

 4    Q.    Where is your restaurant located?

 5    A.    On Boston Road, Springfield.

 6    Q.    And what is the name of your business in Springfield?

 7    A.    Pizza Royale.

 8    Q.    You understand we are here in a disputed insurance

 9    coverage related to a fire that occurred at 24 Bridge

10    Street in South Hadley?

11    A.    Yes, I do.

12    Q.    What was your involvement with that property?

13    A.    I had a lease with the owner.

14    Q.    Who was the owner?

15    A.    C&K.

16    Q.    What was your intended use of the leased premises?

17    What were you going to do with it?

18    A.    It was going to be a pizza restaurant.

19    Q.    Did you sign a lease?

20    A.    Yes, I did.

21    Q.    Was there a need to do some renovations when you took

22    over the space?

23    A.    Yes.

24    Q.    In broad strokes, what had to happen to the building?

25    What did you need to do for renovations?
```

1    A.    For renovations plumbing, electrical, and some

2    construction repair needed to be done.

3    Q.    And did that work involve plumbers?

4    A.    Yes, it did.

5    Q.    Now was there a point in time when you came to be

6    introduced to Leo Lodigiani?

7    A.    Yes.

8    Q.    And can you tell me when was it that you were first

9    introduced to Leo Lodigiani?

10    A.    It was late September or beginning of October of that

11    year.

12    Q.    And who introduced you to Leo Lodigiani?

13    A.    It was Mr. Brantley.

14    Q.    And was there a point in time where you actually met

15    in person with Leo Lodigiani?

16    A.    Yes, there was.

17    Q.    What was discussed with Mr. Lodigiani?

18    A.    We went to the job site and I showed him the floor

19    plan and we discussed what needed to be done.

20    Q.    I'm going to show you what's been marked and is in

21    evidence as Exhibit 9.  Do you recognize that document?

22    A.    Yes.

23    Q.    And what is that document?

24    A.    That was the first contract we had with Mr.

25    Lodigiani.

1    Q.   And down at the bottom, do you see a signature that

2    appears on the bottom?

3    A.   Yes.

4    Q.   Whose signature is that?

5    A.   It's Leonard Lodigiani.

6    Q.   And did you understand when Mr. Lodigiani signed that

7    document that he was taking over the job of plumbing at

8    your leased premises?

9    A.   Yes.

10   Q.   And did you understand that Mr. Lodigiani had a

11   master plumber's license?

12   A.   Yes.

13   Q.   Now, was there a point in time where Mr. Lodigiani

14   applied for permits to obtain a plumbing license or

15   plumbing permit to the work?

16   A.   Yes, there was.

17   Q.   I'm going to show you what's been marked in the trial

18   as Exhibit 8.  Is that the plumbing application that Mr.

19   Lodigiani submitted after you hired him?

20   A.   Yes.

21   Q.   Now was there a point in time where you had

22   interaction with the South Hadley plumbing inspector and

23   there was a need to do additional work beyond that which

24   was contained in the first plumbing contract that was

25   marked as Exhibit 9?

1    A.    Yes.

2    Q.    I'm showing you what's been marked as Exhibit 10 in

3    this trial.  Do you recognize that document?

4    A.    Yes, I do.

5    Q.    What is that document?

6    A.    That is the second contract we had with Mr.

7    Lodigiani.

8    Q.    I got to see if I can play with this system because

9    everybody else has such fun with it.

10   A.    I memorized those.

11   Q.    Down here where I just circled, is that a signature

12   you recognize?

13   A.    Yes, that's mine.

14   Q.    And then over to the right of that, there's another

15   signature; do you recognize that signature?

16   A.    It's not clear here but I know it was Leonard

17   Lodigiani.

18   Q.    Okay.  Did you enter into a second written contract

19   with Mr. Lodigiani regarding the work to be performed at

20   your leased premises?

21   A.    Yes, we did.  We had to.

22   Q.    Now, what was your understanding about Mr.

23   Lodigiani's role in the work?

24   A.    He was the master plumber and he was going to be

25   taking over the job and he was going to be in charge.

1  Q.   Were there occasions once the work was underway did

2  you go and visit the job site?

3  A.   Yes.

4  Q.   And when you would go there each time to check on the

5  work, was Mr. Lodigiani there working on the job?

6  A.   Yes, he was.

7  Q.   There were some other men working there too?

8  A.   Yeah.

9  Q.   And who was calling the shots?  Who was giving the

10  orders from what you recall on the job site?

11  A.   Mr. Lodigiani.

12  Q.   And was there any occasion during the time you worked

13  with this project where you would have to go and get

14  supplies for the work that was being performed?

15  A.   Materials, yes, we did.

16  Q.   Who would you travel with to go get those?

17  A.   We went with Mr. Lodigiani to his accounts.  We used

18  his accounts.

19  Q.   So you would go to plumbing supply houses where Mr.

20  Lodigiani had an account?

21  A.   Yes.

22  Q.   And then would you pay for the materials?

23  A.   Yes, I did.

24  Q.   Now with regards to the work that is in Exhibits 9

25  and 10, the two written contracts, was it your

1  understanding that you were going to be issuing payments

2  when the work was done after Exhibit 10 work was

3  completed?  Was there an expectation you're going to be

4  paying somebody?

5  A.   Oh, no.  No, not at all, no.

6  Q.   Did you understand that Mr. Lodigiani was going to be

7  being paid for the work he did?

8  A.   Yes.

9  Q.   And were you intending or planning to pay anybody

10  else?  Were you going to be delivering payment for the

11  work to Mr. Lodigiani?

12  A.   It was Mr. Lodigiani only.

13  Q.   During the time you were on the job, did Leo

14  Lodigiani ever tell you that he was in a partnership with

15  Evins Brantley?

16  A.   Not that I remember.

17  Q.   And was it your understanding when you were working

18  on this job that you had an agreement to work with Mr.

19  Lodigiani and he was going to be supervising, controlling,

20  and running the job?

21  A.   Yes.

22           MR. STEWART:  I object to the form, Judge.

23           THE COURT:  It's a leading question.  This is

24  your witness.  The question will be stricken.  Just

25  rephrase.

| | |
|---|---|
| 1 | MR. GIROUARD: Certainly. |
| 2 | Q. (By Mr. Girouard) Sir, who was in control of the |
| 3 | work? |
| 4 | A. Mr. Lodigiani. |
| 5 | MR. STEWART: I object to that, Your Honor. |
| 6 | THE COURT: I'll allow it. |
| 7 | THE WITNESS: Mr. Lodigiani was in charge. |
| 8 | Q. (By Mr. Girouard) I'm going to show you what's been |
| 9 | marked and entered in evidence as Exhibit 11. Do you |
| 10 | recognize that document? |
| 11 | A. Yes, I do. |
| 12 | Q. What is that document? |
| 13 | A. That is the bill that Mr. Lodigiani gave to me after |
| 14 | the fire. |
| 15 | Q. And is it your understanding that Mr. Lodigiani |
| 16 | delivered that bill to you for the work that had been |
| 17 | preformed prior to the fire? |
| 18 | A. Yes, for how many hours they were there. |
| 19 | Q. Now, you're a party to another lawsuit that relates |
| 20 | to this fire, correct? |
| 21 | A. Yes, that's correct. |
| 22 | Q. And in that case you have filed claims seeking |
| 23 | payment for damages that you have suffered as a result of |
| 24 | this fire, correct? |
| 25 | A. That is correct. |

1    Q.    You went out to the fire after the fire?

2    A.    Yes.

3    Q.    Can you tell the jury what the condition of the

4    building was when you arrived after the fire?

5    A.    It was destroyed completely.

6    Q.    And as you sit here today do you know whether that

7    building is still no longer -- there's no building there?

8    A.    No, it's trash.

9    Q.    How close were you to opening your establishment

10   before the fire occurred?

11   A.    Two weeks at the most I would say.

12   Q.    And in the other case, the case where you have sought

13   to recover your damages, who have you sued?

14   A.    Mr. --

15             MR. STEWART:  Objection, Your Honor.

16             THE COURT:  I'll sustain that unless you have a

17   basis you want to tell me at sidebar.

18             MR. GIROUARD:  I'm happy to.

19   (Sidebar conference.)

20             MR. GIROUARD:  I would suggest the question

21   being asked is he has filed a lawsuit against Leo

22   Lodigiani.  If this witness had perceived there to be a

23   partnership, that he would have immediately filed an

24   action against both men if they were jointly responsible.

25        It's my expectation that the evidence will be offered

1  in the case that Mr. Brantley had his own insurance so it

2  begs the question that if he didn't perceive him to be a

3  sole proprietor of a business, why not sue?

4          THE COURT:  It's coming close to the motion that

5  dealt with excluding evidence of other coverage.

6          MR. GIROUARD:  I don't think -- I appreciate if

7  I came close to it, it was not intentional.  He has not

8  sued -- strike that.  He has damages that are specifically

9  not covered by any policy.  He has out-of-pocket

10  damages.

11          THE COURT:  I wasn't sure where you were going.

12  All right.  It does go to his state of mind.  It goes to

13  his belief as to how he was dealing with the respective

14  plumbers at his property and his feeling is relevant for

15  the jury to consider.  They can choose to accept it or

16  disregard it.  Okay.

17          MR. GIROUARD:  Okay.  Thank you.

