UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION

Preferred Mutual Insurance )
                          )        13cv30138-MGM
vs                        )
                          )
Leonard Lodigiani, et al  )
_____ )

**Transcript of Trial** Held Before
The Honorable Mark G. Mastroianni,
United States District Court Judge and a Jury,
on **April 9, 2015**.

APPEARANCES:

For the plaintiff Preffered Mutual:  John B. Stewart,
Suite 301, 20 Maple Street, Springfield, MA 01103.

For the defendant Leonard Lodigiani: David H.
Burstein,1331 East Columbus, Ave., Springfield, MA 01105.

For the defendant Evins C. Brantley:  Anthony R. Zelle
101 Federal Street, Boston, MA 02110

For the defendant Adnan Yildirim: John A. Girouard, 446
Main Street, 12th Floor, Worcester, MA 01608.

Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
300 State Street, Room 303D
Springfield, MA 01105
Tel: (413)731-0086  Fax: (413)737-7333
alice.moran@verizon.net

```
 1                          INDEX
 2                      April 9, 2015
 3
 4    Witness Name:        Direct   Cross   Redirect   Re-cross
 5
 6    None
 7
 8
 9    Plaintiff's Exhibits:                          Page
10
11    None
12
13
14    Defendants' Exhibits:                          Page
15
16    None
17
18
19    Closing argument by Mr. Girouard               23
20    Closing argument by Mr. Zelle                  28
21    Closing argument by Mr. Burstein               34
22    Closing argument by Mr. Stewart                47
23
24    Judge Mastroianni's jury instructions          70
25
```

**(Court commenced at 10:02.)**

1

2          THE CLERK:  All rise.

3          THE COURT:  Good morning, everyone.

4          MR. BURSTEIN:  Good morning, Your Honor.

5          MR. STEWART:  Good morning.

6          MR. ZELLE:  Morning, Your Honor.

7          MR. GIROUARD:  Good morning.

8          THE COURT:  All right.  So on the jury

9  instructions there was some changes, very minor.  Did you

10 have a chance to look at them?

11         MR. STEWART:  The plaintiff is satisfied, Your

12 Honor.

13         THE COURT:  Thank you.

14         MR. BURSTEIN:  Your Honor, if I may, just some

15 clarification between the special jury verdict form that

16 you've given us and page 20 of the instructions.  I just

17 think there's an inconsistency that I think could be

18 easily fixed.

19         THE COURT:  Okay.

20         MR. BURSTEIN:  So as I understand it, with the

21 special verdict form for the claims made by the plaintiff

22 on Count 2, the jury would have to answer yes on Count 1

23 --- I'm sorry.  Well, it would be Questions 1, 5, and 6

24 would apply to that count so if they got to Question 5,

25 and Question 5 says "At the time of the fire, was Mr.

1    Lodigiani in a partnership or joint venture?"  And the

2    instruction on page 20 says to prove Count 2, "At the time

3    Mr. Lodigiani made his application for insurance, he was

4    engaged in a partnership or joint venture," so I just

5    think there's some inconsistency there and I think it

6    probably --

7           THE COURT:  I think, yes, that's a good point.

8           MR. BURSTEIN:  -- needs to refer to both time

9    frames.

10    Your Honor, I would suggest that maybe that could be

11    solved by just adding number 2, at the time of the fire he

12    was engaged in a partnership or joint venture, and then

13    Number 3 would be the partnership or joint venture --

14           THE COURT:  On the declarations we can just

15    change it and take out at the time he made his application

16    because if the jury has found that at the time of the

17    application he was involved in a partnership or joint

18    venture, they will not be getting to five, not getting to

19    this question.

20           MR. ZELLE  Right.

21           THE COURT:  They wouldn't even answer that

22    question.  So I can change number 1 to at the Mr.

23    Lodigiani, take out the words made his application and

24    just insert in at the time of the fire.  At the time of

25    the fire he was engaged in... you following me?  Does that

1    make sense?

2              MR. GIROUARD:  Could you say that again?

3              MR. BURSTEIN:  I'm not sure it does, Your

4    Honor.

5              MR. GIROUARD:  Is what you proposed as to number

6    1?

7              THE COURT:  I'm on page 20 of the instructions.

8    As to Count 2, under the bottom part of the page where it

9    says number 1.

10             MR. BURSTEIN:  Okay.

11             THE COURT:  I would strike at the time Mr.

12   Lodigiani made his application and insert at the time of

13   the fire on January 28, 2014 at the Bridge Street

14   location.

15             MR. BURSTEIN:  I believe that would solve the

16   problem.

17             MR. GIROUARD:  Agreed.

18             MR. STEWART:  Judge, I'm not sure I'm following,

19   but I'm looking at the exclusion "no person or

20   organizations insured with respect to the conduct of any

21   past"...  It has no time frame.  I think it's at the time

22   the insurance company is called to pay or a claim is --

23   it's not at the time of application, that's clear to me.

24             THE COURT:  For Count 1 it is.

25             MR. STEWART:  No, I'm talking about Count 2.

1           THE COURT:  All right.

2           MR. STEWART:  So to the extent we're talking

3   about Question No. 5, I think it's accurate at the time of

4   the fire.

5           THE COURT:  But my point is if they find at the

6   time of the application there was a partnership or joint

7   venture therefore rescinded it, they're not even getting

8   to the verdict form that asks that question.

9           MR. STEWART:  I think you're right.

10          MR. BURSTEIN:  I think my brother counsel is

11  just confused.  We are fine with this special verdict

12  form.  We are just trying to make page 20 consistent.

13          THE COURT:  I think you're right.

14          MR. BURSTEIN:  John, we're just trying to make

15  page 20 consistent with the verdict form.

16          MR. STEWART:  Yes.

17          MR. BURSTEIN:  We agree with the verdict form.

18          THE COURT:  We are going to make that change.

19  Thank you for that point.

20          MR. BURSTEIN:  Thank you.

21          THE COURT:  Anything else?

22          MR. GIROUARD:  There was a submission relative

23  to a proposed --

24          THE COURT:  Yeah.

25          MR. GIROUARD:  -- fourth.

1          THE COURT:  Right.

2          MR. GIROUARD:  -- element or paragraph for the

3   analysis on partnership.

4          THE COURT:  Yes.

5          MR. GIROUARD:  And I guess I'm just requesting

6   that that be considered as an addition to follow three.

7   The statute suggests that a partnership is sharing

8   liability.

9          THE COURT:  If there is a partnership, yes.  But

10  where would I put this?  So this would not be a factor

11  which you could consider to determine if there was a

12  partnership.  This kicks in after you find there is one.

13         MR. GIROUARD:  I think if you're reading the

14  statute that if there's going to be an agreement, it's an

15  agreement that is understood that would include the

16  potential penalty, so to speak, of being held accountable

17  for your partner's actions.  That's one of the elements

18  that partners agree to.

19         THE COURT:  So you mean in that agreement it

20  would as part of the agreement they assume that they would

21  be jointly and severally liable for each other?

22         MR. GIROUARD:  I think that's a fundamental

23  expectation partners have with each other is that if

24  Partner A is going out and doing something and Partner B

25  is sitting at home, if you're in a partnership, it's

understood that you are agreeing that while you sit at home and A is out negligently doing something, you're going to be jointly responsible and you could be losing the house you're sitting in. That's a key element of partnership.

MR. ZELLE: It's also the way that Mr. Griffin described it if you recall.

THE COURT: Yeah, I remember Mr. Brantley was asked a question like that. Mr. Brantley said we didn't really think about things like that because we just always assumed things were going to go well.

MR. GIROUARD: Right, but doesn't one expect that if there's going to be an agreement and the penalty of that agreement could be potentially joint and several liability for the loss, that even if one doesn't talk about that suggest it was not part of the agreement.

If there's going to be a meeting of mind, the terms of the agreement have to be understood by both parties and that's one of the key elements of the defense in that these guys didn't share each other's liability. They didn't understand that relationship to be that way. In fact, it's to the contrary. Mr. Lodigiani repeatedly testified in this case that he understood that the buck stopped with him.

THE COURT: Yeah, good point, well made. I'm

1    not going to add it.  I think the sharing of profits and

2    losses and the participation and control and management,

3    et cetera, that's already in there fairly, fairly

4    categorizes the considerations.

5              MR. ZELLE:  I've got some points to put on the

6    record.  Beginning with the first or actually the second

7    sentence in the partnership page it says, "To establish a

8    partnership as a legal entity there must be an agreement

9    by the parties indicating an intention to associate in a

10   partnership."  That's circular reasoning.

11             THE COURT:  "To establish a partnership as a

12   legal entity, there must be" --

13             MR. ZELLE:  -- an intention to be a partnership.

14   Well, okay.  That's right.  But then what is a

15   partnership?  See that really shouldn't be a sub-element

16   in the sense that the elements that ensue are.  So there

17   must be an intention, and what I would suggest, Your

18   Honor, to associate as an entity that shares profits or

19   losses, participates in control -- where each participates

20   in the control or management.

21        I know Your Honor you're taking this right out of the

22   legal authority.  I just think it's a little bit off.

23   It's semantically.

24             THE COURT:  Granted the legal authority is not

25   the easiest to read and understand.

1     MR. ZELLE:  Right.  It's just a matter of
2   confusion because they could get to that point "to
3   establish a partnership there must be an agreement by the
4   parties indicating an intention to associate in a
5   partnership," well, then the other things don't matter.
6   If they say, yeah, there was, they don't get to the
7   sub-elements so I think it ought to be laid out as an
8   entity that satisfies these elements.

9     MR. STEWART:  Judge, it's my position that you
10  have almost word for word quoted Judge Keeton's decision
11  in *Andrews v. Elwell*, 367 F.Supp.2nd.  The decision starts
12  at page 35 but the language, as best as I can tell, word
13  for word is from page 39 of that decision, and obviously
14  Judge Keeton thought that was the controlling law in
15  Massachusetts and I'd suggest it still is since 2005.

16    THE COURT:  I think in a very critical analysis,
17  Attorney Zelle, you're correct but I'm not going to make
18  the change.  There's a little bit of semantics.  I think
19  one, two, and three subsections are broken off the way
20  it's formed to show enough of a space that the reader is
21  not going to be confused.  All right.

22    MR. ZELLE:  Understood.

23    We spoke yesterday about defendants' request that
24  referring to another as a partner does not a partnership
25  make.

1          THE COURT:  Yes.  I added that.

2          MR. ZELLE:  I'm sorry, did I not see that?

3          THE COURT:  I don't know.  I remember I put it

4     in.

5          MR. ZELLE:  I got you.  I'm not as thorough a

6     reader the first time around and that's why I read things

7     twice.  Thank you.

8          Then the other thing we spoke about yesterday was

9     wages and I requested a definition.

10          THE COURT:  You did, yes.

11          MR. ZELLE:  I see that you've not accepted that

12     request, and I just would like to then say, Your Honor,

13     that if the issue is raised in closing by the plaintiff

14     that there's a technical definition of wages or wage and

15     hour laws that weren't complied with, at that point I

16     would want this Court to make a supplemental instruction

17     simply because I would perceive that as plaintiff's

18     counsel leveraging the undefined term wages.

19          THE COURT:  If it comes up, I will consider it.

20          MR. ZELLE:  All right.  That's all I have on

21     partnership.

22          THE COURT:  All right.

23          MR. ZELLE:  I've got some other things but if

24     other folks --

25          THE COURT:  Let's move it along.

1     MR. BURSTEIN:  Your Honor, I know I did give you

2     a submission on *prima facie* evidence, possibly just to add

3     to the last paragraph on page 17, that once rebutted -- if

4     the jury finds that that evidence is rebutted, that that

5     evidence just becomes regular evidence treated like any

6     other evidence in the case.

7         I just think that helps clarify the whole issue of

8     whether there's a presumption and then it's rebutted.  I'm

9     not sure a jury understand what that means.

10        THE COURT:  Well, I think a jury understands the

11    word "unless," so it's sufficient to raise a fact or raise

12    a presumption unless disproved.

13        MR. BURSTEIN:  I'd just ask that one sentence be

14    added to that that just says that if it is rebutted, it

15    becomes just like any other evidence in the case, which I

16    believe I can give you authority for, Your Honor.

17        MR. STEWART:  Judge, I have a problem with that,

18    and believe it or not I spent a lot of time yesterday

19    morning when I had other things to do trying to find a

20    good instruction on *prima facie* evidence, and what you did

21    here based on what I was looking at is a lot better than I

22    ever would have come up with it.  It's actually superb.

23        I am not asking for an instruction that I believe I

24    might be entitled to that continues to have an artificial

25    force, all that stuff we were talking about yesterday

1    afternoon.  But I think what Attorney Burstein is

2    suggesting makes this a lot more difficult and it's

3    accurate as it is.

4        If you add what he is suggesting, then we might need

5    to add what I'm suggesting, that artificial force business

6    and that it continues throughout the case even though it's

7    rebutted.  What I'm suggesting is I think this is fine and

8    we would make things more difficult by adding that.

9                MR. BURSTEIN:  What I gave you was from the

10   model jury instructions for Massachusetts and the line

11   just says "after contrary evidence is introduced, it

12   remains evidence throughout the trial and is to be weighed

13   like any other evidence on relevant questions of fact."