18  (End of sidebar conference.)

19  Q.  (By Mr. Girouard)  I don't remember the exact way I

20  phrased the last question so I'll try it again.

21      Sir, there's another lawsuit that has been commenced

22  as a result of the fire; you're aware of that?

23  A.  Yes.

24  Q.  In that case you are a party where you have filed an

25  action seeking to recover your damages, agreed?

1    A.    Yes.

2    Q.    Who did you sue in that case?

3    A.    Mr. Lodigiani.

4    Q.    All right.  You didn't see anyone else in that case?

5    A.    No.

6            MR. GIROUARD:  I don't have anything else.

7    Thank you.

8            THE COURT:  Thank you.

9            MR. ZELLE:  No questions.

10         MR. BURSTEIN:  No questions, Your Honor.

11         THE COURT:  All right.  Thank you.

12    **CROSS-EXAMINATION**

13    Q.  (By Mr. Stewart) Mr. Yildirim, you have a suit

14    against Mr. Lodigiani?

15    A.    Yes.

16    Q.    Okay.  And Attorney Girouard represents you in that

17    suit, correct?

18    A.    Yes.

19    Q.    Okay.  And you could -- Attorney Girouard could

20    decide to sue anyone or not sue anyone, is that correct?

21         MR. BURSTEIN:  Objection, Your Honor.

22         MR. GIROUARD:  Objection.

23         THE WITNESS:  I don't think so.

24         THE COURT:  I understand where you're going with

25    it and I will let you go there, but just rephrase that

1   question.  It's sustained as to the form of the
2   question.
3   Q.   (By Mr. Stewart) There was a decision made to only
4   sue Mr. Lodigiani, is that correct?
5            MR. GIROUARD:  Objection.
6            THE COURT:  That will be allowed.  Sorry, you
7   can ask the question.
8   Q.   (By Mr. Stewart)  There was a decision made to sue
9   Mr. Lodigiani?
10  A.   Yes, I think so.
11  Q.   And there was a decision made not to sue Mr.
12  Brantley, correct?
13  A.   I don't see Mr. Brantley here at all.
14  Q.   You have not sued Mr. Brantley?
15  A.   Which one?
16  Q.   You have not sued Evins Brantley?
17  A.   Evins Brantley, no.
18  Q.   Okay.  And your attorney in that case is
19  Mr. Girouard?
20           MR. GIROUARD:  Objection, Your Honor.  May I
21  approach?
22           THE COURT:  No, not on that.  You can ask who
23  the attorney was.
24           MR. STEWART:  I'm sorry.
25  Q.   (By Mr. Stewart) Do you have an attorney?

1     A.    I do have an attorney.

2     Q.    Can you tell us who your attorney is?

3     A.    Mr. Daniel Kelley.

4     Q.    And is it that gentleman right there?  Does he

5     represent you?

6     A.    No, he does not.  I have my own personal attorney

7     too.  He's on that case.  I don't know, but he does

8     represent me here and on the other case I get my own

9     attorney as well.

10    Q.    Your own attorney is working with another attorney in

11    that case, is that correct?

12    A.    I suppose so.

13    Q.    And that other attorney is in this room currently,

14    correct?

15    A.    No, he's not.

16    Q.    Okay.  Now, let's talk about the night of the fire.

17    You found out about the fire on the night of January 28,

18    2013, is that correct?

19    A.    Yes.

20    Q.    And the first call you made was to Evins Brantley, is

21    that correct?

22    A.    I don't remember.

23    Q.    Yeah.  Well, you didn't call Mr. Lodigiani first,

24    correct?

25    A.    I did call him.

1   Q.   Okay.  If somebody else testified that you called Mr.

2   Brantley first, do you have reason to doubt that?

3   A.   Now that is usually because I can't really get ahold

4   Mr. Lodigiani the first time.  Like even before when I

5   questioned that I had to find him, it wasn't always easy

6   to find him with the phones because he didn't have a cell

7   phone.  I had other ways to find him.

8   Q.   All right.  So there were some previous permits

9   before Mr. Lodigiani got involved, correct?

10  A.   That's not correct.

11  Q.   Okay.  Well, let me show you.

12  A.   There were applications to the city hall, town of

13  South Hadley.

14  Q.   So Exhibit 8 that appears to be an application for a

15  permit?

16  A.   Yes, that is an application.

17  Q.   Okay.  And there's your signature again, right?

18  A.   Yes.

19  Q.   Okay.  And then the plumber that was applying was

20  Charles Brantley?

21  A.   Yes.

22  Q.   And Charles Brantley said that his business was 107

23  Albemarle Street in Springfield?

24  A.   Yes.

25               MR. ZELLE:  Objection.

1        THE COURT:  Overruled.

2   Q.   (By Mr. Stewart) Now it turns out that Mr. Brantley

3   was not actually at that address, is that correct?

4   A.   I suppose.

5   Q.   Did you come to find out that Mr. Brantley was

6   actually living in North Carolina?

7   A.   Mr. Brantley, which one?

8   Q.   Okay.  Charles Brantley.

9   A.   Yes, I did find that out later.

10  Q.   Okay.  And then there was a plumber named Evins

11  Brantley, correct?

12  A.   Yes.

13  Q.   All right.  And he actually lived in Springfield,

14  correct?

15  A.   Yes, that's correct.

16  Q.   And unfortunately Evins Brantley didn't have a

17  license?

18  A.   That's what I was told from the city.

19  Q.   Okay.  So there came a time apparently you tried to

20  have this permit approved going with the plumber named

21  Charles Brantley but before the permit was issued, they

22  found out that he doesn't live in Massachusetts, is that

23  accurate?

24  A.   That's accurate, yeah.

25  Q.   Okay.  So at that point you kind of had a problem,

1    didn't you?

2    A.    Yes, I did.

3    Q.    And you needed to find someone that -- actually had

4    you met Evins Brantley before all this?

5    A.    Before the job?

6    Q.    Before you had the problem with the permit.

7    A.    Yes, I had met him.

8    Q.    Okay.  And had you had discussions with Evins

9    Brantley about doing the job?

10   A.    Yes, we did.

11   Q.    Okay.  And did you understand that his son was the

12   one that had a master permit?

13   A.    Later, yes.  When we first start talking about the

14   contract, I assumed that he had a license.  We didn't get

15   that far to make a contract or make it all legal.  It was

16   just verbal.  I showed him the site and he told me he can

17   do it.  We didn't get to all the technicality that far

18   yet.  I didn't know about the permit.  That was later on,

19   not at that time.

20   Q.    Okay.  So at first you didn't know that Evins

21   Brantley didn't have a master's permit, is that accurate?

22   A.    That's accurate.  I didn't know.

23   Q.    Okay.  You thought that Evins Brantley was the one

24   that could actually do the job for you?

25   A.    Charles.

1    Q.   Charles Brantley.  Okay.

2         So, in any event, at some point you determined that

3    Charles Brantley couldn't do the job for you?

4    A.   The city called me and told me that they couldn't

5    issue permit.

6    Q.   Okay.  The city notified you of that?

7    A.   Yes.

8    Q.   I'm sorry, the town of South Hadley.

9    A.   The town of South Hadley, sorry.

10   Q.   And your first permits you were applying for did not

11   require that the contractor have insurance, is that

12   correct?

13   A.   That is not correct.

14   Q.   Okay.  You insisted on insurance the whole time?

15   A.   My conditions were that all jobs were supposed to be

16   done by city and state codes, and they were responsible to

17   take all the permits and all necessary papers down.  So

18   that included inside, they were supposed to have insurance

19   and license.

20   Q.   So when there's a box on the Charles Brantley permits

21   and it talks about owner's insurance waiver, it's your

22   position that you did not waive the requirement that you

23   have insurance?

24   A.   Actually that was my mistake that I wasn't supposed

25   to sign that, that was supposed to be the building owners.

1    So after I signed that and the plumbing department called

2    me that I did sign the wrong place, so we swapped the

3    application that I went there and it was not supposed to

4    be my signature.

5    Q.    So you had submitted -- and I understand the permit

6    was never issued, but if you submitted an application for

7    a permit waiving the requirement of insurance, you're

8    saying that would have been mistake?

9    A.    Waiving that right wasn't up to me.  They called me

10   so I went there and swapped the application.  I filled out

11   another paper so I signed the wrong place.

12   Q.    So you wanted to open up a pizza business at 24

13   Bridge Street in South Hadley, correct?

14   A.    That's correct.

15   Q.    Okay.  And did you know that there had previously

16   been a pizza restaurant there?

17   A.    Yes, I did.

18   Q.    Okay.  And did you know that there used to be a

19   Domino's franchise there?

20   A.    Yes, I did.

21   Q.    And did you investigate why that business was not

22   still there anymore?

23   A.    Yes, I did.

24   Q.    Okay.  And you know that that's right on Bridge

25   Street?  I mean, you can look a cross the bridge and see

1    Holyoke from there, correct?

2    A.    Yes.

3    Q.    And right at the other end of the bridge probably

4    about a quarter a mile away is another pizza restaurant,

5    correct?

6    A.    Yes, that is correct.

7    Q.    Amedeo's?

8    A.    Yes.

9    Q.    Okay.

10            MR. BURSTEIN:  Objection.  May I approach?

11            THE COURT:  Are you finished with that line of

12    questioning or are you going to keep going on that?