14   That's *Commonwealth v. Chapin*, a 1986 case, and I've heard

15   that in many, many trials.  I mean, it just clarifies for

16   the jury.

17       A jury doesn't necessarily understand what *prima

18   facie* evidence is and I know we're trying to explain to

19   them what that is, but then they have to understand what

20   the effect of the rebuttal is.

21               THE COURT:  Well, the jury instructions are

22   looked at as a whole and I tell the jury in the beginning

23   section in the general instructions about evidence and

24   what evidence is and how evidence should be considered.

25       It seems to me using that very clearly understood

1    term "unless," so it tells you have *prima facie* up to this

2    point unless and then you talk about disproved or rebutted

3    by other evidence.  I mean, it's a slight addition.  So

4    what would be the real problem if I add that?

5            MR. STEWART:  I think it's fine as it is, Judge,

6    but if he's going to add what he's going to add, I would

7    suggest that the Court be guided by 17(B) Mass. Practice

8    *prima facie* case, Section 544.

9        It goes like this:  "*Prima facie* evidence means

10   evidence which not only remains evidenced throughout the

11   trial but also has up to a certain point an artificial

12   legal force which compels the conclusion that the evidence

13   is true.  This is only until evidence appears that

14   warrants a finding to the contrary."

15       You know, I can see a jury being really tied up in

16   the weeds with this artificial horse business.  I think

17   that actually the way you have this instruction, what

18   you've done is great and it's better than I could have

19   done if I had a week.  But, like I say, if you confuse the

20   issue with what Attorney Burstein is saying, I think would

21   need to be added is the part that I just quoted.

22           THE COURT:  All right.  I'm going to leave it.

23   I think that says essentially the same as Attorney

24   Burstein is asking for especially when you view the

25   instruction as a whole on the finding evidenced earlier

1    that the jury can consider but good point.

2             MR. BURSTEIN:  Thank you, Your Honor.

3             MR. ZELLE:  On the joint venture charge, Your

4    Honor, we provided the Court with I think it's *Ryba*, which

5    provides that the term joint venture doctrine is narrowly

6    defined and applied.  I don't think there's any quotes to

7    that.  It does kind of set up introductory what I think is

8    the appropriate balance for the jury to understand that

9    there are a lot of elements, that they've got to go

10   through all of them.  They need to go through them

11   carefully and they are narrowly defined and the plaintiff

12   has to put them into the narrowly defined boxes.

13            THE COURT:  So you're asking to add language

14   about narrowly defined?

15            MR. ZELLE:  Yes, I am.

16            THE COURT:  I'm not going to do that.

17            MR. ZELLE:  The other point, Your Honor, is on

18   the rescission count and we provided the Court with the

19   *Hingham Mutual v. Mercurio* case which states that when

20   there's more than one rational interpretation of a

21   question on an application, that the inference goes to the

22   insured.

23       What I would suggest is very important in this case

24   is that to the extent that the boxes or the drop-down menu

25   indicated partnership, indicated sole proprietorship, all

1     completely undefined terms, terms that Mr. Griffin
2     referred to as "loose," if in this Mr. Lodigiani
3     thoughtfully considered those terms, undefined terms, and
4     said, well, I'm a sole proprietorship, he gets the benefit
5     of the doubt here, that he's entitled to that inference.
6            THE COURT:  He would be entitled to that
7     inference because you're saying essentially he didn't know
8     it wasn't true?
9            MR. ZELLE:  That's not quite there because I
10    know the Court has rejected that.
11           THE COURT:  Right.
12           MR. ZELLE:  It's not because he knows it's not
13    true.  It's that I have an entity, it fits into both boxes
14    and I've got to pick one.  I'm a sole proprietorship.  You
15    know, maybe for this job I'm a partnership.  There was no
16    definition and for this job it could go either way.
17           THE COURT:  I'm going to take a look at that
18    case.  It seems -- actually now that I'm reminded of what
19    the case was, we spent quite a bit of time looking at the
20    facts of that case with the car insurance and how answers
21    were made on the application.
22        Attorney Stewart, what would you say to that request?
23           MR. STEWART:  I'm not sure which instruction my
24    brother is referring to, so could you tell me which one?
25           MR. ZELLE:  Sure.

1    MR. STEWART:  Number 4, okay.

2    Judge, I think that is something he can argue.  I

3    don't -- I think we are kind putting the thumb on the

4    scale to go further than that.

5    Mr. Lodigiani did not suggest that he had any problem

6    with the questions.  He had an opportunity to ask

7    questions of Ms. Grundstrom, he chose not to.  He knew he

8    had a tricky situation but he did not give Ms. Grundstrom

9    any detail other than saying he was a sole proprietor.

10   There's no -- he didn't seem to indicate there was

11   any confusion either at the time of application or in this

12   courtroom.  I don't know, I just don't think that this is

13   really going to aid the jury in disposition of the case

14   except for possibly confusing the jury.

15   THE COURT:  My concern is that the case that you

16   cited where it applies to about a learner's permit and

17   what needs to be put on the application, it seems to be

18   that that instruction or that theory was specifically

19   designed and directed towards the facts of that case and

20   I'm not sure.

21   MR. ZELLE:  You're absolutely right.  I mean, as

22   you know as well as I, every legal principle of law is

23   established -- not every but for the most part are in the

24   context of very specific facts that can always be

25   distinguished and the question is, well, does it have

1    force as a broader principle?

2        Sometimes the SJC says this is a broad principle and

3    really creates new law.  Most of the authority we're

4    relying on is contextually developed.

5        What I'm suggesting is in this case it does fit the

6    context.  It can be the same as factual for sure but

7    contextually it fits because, as Mr. Stewart points out,

8    well, Mr. Lodigiani didn't express any misunderstanding or

9    confusion.  Well, no, in his mind he was a sole

10   proprietorship.

11       So you look at the context these are the options,

12   this is the box I choose, this goes back to the point of I

13   think inferences in that situation and the *Mercurio* case

14   court thought it's appropriate to give the policyholder

15   the benefit of the doubt.  I think the same is true

16   here.

17            THE COURT:  Again, these are very good

18   arguments.  I don't think the facts of this case warrant

19   it like in the case of *Mercurio* or whatever the name was

20   regarding the application and the learner's permit issue.

21       However, I think that -- I mean, clearly you're

22   covered because that's your argument about burden of proof

23   and why it's ambiguous and they can't make their burden of

24   proof.  For me to state it I think makes it a little bit

25   unfair and kind of tips the instructions a little bit over

1    to your side more than the middle of the road that I have

2    to keep them.

3              MR. ZELLE:  Okay.  That's fine.

4         There's one more point and I'd ask the Court only to

5    listen this is primarily just to put it on the record

6    because I know we've discussed yesterday at some length

7    about the court giving it some thought to the known to be

8    false, the statement has to be known to the applicant to

9    be false, and I just want to explain why it's so important

10   to me in this particular case.  Because here the absence

11   of that charge begs the question, how can an insurance

12   company rescind a policy when the statement by the insured

13   is believed to be true and is only false when it's

14   squeezed after the loss into a tightly defined legal box

15   that is in the words of Mr. Griffin, certainly the

16   authority on underwriting, a loose undefined term in the

17   underwriting context?

18        So we're looking at this case now in the legal

19   context, Preferred Mutual was looking at it in the

20   underwriting context, Mr. Lodigiani was looking at it in

21   the underwriting context, it just isn't fair.

22             THE COURT:  It's a well made point that I had

23   spent some time thinking about and looking at cases.  In

24   fact, we've looked at some cases including an opinion

25   written by Judge Saylor that talked about using the word

1    an innocent misrepresentation, which you know really takes

2    away from what you want to argue.

3             MR. ZELLE:  I agree.  I did not put that case in

4    front of Your Honor.

5             THE COURT:  We found it.  So the cases I read

6    it's almost -- I agree with you, it seems almost

7    counterintuitive when you're reading what

8    misrepresentation is, when you're reading how other courts

9    are interpreting it, and the question really goes back to

10   what's the real thrust of trying to protect the rights of

11   the insurance company to make it a fair market for the

12   insurance company to do business in, and I think that when

13   they then break down the elements and include an intent to

14   deceive, they're trying to level the playing field a

15   little more.

16        Because of what I have found, including that Judge

17   Saylor opinion and what he cited in reference to talking

18   about an innocent misrepresentation, yeah, I don't think

19   I'm going to give it.  I don't think it's appropriate.

20   That's a good issue though and maybe an appeals court will

21   talk about that some day.

22            MR. ZELLE:  That's why I made my speech.

23            THE COURT:  All right.  Are we ready to go?

24            MR. STEWART:  Yes, Judge.

25            MR. ZELLE:  Just a couple of minutes to make

1    sure that my argument is in full conformance.

2              THE COURT:  Take a few minutes and Theresa will

3    round up the jury.

4              MR. ZELLE:  We're going to rest when they come

5    back and we've got that exhibit now.

6              MR. GIROUARD:  Do we need to renew the motion?

7    We renew the prior filed motion for judgment as a matter

8    of law on the same basis and argued at the conclusion of

9    the plaintiff's case.

10             THE COURT:  All right.  I will rule -- first,

11   let's do it in order so that the transcript looks clean.

12   So they will come back in and you will rest and you will

13   make the motion.

14             MR. GIROUARD:  One last thing, Your Honor, in

15   your scheduling order for the trial you had designated the

16   order of openings, closings, and cross-examination, et

17   cetera.  If it's okay with the Court, we have just

18   re-shuffled our order for purposes of addressing them in

19   closing.

20             THE COURT:  You can reshuffle them in whatever

21   order you want to go.  It's the same time, and again there

22   was no -- I apologize for not putting that in the order,

23   there's no sharing or pooling.

24             MR. BURSTEIN:  Fair enough.

25             MR. GIROUARD:  I just didn't want you saying why

1  you getting up first.

2          THE COURT:  Okay.

3  **(The jury entered at 10:32.)**

4          THE COURT:  All right.  Good morning.

5      I need to ask you if everyone was able to comply with

6  my instructions not to begin deliberations, talk with

7  anyone about the case, look up any media reports, do any

8  investigation on your own?

9      All right.  So affirmative answers to all, the jury

10  remains fair and impartial.

11      So this morning what we're going to do is the defense

12  is going to rest their case.  The case will be for one

13  reason or another essentially concluded and we will hear

14  closing arguments.

15      After the closing arguments, however long that takes,

16  we'll see what time it is and we'll probably take a

17  shorter coffee break after the closing arguments just so

18  you can stretch.  Then you'll come back and I will give

19  you the instructions and then the case will be yours to

20  begin deliberations.  All right.

21          MR. ZELLE:  Yes, Your Honor, we will rest.

22          THE COURT:  Okay.

23          MR. ZELLE:  If we can see you at sidebar?

24          THE COURT:  Yes.

25  (Sidebar conference.)

1       THE COURT:  The defense has rested.  Is there
2   any motion?
3       MR. ZELLE:  Yes, Your Honor.  We would renew the
4   motion for judgment as a matter of law.
5       THE COURT:  All right.  Do you want to be heard?
6       MR. ZELLE:  No, Your Honor.  We'll simply rely
7   on the argument previously made.
8       THE COURT:  All right.  Motion denied.
9   (End of sidebar conference.)
10      THE COURT:  The parties prepared to close in
11  whatever order you've chosen?
12  **CLOSING ARGUMENT BY MR. GIROUARD**
13      MR. GIROUARD:  Good morning.
14      THE JURY:  Good morning.
15      MR. GIROUARD:  Partner, partners, we were
16  partners.  We divided customers by alphabet and my partner
17  was out to lunch.  Rosemary was my partner.  A simple
18  little word "partner," and it's the whole theme of the
19  case focuses on partnership and partners.
20      When Mr. Kagels contacted Joe Doyle and Joe Doyle
21  said Mr. Lodigiani said he was a partner, that started the
22  machine of the insurance company to start to go down the
23  path that has led you to today.
24      At the end of this trial you're going to be asked to
25  make a decision.  You're going to be asked to look at the

1    elements of a partnership, and I submit to you when you

2    look at all the evidence you're going to conclude there

3    was no partnership, there was no joint venture, and there

4    was no misrepresentation.

5        If that's where you end up at the end of the day, and

6    I submit the evidence will lead you there, a judgment for

7    the defense is appropriate.

8        Partner, that simple word, we all use language in a

9    kind of simple day-to-day way.  And you saw through the

10   testimony of Ms. Grundstrom who two times at trial and

11   then when she was shown her deposition from a year before

12   characterized a co-worker, a co-employee as a partner.

13       You saw her reaction when I pointed it out to her.  I

14   wasn't trying to pick on her or give her a hard time, but

15   she realized she did exactly what we would suggest Mr.

16   Lodigiani did in this instance.

17       Here the insurance company wants you to say that the

18   partner -- the word partner is equated to partnership,

19   that that automatically is one in the same.  You heard the

20   insurance company witnesses say that.