13            MR. STEWART:  I've gone as far as I'm going on

14    that.

15            THE COURT:  All right.

16            MR. BURSTEIN:  I withdraw the objection.

17    Q.    (By Mr. Stewart)  Now, sir, there were some questions

18    that your own attorney asked you about your knowledge of

19    the partnership between Evins Brantley and Leonard

20    Lodigiani.  Are you with me?

21    A.    Yes.

22    Q.    Okay.  So I would like to call to your attention the

23    fact that Evins Brantley gave a recorded statement, and at

24    the top here at page 16 there's some discussion about

25    Charles Brantley living in North Carolina and then we get

1    to this part where Mr. Doyle --

2            MR. BURSTEIN:  Objection, Your Honor.  There is

3    no foundation that this witness has any knowledge that

4    that statement was given.

5            MR. STEWART:  Judge, this is --

6            THE COURT:  Sidebar.

7    (Sidebar conference.)

8            THE COURT:  That was this witness's depo?

9            MR. STEWART:  No, this is hearsay offered

10   against this gentleman.  It's already in evidence.  I'm

11   using what Mr. Brantley is saying, it's in evidence,

12   against this man.  He says that he knew of the

13   partnership.

14           THE COURT:  I --

15           MR. STEWART:  "Did the owner know?  Yes."  The

16   owner was aware of this.

17           THE COURT:  I don't see that it would be proper

18   for you to impeach this witness here.  I question how it's

19   proper impeachment with what someone else said.  There's

20   no indication in what you're showing me that this witness

21   has adopted that statement as true.

22       You've asked him what he knew about the relationship

23   and he indicated he didn't believe they were in a

24   business.  I don't see how you impeach him with the

25   testimony of Brantley.

1        MR. STEWART:  That's fine.  Mr. Brantley is

2   coming and I can do it at that point.

3        THE COURT:  Okay.

4   (End of sidebar conference.)

5   Q.   (By Mr. Stewart) So let's go back, Mr. Yildirim.  You

6   hired a plumber that wasn't able to do the job because the

7   town of South Hadley wouldn't issue the permit, correct?

8   A.   That's correct.

9   Q.   Okay.  And at that point the senior Mr. Brantley, the

10  one that you had met before, arranged for another master

11  plumber to contact you?

12  A.   That's correct.

13  Q.   And you knew that those gentlemen were going to do

14  the job as partners, correct?

15  A.   I don't know who you mean.

16  Q.   Oh.  The gentlemen I just talked about, Evins

17  Brantley and Leonard Lodigiani.

18  A.   No, there was nothing like that.  I had a contract

19  with Leo Lodigiani.  I didn't care who he was going to do

20  the job with.  I don't know how many people that was.  He

21  had the permits and the license and he did the job

22  according to the floor plan, the rest wasn't really for me

23  to investigate.

24  Q.   When you say you had a contract with him, you mean he

25  signed that piece of paper, those two pieces of paper that

1  we saw earlier?

2  A.   Yes.

3  Q.   Okay.  And the dates that are reflected on those

4  pieces of paper are not the dates that Mr. Lodigiani

5  actually signed those things, correct?

6  A.   That's correct.

7  Q.   Okay.  Because they were dated in September.  In

8  September you were still dealing with Charles Brantley,

9  correct?

10  A.   That's correct.

11  Q.   Okay.  In fact, your first set of permits were like

12  in late August of 2012, correct?

13  A.   I'm not sure about dates, but early September to late

14  August, somewhere in there.

15  Q.   Well, do you want me to see if I can refresh your

16  recollection?

17  A.   Okay.

18  Q.   Let me show you this and I'll direct you to the top

19  where I'm pointing.

20          THE COURT:  What is that document?

21          MR. STEWART:  That's the Charles Brantley

22  permit.

23          MR. GIROUARD:  Objection.

24          THE COURT:  What's the objection?

25          MR. GIROUARD:  It's a mischaracterization.

1    They're not permits.  They're applications.  There's no
2    evidence of any permits.
3                THE COURT:  Let's just step it back one second.
4    Just state for the record what the witness was referring
5    to.
6                MR. STEWART:  Gladly.
7    Q.   (By Mr. Stewart)  Exhibit 8, third page, correct?
8    A.   Yeah.
9    Q.   Okay.
10                THE COURT:  What is the exhibit?  What is the
11    document?
12                MR. STEWART:  Oh, it's the permits of Charles
13    Brantley and Leonard Lodigiani, both in the same exhibit.
14                MR. GIROUARD:  Okay.  It's not a permit.  He's
15    mischaracterizing it.  They're applications for plumbing
16    permits and it's not an insignificant detail because of
17    the lack of --
18                THE COURT:  Okay.  That's enough.  Is that an
19    application, would that be the correct term?
20                MR. STEWART:  Yes, Your Honor.  I misspoke.
21                THE COURT:  All right.
22    Q.   (By Mr. Stewart) So are you saying that's a nine or
23    an eight?
24    A.   That's a nine.  That's my nine.
25    Q.   So that's just about the date of those contracts that

1  you were talking about earlier, correct?

2  A.   Yes, September.

3  Q.   All right.   Thank you, sir.

4          MR. GIROUARD:   Nothing further, Your Honor.

5          THE COURT:   Very well.   Thank you.   You can step

6  down, sir.

7          MR. BURSTEIN:   If I may, the defense would call

8  Evins Brantley to the stand.

9          THE COURT:   All right.

10          THE CLERK:   Raise your right hand please.

11  **EVINS BRANTLEY (sworn)**

12          THE CLERK:   State your name for the record.

13          THE WITNESS:   Yes, Evins C. Brantley.

14          THE CLERK:   Can you spell your last name?

15          THE WITNESS:   B-r-a-n-t-l-e-y.

16          THE CLERK:   Thank you.   You may be seated.

17  <u>**DIRECT EXAMINATION**</u>

18  Q.   (By Mr. Burstein) Good afternoon, sir.

19  A.   Good afternoon.

20  Q.   Do you have trouble hearing, sir, because if you do,

21  we can have you wear a device that might assist you in

22  hearing?

23  A.   A little bit.

24          MR. BURSTEIN:   May I approach, Your Honor, and

25  try to use the device?

| | |
|---|---|
| 1 | THE COURT: Yes. |
| 2 | MR. BURSTEIN: Thank you. |
| 3 | THE WITNESS: Thank you. |
| 4 | Q. (By Mr. Burstein) Sir, can you hear me okay now? |
| 5 | THE CLERK: I can hear the static. |
| 6 | Q. (By Mr. Burstein) Can you hear me okay now? |
| 7 | A. Yes. |
| 8 | Q. Okay. Sir, could you state your name again for the |
| 9 | record? |
| 10 | A. Evins C. Brantley. |
| 11 | Q. Where do you live, sir? |
| 12 | A. 91 Dunmoreland Street in Springfield. |
| 13 | Q. And how long have you lived in Springfield, sir? |
| 14 | A. Since 1952. |
| 15 | Q. And how are you employed, sir? |
| 16 | A. I'm self-employed. |
| 17 | Q. What type of work do you do? |
| 18 | A. Plumbing. |
| 19 | Q. Are you still actively employed? |
| 20 | A. Part time. |
| 21 | Q. You still do some plumbing jobs? |
| 22 | A. Yes. |
| 23 | Q. And how old are you, sir? |
| 24 | A. I will be 83 August 5th. |
| 25 | Q. This August 5th you will be 83? |

1    A.    Right.

2    Q.    And how long have you been a plumber, sir?

3    A.    Since 1971.

4    Q.    And where did you grow up?

5    A.    South Carolina.

6    Q.    And what brought you to the Springfield area?

7    A.    Better living.

8    Q.    Okay.  Did you have relatives up here or anybody else

9    here?

10   A.    Yes.

11   Q.    And tell us a little bit about your plumbing career.

12   How did you get started in plumbing?

13   A.    Well, there was a corporation called Springfield

14   Corporation and I used to do small work for

15   the cooperation and the company hired Mr. Lodigiani to do

16   their plumbing work and the guy who ran Springfield

17   Corporation was telling him about me and what I could do

18   and so Mr. Lodigiani approached me and he took me on.

19   Q.    Is it fair to say that you've known him quite awhile?

20   A.    For quite a while, yes.

21   Q.    Is he how you got your start in plumbing?

22   A.    That he signed me up, yes, for my plumbing permit.

23   Q.    Okay.  Have you worked on many jobs with Mr.

24   Lodigiani over the years?

25   A.    Quite a few.

1  Q.   And since 1971 until now, have you done jobs on your

2  own?

3  A.   Oh, yes.

4  Q.   And does he do jobs on his own to your knowledge

5  without you?

6  A.   Yes.

7  Q.   And I'm going to direct your attention to this

8  particular job and you know the gentleman who was just on

9  the stand is Adnan Yildirim?

10  A.   Yes, I do.

11  Q.   How did you first come to know him?

12  A.   He was introduced to me or I was introduced to him by

13  another friend that I did work for before.

14  Q.   Okay.  You've heard talk about some work that

15  occurred on Bridge Street in South Hadley.  Before you got

16  involved with Mr. Yildirim with that project, had you done

17  work for him in the past?

18  A.   For Mr. Adnan?

19  Q.   For Adnan Yildirim.

20  A.   Yes.

21  Q.   What type of work had you done for him in the past?

22  A.   I did some plumbing work for him.

23  Q.   Do you remember if it was residential or commercial?

24  A.   It was a restaurant.

25  Q.   Was that the Pizza Royale restaurant?

1    A.    Correct.

2    Q.    And was Mr. Lodigiani involved in that work?

3    A.    No.

4    Q.    To your knowledge, did Mr. Lodigiani have any

5    knowledge that you were doing that work without him?