21       Well, when they heard partner, they didn't do

22   anything further on some of the other elements.  I think

23   you recall back it was Mr. Griffin and Mr. Kagels both

24   said that they wanted to lump it together.  Well, he said

25   he was a partner.  He said we had a partnership.  The dye

1   was cast.  The investigation starts, and what did they

2   look at?  What was presented to you?  Only that fact that

3   they found initially that dovetail with that theory, but

4   they don't focus on anything else in this case that would

5   lead you away from that determination.

6        When we looked at the evidence in the case and the

7   plaintiff had the burden to show a misrepresentation by

8   Mr. Lodigiani, and I'd suggest there was no

9   misrepresentation, he checked off individual.  He checked

10  off sole proprietor because that's what he was.  He

11  understood that at the time he made that representation,

12  that was what he was doing when he ran his business.

13       You're going to hear instructions at the end of the

14  trial about what elements you can look at to make the

15  decision about whether there was a partnership, and you're

16  going to be told if they were sharing profits and that

17  seesaw, the teetertotter of the case, it tips it in the

18  plaintiff's favor, but I'd suggest to you that you'll also

19  be instructed that other evidence could be considered and

20  you could tip it back over and there's an abundance of

21  evidence to tip it back over.

22       If you decide -- you'll be told that there were wages

23  paid, that the sharing of profits were wages, that that

24  presumption has been potentially rebutted, it's one piece

25  of evidence for you to consider.

1    You have heard evidence that Mr. Brantley and Mr.

2    Lodigiani were going to share the profits and Mr. Brantley

3    understood that and he testified to you that that was for

4    his labor.  It's consistent with wages.

5    You heard extensive testimony from Mr. Brantley, Mr.

6    Lodigiani, and my client Adnan Yildirim about the control

7    on this job, another key element of the analysis about

8    whether this is a partnership.

9    Mr. Yildirim testified.  You heard that every time he

10   went to the job site, Mr. Lodigiani was there and he was

11   working on the job and he was calling the shots.  He was

12   giving the orders.

13   When they had to get parts and supplies, where did

14   they go?  They went to a supply house that was in Mr.

15   Lodigiani's account.  He would go with that man.  When

16   there was discussion about how we're going to progress

17   with the work, it was communicated to Mr. Lodigiani.  It

18   was not communicated to Mr. Brantley.  And then who made

19   the decisions once they moved forward?  Mr. Lodigiani.

20   You were shown evidence in this case, documentary

21   evidence about permits and it's clear that Mr. Lodigiani

22   applied for the permits after he signed contracts with my

23   client.  You have Exhibit 9 which you will have before you

24   when you go to deliberate.  You recall the testimony

25   yesterday Mr. Lodigiani acknowledged that he signed that

1    document and Adnan Yildirim identified that signature as

2    being only one person, not a partnership.

3         You also saw the second contract that will be

4    presented to you for your review as you deliberate, and

5    again Mr. Lodigiani is the fellow that's signing with Mr.

6    Yildirim being the other partner to the contract, and

7    consistent with that, you heard Mr. Yildirim's clear

8    testimony that he understood he was dealing with one

9    person as the master of this job.  One person was going to

10   be responsible for the job, one person was in control of

11   that job, and that was Mr. Lodigiani.

12        In this case you also heard testimony repeatedly by

13   Mr. Lodigiani about the fact that he knew that he could

14   not be in a partnership with a journeyman, that was

15   something that he understood.  And consistent with 50

16   years of plumbing experience, he started this job and took

17   this job over and had control of this job as his business.

18   He was in charge of the job.

19        The plaintiffs have the burden in this case of

20   establishing that there was a misrepresentation.  If you

21   don't find a misrepresentation, if you don't find that

22   there was a partnership, if you don't find there was a

23   joint venture, the case is over.  That's the end of the

24   analysis.

25        I'd respectfully suggest in this case there is no

1    evidence to support the plaintiff's theory where the

2    plaintiffs had the burden of proof.

3         Mr. Yildirim appeared and you saw him testify.  He

4    was here most of the trial.  On behalf of him and also for

5    myself, I appreciate the effort you've all put in.

6    Sitting on a jury has been a burden.  You've been here

7    four days now and given up time from your workplace, and

8    he's appreciative and I am appreciative of the time that

9    you've spent.

10        When you go back to the jury room, look at the

11   evidence.  That evidence is going to lead you to a path

12   that should go to one result, and that result is that

13   there was no misrepresentation, there was no partnership,

14   there was no sole proprietorship.  Thank you for your

15   time.

16        Thank you, Your Honor.

17             THE COURT:  Whenever you're ready.

18             MR. ZELLE:  Thank you.

19   **CLOSING ARGUMENT BY MR. ZELLE**

20             MR. ZELLE:  Thank you, members of the jury.  I

21   echo Mr. Girouard's sentiment.  I appreciate your

22   attention, particularly in an insurance case.  I've been

23   involved in many, and the level of attention in this case

24   was remarkable, so thank you all very much.

25        Because I've seen you paying attention, I think that

the evidence will speak for itself and I'm going to try to
keep this as short as I can and highlight a few points.

You heard at the beginning of the case that there's
this partnership issue and also a joint venture issue.
Very, very little evidence about what joint venture is,
and the reason is, and the judge will explain the law, is
that a joint venture depends on an equal right of both
joint venturers to control the venture.

You've heard I think through the witness that, well,
maybe Evins Brantley set things up in the morning before
Mr. Lodigiani got in.  It doesn't come anywhere near an
equal right to control, and I think you will find quite
readily that the insurance company cannot force this case
into the box.

Profits is a very important element, shared profits
of a partnership, and there's no dispute that the
agreement between Mr. Lodigiani and Mr. Brantley was share
the profits, but it's not the only element.

You will hear and have heard through the examination,
the judge will charge you on the law, but there were lots
of other things that go into a partnership and one of them
is control as with the joint venture issue.  Another is
responsibility, liability, it's where the buck stops.  You
might remember that.  Those weren't my words, those were
Mr. Griffin's words, the underwriter.

He said when I assess partnership and it's a loose
term in the insurance industry, which raised my eyebrow
because you're now trying to hang out Mr. Lodigiani on a
loosely defined term by fitting him it into a narrowly
legally defined box, I digress, he said the buck stops
with control.  Who was in control?  Who had
responsibility?

What did Mr. Lodigiani say?  He said, it was my job.
He said that with authority and I direct you if you look
at the examination under oath of Mr. Lodigiani, he says
somewhere around page 42, "it was my job.  I was in
control."

You probably perceived that he was susceptible to
leading questions.  We are all to some degree, that's what
interrogation is all about.  That's what we lawyers do; we
interrogate witnesses.  Some people are more susceptible,
but he stood up when he said this is my job.  I'm
responsible.

You need to pay attention to the demeanor of
witnesses and maybe you picked up on that.  I suggest you
think back and that's where he stood up for himself, and
he also, again for the most part, followed the lead of the
questions but he said it here in court, and again I'd
suggest you look and this I know is on page 42 of his
examination under oath, he says "I couldn't have been in a

partnership if I wanted to.  It's prohibited by the
plumbing code."  He offered that.  Of course, we know the
insurance company didn't follow up on that.  They didn't
consider that fact, but if you look at it from a different
angle, what the insurance company is saying is that he did
something that violated the plumbing code and what he told
you is I knew the plumbing code, I would never do anything
to violate the plumbing code.

He believed his company was a sole proprietorship.
The evidence shows that it was.  I think it will be
relatively simple for you to conclude when you go through
all of the elements that this was not a partnership.

So I want to talk for a brief time here about
misrepresentation.  I don't think you're going to find
it's a partnership.  I don't think you're going to find
it's a joint venture.  I don't think you're going to get
to the issue of misrepresentation, but in the event you
do, I just want to make a couple of points.

The plaintiff has conceded Mr. Lodigiani was not
lying.  He didn't intentionally attempt to deceive the
insurance company.  He made a mistake.  They're trying to
take advantage of that mistake.  That's life.  We all know
we all make mistakes and others try to take advantage of
our mistakes.  I don't fault them for that.  What I do
think, however, they should be faulted for is a failure to

1    provide evidence to support the claim based on a mistake.

2         The insurance company's claim is we wouldn't have

3    issued this policy if we knew it covered more than Mr.

4    Lodigiani's liability.  We would have charged more if we

5    believed it also covered -- if we were told it also

6    covered Mr. Brantley's liability.

7         Well, what did Mr. Brantley say?  It doesn't cover my

8    liability.  I have my own insurance.  The insurance

9    company didn't ask that question because they were trying

10   from the beginning to put this case in a position to

11   disclaim coverage, and Mr. Kagels jumped to the conclusion

12   that it was a partnership simply because there was a

13   reference by Mr. Lodigiani to Mr. Brantley as his partner.

14        You will hear a legal instruction from the judge that

15   reference to another as a partner does not a partnership

16   make.  But that's all they have, plus the profits, but, as

17   I said earlier, there's no shared liability and there's no

18   evidence of a partnership formation in the terms of a

19   written agreement.  There's no filing with the Secretary

20   of State's office.  There's no partnership returns, and

21   Mr. Brantley testified, and I just think this is critical,

22   he had his own insurance.

23        So what is it that the insurance company is trying to

24   deny?  What do they say gives them to right to deny?  They

25   say we didn't want to provide coverage for Mr. Brantley's

liability.  They are not.  Mr. Brantley is not being sued.

We are seeking coverage in this case, Mr. Lodigiani
is, of course my client is as well, under the insurance
policy issued by Preferred Mutual based on Mr. Lodigiani's
personal liability as the plumber, as the sole proprietor,
as the person who pulled the license.  We don't care if
Mr. Brantley was involved.  It's not an issue.

The last thing I want to mention here is that what
Mr. Kagels did is something we all do.  You hear something
and you make a quick connection.  That's how our brains
work.  That's how man has survived for eons and eons.

We perceive things and we make these snap decisions,
that's not deliberation.  That's the other way people
think.  We make that decision and then we think, well,
wait a minute.  Let's think about this.  Let's make sure
that snap decision was right.  That's what is special
about being a juror, because it demands that you think
about that first impression and then you think about the
evidence and you do everything you can -- and it is in
your mind, this is how it's working, to prove or disprove
that the intuitive thought was right.

Mr. Kagels's intuitive thought was wrong.  Ms.
Grundstrom's intuitive thought with a reference to
Rosemary as her partner was wrong as a matter of law.  The
judge is going to tell you what the law is.  It's only

been a couple of days of evidence. You will remember what the evidence is, and I believe after your deliberations you'll conclude that Mr. Lodigiani was not operating a partnership. He was not operating a joint venture and he made no misrepresentation, and that the insurance company cannot disclaim coverage because after the fact they squeezed the evidence into a joint venture or partnership box. Thank you.

THE COURT: Thank you. Attorney Burstein, whenever you're ready.

MR. BURSTEIN: Thank you, Your Honor.

**CLOSING ARGUMENT BY MR. BURSTEIN**

MR. BURSTEIN: Good morning again, ladies and gentlemen of the jury, again just like the other attorneys, I want to thank you all for your service.

I've actually had the opportunity, even though I'm a lawyer, to serve on a couple of juries and I understand the inconvenience that's involved, and I also want to thank you as Attorney Zelle did for paying attention throughout the case.

I understand that sometimes there's interesting and boring parts, and again we all noticed that all of you were paying very close attention and we really appreciate that.

You may recall that I represent Leo Lodigiani who's

sitting at the table who was the plumber in this case and

the person who applied for and obtained a business owner's

policy from Preferred Mutual Insurance Company and now the

company is trying to rescind or take away that policy from

him after they got notice of a significant fire of a

significant loss in this case.

And really from Mr. Lodigiani's perspective as a

defendant in this case is this case comes down to one

issue and one issue only, and that issue is that he's not

a partnership.  That he's always been a sole proprietor

and based on that he's made no misrepresentation.  He

believed that to be true when he sat down with Peggy

Grundstrom and applied for workers' comp. insurance.

He believed that to be true when he called her and

then went in the second time because he needed liability

insurance on the job.  He believed that in his dealings

with the other workers on the job and with the owner at

the job site.

He believed it when the fire happened.  He believed

it throughout his dealing with the insurance company

during their so-called investigation of what happened, and

he believes it today as he sits here in the courtroom

before you.

And if he filled out that application correctly for

insurance and he wasn't operating on the job as a

1    partnership, then he's made no misrepresentation.  He's
2    always been a sole proprietor, ladies and gentlemen.  He's
3    always been in business for himself.

4         You heard his testimony.  You heard how people
5    interacted with him on the job site.  He's never filed a
6    partnership tax return.  He has never filed to be a
7    partnership with the Secretary of State in Massachusetts.
8    He's never taken any actions that would lead anyone that
9    he was dealing with on the day-to-day work business to
10   believe that he was a partner.

11        Did he refer to his close friends who work alongside
12   him on numerous jobs as a partner from time to time the
13   same way that Peggy Grundstrom referred to Rosemary who
14   she worked with on a day-to-day basis as her partner?
15   They worked side by side and they split the alphabet in
16   half and they essentially do the same job each and every
17   day.  They do the same type of work.  That's all he meant
18   when he said that, but it's maybe a little bit more
19   confusing to him.

20        I'm sure you noticed during the testimony I mean he
21   was easily led in a direction when he was asked certain
22   types of questions.  Lawyers are trained in asking leading
23   questions, and I think there was some discussion during
24   trial what a leading question is.  Well, a leading
25   question is a question that suggests the answer.  Don't

1    you know that...?