6    A.    Yes -- I don't know whether he did or not.  I'm not

7    sure.

8    Q.    But he really didn't have anything to do with that

9    project?

10   A.    Absolutely.

11   Q.    And that was before this project on Bridge Street in

12   South Hadley?

13   A.    Yes.

14   Q.    Do you have any idea how long before?

15   A.    Well, it was awhile.  I don't remember the time

16   frame.

17   Q.    Okay.  And at some point in time Mr. Yildirim called

18   you again regarding a project?

19   A.    Well, the only time I did that job, he mentioned he

20   had another job that he was going to do.

21   Q.    Okay.  And did he approach you regarding that project

22   initially or did he approach your son Charles Brantley?

23   A.    Well, he approached me and Charles being my son, I

24   spoke to him about it.

25   Q.    Okay.  And you just heard testimony that Charles

1    Brantley spends part of his time in North or South

2    Carolina, is that correct?

3    A.    He does work here as well.

4    Q.    Okay.  So he goes back and forth?

5    A.    Back and forth.

6    Q.    And how did your son Charles get involved in this

7    project with Mr. Yildirim?

8    A.    I told him about it.

9    Q.    Did they have a meeting?

10   A.    Yes.

11   Q.    And did they come to an agreement on the scope of the

12   work to be done?

13   A.    Yes.

14   Q.    Okay.  Did they come to an agreement on the price, if

15   you know?

16   A.    Yes.

17   Q.    Was that a flat rate price or was that an hourly

18   rate?

19   A.    I'm not sure what type of arrangement they had, but

20   he came to an agreement because he started the work.

21   Q.    That agreement was between Charles Brantley your son

22   and Mr. Yildirim?

23   A.    Yes.

24   Q.    Your son Charles Brantley has a master plumber's

25   license?

1    A.   Yes.

2    Q.   And what type of license did you have in 2012?

3    A.   Journeyman.

4    Q.   Can you give us a brief explanation of your

5    understanding, sir, of the difference between those

6    licenses?

7    A.   Well, the code says a master can hire him and a

8    journeyman only worked for himself.

9    Q.   So as I understand it, I just want to make sure I'm

10   clear, a journeyman can do a project by themselves?  They

11   can pull permits for that project if they're working by

12   themselves?

13   A.   Yes.

14   Q.   And if there's going to be any plumbers hired as

15   employees, that would have to have a master plumber

16   involved on the project?

17   A.   Yes.

18   Q.   And so for this project a determination was made by

19   someone that a master plumber needed to be there?

20   A.   Well, the size of the job we would need some help.

21   Q.   Okay.  And that's why your son Charles was hired?

22   A.   Yes.

23   Q.   And was there work done on this project under

24   Charles' supervision before Mr. Lodigiani became involved?

25   A.   Very little.

1   Q.   Was there some work done?

2   A.   What happened was he needed to cut the permit and I

3   guess the job was started just before we got the permit

4   and that's how he got some work done.

5   Q.   Okay.  And at some point in time were you made aware

6   that your son Charles could no longer continue with this

7   project?

8   A.   Yes.

9   Q.   I want to back you up for a minute.

10      At the point where the permit was applied for, the

11  original plumbing permit by your son Charles, was he

12  actually local here in Springfield at the time?

13  A.   He was not employed here at the time, no.  He was not

14  doing it here, but he was here on a visit and I let him

15  know about the job.

16  Q.   Okay.  Did he actually do work on this job in South

17  Hadley?

18  A.   Yes.

19  Q.   Okay.  So he was physically present on the job?

20  A.   Oh, yes.

21  Q.   And at the point in time where he was told or the

22  owner was told that the permit was not going to be issued,

23  the work stopped at that point?

24  A.   Yes.

25  Q.   And did you have any conversation with the owner of

1   the restaurant that was being built out at that point in

2   time how to solve that problem?

3   A.   Yes.

4   Q.   What was the substance of that conversation, sir?

5   A.   Well, after Charles couldn't continue to work, then I

6   mentioned to him about Mr. Lodigiani.

7   Q.   When you say you mentioned it to him, that would be

8   Mr. Yildirim, the owner of the pizza restaurant?

9   A.   Yes.

10  Q.   And what was his reaction to your suggestion?

11  A.   He was very responsive to the job, to do the work,

12  yes.

13  Q.   And after that conversation did you have a

14  conversation with Mr. Lodigiani about the project?

15  A.   I probably told it to him about the job and whatnot,

16  yes.

17  Q.   After you told Mr. Lodigiani about the project, what

18  happened next?

19  A.   Then he proceed to make contact with Mr. Adnan and

20  they went forth with their procedures.

21  Q.   I just want to make sure I understand when you're

22  using me and him.  You're saying Mr. Lodigiani then had a

23  meeting with Mr. Adnan Yildirim?

24  A.   Yes.

25  Q.   And were you present at that meeting?

1    A.    I was not.

2    Q.    What's your understanding of what happened after that

3    meeting?

4    A.    Well, he started the job.

5    Q.    Okay.  And did Mr. Lodigiani tell you that they had

6    made a contract at that point?

7              MR. STEWART:  Objection.

8              THE WITNESS:  I believe he did.

9              THE COURT:  Overruled.  The answer can stand.

10   Q.    (By Mr. Burstein) And then work started on the

11   project?

12   A.    Yes.

13   Q.    And did you have a conversation with Mr. Lodigiani

14   about how you would get paid for this project at that

15   point once he took over?

16   A.    I don't remember whether we had a conversation right

17   then or later, but we came to a conclusion that when the

18   job was done then he would pay me then.  We would share

19   the profits.

20   Q.    Okay.  And would that be half of the total profit or

21   was that half of the profit after expenses?

22   A.    After expenses.

23   Q.    Okay.  Had you had that arrangement ever in the past

24   with Mr. Lodigiani?

25   A.    We had.

1   Q.   Okay.  And why were you going to get half of the

2   profits?

3   A.   That would be for the time that I spent on the job,

4   my labor.

5   Q.   So that was going to be your pay?

6   A.   Yes.

7   Q.   And did you make an understanding with Mr. Lodigiani

8   as to whether you were going to have to come up with any

9   money towards the up-front expenses like workers' comp.

10   insurance or liability insurance?

11   A.   No.  I didn't discuss that with him at all.

12   Q.   Did you ever -- strike that.

13       When you were working on the job before Mr. Lodigiani

14   was involved, did you have other helpers helping you at

15   that point?

16   A.   With Charles?

17   Q.   With Charles.

18   A.   Yes.

19   Q.   Do you remember who those individuals were?

20   A.   It was Ronnie Moore and Willie C. Costin.

21   Q.   Willie C. is a relative of yours?

22   A.   A nephew.

23   Q.   This other gentleman Ronnie, is he a relative?

24   A.   No.

25   Q.   How do you know him, sir?

1    A.    Yes, I do.

2    Q.    How?

3    A.    How do I know Ronnie?  Through Willie C.

4    Q.    He is a friend of his?

5    A.    I think they're cousins.

6    Q.    And are those gentlemen plumbers?

7    A.    They have done some plumbing work.  They have some

8    experience in plumbing, yes.

9    Q.    Do they have any plumbing licenses?

10   A.    No, they don't.

11   Q.    They both don't have any license at all?

12   A.    No.

13   Q.    And as I understand it, and you can correct me if I'm

14   wrong, there's different levels of plumbing licenses.  You

15   start out as an apprentice and then you get a journeyman's

16   license and then a master plumber's license?

17   A.    That's correct.

18   Q.    They didn't have any of those licenses?

19   A.    No.

20   Q.    They're basically just labor, just to help with

21   things?

22   A.    Right.  Well, they were there to do the work that we

23   -- it was not really plumbing all the time, but there was

24   a lot of digging that had to be done, demolition had to be

25   done.  They were there more or less for that purpose.

1    Q.    Okay.  So there was some demolition being done by the

2    plumbers as well and your helpers?

3    A.    It was in the jurisdiction of things.

4    Q.    Then there was cleanup that was going on as well?

5    A.    Yes.

6    Q.    As the project went on, is it fair to say that

7    because of your age and Mr. Lodigiani's age they would go

8    up on ladders and help you with that type of work?

9    A.    That's correct.

10   Q.    And once Mr. Lodigiani took over this job, who was

11   controlling the scope of what happened each day on the

12   job?

13   A.    Mr. Lodigiani.

14   Q.    And was he there on the job site every day that a

15   crew was there working?

16   A.    Yes.

17   Q.    And do you have any recollection of how many days you

18   and the other men were actually on the job?

19   A.    Oh, it was a few days.  I don't remember exactly how

20   many days.

21   Q.    Would it have been less than ten days?

22   A.    Thereabouts.

23   Q.    Okay.

24   A.    I would think.

25   Q.    And I believe there was some prior testimony and I

1    just want to know your opinion, were there some days that

2    Mr. Lodigiani didn't come in the first thing in the

3    morning and you would be there and start the helpers with