2         Well, these are questions where you're suggesting the

3    answer to them.  And Mr. Lodigiani when he's asked the

4    same question three or four, five times different ways in

5    a leading manner, he's going to say yes.  He wants to

6    cooperate.  He's trying to, you know, be agreeable.

7         You will see that if you look at the examinations

8    under oath, which are actually admitted as evidence in

9    this case, you can see when the statements are taking from

10   him, look at the way the questions are worded that he's

11   answering.  He's almost never providing the answer to the

12   question in his own words.  The answer is being suggested

13   to him.  Take a look at that.  It's important in this

14   case.

15        I asked you to pay careful attention at the beginning

16   to how the investigation or so-called investigation was

17   conducted in this case.  What happened after the fire?

18   What did the insurance company really do to figure out

19   coverage?

20        Well, they started out doing the right thing.  They

21   hired an independent adjuster to basically supervise the

22   investigation and figure out what's going on and Mr.

23   Trudeau you heard from him.  He didn't really have too

24   much to say, but you heard from him.  He hired a fire

25   origination expert who you did not have a chance to hear

1 from who's involved in the other case I imagine and they

2 hired an attorney, Attorney Doyle out of Quincy,

3 Massachusetts.

4  You were told that he was hired to represent the

5 interests of Mr. Lodigiani.  And sometimes attorneys have

6 trouble understanding what their role is.  You heard some

7 testimony about what Attorney Doyle's role is, and you

8 even heard that Preferred Mutual is paying the bill and

9 that attorney's obligation is to Mr. Lodigiani to protect

10 his interests.  That's the lawyer's obligation, you have

11 to protect your client.  You have to zealously advocate

12 for your client.  We have rules.  Like the plumbing code

13 has rules for plumbers, attorneys have to zealously

14 advocate for our clients.

15  Did Attorney Doyle who was an agent who's hired by

16 Preferred Mutual advocate, zealously advocate for his

17 client in this case?  Think about what happened.

18  The fire happened on January 28, 2013.  About a month

19 later, the end of February, the independent adjuster who

20 testified he's from this area, Western Massachusetts, and

21 Attorney Doyle was out in Quincy required that Mr.

22 Lodigiani drive all the way to Quincy to give a recorded

23 statement, a recorded statement along with Mr. Brantley

24 and one of the workers.

25  So they have to truck all the way out, this

1    84-year-old man, another 80-year-old plumber, at that

2    point in time have to go all the way to Quincy to give a

3    statement.  Why couldn't it have been done here?  They

4    make them drive out.

5        Attorney Doyle meets with Mr. Lodigiani in his office

6    before that statement begins and asked him a few

7    questions.  It may be the first time they met, it's

8    unclear.  He asks him a few questions and Mr. Doyle says

9    based on what you're talking about, the splitting of

10   profits, you're a partner.  What did Mr. Lodigiani say?

11   Well, he adopted that.  You're the lawyer.  You're telling

12   me, you're my lawyer.  I'm just a plumber.  I know the

13   plumbing code.  You can ask me about plumbing.  I don't

14   know the law.  Okay.

15       Now the recorded statement starts.  Three, four, five

16   questions get asked by Mr. Trudeau.  The tape recorder

17   gets paused and all of a sudden Attorney Doyle is there

18   asking his own client questions about coverage, that would

19   affect coverage on a recorded statement.  Is that

20   something that's normal?

21       I think you heard attorney -- you heard Mr. Kagels

22   indicate that that's out of the ordinary.  Why would an

23   attorney trying to make a record with a recorded statement

24   that's going in a transcript that's going to go against

25   his own client?  That doesn't happen.

1    The same thing with Mr. Brantley's statement, look at

2    that in the jury room.  The same thing happens, Mr.

3    Trudeau is taking the statement and all of a sudden

4    there's Attorney Doyle asking questions.  Why?  I don't

5    know.  Ask yourself why.  You're allowed to draw

6    inferences.

7    So what happens after that?  Mr. Trudeau is supposed

8    to get those tape recordings made into a transcript and

9    get them to the insurance company.  Does that happen right

10   away?  Nope, not for a long time, right?

11   In fact, all that happens is Attorney Doyle, without

12   ever telling Mr. Lodigiani what he's doing, reports to the

13   insurance company to Mr. Kagels that Mr. Lodigiani is

14   operating as a partnership.

15   Look at the case notes, the claim notes of the

16   insurance company.  You're going to have them before you

17   in the jury room.  Look at those claim notes.  There's a

18   lot of information in there about how they handled this

19   investigation.

20   It says, "Attorney Doyle says insured operating as a

21   partnership."  Okay.  Wouldn't you want to know more

22   maybe?  Mr. Kagels says no, he told me that.  That's what

23   I wrote down.  I didn't have the statement.  In fact, I've

24   never looked at the statement, that transcribed statement.

25   I relied on what was told to me.  They were sharing

1    profits.  He said the word partners.  That was enough.

2        What happens next?  It happens pretty quickly.  He

3    does an underwriting memo.  They're partners.  It's a

4    conclusion.  Not we need more information to find out,

5    they're partners, conclusion.

6        Now that's part of the record.  Everybody who's

7    evaluating the file at the insurance company is reading

8    that.  He still hasn't read the recorded statement from

9    the insured to see this how this information was garnered,

10   to see if that's true or not.

11       What happens next?  Well, a few different things

12   happen in March of 2013.  March 18th you're going to see a

13   case note where they say "the insured is a partnership"

14   and again that's based on Attorney Doyle's communication

15   solely.

16       Two days later, March 20th, a case note:  "Approval

17   to hire Attorney Stewart to conduct examination under

18   oath.  Okay to send reservation of rights letter."  We

19   need to protect ourselves.  We're going to make sure that

20   we can disclaim this coverage; that we cannot cover Mr.

21   Lodigiani in the future if we decide to do that.  So they

22   send that letter out to Mr. Lodigiani.

23       Two days later, March 22nd, again this is without

24   anybody having read the statement that Mr. Lodigiani and

25   Mr. Brantley gave.  All they have is what Mr. Doyle

1  represented to them, Mr. Lodigiani's own attorney hired by

2  them.

3      March 22nd, "spoke with Attorney Doyle.  How far

4  should we go into coverage and liability issues at the

5  examination under oath?"

6      You heard Mr. Kagels indicate that there was a

7  conflict between Attorney Doyle getting into any coverage

8  issues.  Clearly they had decided to go in that direction.

9  They had gotten approval two days earlier to hire Attorney

10  Stewart as coverage attorney and to send a reservation of

11  rights letter and a mere two days later Attorney Doyle is

12  advising them to get everything, go after the guy.  Is

13  that a fair investigation?  Is that fair how that

14  happened?

15      They do not one but two examinations under oath.

16  Why?  Supposedly because even Attorney Stewart wasn't

17  given the prior recorded statement.  How many times did

18  they take statements from their own insured?  A recorded

19  statement, a first examination under oath, a second

20  examination under oath, a deposition, live testimony in

21  court.  Is that how you treat your own insured?

22      Does additional information come out during the

23  course of that part of the investigation once Attorney

24  Stewart got hired?  It sure did.  Look at the documents

25  that you're going to have in the jury room.  Look at what

1       came out during the examination under oath.

2           Finally Mr. Lodigiani got to explain what was really

3       happening, how the employees were getting paid, whether

4       they had their own insurance; that he's aware that he

5       can't be in a partnership with Mr. Brantley under the

6       rules of the plumbing code or as he says the regs.  He

7       knows the regs.  He knows what he can and can't do.  He

8       knows he can lose his license if he's not in compliance.

9       He knows that a master plumber cannot legally be in

10      partnership with someone who's a journeyman plumber, and

11      he clearly knew that Mr. Brantley was just a journeyman

12      plumber.

13          The insurance company never wanted to acknowledge any

14      more information than Mr. Lodigiani said he was sharing

15      profits and that Mr. Lodigiani said that he was a partner

16      one time in that first recorded statement.  They never

17      went any further.  Is that right?

18          It was wrong, ladies and gentlemen.  That's not how

19      you treat your insured.  That's not how you treat an

20      86-year-old man who's worked hard his whole life, who's

21      been cooperative in your investigation, who's driven all

22      the way to Quincy and given statements, who's gone to the

23      scene and told people where things happened, who's helped

24      them try to defend the case, who's been honest in his

25      answers to questions that have been posed to him, and who

1    paid a premium, a significant premium for liability

2    insurance so that he would have coverage if something ever

3    happened like a fire like this.  That's what Mr. Lodigiani

4    did, and yet he sits before you in court today because of

5    the investigation that was supposedly done by this

6    insurance company.

7        Presumably under their definition of partnership

8    Peggy Grundstrom would be partners with Rosemary from her

9    office and you know that that's not true, and you

10   hopefully know people use that term all the time.

11       It's a same thing with sharing of profits and I want

12   to talk about that for just a minute.  The sharing of

13   profits does not make you a partnership.  That's not the

14   end of the inquiry and I want you to just think about a

15   situation hopefully you're familiar with.

16       Let's take a mall like the Holyoke Mall.  Okay.

17   Well, if you want to have a restaurant in the Holyoke

18   Mall, they may require you to pay some rent but they may

19   also require that you pay them a percentage of your

20   profits, that's part of the rent.  In fact, a lot of malls

21   and places do that.  I think you can use your common

22   experience to know that.

23       Well, that doesn't make the mall and the restaurant a

24   partner.  The restaurant is still running the restaurant

25   any way they want to run the restaurant.  They're simply

1    sharing a percentage as rent.

2        You heard uncontroverted testimony from Mr. Brantley

3    that he was getting 50 percent of the net profit, that was

4    his pay for the job.  That's how he was getting paid.

5    They had that arrangement in the past sometimes, not

6    always but sometimes.  He found this job.  He's working on

7    the job and that's how he's getting paid for the job.

8        If he doesn't get his 50 percent of the profit and

9    you heard testimony that there was no pay because of the

10   fire, Mr. Lodigiani never got paid, so Mr. Brantley never

11   got paid but that was his pay.  He was going to get 50

12   percent of the profits.

13       You're going to hear the judge's instructions that if

14   there's evidence introduced that the profits from this job

15   were being paid as wages, then that rebuts the presumption

16   that sharing profit is the only thing you consider.  It's

17   just like any other evidence in the case after that

18   evidence is introduced and I would put before you there

19   was nothing to the contrary.  Mr. Brantley sat there

20   before you, you can judge his credibility, and he honesty

21   told you that's how he was getting paid for the job.

22       Now you guys have heard -- you, the jurors, have

23   heard all the evidence in this case.  You've heard live

24   testimony and you're going to have documents that you're

25   going to be able to take back into the jury room with you.

1    You alone have the ability to follow the judge's

2  instructions in this case, including the instructions on

3  what constitutes a legal partnership, all the factors that

4  constitute a legal partnership or a legal joint venture

5  that are going to include sharing of profits, sharing of

6  losses, control of the business, think about whether the

7  insurance company ever considered control of the business.

8  I would put before you that they did not, even though Mr.

9  Griffin said they should.  For him he said the most

10  important thing is who the buck stops with.  Right?  Who's

11  in charge.  It was very clear in this case that Leo was in

12  charge.  He was running this job.  It was his job but

13  consider all those factors.

14    You have a unique ability to consider all of this

15  fresh.  The insurance company did not, but you have the

16  ability based on the evidence that you've heard to decide

17  all the factors of partnership and joint venture, and I'm

18  very confident that once you hear all of those you are

19  going to be convinced that there was no partnership; that

20  there was no joint venture; that Mr. Lodigiani was a sole

21  proprietor at all times relevant to this case; that you're

22  not going to allow the insurance company to rescind the

23  policy, and that you're going to require they continue to

24  cover him with respect to this fire.  Thank you very much.

25

**CLOSING ARGUMENT BY MR. STEWART**

MR. STEWART: Ladies and gentlemen, Your Honor, if it please the Court, as you know my name is John Stewart. I represent the Preferred Mutual Insurance Company. This is my final opportunity to speak with you about the case.

Now, let me talk to you first about some nuts and bolts of what you're going to be doing shortly. The judge is going to be instructing you and you're going to be getting a special verdict form. It's kind of a questionnaire. It has some questions on that and I'll be directing my argument to the things that you'll have to decide, and I suggest for your consideration that Preferred Mutual's handling of this case and how the investigation went and other things like that are not things that are addressed in the questions that you need to answer.

In any event, look, I believe his Honor is going to instruct you about a couple of legal things called inferences. You will hear evidence, sometimes there's direct evidence right on point that somebody says they did something that might prove the proposition that somebody did something.

Other times there's sort of circumstantial evidence that somebody did A, B, C and from that you can infer that

1    D happened, and his Honor will give you instructions how

2    inferences work.  Inferences always have to be reasonable.

3    You can't be guessing and speculating about things.  So

4    that's going to be one of the things you're going to be

5    hearing about that I'll be addressing in part of my

6    argument shortly.