4    work and then he would come later?

5    A.   Oh, yes.

6    Q.   And during those periods of time when Mr. Lodigiani

7    was not on the scene, were you able to change the scope of

8    the work with the owner of the property?

9    A.   No.  We went according to what Mr. Lodigiani said.

10   Q.   Okay.  Was there any time after Mr. Lodigiani got

11   involved in this project that he was not in control of

12   this job?

13   A.   Not since, no.

14              MR. STEWART:  Objection.

15              THE COURT:  Overruled.

16   Q.   (By Mr. Burstein)  I'll repeat the question.

17       Was there any time after Mr. Lodigiani got involved

18   in this project that he was not in control of this job?

19   A.   He was always in control.

20   Q.   And did you have any agreement with Mr. Lodigiani

21   that if there were any losses as a result of this project

22   that you would share in those with him?

23   A.   No, we never discussed that at all.

24   Q.   Okay.  Did you have any discussion with Mr. Lodigiani

25   or an agreement with Mr. Lodigiani that if there was some

1    event that occurred where there would be liability, that

2    you would share the liability with him?  You would be

3    responsible?

4    A.    No, I didn't.

5    Q.    What was your understanding with respect to

6    liability?

7    A.    We didn't discuss that.

8    Q.    Okay.  Would you expect that if there was a problem,

9    somebody would be able to make a claim against you?

10   A.    No, because I had -- I was only a worker.  I had

11   nothing to do with project as far as I was concerned.

12   Q.    Okay.  And is that because it's the person's license

13   who applies for the license would be responsible for the

14   job?

15   A.    Yes.

16           MR. STEWART:  Objection.

17           THE COURT:  Sustained.  It will be stricken.

18   Q.    (By Mr. Burstein)  What's your understanding, sir, of

19   who would be able to be sued if there was a problem on

20   this job?

21   A.    Well, I don't remember me -- we talked about that or

22   it never occurred that would happen because we always

23   anticipate things going well.

24   Q.    So again I just want to make sure you understand my

25   question.  I want to know what your understanding is of

1  what would happen if something went wrong on the project

2  as far as whether someone would be able to sue you, what

3  was your understanding?

4  THE COURT:  I think you have to extend the basis

5  of knowledge before I will allow that.

6  MR. BURSTEIN:  Okay.

7  THE COURT:  I'll strike that.

8  Q.  (By Mr. Burstein)  Sir, did you have your own

9  liability insurance policy in effect at the time of this

10  project in 2012 into 2013?

11  A.  Yes.

12  Q.  Okay.  And do you know who that insurance was with?

13  A.  I can give you the agent, FSC in Southwick.

14  Q.  FSE?

15  A.  C.

16  Q.  FSC in Southwick?

17  A.  Yes.

18  Q.  And as far as you know, you had liability coverage in

19  effect at that point in time?

20  A.  Yes.

21  Q.  And with respect to the day-to-day business of this

22  job, did you ever have any conversations with the owner

23  after Mr. Lodigiani took over changing the scope of this

24  project?

25  A.  No.

1    Q.    Did you ever drive the owner to any of your supply

2    houses to go get supplies for this project?

3    A.    No.

4              MR. BURSTEIN:  I have no further questions, Your

5    Honor.

6              MR. ZELLE:  No questions, Your Honor.

7              THE COURT:  All right.  Attorney Stewart.

8              MR. STEWART:  Thank you, Judge.

9    **CROSS-EXAMINATION**

10   Q.    (By Mr. Stewart) Good afternoon.

11   A.    Good afternoon.

12   Q.    Now, like last week did you get dropped off in your

13   mail slot a copy of your statement?

14   A.    Yes.

15   Q.    Okay.  You had a chance to look at it?

16   A.    I did.

17   Q.    Okay.  Now, are there any -- we marked your statement

18   as Exhibit 13.  Have you -- in your review of that did you

19   notice any errors in the transcription between what you

20   said to Mr. Trudeau on January 28th -- I'm sorry, on

21   February 28, 2013, what you said and what was recorded in

22   the transcription?

23             Are you following my question, sir?

24   A.    Did I do -- could you repeat it?

25   Q.    Gladly.  I ask questions that are convoluted

1    sometimes.

2    A.    Okay.

3    Q.    I'm asking you the copy of the statement that was

4    dropped off in your mail slot if you had a chance to

5    review it and you said you did, and I'm asking you now if

6    you noticed any errors between what you remember that you

7    said and what is in the typed transcript?

8    A.    The only thing I can remember is that there was that

9    -- I didn't remember there I said I was a partner.

10   Q.    Okay.

11   A.    I don't know nothing.  I don't remember that,

12   otherwise.

13   Q.    Let me go to page 16 and we will review that.

14         So the questioning went down about the fact that your

15   son had pulled a permit and that he lived in Charlotte,

16   North Carolina.  Then there was a question:  "As a result

17   of that, you went to Leo and had an agreement with Leo

18   that you and he would do the job as partners under his

19   permit, correct?"  And your answer was "yes."

20         Are you saying that you didn't say that?

21   A.    I don't remember saying that we would do this job as

22   partners, no.

23   Q.    If you were to hear the tape, would that assist you

24   in feeling confident that you actually said that?

25   A.    Well, I would think that I'll hear my voice.

1           MR. STEWART:  Judge, may I ask for a short

2   recess to play the tape to this gentleman?

3           THE COURT:  Where is the tape?

4           MR. STEWART:  We have the actual tape recording.

5   He is saying he doesn't remember.  I'd like to break here

6   for five minutes, play him the tape, and then we can

7   resume.

8           THE COURT:  All right.  Is there a reason you

9   can't refresh his memory with it here?

10          MR. STEWART:  Judge, the difficulty is we're in

11  the last millennium and it's a cassette tape and I'd bore

12  the jury to death finding that place.

13          THE COURT:  All right.  How much time do you

14  think you need?

15          MR. STEWART:  Five minutes will be fine.

16          THE COURT:  All right.  We will take a

17  five-minute break and I'm hopeful we'll come back and

18  finish the testimony today.  All right.

19      So my instructions are the same.  Do not begin

20  discussing the case or deliberations.

21          THE CLERK:  All rise.

22  (The jury left.)

23          MR. STEWART:  I'll go in the conference room and

24  find that place and then I will meet with him and we will

25  do this.

1    (A recess was taken.)

2         THE COURT:  Attorney Stewart, I'll give you five

3    more minutes and then we've got to get started.

4    **(A recess was taken until 3:41.)**

5         MR. STEWART:  We're ready, Judge.

6         THE COURT:  Okay.  Let's go.

7    **(The jury entered at 3:42.)**

8         THE COURT:  Okay.  Was everybody able to comply

9    with not beginning to talk about the case at all?  Thank

10   you.

11        Affirmative responses, the jury remains fair and

12   impartial.

13   Q.   (By Mr. Stewart)  Thank you for your patience.  Mr.

14   Brantley, are you with me?

15   A.   Yes.

16   Q.   Thank you.  Do you need to put your hearing on?  Can

17   you hear me okay?

18   A.   I hear you.

19   Q.   Now, while the jury was out of the room, did you

20   listen to the beginning of the tape and hear your voice

21   and are you satisfied that this is a tape recording of you

22   giving the statement on February 28, 2013?

23   A.   Yes.

24   Q.   Okay.  And with some difficulty we got to the part on

25   page 16 and you heard the question about "As a result of

1  that, you went to Leo and had an agreement with Leo that

2  you and he would do the job as partners under his permit,

3  is that correct?"

4  A.   My voice said "yes."

5  Q.   And your voice said "yes?"

6  A.   Yes, but not understanding it as a partnership.

7         MR. STEWART:  Okay.  Judge, do you mind if we

8  play this, Judge?

9         THE COURT:  No, you can play it.

10  (Audiotape playing.)

11  Q.   (By Mr. Stewart) That was your voice, sir?

12  A.   That was my voice.

13  Q.   Okay.  Thank you.

14       And there was some additional questioning about --

15  are you looking at the screen, sir?  Can you look at the

16  screen now?

17  A.   Yes.

18  Q.   And we just read the portion that I've circled,

19  right?

20  A.   Yes.

21  Q.   And the next question was:  "Was the owner aware of

22  that arrangement, that agreement with Leo?"

23       And your answer was "yes."

24       And "that the owner was okay with that?"

25       And your answer was "yes."  Is that correct?

1  A.   Yes.

2  Q.   Okay.  Thank you, sir.

3           MR. STEWART:  Judge, I'll mark this for ID.

4           THE CLERK:  That's going to be number 4, 4 for

5  ID.

6           THE COURT:  The tape is ID-4?

7           THE CLERK:  Yes, Judge.

8  **(Plaintiff's Exhibit 4 marked for ID.)**

9           THE COURT:  Mr. Burstein, whenever you're ready.

10 **REDIRECT EXAMINATION**

11 Q.   (By Mr. Burstein) Sir, when you were just answering

12 that question at the tape recorded statement, that was the

13 attorney that was asking you that question?

14 A.   When I was giving the deposition, yes.

15 Q.   I'm not talking about a deposition.  I'm talking