7         The other thing you're going to hear about is burden

8    of proof and my brother counsel has already referred to

9    burden of proof a little bit, but I believe what you're

10   going to be hearing is and I think you've heard in the

11   pre-instructions on the law that this is not a criminal

12   case where proof has to be where -- where guilt has to be

13   proven beyond a reasonable doubt.  It's a civil case where

14   liability and whether a proposition is true or not has to

15   be more probably true than not.

16        If the scales of justice are weighing out the weight

17   of the evidence, not the number of witnesses or anything

18   else, but what weight you give the evidence, if it's

19   enough to tip the scales slightly, then the proposition is

20   more probably true than not, and basically in a civil case

21   it's a lower standard of proof.  It's a standard of proof

22   that reasonable people think something is proven, that

23   usually means it's proven.

24        So let's talk about some of the claims in the case.

25   You are going to be receiving instructions from Judge

1    Mastroianni about what a partnership is, and I submit for
2    your consideration that you're going to hear things about
3    a partnership doesn't need to be in writing.  A
4    partnership can inferred from the circumstances.  Again
5    these are reasonable inferences.

6        One of the factors you might consider and think
7    important is what the people call themselves.  We've
8    offered you evidence, I'm submitting for your
9    consideration that you accept it, that the fact these
10   gentlemen called each other partners, Mr. Brantley and Mr.
11   Lodigiani, has some significance.

12       Perhaps even greater than that, than the admission
13   that the men were partners, is the fact that they were
14   sharing profits.

15       You will -- I believe there will be an instruction
16   from the Court of the significance of gentlemen sharing
17   profits, and I suggest you will be hearing things about
18   *prima facie* evidence and the Court will be instructing you
19   what *prima facie* evidence is.  But let me suggest for your
20   consideration that it's important evidence and it proves
21   the proposition until there's other evidence that comes
22   forward that's more strong and disproves that proposition.

23       But again if there's anything that I say that -- it's
24   what Judge Mastroianni says.  I'm just asking you to
25   consider these points when you hear his instructions.

1      You will also be hearing that one of the factors you

2   should be considering is the management of the company and

3   whether both parties were sharing in the supervision.  You

4   heard evidence that there was this agreement that Mr.

5   Brantley unfortunately had a journeyman's license but that

6   license had been suspended so at the time of this job in

7   the fall of 2012 Mr. Brantley needed to bring in a man

8   with a license, and Mr. Lodigiani had a license and they

9   had an agreement about how this job was going to go.

10      I think it's important to point out, and this may be

11   a subtle point, but it's in the documents and it was in

12   the testimony, that the agreement was not only for

13   plumbing work, it was also for removing all the debris.

14      The agreement was that there was going to be an

15   hourly rate paid, kind of like time and materials job but

16   take the materials out because the owner was going to pay

17   for the material, so really these gentlemen were being

18   paid for their time, not only Mr. Brantley and Mr.

19   Lodigiani but also the two helpers.  There was going to be

20   a bill for all that time that was going to be submitted to

21   Mr. Yildirim, and that was going to be the gross amount of

22   the job.  So they were going to tally up their hours.

23      Part of those hours they had to do some

24   deconstruction, some demolition, and before they could do

25   the build out of the pizza restaurant they had to take all

1    that stuff to the dump and the time it took to gather it

2    all up pre-operation, that took time and that was among

3    the hours that Mr. Brantley and Mr. Lodigiani were going

4    to split up.

5        So it's not only the profits of the plumbing job,

6    it's the profits of the demolition job, and remember what

7    we're talking about here is splitting the profits after

8    expenses.  The expenses that Mr. Lodigiani told us that he

9    was going to be subtracting from the gross amount received

10   from the owner before he split up the profits were the

11   cost of buying the workers' comp. insurance, the cost of

12   buying the liability insurance.

13       Remember, this is insurance they got just for this

14   job.  When he went to the agent he says, I've got a job.

15   That's why I need the insurance.  Unfortunately Mr.

16   Lodigiani didn't go further and say I'm doing this job

17   with another plumber.  We are splitting the profits.  It's

18   a joint job.  That got us to where we are, but just

19   speaking about partnership, we've got a sharing of the

20   profits; we've got a sharing of the liabilities for paying

21   employees, for paying costs, and also Mr. Lodigiani told

22   us that there might be some other liabilities out there

23   and it took awhile to get there but he finally did say

24   yes, that they would be sharing liabilities for payroll

25   taxes, that kind of thing.

1           MR. BURSTEIN:  Objection, Your Honor.

2           THE COURT:  Overruled.

3           MR. STEWART:  Moving forward folks, you also

4    heard that there was evidence that Mr. Lodigiani was not

5    always at the job site, and this is pertinent to both the

6    joint venture and the partnership that there were times

7    that Mr. Brantley was the senior man on the job

8    supervising the other two employees.  He was supervising,

9    he was in charge of the enterprise when Mr. Lodigiani

10   wasn't there.

11        You will see in the examination under oath that, here

12   we go, Exhibit 14 on pages 102, 103, and 105, there is

13   testimony from Mr. Lodigiani about the fact that Mr.

14   Brantley participated in the supervision.

15        So those are going to be some of the kind of things

16   you've heard of and that are significant to the jury

17   instructions that you're going to be receiving and to the

18   jury verdict questionnaire that you're going to need to

19   fill out.

20        Now let me talk about joint venture.  Joint venture

21   is not much different than a partnership.  Actually a

22   partnership is kind of a larger concept.  A joint venture

23   is kind of a partnership for one job and you'll see that

24   many of the elements are the same.  It doesn't have to be

25   in writing.  It could be implied rather than expressed.

1     There's the same idea about both partners being

2     involved in directing and controlling the business, the

3     supervision thing I was talking about a minute ago, and

4     those are all factors for you to consider.

5     You don't necessarily need to find all factors

6     present or the fact that several are not there, it's just

7     something for you to consider, but the fact -- what are

8     both of the people bringing to the table?

9     Well, Mr. Lodigiani had a license and Mr. Brantley

10    had the relationship with the owner of the job, with Mr.

11    Yildirim, and both of them were contributing to this joint

12    enterprise.  They're both participating in the control of

13    the management.  They both have an expectation of profit.

14    They have a right to receive profits.  They have an

15    implied duty to share losses.  These are the types of

16    factors that you're going to consider and I submit for

17    your consideration that have been fairly proved to you.

18    Now let's talk about the rescission.  Now, as you

19    know, folks, Preferred Mutual wrote this policy to a

20    single proprietor, a one-owner business.

21    What happened is that there were actually two owners

22    that should have been disclosed, and had that been

23    disclosed that this is a partnership or a joint venture,

24    the premium rate, the amount that was paid for the policy,

25    would be roughly double.

I submit for your consideration that that is
something that's material to an underwriter and under the
rules of today that is enough for a rescission.  That if
there's an increase in the risk of loss to Preferred
Mutual or there's a situation where when Preferred Mutual
knew the true facts that the premium would have been
higher and under the facts that were given the premium was
lower, that is sufficient for a rescission.

You heard from both Mr. Griffin and by Peggy
Grundstrom that the minimum payroll for a one-owner
business is $28,600 times the multiplier and then it comes
up with a premium rate.  For a two-owner business it's
double that, 57,200.  That is a significant thing to an
underwriter.

Folks, it's kind of like if a person were 50 years
old and applying for a life insurance policy, a life
insurance company might have a particular rate on that.
But if a person were 75 years old and applying for the
same policy, it wouldn't be the same price.

If a person that was 50 -- I'm sorry, if the person
was 75 and said he was 50 in an application, it wouldn't
matter whether he made a mistake, whether he was doing it
on purpose to get a cheaper rate, that's the kind of thing
that is material to an underwriter and would give an
insurance company a right to rescind the policy.

1          Folks, a contract is really a social contract.  The

2     glue that holds that contract together are the promises

3     both parties make to each other.  One party isn't allowed

4     to have another party get involved in a contract on

5     incorrect premises, and in the case of an insurance

6     company take on a lot more risk, receive less premium than

7     they were being told that they were undertaking as far as

8     risk.  That's what we're talking about here.

9          So you will be hearing the instruction about

10    rescission.  I suggest that when you hear the elements,

11    you will accept that these have been fairly proven by

12    Preferred Mutual that there was a misstatement.

13         Mr. Lodigiani said it was a one-owner business when

14    the true facts were he was a partnership or a joint

15    venture, and he should have been charged a higher rate but

16    for the fact that Preferred Mutual didn't know.  That's

17    enough for rescission.

18         Now, the last count of the complaint is under an

19    exclusion of the policy, and remember that basically talks

20    about whether there is a -- whether there's an undisclosed

21    partnership.  "No person or organization is an insured

22    with respect to the conduct of any current or past

23    partnership, joint venture, or LLC that is not shown in

24    the policy declarations," and, of course, as you know the

25    name insured is Leonard Lodigiani d/b/a.  There is not a

1    joint venture or a partnership named on the policy

2    declarations.

3         So how is this going to come to you?  It's going to

4    come to you for a decision on this special jury verdict

5    questionnaire.  You will be asked at the time of the

6    application, was Mr. Lodigiani involved and engaged in a

7    partnership or joint venture?  If you're satisfied, you

8    check that box yes.

9         Did Mr. Lodigiani make a misrepresentation for

10   applying for insurance?  Now, if he was in a partnership

11   and he said that he was a single owner or he was in a

12   joint venture and he said he was a single owner, then that

13   is a misrepresentation and you check that box yes.

14        Now Question Number 3 asks if Mr. Lodigiani -- did

15   Mr. Lodigiani make a representation with intent to deceive

16   Preferred Mutual?

17        You know, trying to read somebody's mind is a very

18   difficult thing to do.  You can never have direct evidence

19   on that.  You can have circumstantial evidence on that.  I

20   think it was a pretty thin case, but you folks are in the

21   best position to make a determination about Mr.

22   Lodigiani's state of mind.  If you think that he did, you

23   check that yes.  If you think he did not, you check that

24   no.

25        Now I suggest for your consideration Question Number

1    4 is a little easier. "Did Mr. Lodigiani make a

2    misrepresentation that increased Preferred Mutual's risk

3    of loss?" If you find that he was a partnership, you

4    check that box yes because there's a difference, about

5    double the premium, that is material.

6         Now, Questions 5 and 6 are more along the lines of

7    this joint venture, and again you're going to be asked in

8    Question 5 "was Mr. Lodigiani in a partnership or joint

9    venture?" You probably are guided by the question that

10   you made earlier, and then was that -- if you answer that

11   question, was that joint venture or partnership of the

12   name insured in the policy declarations and as we just

13   reviewed if you find he was in a partnership, it was an

14   undisclosed partnership, it was an undisclosed joint

15   venture, and you will answer he was in a joint venture --

16   I'm sorry, you will answer no, was Mr. Lodigiani's joint

17   venture the named insured? It was not. So that will be

18   the jury verdict.

19        Let me leave you with a few other comments. There

20   was a lot of discussion about Preferred Mutual's

21   methodology. The only methodology that you need to know

22   about is the evidence that you heard about partnership and

23   whether it's sufficient for you. Whether it was

24   sufficient for Preferred Mutual or whether it was

25   insufficient for people representing Mr. Lodigiani, that

1    is not your concern.

2         I suggest for your consideration you look at the

3    evidence that came before you, and I suggest for your

4    consideration it was pretty persuasive.

5         So, you know, back in England in the fifteen hundreds

6    or sixteen hundreds, whenever it was, they used to have

7    fox hunting and this is where a bunch of guys with red

8    coats and hats I guess ride around on horses and they have

9    dogs with them and they're hunting for foxes.

10        Sometimes when that was going on somebody would go

11   out on the course where they going to do this beforehand

12   and go out and pick up a rock and put something underneath

13   it and then they have, you know, the fox hunt several

14   hours later and all the dogs would go to this place and

15   you pull it up.  That has nothing to do with a fox.  You

16   pull it up and there's a red herring there.  That's where

17   that came from, ladies and gentlemen.  I'd suggest for

18   your consideration that some of the things that the

19   defense is suggesting are kind of red herrings.

20        Let me kind of phrase this a different way.  You

21   know, there's a marine animal called an octopus that has a

22   lot of arms and you know octopus don't swim fast.  They're

23   not particularly strong and they don't have a lot of

24   defense mechanisms but when they're attacked, they have a

25   special thing that they do.

1          When an octopus is under pressure and being attacked

2     by a predator or something, they put off this ink and it

3     makes the water all hard to see through and dark and kind

4     of muddies the waters and they're able to escape and not

5     have to deal with whoever is coming after them.  That's

6     kind of what I suggest for your consideration is going on

7     in this case.

8          This is kind of a simple case.  Is there a

9     partnership?  And once you get past that question, a lot

10    of questions are kind of pretty obvious.  It would affect

11    an underwriter; it was not named in the policy

12    declarations.  But this case perhaps you think it's been

13    unnecessarily difficult and looking at all these questions

14    that really have nothing to do with the case, but that's

15    up to you.  I'm just suggesting you think about that.

16         We have a case where these men called each other

17    partners.  They're splitting profits.  They admitted at

18    various times that they had shared supervision of this job

19    site.  They were sharing liabilities.  I suggest to you

20    that their partnership has been fairly proven.