16 about the recorded statement that you just heard with the

17 tape recording.

18 A.   Yes.

19 Q.   Was that the attorney's voice we heard asking the

20 question?

21 A.   I didn't know if he was an attorney or what, but the

22 gentleman that asked me the question, yes.

23 Q.   And what did you mean when you -- I'll strike that.

24      That question asks a number of different things

25 within the same question, is that fair to say?

A.    Correct.

Q.    And it asks if you had an agreement with Leo who is part of that statement, right?

A.    Yes.

Q.    And it asks if you were working under Leo's permit?

A.    With him, yes.

Q.    Right?

A.    Uh-huh.

Q.    And then the question asked the word partners as well in the middle, right?

A.    Yes.

Q.    When you say the word partners, what do you mean by that?  When you said yes to his saying partners, what do you mean by that?

A.    Well, we do work together sometimes and we just worked as -- we acquaintances and we didn't form a partnership or anything like that.  I was concerned at the end of the job that we knew each other, we worked with each other in the past and had the same arrangement we always had.  At the end of the job, we split the profits.

Q.    Thank you, sir.

            THE COURT:  Thank you, sir.  You're all set. You can step down.

            THE WITNESS:  Thank you.

            THE COURT:  Thank you very much.

1          MR. ZELLE:  We have no further witnesses.  We

2     formally rest.  We'd just like to review the exhibits.

3          THE COURT:  All right.  I'll see parties at

4     sidebar.

5     (Sidebar conference.)

6          MR. ZELLE:  The only thing is that one, 16A that

7     we are going to look at.

8          THE COURT:  Review the exhibits formally and

9     rest in the morning, so we will do that.

10         MR. ZELLE:  Then we will do a charge conference

11    in the morning?

12         THE COURT:  We are going to try to squeeze in

13    ten minutes or so this afternoon.  Let me get the jury out

14    of here.

15    (End of sidebar conference.)

16         THE COURT:  All right.  We are done for the day.

17    So you are excused for the day.  Report tomorrow at ten

18    o'clock.  All right.  I'm saying ten o'clock because what

19    I anticipate we'll do -- I'm sure there's some

20    housekeeping matters I will have to deal with with the

21    attorneys in the morning, just a standard thing that we do

22    at the end of a trial.

23        Tomorrow what I anticipate happening is you'll hear

24    closing arguments and then I will give you the formal

25    instructions.  I'll read those to you.  The formal

1    instructions might be in the range of maybe a little under

2    an hour.  Of course we'll take some time for the closing

3    arguments as well, but I anticipate you're going to have

4    this case tomorrow.

5        If you come in at ten, we'll avoid having you sit in

6    that room while we just get everything in order to go.

7    All right?

8        I understand there might some weather issues in the

9    morning as well so ten o'clock would work.  All right.  So

10   you're excused for the evening.  Please do not discuss the

11   case, begin your deliberations, or start any research or

12   investigation of the case on your own.  All right.  Thank

13   you.

14   **(The jury left at 3:52.)**

15            THE COURT:  So you do what you need to do for

16   the exhibits.  All right.  You need to review them, is

17   that right?

18            MR. ZELLE:  Yeah, I'll review them.  Mr. Stewart

19   was going to bring in a redacted copy of that note of

20   Exhibit 16A.

21            THE COURT:  Okay.

22   **(A recess was taken until 4:04.)**

23            THE COURT:  I'll start on page 17, elements of

24   the case, and we'll try to get through it in pretty

25   summary fashion right now and then pick up in the morning.

1           MR. ZELLE:  Are we just starting with

2   partnership or looking through all of them?  That's how

3   far I got.

4           THE COURT:  Why don't you read joint venture and

5   then that's as far as we are going today.

6       You'll have this overnight.  This will obviously help

7   with getting through this quickly in the morning as well.

8   This is just to start a discussion of this and nothing we

9   say here is going to be the final version.  We will

10  discuss everything tomorrow morning, but starting on page

11  17, the elements of the case, Attorney Stewart, you want

12  to first comment on these?

13          MR. STEWART:  I think it's perfect.

14          THE COURT:  Well, thank you.  All right.

15  Elements of the case?

16          MR. ZELLE:  I've got a little concern about the

17  fifth -- in the fifth line, "plaintiff does not have" and

18  you've written "a duty under the insurance policy to

19  defend," and later you say in the last sentence there the

20  defendants alleged that Massachusetts law --

21          THE COURT:  When you say the last sentence, what

22  do you mean?

23          MR. ZELLE:  Let me just see.

24          THE COURT:  Do you want to put it up on the

25  screen so we can all see it?

1          MR. ZELLE:  It's not going to help me.

2          MR. STEWART:  It's pretty neat.

3          MR. ZELLE:  But, okay.  So you've got here --

4     you break coverage down and the duty to defend and to pay

5     damages.  Under the defense it says, "they allege under

6     Massachusetts law Preferred Mutual does have a duty to

7     provide liability coverage," and I think things get dicey

8     when you're talking about defense versus indemnity.

9          If the jury rules there's no coverage, there's no

10    coverage.  If you break it down into defense and indemnity

11    I think in the interest of completeness, you need to

12    describe a duty to defend as part of a duty to indemnify

13    and things that call into question evidence that we

14    haven't put in this case, namely the complaint in the

15    underlying case.

16         I understand the judge's ruling when we talked about

17    the pre-charge, although I disagree, I understand where

18    you're saying if there's no duty to indemnify, there's a

19    joint venture or a partnership here, there's no coverage.

20    It doesn't matter whether the complaint says there's a

21    duty to defend.  I just think it's more clear.

22         THE COURT:  So what's your suggestion for that?

23         MR. ZELLE:  Just scratch the duty under the

24    insurance policy to defend and just substitute duty to

25    provide liability insurance coverage, because coverage

1  includes defense and indemnity.

2          THE COURT:  Okay.  Any comment, Attorney

3  Stewart?

4          MR. STEWART:  I'm agreeing with my brother.

5          MR. ZELLE:  Then I got to do something else.

6          MR. STEWART:  If he is agreeing that this

7  decides the issue then, that's fine and I think he is so I

8  can work with that.

9          THE COURT:  Yeah.

10          MR. STEWART:  In other words, if we win this

11  case, the duty to defend ends.  I mean, if that's where we

12  are, that's where we are.

13          THE COURT:  So a duty under the policy to

14  provide liability coverage.

15          MR. ZELLE:  Right.  Again the reason I'm willing

16  to go there is because it simplifies this instruction.  I

17  am not in any way trying to waive what I've previously

18  said --

19          THE COURT:  I know.

20          MR. ZELLE:  -- in terms I don't think that it's

21  a correct statement of law.  I think you have to look into

22  it to determine that.

23          THE COURT:  I think there's another way to say

24  what we did say perhaps simpler, so it's fine.  Okay.

25          MR. ZELLE:  I mean, I will put -- I think

1    Mr. Burstein will have something to say because the

2    defense issue coverage for Mr. Lodigiani really isn't my

3    fight.  Indemnity sure is so you might have some thoughts

4    on that.

5        MR. BURSTEIN:  Well, again, Your Honor, I guess

6    the question would be then what comes after the statement

7    to provide liability insurance coverage?  Are you just

8    going to say to Lodigiani or are you going to say to

9    Lodigiani and Brantley?

10        THE COURT:  What line are you at?

11        MR. BURSTEIN:  So if we start the sentence that

12   starts four lines down, the second claim, so the second

13   claim "arising under Massachusetts law the plaintiffs did

14   not have a duty," I understand you'll change it to provide

15   liability insurance coverage, the question is what comes

16   after that?  Is it going to say to Lodigiani or to

17   Lodigiani and Brantley?  I mean, it does make a

18   difference.

19        THE COURT:  Not providing liability insurance

20   coverage in any suit brought against a partnership or

21   joint venture between Lodigiani and Brantley.

22        MR. ZELLE:  That's fine.

23        MR. BURSTEIN:  I have to defer back to Attorney

24   Stewart, but the lawsuit in this case has only been

25   brought against Lodigiani for the fire case.

1            MR. ZELLE:  That's what this refers to, that's

2    why it says partnership.  That suit again is the fire

3    case.

4            MR. BURSTEIN:  I understand, but this says

5    against any claims brought against Lodigiani and Brantley

6    against any partnership or joint venture between Lodigiani

7    and Brantley, that's not how the suit that exists was

8    brought.

9            THE COURT:  Hang on one second, gentlemen.  I'll

10   let you articulate that again.

11           MR. BURSTEIN:  I'm going to try, but maybe I'm