21         Now, look, you're going to be filling this out soon,

22    special verdict form.  The word verdict comes from a Latin

23    word.  It means speak the truth.  That's exactly what I'm

24    asking you to do here is to deliberate and to speak the

25    truth through your verdict.

1          Now, let me just leave you with one thought.  As you
2    know, Mr. Lodigiani had stationery that says L.C.
3    Lodigiani, various things like that, and his actual name
4    Leonard C. Lodigiani, but when he applied for this policy
5    it was L.B. Plumbing, and I suggest for your consideration
6    that among the inferences you can make are that stood for
7    Lodigiani-Brantly.  Thank you very much, ladies and
8    gentlemen.
9          THE COURT:  Thank you.  May I see the parties?
10   (Sidebar conference.)
11         THE COURT:  I want to give the parties an
12   opportunity to place any objections on the record if you
13   have any.  I wanted to ask what is the exhibit number was
14   that you put on the screen during your closing?
15         MR. STEWART:  Well, the policy was number one.
16         THE COURT:  I want to tell the jury what the
17   exhibit number is so I can make a record of them.
18         MR. STEWART:  I understand.  Can I get it?  I
19   can give you a sheet of paper.  Can I do it now?
20         THE COURT:  Yeah, I want to tell them the
21   exhibit.
22         MR. STEWART:  I can't even think right now.
23   I'll figure it out.
24         THE COURT:  All right.  Yeah, if you can get it
25   now.

1          MR. STEWART:  I think it was only the front page

2     and the second page of number one and then page 39 of

3     number one.

4          THE COURT:  It was all number one, the policy?

5          MR. STEWART:  That's number one.

6          MR. ZELLE:  Right.  I referred to the

7     examination under oath.  You want that number too?

8          THE COURT:  Yes.  All right.  I'll put on the

9     record that during Attorney Stewart's closing argument for

10    the plaintiff you put it up on the monitor on the screen

11    so we have a record of what was shown to the jury, a

12    reference during the closing to Exhibit Number 1.

13         MR. STEWART:  Correct.

14         THE COURT:  I just want to make a record.  Now

15    for Attorney Zelle's closing did you reference anything?

16         MR. ZELLE:  I did not.

17         MR. GIROUARD:  I'd say either 8 or 9, the

18    contracts, the two contract documents.

19         THE COURT:  Do you know what the exhibit was?

20         MR. GIROUARD:  Eight and 9.

21         THE COURT:  Eight and 9 so that was Attorney

22    Girouard's closing.

23         MR. ZELLE:  I didn't put anything up.

24         THE COURT:  I want to make that record.  Okay.

25    So anyone want to place objections on the record?  Do you

1    want to be heard on your objection and are you requesting

2    any type of instruction?

3            MR. BURSTEIN:  I don't believe that there was

4    any testimony from Mr. Lodigiani that there was an

5    agreement on shared liability regarding wage and hour

6    potential liability.

7            MR. STEWART:  I didn't go there.

8            THE COURT:  Can you develop it a little more?

9            MR. BURSTEIN:  I believe Attorney Stewart in

10   arguing to the jury said that there were other shared

11   liabilities, argued that and wage and hour potential

12   liabilities.  There was no evidence that was adduced to

13   that effect during Mr. Lodigiani's testimony either prior

14   to court or any court in this matter.

15           THE COURT:  Okay.

16           MR. STEWART:  I said payroll taxes, Judge.  I

17   said nothing about wages I don't think.

18           THE COURT:  I thought I heard wages but, you

19   know, I didn't hear that portion of what Attorney Stewart

20   said in a way suggestive of facts that were not in

21   evidence or at least facts that could be inferred

22   reasonably from the evidence.  I thought it was fine so I

23   will overrule the objection at this time.  I will not

24   address it any further.

25           MR. ZELLE:  Yes, Your Honor.  This is a serious

1     objection.  I'd like a charge on it if you're not going to

2     bring it up to the jury.

3          The jury cannot as a matter of law infer that L.B.

4     Plumbing stands for Lodigiani-Brantley.  There are two

5     reasons.  The factual basis is Mr. Lodigiani said it stood

6     for Leo Bones and I'll cite two cases, *Santosuosso* and

7     *Cahaly v Benistar*, that provides that you may not infer

8     the opposite of something someone is saying from the

9     disbelief of the affirmative statements.

10         So they can say it doesn't -- they can infer it

11    doesn't stand for Leo Bones but they cannot infer that it

12    stands for Lodigiani-Brantley.

13              MR. STEWART:  Judge, I agree with my brother as

14    a question of law that you can't infer the opposite

15    proposition.  You can't, but I think the inference flows

16    totally independent of Mr. Lodigiani's denial.  I know

17    what my brother said is right.  A disbelief of Leo Bones

18    does not permit otherwise an opposite inference.  Okay.

19    So we are agreed on the law.

20         What I'm saying is totally independent of that a jury

21    could determine that that name -- that Mr. Lodigiani kept

22    track of these things and he used different names for

23    different jobs and this particular jobs was an L.B. job.

24              MR. GIROUARD:  That's not what he testified

25    to.

1           MR. BURSTEIN:  There's no evidence to that on

2      the record.

3           MR. STEWART:  No direct evidence I agree.  It's

4      an inference.

5           THE COURT:  All right.  What I'm going to do is

6      I want to look up a few cases on inferences.  All right.

7      I'll let them go anyway.

8           MR. ZELLE:  Okay.

9           THE COURT:  We'll take a coffee break and I'll

10      bring them back here and charge them.  That will give me

11      enough time take a look at some cases.

12      (End of sidebar conference.)

13           THE COURT:  So, ladies and gentlemen of the

14      jury, what we just accomplished at sidebar, among some

15      other legal issues, and deciding was whether or not this

16      was a good time to take a short break and I think it would

17      be.

18          So we are going to take a break and come back, have

19      the jury charge, and then the case will be yours.  So

20      please do not -- you're getting close.  Do not begin your

21      deliberations or talk about the case, and all my other

22      admonitions that I gave you.  Don't do any research about

23      the case, et cetera.  All right.  Thank you.

24      **(The jury left at 11:42 until 12:26.)**

25           THE COURT:  We're back on the record here

1    regarding the objection that was made to the inference in

2    the closing by the plaintiff about L.B. doing business as

3    L.B. Plumbing.

4        I have a copy of *Santosuosso* and I just want to make

5    sure I correctly understood the objection in the context

6    of relying on *Santosuosso*.  I'll give the defendants an

7    opportunity to point to the specific language or holding

8    in *Santosuosso* you're relying on.

9            MR. ZELLE:  I don't have a copy of the case.

10   The holding of the case is that, as I recall it, is the

11   inference based on the disbelief of testimony that

12   something happened, specifically standing on the runner

13   board, a disbelief doesn't provide the basis for an

14   acceptable inference of the opposite.

15       Now, in this case there was testimony about what the

16   B in L.B. Plumbing stood for.  There was obviously no

17   evidence to the contrary.  There's an argument disbelieve

18   what Mr. Lodigiani said.  That's fine, but then there is

19   no other evidence, other than the alphabet which, of

20   course, isn't in and of itself a basis for inquiry to

21   support the inference that the plaintiff has argued to the

22   jury was proper.

23       There has to be some evidence to support the

24   inference, even circumstantial, and I just cannot imagine

25   this Court would say, well, Mr. Brantley starts with B so

1    that's a permissible inference.

2              THE COURT:  Well, there's more than that.

3    Brantley starts with B.  These two gentlemen have known

4    each other and worked together for years and years and

5    years including done jobs together many other times in the

6    same trade, the plumbing trade.

7         In fact, Mr. Brantley started in the plumbing trade

8    by being trained by Mr. Lodigiani so there's an extensive

9    history between the two gentlemen with Mr. Brantley

10   learning from Mr. Lodigiani and then developing a business

11   and them working together, so there's a little bit more.

12        It's not like it just happened to be a person with a

13   B in their last name that comes on to the scene and this

14   is the first time they've even been in the same room

15   together doing plumbing, there's more than that.

16        So here's what I'm going to do on this.  I am going

17   to overrule the objection and I am going to make the

18   following findings or comments regarding my thoughts on

19   this.  Clearly we all know that attorneys may argue

20   reasonable deductions and inferences from the evidence.

21        It's also clear that attorneys are given wide

22   latitude in drawing reasonable inferences and conclusions

23   from the evidence as long as such inferences are based on

24   conclusions fairly deducible from the evidence, and here's

25   where we get to the point you were just making, Attorney

1    Zelle, and do not involve presentation of new evidence or
2    rely upon evidence that has not been presented.

3        However, in asking that inferences be drawn attorneys
4    may proffer by use of inference and point out the
5    incredibility of certain testimony when they analyze the
6    evidence through inference, and I do think it's
7    permissible for counsel to ask that an inference be drawn
8    even though it's contrary to evidence that came out in the
9    case.

10       As we just were discussing when Attorney Zelle made
11   the point of there has to be more than just a B and
12   Brantley starts with B, and in this case I think there is.
13   I think there's that long history that I detailed between
14   the two gentlemen and the long history of them doing work
15   together.

16       So you should know that -- and you have this already,
17   but there's an inference instruction specifically that
18   will be given and included in that inference instruction
19   I've added a little bit, maybe one and a half sentences,
20   but the jury will be told that an inference -- among other
21   things, they will be told an inference is a deduction or
22   conclusion that may be drawn from the facts that have been
23   established and does not -- and those facts do not involve
24   presentation of new evidence or rely on evidence that has
25   not been presented, the jury will be told that inferences

1    have to be reasonable.  So that's my ruling on that.

2                MR. ZELLE:  Okay.

3                THE COURT:  Thank you.  This is going to be an

4    angry jury, angry and hungry.

5                MR. STEWART:  Judge, I had some concerns about

6    Mr. Burstein talking about obligations of attorneys and

7    zealous advocacy and malls sharing profits, but I think

8    that instruction totally adequately addresses that point.

9          The only other point I would -- there was a point

10   during Mr. Zelle's closing that he said "I think," and I'm

11   sure it was unintentional.  Obviously there is a rule

12   about personal opinions of counsel.

13         I've looked for that in your instruction.  I think

14   it's kind of covered where you say the statements of

15   lawyers are not evidence but I don't know.  It wouldn't be

16   anything I'd want to preserve rights on, but I would just

17   suggest that if there's a place that we can shoehorn in

18   personal opinions of counsel are not evidence, I think

19   that would be great.

20               THE COURT:  I did plan on adding something like

21   that.  Attorney Zelle wasn't the only one that snuck in an

22   "I think."

23               MR. ZELLE:  I got to object to the "snuck in,"

24   but.

25               MR. GIROUARD:  Did I sneak it?

1          THE COURT:  I think you did.

2          MR. GIROUARD:  I did?  I tried hard not to.

3          THE COURT:  I think you all did.

4          MR. ZELLE:  We weren't sneaking; we're just not

5     polished.

6          MR. GIROUARD:  I think it was a mistake.

7          THE COURT:  All the arguments were very well

8     made.

9          MR. STEWART:  I've made that mistake myself.

10         THE COURT:  All right.  So I did notice that and

11    I'm just going to say something in the general

12    instructions about that.

13         I'm just going to note that my comment on the jury

14    being angry, actually I don't think the jury is going to

15    be too upset, but I've left them sitting in there a

16    littler than I thought so that I could look up some cases

17    on the issue regarding an objection that was raised to the

18    closing.

19         I told them it would be ten minutes and we've left

20    them in there about 35 minutes now and so I'm just going

21    to explain to the jury that I needed to do research that

22    was unanticipated.

23         I'm going to instruct them that they should not hold

24    the delay against any party in this case; rather, they

25    should -- if they are concerned and upset about how their

1  time is being used, address that to an issue caused by me

2  and my timing and need to pull up some legal issues.  All

3  right.

4        MR. BURSTEIN:  Thank you, Your Honor.

5        THE COURT:  Okay.

6  **(The jury entered at 12:37.)**

7        THE COURT:  Just to make sure the record is

8  clear, has the jury been able to follow my instructions

9  and not begin discussing the case or begin deliberations

10  or research the case?

11     All right.  Affirmative answers by all, the jury

12  remains fair and impartial.

13     I apologize for the delay for keeping you waiting.

14  You may be appropriately upset and rightly so, and that's

15  how I would feel if I was in your situation about the

16  delay.

17     I want to make sure that I explain to you where you

18  should direct that feeling; that feeling should be

19  directed at me.  This delay was caused by my need to do

20  some research on an issue that came up unexpectedly, and

21  the delay is entirely based upon how long it took me to go

22  back and look some things up that I needed to look up.

23     I want to make you sure understand that because you

24  shouldn't be upset or hold it against either party in this

25  case.  It is not a situation either the plaintiff or any

1    of the defendants created.  All right.  I am sorry about

2    that particular misuse of your time.

3        We are going to proceed right now with the

4    instructions and then you'll have the case.  The

5    instructions are broken down into two parts, and the first

6    part are going to be what I'll call general instructions.

7    It talks about your function of the jury, types of

8    evidence, how you evaluate evidence, standard of proof,

9    and then the second part of the instructions will be case

10   law, the law that you specifically apply in terms of

11   partnership and joint venture and misrepresentation and

12   what those terms mean.