12   not being very successful, Your Honor.

13           THE COURT:  I understood, but just if you want

14   to elaborate on what you said because so far I'm not

15   satisfied I'm going to do what you want and I'll give you

16   another round.

17           MR. BURSTEIN:  I understand, Your Honor.  Really

18   the crux of the issue is that in the other case, the

19   subrogation investigation case, as it may, Mr. Lodigiani

20   was sued individually.  And so now we're here really as a

21   question of whether Preferred Mutual has to offer coverage

22   to Mr. Lodigiani as a result of that case having been

23   brought but this case is completely separate.

24       So if we ask a jury to decide if there is liability

25   insurance coverage relative to only any partnership

1    between Brantley and Lodigiani or any joint venture

2    between Lodigiani and Brantley and they come back and they

3    say no there's no, coverage for that, we still haven't

4    answered the question as to whether the insurance company

5    has to cover Mr. Lodigiani.

6          MR. STEWART:  And that's precisely, Judge, why

7    some --

8          THE COURT:  Well, right.  I thought the exact

9    same thing.  I think I understand what you're saying, but

10   the special verdict form is not completely ready yet.  I

11   think the special verdict form is going to have to be

12   broken down to several questions where they're checking

13   yes or no as to certain questions that are going to cover

14   exactly what you're talking about.

15         MR. BURSTEIN:  I completely understand that.  I

16   just want the jury instructions to match up with what we

17   are asking the jury to come back with because I think our

18   jury forms that we submitted are fairly similar other than

19   maybe the last question.  I think we are pretty much in

20   sync on the special verdict form but I'm not comfortable

21   with it.

22         THE COURT:  I'm going to think about it.  Let's

23   move on and make a note to yourself that we will discuss

24   this point again tomorrow morning.

25         MR. BURSTEIN:  Thank you.

1          MR. STEWART:  Judge, I don't know if this is
2    going to be helpful, but I gave consideration to waiving
3    Count 1 and only going on Count 2 and then I said, wow,
4    it's not going to decide the whole case and that's what
5    Mr. Burstein is saying, that's why we have two different
6    counts.
7          THE COURT:  I'm not sure changing the language
8    in this section, elements of the case portion, solves or
9    really accomplishes what you want to accomplish.  I think
10   that's accomplished through the special verdict form, but
11   let's talk about it again in the morning after I've had
12   more time to look at this as a whole on what I'm doing
13   with the verdict form.  So that's one point you can bring
14   up in the morning, Attorney Burstein.
15       Now for partnership?
16         MR. STEWART:  Well, Judge, the last paragraph,
17   the last dotted part, and I looked for it this morning and
18   I kind of found it but not really, I'd like to ask the
19   Court to define and give the jury an instruction on what
20   is *prima facie* evidence and I will get you that overnight,
21   at least my proposal.  It will be short.
22         THE COURT:  I agree with you if we keep that
23   *prima facie* language in, yes.
24         MR. STEWART:  Now the one above that which --
25   and actually these kind of run in cross purposes at least

1    to my reading, the partnership is not established merely

2    because persons sharing money, received some of the

3    business.  I understand what the Court is trying to tell

4    the jury, I don't have any particular objection but --

5              THE COURT:  So the statute itself says the

6    sharing of gross returns does not itself establish a

7    partnership.

8              MR. STEWART:  It's fine by me, Judge.

9              THE COURT:  So the way it is is fine with you?

10             MR. STEWART:  Yes.  We can all be nitpicky but

11   it's acceptable.

12             MR. BURSTEIN:  Your Honor, with respect to the

13   last bullet, the *prima facie* evidence, I think that

14   there's uncontroverted evidence on the record from Mr.

15   Brantley, maybe even substantiated by Mr. Lodigiani's

16   testimony, that the money that he was receiving as half of

17   the net profits from this job was going to be his pay.

18        So I believe that that burden has been met to rebut

19   that there's any *prima facie* evidence of a partnership

20   here, and I think the fact that that testimony was

21   uncontroverted I would ask that be removed.  I believe the

22   defense has met its burden of showing that any shared

23   profits were for pay, which would make the instruction

24   above make more sense as well.

25             THE COURT:  Well, I agree with you that those

1    two sections even if you look at the statute, you've got

2    to read it a few times to understand what's being talked

3    about.

4          MR. STEWART:  If I could be heard, Judge?  It

5    will be clear when we get a get *prima facie* instruction

6    that even through *prima facie* evidence is rebutted, it

7    still has an artificial force that goes forward in the

8    case.  So I agree with my brother that a jury would be

9    compelled and required to find for the plaintiff if there

10   were none and now there has been some to rebut it but that

11   doesn't wipe it out entirely.

12         THE COURT:  I agree.

13         MR. STEWART:  You know what I mean.

14         THE COURT:  I agree.  I agree that that needs to

15   stay in and we'll see how it reads when we have the *prima*

16   *facie* instruction.

17         MR. ZELLE:  On that bullet point, as long as we

18   are on it, the term wages, there was I think a question,

19   I'm not sure there was an answer but there was certain

20   questioning about wage and hour laws and things like that

21   and wages, I'm not an employment lawyer so I can't tell

22   you technically what it means, but as a lawyer who has

23   some knowledge -- a very little bit of knowledge is a

24   dangerous thing I think they say -- I think it would help

25   because if they're thinking an hourly wage or something

1    like that, then that could be misconstrued.

2          As I understand wages here, it's more in the form of

3    compensation.  If it's compensation for the work, the time

4    spent on the job, then that rebuts the inference.

5          THE COURT:  So change the word wages to

6    compensation to an employee?

7          MR. ZELLE:  Yes.

8          MR. STEWART:  Judge, I'm just concerned that I

9    think you took it from the statute.

10         THE COURT:  Yes, we took most of this from the

11   statute.

12         MR. STEWART:  And now we're deviating from that

13   and, you know, there was evidence that they were splitting

14   profits so I don't know that can be recast as wages, but I

15   would rather stick with the word that's in the statute.

16         MR. GIROUARD:  Except on that note, Your Honor,

17   if you take the verbiage that you have "unless such

18   profits were received as wages," so it can be profits that

19   are -- that's how you generate the bottom line that's

20   going to be distributed, but I think what Attorney Stewart

21   just captioned is not an accurate reflection on what the

22   statute intended.

23         THE COURT:  But the statute, which I'm holding

24   now right here, lays it out the same way, doesn't it?  The

25   statute itself lays it out the same way.

1          MR. GIROUARD:  I guess my response and maybe I'm
2     not properly doing it, this not the proper form for my
3     rebutting what John just said -- what Attorney Stewart
4     said.  He was saying that they can't characterize it as
5     wages and I'm saying that's exactly what the statute talks
6     about.  You take the profit and distribute them at the
7     end, that is wages.  It's payment for the labor.
8          Maybe I shouldn't have jumped up.
9          MR. ZELLE:  No.
10          MR. STEWART:  That would run afoul with the wage
11     and hour laws.  You can't say I'll pay you minimum wage
12     six months from now when the profits come in.
13          THE COURT:  Right.  But who cares?  We're not
14     talking about a wage and hour violation law here.  I think
15     you all have said and are correct that when the statute
16     uses profits and wages the same, they're looking at it as
17     a form of compensation, profit and wages.  They're not
18     looking at it in terms of being super hyper-technical
19     about wages and hour laws.
20          MR. GIROUARD:  What I love is you said what I
21     was trying -- that's the point I was trying to make.  You
22     can't recharacterize it.  You can't say it's wages because
23     it's profit.  The statute is specifically saying when
24     there are profits and you disburse them for the labor that
25     you did, that is the wage for the work.  If that's what

1    you find, then the *prima facie* effect of the statute is

2    rebutted.

3              MR. ZELLE:  That does kind of take us full

4    circle just because of the evidence that came in about

5    wages, I just want --

6              THE COURT:  I'll think about this.  I'm inclined

7    to leave the word wages in.  It's in the same spirit as

8    the statute.

9              MR. ZELLE:  I have no problem leaving wages in

10   as I said at the time outset, as long as wages is

11   explained that it doesn't have to simply be an hourly wage