13       The instructions will go with you to the jury room so

14   you will have a copy of the instructions so that you will

15   be able to refer to them.  You won't have to think you

16   have to take -- you may still want to take notes so you

17   can reference it but you don't have to.  These will go

18   with you to the jury room during your deliberations.

19       You have heard the evidence and the closing arguments

20   in this case.  It is now my duty to instruct you on the

21   law that you must follow and apply.  These instructions

22   can be at times complicated so I ask you to pay careful

23   attention.  You will have a copy of the instructions that

24   will go with you to the jury room.

25       You have been chosen and sworn as jurors to decide

the issues of fact presented in this case.  Throughout the
instructions I shall refer to the plaintiff Preferred
Mutual Insurance Company as the plaintiff.  I shall refer
to the defendants either individually by name which is
just referring to the defendants as defendants
collectively and that is Mr. Lodigiani, Mr. Yildirim, and
C&K Limited Liability Company.

It is your duty to find the facts from the evidence
admitted in this case.  You are the sole and exclusive
judges of the facts.  You shall determine the weight,
value, and effect of the evidence that has been presented
to you in the course of the trial.

Where there are disputes about material facts, about
what actually happened, it is up to you, the jury, to
resolve those disputes in reaching your verdict.

You must determine the facts without fear or favor
based solely on a fair consideration of the evidence.  You
must base your findings of fact without any bias or
prejudice favoring or against any party.

You must not consider sympathy or your feelings about
likes or dislikes of anyone in the case but base your
findings only on the evidence as you find them.

Both the parties and the public expect that you will
carefully and impartially consider all the evidence in
this case, follow the law as stated by the court, and

reach a just verdict, regardless of any consequences.  All

the parties stand equal before the law and are to be dealt

with as equals in this court of justice.

It's your duty to apply the law exactly as I give it

to you, whether you agree with it or not.  Even if you

disagree with one or more of the rules of law, or don't

understand the reasons for those rules, you are bound to

follow them.  This is a fundamental part of our system of

government by law, rather than by individual views.

In following my instructions, you must follow all of

them and not single out some of them, ignore some of them

or give others more weight than you give any other

instructions.  They are all equally important.  Consider

these considerations as a whole and apply them sensibly

and faithfully in your deliberations.

Nothing I say in these instructions is to be taken as

an indication that I have any opinion about the facts of

this case or what that opinion might be.  It is not my

function to determine the facts.  That is entirely yours.

All of my instructions are about the law you must

apply.  I do not intend for any of my instructions to be

understood by you as a comment by me on the facts or on

the evidence in this case.

The lawyers were allowed to comment during their

arguments on some of these rules of law, but if what they

have said about the law differs in any way from my
instructions, you must be guided only by the instructions
as I give them.

Your verdict must be based solely upon the evidence
and according to the law.  In reaching your decision as to
whether the plaintiff, Preferred Mutual, has sustained its
burden of proof, it would be improper for you to consider
anything that is not evidence.

Again, you may not base your verdict on any personal
feelings, prejudice, or sympathy you may have about the
plaintiff or any of the defendants or about the nature of
the particular charges.

Now as to what is and what is not evidence, the
evidence in this case consists of the sworn testimony of
witnesses both on direct and cross-examination, and then
also you saw redirect and recross examination sometimes so
that's all evidence.

Evidence includes the exhibits that have been
received into evidence and any facts to which the parties
happen to stipulate or agree.  I don't think there was any
stipulations for the record in this case, so you have the
testimony of witnesses and the exhibits.

Anything that was marked as an exhibit had a number
and you heard that was introduced and was given a number.
Sometimes you heard things referred to as ID, marked for

1    ID only I would say.  What's been marked for

2    identification is not an exhibit.  So the exhibits will be

3    given to you that were introduced formally during the

4    trial.

5         Arguments and statements by the lawyers are not

6    evidence.  The lawyers are not witnesses.  As I said to

7    you, when a lawyer makes an argument to you, especially

8    good lawyers as you heard in this case making good

9    arguments, they may sometimes interject in that argument

10   what they think as a lawyer.

11        What the lawyer happens to think is irrelevant.  What

12   the lawyers happen to think has no bearing in this case at

13   all.  It's what you think, not what the lawyer thinks.  If

14   any lawyer said to you during their argument, well, this

15   is what I think should happen, you should give that

16   absolutely no weight and take it just for what it is.

17   It's lawyers giving arguments on behalf of their clients.

18        If the facts as you remember them from the evidence

19   differ from the way the lawyers have stated the facts came

20   out, or even the way I may refer to the facts, it is your

21   collective memory of the facts that control.

22        Questions by lawyers, standing alone, are not

23   evidence.  Again, the lawyers are not witnesses.  The

24   question and the witness's answer, taking together, once

25   the answer comes in, is the evidence.

1      Objections by lawyers are not evidence.  Lawyers have

2   a duty to their clients to object when they believe a

3   question is improper under the rules of evidence.  You

4   should not be influenced by any objection or by my ruling

5   on it.

6      If an answer or an exhibit happens to be excluded

7   because of an objection, you should not speculate or guess

8   about what the answer might have been if that objection

9   was not allowed.

10     Anything that I have excluded from evidence or

11   ordered stricken from the record and instructed you to

12   disregard is not evidence and should not be considered or

13   speculated about.

14     Anything you may have seen or heard when the court

15   was not in session is not evidence.  Also, during the

16   course of the trial I may have made comments to the

17   lawyers or spoken to a witness concerning the witness's

18   manner of testifying.  Do not assume from anything that I

19   may have said that I have an opinion concerning any issue

20   in this case.  Except for my instructions to you on the

21   law, you should disregard anything I may have said during

22   the trial in arriving at your own findings as to what the

23   facts in evidence is.

24     As for kinds of evidence, there are two kinds of

25   evidence, direct and circumstantial.  Direct evidence is

evidence that directly addresses the truth of a fact, such
as testimony from an eye witness that the witness saw
something.  Direct evidence could be a simple assertion
from someone, for example, it's raining outside.  That is
a statement of fact that was observed by that person.

Circumstantial evidence is indirect evidence; that
is, proof of a fact or facts from which you could draw the
inference, by reason and common sense, that another fact
exists even though it has not been proven directly.

To illustrate an example of circumstantial evidence,
let's talk about the weather outside.  Suppose that
instead of having someone report to you about what the
weather conditions were because they saw it, someone comes
in from outside wearing a wet raincoat and shaking off the
water from an umbrella.

Without any words being spoken -- that is, without
any direct statement or assertion being made -- an
observer might look at that person shaking off the water
and conclude that it was raining outside.

You are entitled to consider both kinds of evidence.
The law permits you to give equal weight to both or to
give greater weight to one or the other.  It remains for
you to decide how much weight to give any evidence.

Relative to inferences that you may draw and apply in
this case, although you may consider only the evidence

1    presented in the case, you are not limited to the plain

2    statements made by the witnesses or contained in the

3    documents.  In other words, you are not limited solely to

4    what you saw and heard as the witnesses testified.

5        You are also permitted to draw reasonable inferences

6    from the facts if you believe those inferences are

7    justified in light of common sense and personal

8    experience.

9        Any inference is simply a deduction or conclusion

10   that may be drawn from the facts that have been

11   established and which does not involve the presentation of

12   new evidence or rely on evidence that has not been

13   presented.  Any inferences you draw must be reasonable

14   based on the facts as you find them.  Inferences may not

15   be based on speculation or conjecture.

16       I have spoken to you about the categories of evidence

17   and that includes exhibits and witness testimony in this

18   case.  You will have a number of exhibits.  You will have

19   the exhibits that have been introduced into evidence

20   during the course of the trial.  They will go with you to

21   the jury deliberation room.  You may consider the exhibits

22   and give them whatever weight and value or significance

23   you believe is appropriate.

24       As to the credibility of witnesses, in addition to

25   the exhibits, you have the testimony of the witnesses who

1  appeared in this case.  You do not have to accept the

2  testimony of any witness if you find the witness not

3  credible.

4       You must decide which witnesses to believe and which

5  facts are true.  To do this, you must look at all the

6  evidence, drawing upon your common sense and personal

7  experience.  You may believe everything a witness says,

8  part of what a witness says, or you may just decide not to

9  believe anything a witness says.  It is entirely up to you

10 in your evaluation of that witness.

11      With regard to all the witnesses, you may want to

12 take into consideration such factors as the witnesses'

13 conduct and demeanor while testifying; their apparent

14 fairness or any biases they may have displayed; any

15 relation they have to either party and any interest they

16 may have in the outcome of the case; any prejudices they

17 may have shown; their opportunities for seeing or actually

18 knowing some of the things about which they testified

19 about; their reasonableness or unreasonableness of the

20 events as they described them.

21      Those are all kinds of questions you may want to

22 consider and things you may want to include in your

23 evaluation of a witness's credibility.  Did that person

24 seem honest?  Did he or she have some reason not to tell

25 the truth?  Did the witness have an interest in the

1    outcome in the case and the other things that I have

2    talked to you about?  You may also consider that witness's

3    manner while testifying.

4        The mere number of witnesses or exhibits or the

5    length of the testimony has no bearing on what weight you

6    give the evidence or on whether you find that the burden

7    of proof has been met.  Weight does not mean the amount of

8    evidence.  Weight means your judgment about the

9    credibility and importance of the evidence.

10        As to prior inconsistent statements, the testimony of

11    a witness may be discredited or impeached by showing that

12    he or she previously made statements that are inconsistent

13    with their testimony that they gave on the witness stand.

14        If a witness is shown to have given an inconsistent

15    statement concerning any material matter, you have the

16    right to distrust that witness's testimony in other

17    respects.  You may reject all of the testimony of that

18    witness or give it such credibility as you think it

19    deserves.

20        Sometimes, of course, people make innocent mistakes,

21    particularly as to some unimportant details.  Not every

22    contradiction or inconsistency of a person is necessarily

23    important.  Again, you alone are the judges of the

24    witnesses' credibility and how to factor in any

25    inconsistent statement regarding credibility and who you

1    chose to believe or disbelieve.

2        Some prior inconsistent statements may be used for

3    purposes other than impeachment.  If you find that a

4    witness has made inconsistent statements under oath on an

5    earlier occasion, such as in a deposition, you may

6    consider that earlier statement for its truth or falsity

7    the same as any other testimony at the trial.

8        I have explained to you the role of note-taking and I

9    gave you the introductory instruction at the beginning of

10   this trial.  You should bear in mind that not everything

11   that is written down is necessarily what was said.  Thus,

12   when you return to the jury room to discuss the case, do

13   not assume simply because something appears in your notes

14   that it necessarily accurately reflects what took place at

15   the trial.  Use your notes to assist you in your own

16   recollection.  You can look at and see what other people

17   took notes about and discuss the matter collectively.

18       All right.  Now we are going to talk about what the

19   burden of proof is.  I will consider that the middle part

20   of the instructions regarding more general matters.  We

21   will now talk about the burden of proof and discuss the

22   particulars specifically applied to this case.

23       The plaintiff, Preferred Mutual, has the burden of

24   proving every element of its claims by a preponderance of

25   the evidence.  If you conclude that the plaintiff has

failed to establish its claims by a preponderance of the
evidence, you must decide against the plaintiff.

To establish something by a preponderance of the
evidence means to prove that it is more likely true than
not true.  It means that such evidence, when considered
and compared with the evidence opposed to it, has more
convincing force and produces in your mind the belief that
what is sought to be proved is more likely true than not.

If you believe the evidence of each opposing side to
be in balance or equally probable, then the plaintiff has
failed to meet its burden.

To put it differently, if you were to put the
plaintiff's and the defendants' evidence on opposite sides
of the scales and if the plaintiff's evidence would make
the scales tip even slightly to the plaintiff's side, then
you must find for the plaintiff.

If the scale does not tip even slightly to the
plaintiff's side, it remains in the middle or obviously it
tips to the opposing side, then you would have to find
against the plaintiff.

In determining whether any fact in issue has been
proved by a preponderance of the evidence in this case,
you may consider the testimony of all the witnesses and
all the exhibits received in evidence, regardless of who
may have introduced them.

1    Whether a party has sustained its burden of proof
2  does not depend upon the number of witnesses it has called
3  or upon the number of exhibits it has offered, but instead
4  upon the nature and quality of the evidence.

5    Those of you who have sat on or heard about criminal
6  trials will have heard about the burden of proof beyond a
7  reasonable doubt.  That just simply does not apply in this
8  case, which is a civil case.

9    I will now summarize the claims in this case and
10  explain the applicable law.  Preferred Mutual brings two
11  claims against the defendants.  First, Preferred Mutual
12  claims that Massachusetts law permits it to rescind the
13  business owner insurance policy it issued to Mr. Lodigiani
14  because it relied on misrepresentations made by Mr.
15  Lodigiani when it issued the policy.

16    Second, Preferred Mutual asserts that it is not
17  required by the policy to provide liability insurance
18  coverage in connection with the work Mr. Lodigiani did at
19  20-24 Bridge Street, South Hadley, Massachusetts, the site
20  of the January 28, 2012 fire, because that work was
21  performed by a partnership or joint venture.