12   paid by the day or weekly or something along those

13   lines.

14             THE COURT:  We'll talk more about.  I just

15   wanted to get some ideas on the table.

16             MR. GIROUARD:  Can I put one more thing on the

17   table while we're on the partnership issue?

18             THE COURT:  Yes.

19             MR. GIROUARD:  I would be respectfully

20   requesting that the Court enter an instruction on the

21   partnership to the -- an instruction that indicates a

22   reference to another as a partner or a business partner is

23   insufficient to establish a partnership under the case law

24   cited in our preliminary jury instruction submission.

25             THE COURT:  When you say a reference?

 1              MR. GIROUARD:  Yes, Your Honor.  In paper 143,

 2      which was our statement of the case proposed by the

 3      defense along with preliminary instructions, on page 3 of

 4      that document, the top paragraph, it says "the reference

 5      to another as a partner or a business partner is

 6      insufficient to establish a partnership."  And then it

 7      cites to *Gemini Investors* and *Martin v. Stone* with

 8      citations in our document Number 143.  If you want, I can

 9      bring this up to you.

10              THE COURT:  I have it.

11              MR. GIROUARD:  I think based solely on the

12      testimony you heard today and the argument we advanced,

13      that this is, to some degree, a term -- it's not always a

14      term of art when used.  We saw that today demonstrated by

15      some key witnesses, and, therefore, I think it's prudent

16      or appropriate the Court consider offering that

17      instruction to the jury.

18              THE COURT:  All right.  It's under

19      consideration.

20              MR. GIROUARD:  Thank you.

21              MR. BURSTEIN:  One last note, I know we're

22      beating partnership to death --

23              THE COURT:  You're not.  This is fine.

24              MR. BURSTEIN:  Again, we would be asking the

25      Court to take judicial notice of the statute, which is

1    Mass. General Law 142 Section 3(B), which governs whether

2    master plumbers can be partners in Massachusetts with

3    anyone other than another master plumber.  That was

4    referenced by more than one witness in this case.  I have

5    copies of the statute.

6              THE COURT:  But what does that matter?  What

7    does that accomplish?  I cite the statute and that doesn't

8    mean you violated the statute.  So, you know, put the

9    facts in this case aside, you could have that statute and

10   people could still go to work as partners and they would

11   be violating the statute and that's not what we're judging

12   by.

13             MR. BURSTEIN:  That's true, Your Honor, and I

14   guess, you know, where Mr. Lodigiani said that he knew

15   about that statute and that was one of his considerations

16   as to whether or not he was partners with anyone, that the

17   Court could take judicial notice that that statute existed

18   and instruct the jury that that's some evidence, not that

19   that's the law of the case but that's some evidence of the

20   law.

21             THE COURT:  I'm not going to do that.  You can

22   argue that.  I can hear you making the argument right now.

23   You heard the parties talk about the rules that govern

24   them and they know what the rules are, you go ahead

25   absolutely, but, yeah, I'm not going to include it in the

1    instructions.

2                MR. BURSTEIN:   Thank you.

3                MR. GIROUARD:   A question then, and maybe this

4    telegraphs my lack of experience on such an issue, but

5    where there's been repeated testimony from licensed

6    plumbers to regulations and the law that prohibits them

7    from being in this relationship that's alleged and where

8    the jury doesn't have that regulation or the law in front

9    of them, it seems to me that it creates a potential

10   problem where the jury could be confused by what are they

11   even talking about the whole time.

12       So maybe you can -- and I don't say this facetiously,

13   how would one get that before the jury if it's been

14   referenced by multiple witnesses and it's an issue that

15   has been -- it's something that has been explained by the

16   witnesses was what their mindset was as they're going

17   through this business situation.

18                THE COURT:   I would consider putting it in if

19   the statute itself was more closely -- would more closely

20   affect the elements of the case.  Violation of the statute

21   doesn't mean a thing for whether or not the plaintiff can

22   prove their case.  It's simply one consideration along

23   with a whole lot of others that you can argue about.

24       There was testimony that Mr. So and So, you know, you

25   heard testimony that they know the regulations that apply

1    to people in their trade.  You heard them say...  I mean,

2    I'm not limiting you in your closing from talking about

3    it.

4         MR. GIROUARD:  Well, again I don't ask it

5    disrespectfully, I'm like kind of batting with you, but

6    it's more just a question procedurally on how we proceed.

7    Are we able to show that in an argument to the jury to say

8    here on the projector is a regulation.  You heard them

9    talking about a law and here is the law.  I mean, are we

10   able to do that?

11        I mean, I had always envisioned in my mind -- and

12   again I understand you might not see it the same way --

13   that you would instruct this jury that this is this law,

14   and then we're able to dovetail you heard these two guys

15   talking about the law and this is the law.  This is the

16   law that says this is what they're talking about; this was

17   their mindset; this is why they didn't believe they could

18   be in a partnership, which means there couldn't have been

19   meeting of the minds.

20        THE COURT:  Yeah, I disagree with you completely

21   about that.

22        MR. GIROUARD:  I heard that before.  I

23   appreciate that.

24        THE COURT:  I think you can argue about what the

25   law was, but if I'm going to let you do that, then what

1    I'm going to do is affirmatively give an instruction to

2    the jury to say the statute may say one thing but the

3    defense may have violated the statute and it doesn't

4    matter if they violated it, it doesn't affect the

5    plaintiff's rights, what they assert their rights are.

6        So if you want me to let you do that, I know Mr.

7    Stewart is going to stand up and say, well, then I want an

8    instruction saying this doesn't make their case.

9        MR. GIROUARD:  This is why I have two ears and

10   one mouth, I listen.  Thank you.

11       MR. STEWART:  What my brother is suggesting is

12   no insurance company could ever rescind a policy for an

13   illegal partnership ever again.  People could enter into

14   these arrangements and knowing that there's a statute

15   against it, they would be able to come to court and not

16   have to have their policies rescinded.  That can't be the

17   law.

18       THE COURT:  I think that's a good point.  I'm

19   not going to -- I'm going to let you argue that.  When

20   you're talking about the state of mind of Mr. Lodigiani

21   and Brantley, certainly you can talk about, well, these

22   guys have been doing this a long time, they know the

23   rules, they know the laws that affect them.  You can talk

24   about that, but I'm not going to put it up on the screen.

25       MR. GIROUARD:  I appreciate that.  My biggest

concern I had is always a concern I have with an argument
to the jury when there's going to be instructions because
I don't want to run afoul with that.  That's the concern.
I said, look it, mechanically how do you do this?  I can
see right now mechanically I wasn't how that was going to
go, so my bad.

THE COURT:  Okay.  You usually would just pull
it up on your phone and show them, wouldn't you?

(Laughter)

MR. GIROUARD:  You got to admit it was pretty
smooth.

THE COURT:  That was really good.  All right.
We're going to pick joint venture in the morning, but
this should at least maybe give you a chance to put some
of your thoughts in writing so we can talk about them in
the morning so maybe it will go a little quicker.

So if the weather is really bad, I heard that it
might be icy tomorrow morning, I don't know where you're
coming from, but otherwise if there's some bad weather
condition we'll you later in the morning but we will pick
up at 9:15 and we will start working through this.

MR. GIROUARD:  Thank you.  I appreciate that.

MR. BURSTEIN:  Thank you.

THE COURT:  Thank you.

MR. STEWART:  Thank you.

1                    C E R T I F I C A T E

2

3

4          I, Alice Moran, RMR, RPR, CSR, Official Court

5     Reporter for the United States District Court for the

6     District of Massachusetts, do hereby certify that the

7     foregoing transcript constitutes, to the best of my skill

8     and ability, a true and accurate transcription of my

9     stenotype notes taken in the above-entitled matter.

10

11

12    Date:  June 12, 2015

13

14    /s/ Alice Moran

15    _____
      Alice Moran
16    Offical Court Reporter

17

18

19                 Alice Moran, CSR, RPR, RMR
                     Official Court Reporter
20                 300 State Street, Room 303D
                     Springfield, MA 01105
21                      413-731-0086
                   alice.moran@verizon.net
22

23

24

25