22    The defendants Mr. Lodigiani, C&K II, Limited
23  Liability Partnership and Mr. Yildirim have also asserted
24  a counterclaim.  They allege that under Massachusetts law,
25  Preferred Mutual does have a duty to provide liability

insurance coverage to Lodigiani for any negligence of Mr.
Lodigiani, his agents, or employees in connection with the
plumbing work he did at that Bridge Street address that I
referenced.

I will first instruct you as to what constitutes a
partnership and a joint venture.  I will then describe the
elements of each claim.  In order to prevail on a claim, a
party must prove each element of the claim by a
preponderance of the evidence.

Partnership:  Massachusetts law defines a partnership
as "an association of two or more persons to carry on as
co-owners of a business for profit."  To establish a
partnership as a legal entity there must be, number 1, an
agreement by the parties indicating an intention to
associate in a partnership; and number 2, sharing of
profits and loses; and number 3, participation by the
parties in the control or management of the enterprise.

Now, the following rules govern the determination of
whether or not a partnership exists in a particular
situation.

The agreement between the parties need not have been
in writing.  Intent to carry on as business partners may
be inferred from the partners' words and acts; however, a
partnership does not exist merely because individuals
refer to each other as partners.

1    The sharing of gross returns does not of itself

2    establish a partnership, whether or not the persons

3    sharing them have a joint or common right or interest in

4    any property from which the returns are derived.

5        The receipt by a person of a share of the profits of

6    a business is *prima facie* evidence that he is a partner in

7    the business, but no such inference shall be drawn if such

8    profits were received in payment as wages of an employee.

9        Now as I just used the term *prima facie* evidence,

10   it's evidence that is sufficient to establish a fact or

11   raise a presumption unless it is disproved or rebutted by

12   other evidence.

13       Joint venture:  Under Massachusetts law, a joint

14   venture exists where there is, Number 1, an agreement,

15   expressed or implied, written or unwritten; Number 2, for

16   a common purpose; Number 3, such that each member in the

17   joint venture has an equal right to direct and control the

18   operation of the enterprise.

19       The following factors may be used by you and

20   considered by you to determine the intent of the parties

21   under this idea of joint venture:  An agreement by the

22   parties manifesting their intention to associate for joint

23   profit; any contribution of money, property, effort,

24   knowledge, skill, or other assets to a common undertaking;

25   a joint property interest in all or parts of the subject

1  matter of the venture or enterprise; a right to

2  participate in the control or management of the

3  enterprise; an expectation of profit; a right to share in

4  profits; an express or implied duty to share in losses,

5  and a limitation to a single undertaking.

6      Now in order to prevail on its claim for count number

7  1, rescission, Preferred Mutual must establish by a

8  preponderance of the evidence each of the following

9  relative to recission.

10     Number 1, that there was a misrepresentation made in

11 the application for insurance; Number 2, the

12 misrepresentation was made by the insured or on his

13 behalf; and Number 3, the misrepresentation was made

14 either with the intent to deceive or it increased the risk

15 of loss for Preferred Mutual.

16     The following rules govern the determination of

17 whether or not these elements have been established.

18 Misrepresentation -- a misrepresentation is a statement of

19 fact, which is untrue, regardless of whether the person

20 making the statement knew it to be untrue.  A

21 misrepresentation increases the risk of loss if it

22 resulted in a lower premium than would have been charged

23 had the true facts been known.

24     Now as to Count 2, in order to prevail on claim 2,

25 Preferred Mutual must establish by a preponderance of the

1    evidence that a particular exclusion in the insurance

2    policy applies and bars coverage of claims related to the

3    January 28th fire at the Bridge Street location in South

4    Hadley, Mass. that I had referenced.

5        The insurance policy provides as follows in Section 2

6    - Liability:  So in this liability section it talks about

7    who is an insured, and that section indicates no person or

8    organization is an insured with respect to the conduct of

9    any current or past partnership, joint venture, or limited

10   liability company that is not shown as a named insured in

11   the declarations.

12       Preferred Mutual has met its burden only if you find

13   by a preponderance of the evidence that the following are

14   both true.  Number 1, that at the time Mr. Lodigiani --

15   I'm sorry, I have the wrong page.  I'm sorry for that

16   moment.

17       Now, picking up right where I left off.  Preferred

18   Mutual has met its burden only if you find by a

19   preponderance of the evidence that the following are both

20   true.

21       At the time of the fire, at the Bridge Street

22   location that we are talking about, that Mr. Lodigiani was

23   engaged in a partnership or joint venture with respect to

24   the plumbing job carried out at that Bridge Street

25   location; and Number 2, the partnership or joint venture

1    Mr. Lodigiani was involved in is not a named insured on

2    the declarations page of the insurance policy.  If you

3    find Preferred Mutual has not met its burden, then you

4    must enter judgment for the defendants.

5        That completes my instructions to you.  A special

6    verdict form has been prepared and it will be submitted to

7    you.  It contains questions relative to this case.  Now

8    I'm going to explain that a little bit to you.

9        First, I'm going to tell you when you're filing out

10   this special verdict form, you should select a foreperson

11   for the jury.  That's the first thing that you're going to

12   do when you go back in the jury room.  You will select

13   collectively who will act as the foreperson.

14       The foreperson has no more weight, certainly no less

15   weight, than anyone else, but simply the person who will

16   direct the deliberations, keep the deliberations on point

17   and focused and make sure everyone has an opportunity to

18   be heard and everyones' views are considered by the jury

19   as a group as a whole, and then that foreperson will fill

20   out, mark the specific forms where it is indicated.  There

21   will be a person, a court security person, sitting outside

22   your door and you will just notify that person and the

23   clerk will come back and bring you back into court.

24       Now on the verdict form, the answer to each question

25   on the verdict form must be the unanimous answer of the

1    jury.  Your foreperson will write the unanimous answer of

2    jury in the box provided, then date and sign the special

3    verdict form.

4        When you have reached a unanimous agreement as to

5    each question on the special verdict form, you will have

6    your foreperson fill it out as I have just described and

7    you will be brought back into the courtroom.

8        Now, the verdict form, I'm just going to hold it up

9    to you, this contains several questions.  After each

10   question you will see in bold print there's a yes or no

11   where you just simply put a check next to what you find as

12   to each particular question.

13       The important point in this special verdict form is

14   there's instructions as you go.  So after each question it

15   will tell you if you checked the yes box or if you checked

16   the no box, it will give you directions where to go next.

17       For instance, on some questions it will say if you

18   checked, for example, yes, then skip to question whatever

19   it might be, or it will tell you if you checked the no

20   box, don't go any further.  It will give you instructions.

21   Make sure you look at those, whoever your foreperson is,

22   and make sure you follow depending on which box you check,

23   yes or no for each question, that will tell you where to

24   go next.

25       If you have any questions during your deliberations,

whether it's about the verdict form or whether it's on an
issue of instructions or any other questions that you
reach as a jury, notify the person who is sitting outside,
the security person outside.  The clerk will come see you
and bring you back into the courtroom.

What I will ask you to do is to write down what that
question is.  The foreperson will write down what your
question is.  That note will be given to the clerk.  She
will show it to me, and then we'll bring you back into the
courtroom and try to provide you ab answer.  All right.

Can I see the parties at sidebar please?

(Sidebar conference.)

THE COURT:  All right.

MR. STEWART:  The plaintiff is satisfied.

MR. BURSTEIN:  Mr. Lodigiani is satisfied.

THE COURT:  All right.

MR. GIROUARD:  Satisfied.

MR. ZELLE:  We will put on the record objections
that, first, there was no charge in accordance with the
*Mercurio* case that if there's more than one rational
interpretation of a question on an application, that the
inference should be given to the applicant.

I object to the absence of an instruction on the *Ryba*
case that the joint venture doctrine is narrowly defined
and applied, and an objection to the absence of an

1    instruction based on the case of *Daniels vs Hudson* that

2    the misrepresentation must not only be an untrue

3    statement, it must be a statement that is known to the

4    applicant to be untrue.

5            THE COURT:  Okay.  And those are all issues that

6    we discussed prior.

7            MR. ZELLE:  In substantial detail.

8            THE COURT:  Those are all an appropriate part of

9    the record and my rulings are also part of the record.

10   All right.  Very good.

11   (End of sidebar conference.)

12           THE COURT:  Very good.  Now, you're all set and

13   what I'll say to you this time is now you can discuss the

14   case.  You can start your deliberations.

15           A JUROR:  Take these?

16           THE CLERK:  Take your notes, yes.

17           THE COURT:  Yes.

18   **(The jury left at 1:13.)**

19           THE COURT:  All right.  Gentlemen, as long as

20   the clerk has your cell phone numbers.  Okay?

21           MR. BURSTEIN:  Thank you.

22   **(A recess was taken 1:16 until 2:37.)**

23           THE COURT:  All right.  We have a verdict.

24   **(The jury entered at 2:39.)**

25           THE COURT:  All right.  Ladies and gentlemen,

1    you have a verdict?

2               A JUROR:  Yes.

3               THE COURT:  Is the verdict unanimous?

4               A JUROR:  Yes.

5               THE COURT:  All right.  Could you please hand

6    the verdict to the clerk?  You could be seated.  This

7    could be recorded.

8               THE CLERK:  In the matter of Preferred Mutual

9    Insurance Company versus Leonard Lodigiani, Evins

10   Brantley, C&K LLP, Frederick Wohlers, and Adnan Yildirim,

11   Civil Action 13-31038, special verdict form Question

12   Number 1:  "At the time Mr. Lodigiani's insurance

13   application was submitted to Preferred Mutual Insurance

14   Company, was Mr. Lodigiani engaged in a partnership or

15   joint venture?

16        "Answer:  No.

17        "If you answered no, please skip Questions 2 through

18   4 and continue to Question 5.  If you have answered yes,

19   go on to Question 2."

20        There's no answer for Question Number 2; there's no

21   answer for Question Number 3, and there is no answer to

22   Question Number 4.

23        Question 5:  "At the time of the fire on January 28,

24   2014, with respect to the plumbing work carried on at 24

25   Bridge Street, South Hadley, Massachusetts, was Mr.

1   Lodigiani in a partnership or a joint venture?

2        "Answer:  No.

3        "If you answered no, your deliberations are complete.

4   Please sign and date this form and return it to the court.

5   If you answered yes, go on to Question 6."

6        Question 6 is not answered and the form is signed.

7             THE COURT:  Thank you.  All right.  Would the

8   foreperson please stand?

9        Mr. Foreperson, is your signature on the verdict

10  form?

11             THE FOREPERSON:  Yes, it is.

12             THE COURT:  Very well.  And it was unanimous?

13             THE FOREPERSON:  Yes, it was.

14             THE COURT:  Ladies and gentlemen, was the

15  verdict unanimous?

16             THE JURY:  Yes.

17             THE COURT:  Affirmative answers from all that

18  it's a unanimous verdict.  All right.

19       Ladies and gentlemen, thank you very much.  Thank you

20  very much for your service.  I'm going to come back to the

21  jury room and have a few words with you in a moment.

22  **(The jury left at 2:41.)**

23             THE COURT:  All right.  Are there any matters

24  that need to be discussed?

25             MR. ZELLE:  Not right now, Your Honor.  Thank

1    you.

2              THE COURT:  We have a separate claim in this

3    case, there's a 93a in this case?

4              MR. ZELLE:  There is.

5              THE COURT:  Do we need to discuss scheduling of

6    that?

7              MR. ZELLE:  We can.  We are -- I will speak on

8    behalf of C&K, we are prepared to go to trial.  I mean

9    schedule permitting.

10             MR. STEWART:  There's discovery.

11             THE COURT:  There's some discovery that needs to

12   be done in that.  We discussed that getting ready for this

13   trial and discussed moving that case in an expedited way

14   given the discovery that took place in this trial.

15        I'd like the parties to file a joint report with the

16   court as what your plans are.  If the plans are, look, we

17   are going to be engaged in this kind of discovery and it's

18   going to go on this track, just give me some estimates of

19   times so that if you want the matter expedited, we can

20   make room in our schedule to try to get it moving.

21        So will two weeks be enough time to file a joint

22   status report to let us know what your plans are regarding

23   that case?

24             MR. BURSTEIN:  Yes, Your Honor.

25             MR. ZELLE:  Sure.

1          THE COURT:  Thank you.

2          THE CLERK:  That will be April 23rd, Judge.

3          THE COURT:  Okay.

4          THE CLERK:  All rise.

5   **(Court recessed at 2:43.)**

1                    C E R T I F I C A T E

2

3

4          I, Alice Moran, RMR, RPR, CSR, Official Court

5     Reporter for the United States District Court for the

6     District of Massachusetts, do hereby certify that the

7     foregoing transcript constitutes, to the best of my skill

8     and ability, a true and accurate transcription of my

9     stenotype notes taken in the above-entitled matter.

10

11

12     Date:   June 19, 2015

13

14     /s/ Alice Moran

15     _____
       Alice Moran
16     Offical Court Reporter

17

18

19                 Alice Moran, CSR, RPR, RMR
                      Official Court Reporter
20                 300 State Street, Room 303D
                      Springfield, MA 01105
21                       413-731-0086
                    alice.moran@verizon.net
22

23

24

25