UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION

Preferred Mutual Insurance )
                          )         13cv30138-MGM
vs                        )
                          )
Leonard Lodigiani, et al. )
_____)

**Excerpt of Trial** Held Before
The Honorable Mark G. Mastroianni,
United States District Court Judge and a Jury,
on **April 6, 2015.**

<u>APPEARANCES</u>:

For the plaintiff Preffered Mutual:  John B. Stewart,
Suite 301, 20 Maple Street, Springfield, MA 01103.

For the defendant Leonard Lodigiani: David H.
Burstein,1331 East Columbus, Ave., Springfield, MA 01105.

For the defendant Evins C. Brantley:  Anthony R. Zelle
101 Federal Street, Boston, MA 02110

For the defendant Adnan Yildirim: John A. Girouard, 446
Main Street, 12th Floor, Worcester, MA 01608.

Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
300 State Street, Room 303D
Springfield, MA 01105
Tel: (413)731-0086  Fax: (413)737-7333
alice.moran@verizon.net

1    **(Court commenced at 9:27.)**

2              THE COURT:  Okay.  Good morning.

3              MR. BURSTEIN:  Good morning, Your Honor.

4              MR. ZELLE:  Good morning.

5              THE COURT:  We can use this time to go through

6    some motions and preliminary matters.  As you know, we're

7    going to be waiting a little bit.  It's going to be a

8    little time until we have our jurors until they're

9    finished impaneling on the criminal case.

10        As an initial matter why don't you, Mr. Burstein, why

11   don't you tell me what the plan is or what you propose for

12   the 93a counterclaim, how that is going to interact?

13        I guess there's several options, one of which

14   includes perhaps having a trial that I decide on while the

15   jury trial is going on, but what are your thoughts on

16   that?

17             MR. BURSTEIN:  I'm not opposed to that, Your

18   Honor.  To be fair, brother counsel hasn't really had a

19   chance to digest it yet.  I'm happy to have it severed and

20   joined with the other defendants as a 93a counterclaim

21   that's pending in this court as well.

22             THE COURT:  What's your position on the right to

23   a jury trial in the federal court on the 93a?

24             MR. BURSTEIN:  I don't have one, Your Honor.

25   I'm happy to have that tried to the Court.  That's fine

1    and I'm happy to have that probably --

2              THE COURT:  Am I correct under state law you

3    would not have a right to a jury trial under 93a?

4              MR. BURSTEIN:  That would be correct under state

5    law, and the only other factor would be probably from my

6    perspective is I would like to take a deposition of

7    Attorney Doyle which I have not had an opportunity to do

8    and possibly Mr. Trudeau in order to bring out evidence

9    relative to a 93a claim.

10             THE COURT:  I can see that there would be

11   reasons not to have them both resolved whether one is

12   jury-waived or one is jury for discovery purposes, but it

13   may make a difference relative to certain evidentiary

14   rulings how much or how little would come in or be

15   considered.

16        What's plaintiff's position on that, on how the 93a

17   interacts?  Should it be part of this or should it just be

18   dealt with after?

19             MR. STEWART:  Judge, counsel's suggestion is I

20   think what we talked about and actually it was in one of

21   the drafts of the final pretrial memo that upon allowance

22   of those claims that they would be stayed and severed as

23   the other claims already have been.

24             THE COURT:  I did realize that but in

25   preparation this weekend for this I was thinking, boy, I

1    could real streamline this by doing the 93a now.  All

2    right.  We'll bifurcate the 93a.  I don't even know if

3    that's the correct way to say how we'll handel it.  We

4    will give you an expedited track and deal with that after

5    this trial is finished.  All right.

6              MR. BURSTEIN:  Thank you, Your Honor.

7              THE COURT:  So we should look at the motions.

8              MR. ZELLE:  Could I chime in here for a moment?

9    My understanding is that what is established by way of

10   evidence in this case, exhibits and testimony, need not be

11   relitigated when we try the 93a claim.  That this Court

12   will have heard the evidence and that it won't need to be

13   re-presented.

14       I think in that respect bifurcation probably is the

15   appropriate terminology because what's part of this record

16   will be part of that record.  Again, I think you and I are

17   on the same page in terms of streamlining, but I just want

18   to get some clarification that we wouldn't have to have,

19   for example, Mr. Kagels back to go over everything that he

20   may say in this trial.  Maybe there will be supplemental

21   testimony, maybe not.

22             THE COURT:  That's a good point, but there

23   certainly may be some very isolated areas where some

24   evidence might be relevant to 93a but not necessarily

25   relevant or even prejudicial if we're looking at the

1    rescission and declaration part.  So to be technical I

2    think you are correct, yes.

3            MR. ZELLE:  Again I would not offer, for

4    example, hearsay or seek to offer hearsay testimony from

5    Mr. Kagels for purpose of establishing his state of mind.

6    His state of mind will be important to the 93a claim.

7    It's not important to this claim so, you know, I'm not

8    going to go there, but I want to make sure the Court

9    understands that I'm not going there for a reason and that

10   I will have an opportunity to the next time around.

11           THE COURT:  When we talk generally about

12   bifurcating the trial with the assumption, if not the

13   practical reality, that all the discovery would have been

14   done on the part that's not yet bifurcated and otherwise

15   ready for trial.  We're really not there yet on the 93a

16   case.

17           MR. ZELLE:  That's right.

18           THE COURT:  I'm happy to treat it in that

19   bifurcated way where I will be considering what I heard

20   and when we get together dealing with that, we can talk

21   about that, but I agree that would help expedite things.

22   It seems to make the most sense but it's not that exact

23   situation where it's so easy.

24           MR. ZELLE:  It's a bit of a twist and from our

25   perspective for the record-making purposes that we be seen

1    to have foregone the opportunity to ask a question.

2           THE COURT:  It's a fair assumption that what we

3    do today would be considered at that bifurcated portion if

4    can call it that, the 93a claim, if we get there.

5           MR. ZELLE:  Thank you.

6           THE COURT:  So on the motions I'm not sure I

7    have any particular order.  Why don't we just tackle first

8    what seems to be the biggest one and it's the motion of

9    the defendants to compel production of unredacted activity

10   reports, written notes authored by Attorney Perkins or

11   Doyle.  All right.  So that's a motion of the defendants

12   and so I will hear you on that.

13          MR. GIROUARD:  Good morning, Your Honor.

14   Mr. Lodigiani was deposed a week ago Monday, and during

15   the course of that deposition he waived attorney-client

16   communication privileges with Attorney Doyle and Attorney

17   Perkins.

18          THE COURT:  Was it explicit or implicit?

19          MR. GIROUARD:  Well, it's not --

20          THE COURT:  I'm not sure they both do the trick,

21   but.

22          MR. GIROUARD:  Well, he answered questions at

23   length and then there was a colloquy between counsel where

24   Mr. Lodigiani's counsel, Attorney Burstein, in that

25   colloquy between counsel indicated it was -- look, he's

1    waived the privilege of attorney-client communication so I

2    would think both from his conduct during the deposition

3    and the extent to which he testified in the deposition

4    about the interaction and conversations, he did that and

5    then further through the colloquy of counsel.

6        I note that I filed a motion along with Attorney

7    Zelle who joined me in the motion and there's been no

8    opposition and my understanding is there's no opposition

9    from Mr. Lodigiani to our request to see the file notes.

10   We think the file notes are important for a number of

11   reasons.

12           THE COURT:  Can I interrupt you for a second and

13   ask Attorney Burstein to put that on the record that

14   there's been a representation that your client essentially

15   waived -- not essentially but has waived his

16   attorney-client privilege as to any privilege that existed

17   with he and Attorney Doyle or any attorneys assigned to

18   him by PMIC.

19           MR. BURSTEIN:  There is no opposition to the

20   motion, and Mr. Lodigiani does waive any privilege that he

21   had with Attorney Doyle and Attorney Perkins.  That has

22   been communicated to all counsel in the case.

23           THE COURT:  Thank you.

24           MR. GIROUARD:  I also noticed, Your Honor, the

25   request that we seek in the motion is specific to not

1    include a request for the file notes as they reflect to

2    PMIC's investigation of the actual fire itself.  So I

3    understand that they may have had some communications

4    regarding, you know, Mr. Trudeau went out and took samples

5    of fire debris and it looks like whatever, we're not

6    looking for that.

7         What we are looking for is the file notes that are

8    germane to the decision to seek to rescind, and more

9    specifically there's a file note of March 22, 2013 which

10   is I think important to the defense and is on point as to

11   why we want them because it's after Preferred Mutual has

12   taken a position to hire Mr. Stewart to conduct

13   examinations under oath and it's after Mr. Doyle,

14   according to the file notes that have been produced, makes

15   the conclusory statement about the partnership issue and

16   it's before Preferred Mutual Insurance Company has

17   requested and received the statements that -- excuse me,

18   the written transcript of statements that Mr. Trudeau

19   took.

20        So Attorney Doyle is making comments that PMIC

21   thereafter relied upon after it's already hired Attorney

22   Stewart and we think that that's relevant to the defense

23   of the declaratory judgment action because according to

24   Mr. Lodigiani's deposition he was clear to say, it was

25   never my intention to say I was in a partnership, a formal

1  partnership, and if somebody else has characterized that,

2  the insured has run with that.

3      So we'd like to see those notes and in light of the

4  waiver I don't think there's any basis -- the insurer in

5  this instance has the obligation to point to the privilege

6  and then be able to say there's evidence of it and they

7  can't do that.

8      THE COURT:  So right now you're anticipating the

9  plaintiff's response is, and you read what the response

10  is, we can't give you that because it's a privilege

11  between Mr. Lodigiani.  I'm sorry, sir.  I'm going to have

12  trouble with that throughout the trial, but you might have

13  trouble with Mastroianni throughout the trial.

14      MR. GIROUARD:  We work had to spell it right in

15  e-mails, both of those names.

16      THE COURT:  So you anticipate the plaintiff's

17  response is going to be, no, no, there's a privilege

18  between Doyle and Mr. Lodigiani?

19      MR. GIROUARD:  Under Rule 26, they have the

20  right to say as the insurer we're doing the work for the

21  insured and therefore we're going to shield it with the

22  privilege but when he has said, no, no, we waive it, we

23  can see it.

24      THE COURT:  That's clear what we just laid out.

25  What's your response to that?

1     MR. STEWART:  Sure, Judge.  Just so you're

2  aware, and I couldn't find it in paper but I do have it

3  and I will represent to the Court that these were the

4  objections that were produced at the time of the activity

5  report that is redacted that these gentlemen want to

6  pierce at this point.

7     So it is, "These documents are withheld under a claim

8  of privilege, (attorney client, attorney mental

9  impressions, information gathered in anticipation of

10  litigation) and as exceeding the scope of the coverage

11  action and the entries which concern the plaintiff's

12  internal evaluations of liability of the potential claim

13  against its insured; and, 2, opinions, evaluations,

14  recommendations, and comments of coverage counsel and

15  defense counsel retained to represent the insured; and

16  number 3, information concerning the investigation of the

17  underlying claim apart from coverage."

18     So I gather they're kind of conceding that as to the

19  investigation of the fire loss liability aspect, that

20  isn't anything that they would have a right to under a

21  waived attorney-client privilege between Mr. Lodigiani and

22  Mr. Doyle.

23     What they are apparently asking for is communications

24  between basically at this point Mr. Kagels, this gentleman

25  right here, who is the corporate representative for

1    Preferred Mutual in this case, he was at this time doing

2    both parts of the file.

3        He had just -- he was handling the investigation as

4    to coverage and as to liability investigation.  That ended

5    up getting split up when it got further along, but at this

6    point this note that these gentlemen are talking about was

7    one day after they contacted my office to be coverage

8    counsel and Mr. Doyle had been counsel for Mr. Lodigiani

9    for a couple of months.

10       The note they're talking about is on March 22nd.  On

11   February 28th there were these recorded statements and the

12   fire actually happened a month before that on January

13   28th.  So we're all very early in the process and the

14   things are just starting to come about.

15       So I guess what these gentlemen want to do is they

16   want to say that the attorney-client privilege between Mr.

17   Lodigiani and Mr. Doyle is waived.  That may well be true,

18   but I guess where I'm coming from is what does that have

19   to do with Mr. Doyle speaking to Mr. Kagels?

20       I don't get where waiver of an attorney-client

21   privilege would impact on what Mr. Doyle told Mr. Kagels

22   as far as the liability investigation.  So I guess that's

23   where I'm coming from on that issue, Judge.

24           THE COURT:  It seems to me -- I'm happy for the

25   parties to correct me if I'm misstating their positions,

1    but that information that Mr. Doyle turned over to

2    Mr. Kagels would have included information that was

3    derived from Doyle's conversations in an attorney-client

4    relationship with Lodigiani.

5        I think the theory further is after that was turned

6    over that formed the basis for or cemented, if you will,

7    the decision by the insurance company to seek to void or

8    rescind; is that accurate?

9            MR. GIROUARD:  I think it is.

10           MR. STEWART:  Judge, let me add my gloss to

11   that.  It was the tip of the iceberg.  It was the first

12   indication -- it started the investigation for coverage.

13   It didn't conclusively -- it was just enough to warrant

14   hiring coverage counsel taking the man's examination under

15   oath.

16       All it was was basically -- as you know, the fire is

17   January 28th.  February 28th Mr. Lodigiani goes to

18   Mr. Doyle's office in Quincy.  Mr. Trudeau, this gentleman

19   in the sport coat here, took the statement with Mr. Doyle

20   in a conference room.  The first thing about three

21   questions in, after Mr. Trudeau asked him now you need to

22   give us the complete truth, is three questions in how old

23   are you and what was your relation with Mr. Brantley?  We

24   were partners.

25       So obviously that conversation that came up in the

1    investigation was reported by Mr. Doyle to Mr. Kagels.

2    It's the things that defense attorneys report what happens

3    at these investigations.  Mr. Kagels wasn't getting any

4    opinions.  There was no -- it had nothing to do with

5    coverage when Mr. Doyle is telling Mr. Kagels what

6    happened at the recorded statements.

7        So I guess that Mr. Lodigiani waiving the

8    attorney-client privilege, he would get to know that

9    Mr. Kagels was told by Mr. Doyle that Lodigiani told Doyle

10   and Trudeau that they were partners.  We already know

11   that.

12       Mr. Kagels has been deposed.  He's indicated the

13   first time he ever knew about these gentlemen were in a

14   partnership was because he got a report concerning the

15   liability investigation from Mr. Doyle who said that they

16   were partners.  Obviously at that point that's when the

17   coverage investigation starts.  Mr. Kagels spots the issue

18   and further things happen from there, but no decision was

19   made until months later.

20            THE COURT:  But if the theory is on the

21   defendants' part, you know, these terms "business

22   partners" and "joint venture," I didn't really understand

23   or know what these were, these theories were put in my

24   head by Attorney Doyle and then came out of my mouth and

25   then Attorney Doyle went and ran to the insurance company,

1    lo and behold this process starts where I'm not going to

2    get insured.

3         I have no attorney-client privilege.  I want to know

4    what my lawyer, Doyle, told other people.  I want to know

5    if Doyle actually told them, look, hey, I talked to

6    Lodigiani.  I told him what -- we don't know that because

7    they don't have that paperwork so far.

8         So attorney-client is not a basis not to disclose

9    that, so let's talk about other reasons.  I think it's

10   relevant.  I think attorney-client privilege is not going

11   to protect it so what other legitimate good-faith reasons

12   do you have for not disclosing it?  I'll hear you on

13   those.

14             MR. STEWART:  Well, basically it would be a

15   public policy argument that -- well, look it, just let me

16   represent to the Court, and I think this will come out

17   throughout the case, when a person is hired to be defense

18   counsel, they are coverage counsel -- they are coverage

19   issues blind.  They don't concern themselves -- look,

20   coverage or defense counsel can never get involved in any

21   kind of dispute on behalf of the insured or on behalf of

22   the insured when there's a coverage question.  All

23   Mr. Doyle is doing is reporting what he heard, not making

24   an evaluative -- he's not even thinking coverage.

25             THE COURT:  But we can't really know that until

1    we see what's in the logs I imagine.  I understand your

2    argument, but how can that really be assessed until we see

3    what it says?

4         MR. STEWART:  As a matter of public policy,

5    people are going to stop writing things down if courts are

6    ordering these things and that's why all these claims, the

7    93a claim is stayed because the public policy behind

8    discovery of an insured's claims file doesn't occur in

9    tort cases.  You don't want to prejudice the insured's

10   rights, but essentially I don't really have any principal

11   opposition other than the public policy, that and it's an

12   internal claim evaluation which is all wrapped in this

13   part of the same thing.

14        THE COURT:  Good point, and thank you for being

15   so forthright in your argument.  I appreciate that.

16        MR. STEWART:  Judge, as far as process, to try

17   to resolve this dispute before we got here, we went

18   through on a non-waiver type of agreement the substance of

19   what was in these notes.  The redacted -- what was behind

20   all the redactions and I think we are only down to -- we

21   resolved all of this except for this 3/22 note.

22      Now if Your Honor please, I would be glad to have

23   Your Honor look at it *in camera*.  You may decide -- I had

24   some other arguments if you decide that it's in play as to

25   why it should not be part of this trial, but as far as

1    discoverability, which is where we are right now, I think

2    Your Honor may benefit from seeing it.

3            THE COURT:  So we're in agreement we're down to

4    this one small portion?

5            MR. GIROUARD:  I have the utmost respect for

6    Attorney Stewart and I take him at least at face value

7    about what he paraphrased during our discussions, but I

8    think that there are certain nuances in language that when

9    one paraphrases and when one doesn't have the ability to

10   read the language, I don't know whether the other items

11   are something that we say, oh, that's not an issue, we

12   don't need to see those.

13       I think if the Court is inclined to take an *in camera*

14   review, I would ask the Court to take an *in camera* review

15   of all of the unredacted notes and if they comment upon

16   what Mr. Lodigiani reported or the conclusory, and we

17   would argue, inaccurate opinions of Mr. Doyle, Mr. Doyle

18   didn't report that Mr. Lodigiani said that he was a

19   partner.

20       The notes that have not been redacted say it turns

21   out the insured was operating in a partnership.  He

22   rendered an opinion.  So we would suggest there's a little

23   bit more to it than just a fair reading of what he heard

24   at an EUO, a recording statement.  But with regard to the

25   specific March 22nd note, that note is after counsel has

1    been retained and it appears from the four corners of the

2    redaction in the context of where we're at, that Doyle may

3    very well have been giving guidance to Preferred Mutual

4    about what direction to go in an EUO or what direction not

5    to go in and that's right at the center of this case.

6         THE COURT:  Why don't I take a look at it all.

7    I'll just comment relative to the very well made public

8    policy concern is that cases are decided on a factual

9    specific case-by-case basis and I'm not attempting to make

10   a sweeping public policy statement regarding how the

11   insurance industry interacts with its responsibilities.

12        However, in this case where you have clear

13   allegations that counsel assigned by the insurance company

14   did or said or acted in a certain way and then passed that

15   information along, I mean that's a fundamental allegation

16   here of what the defense is saying and, therefore, it

17   casts a different light on my examining what you have

18   described as the public policy position regarding the

19   issues.

20        MR. ZELLE:  Your Honor, do you have the redacted

21   copies so you can compare?

22        THE COURT:  I don't know what I have.

23        MR. GIROUARD:  Your Honor, I can put the

24   redacted one up on the screen so you can look at what you

25   have versus what is redacted.

1          THE COURT:  This is all I need to be looking at,
2     is that right?  (Indicating)
3          MR. STEWART:  That's the 3/22 note.
4          THE COURT:  So I need to look at all of that;
5     that's what you're asking?
6          MR. GIROUARD:  That's what we are asking.
7          THE COURT:  Let me look at everything *in camera.*
8          MR. ZELLE:  That's fine, Your Honor.  Do you
9     have all the exhibits?
10         THE COURT:  Yes.
11         MR. ZELLE:  Okay.  So I think it's marked as --
12         MR. GIROUARD:  16.
13         MR. ZELLE:  -- 16, and so that's the redacted
14    copy and then I expect Mr. Stewart will give you the
15    unredacted copy.
16         THE COURT:  Right.  I'm going to look at those
17    once I go back to chambers.  I'll put it aside for now.
18         MR. GIROUARD:  Thank you.
19         THE COURT:  It does seem to be the motion that
20    has the most issues that we need to talk about and the
21    most time spent.
22         Let's move on to a motion that won't take as much
23    time.  All right.  I have in my hand document Number 144,
24    defendants' motion in limine to preclude evidence or
25    argument relating to property insurance coverage for

1    damages suffered by C&K II, LLP or Adnan Yildirim.

2              MR. ZELLE:  I haven't seen an opposition.  I'm

3    not sure it is opposed.

4              MR. STEWART:  Judge, I didn't -- I know this was

5    filed last Thursday.  I didn't know I was supposed to be

6    filing written oppositions to these but I'm prepared to

7    argue.

8              THE COURT:  You don't have to.  I am prepared to

9    hear you.

10             MR. STEWART:  Yes.  Look, here's my take on

11   this, Judge.  Typically these motions are allowed.

12   However --

13             THE COURT:  So you have an opposition and you're

14   prepared to present it orally.

15             MR. ZELLE:  That's what I want to do.  If he's

16   opposing it, now I got to argue it.

17             THE COURT:  Go ahead.

18             MR. ZELLE:  Well, it's just clearly a probative

19   value issue.  Is it relevant?  I'm not sure how, but I'm

20   willing to perhaps go along with relevance but I don't see

21   how it outweighs prejudicial value here.  Certainly

22   evidence that my client, C&K, and Mr. Girouard's client,

23   Mr. Yildirim, who were paid by their property insurers is

24   going to mislead the jury, well, then why are we involved

25   in a lawsuit involving this other insurance, they already

1   got their insurance.

2          THE COURT:  Any potential to complicate things,

3   if not confuse things.

4          MR. ZELLE:  Absolutely.

5          THE COURT:  What do you say, Mr. Stewart?

6          MR. STEWART:  Judge, as I said, typically at

7   least in a tort case we always keep out the fact that

8   there's insurance.

9      My only concern here -- and I probably have no

10  problem agreeing to this provisionally but there is a

11  point where it may become relevant in the sense that if

12  people are saying how insurance companies act or there's

13  some undue emphasis on Preferred Mutual doing this or

14  that, and, as you know, there's a tort case where

15  Continental Western is suing Mr. Lodigiani, that's the

16  case Mr. Doyle is defending, and in that case Mr. Zelle

17  represents Continental Western so, you know, there are

18  other insurance companies that are involved in this whole

19  drama.

20     I guess what I'm saying is to the extent that there's

21  an overemphasis on insurance companies, I don't want these

22  folks to be hiding behind the fact that they represent C&K

23  and Mr. Yildirim in the case.

24         THE COURT:  You don't want a situation created

25  where the jury is led to believe these poor people, even

1   if we agreed with Mr. Stewart that there might have been a

2   misrepresentation, these poor people have no ability to

3   pay for the damage, that's terrible, the insurance company

4   just might as well pay.

5         MR. STEWART:  Well, I'm just thinking, Judge,

6   that there may be some way that this comes out during this

7   trial where there's an undue emphasis on insurance

8   companies and the way insurance companies act and all this

9   kind of business.

10         THE COURT:  Well, hopefully we'll get jurors who

11   have that perception during the voir dire process.  I know

12   you asked a question that will give it.

13         MR. STEWART:  I'm not going to elicit it.

14         THE COURT:  No, but you still want to know if

15   there are jurors who have a propensity to believe negative

16   things or would be looking to rule against an insurance

17   company for any reason.

18         MR. STEWART:  I guess I'm just kind of late on

19   the marker here, Judge.  I kind of agree with my brother

20   that it shouldn't come in.  However, I can foresee

21   circumstances depending how the trial goes that I may be

22   asking Your Honor to revisit that.

23         THE COURT:  Well, certainly if something comes

24   up during the trial that needs to be addressed, I'm happy

25   to revisit during trial.  We can also just craft a jury

1    instruction at the end that takes the issue head on and

2    deals with it.

3            MR. STEWART:  Thank you, Judge.

4            THE COURT:  Unless you have anything else to say

5    on that defendants' motion, which is docket 144, that will

6    be allowed.

7        Now as with all of these motions, if there is a good

8    cause and good-faith reason to revisit or reconsider that

9    matter, then it will be addressed outside the presence of

10   the jury by the parties but that motion is allowed.

11       Defendants' motion in limine to preclude evidence or

12   argument that Mr. Lodigiani was engaged in a joint

13   venture.  All right.  Who is arguing that?

14           MR. ZELLE:  I'll argue that one, Your Honor.  We

15   discussed last week during a pretrial conference that

16   there was testimony binding on Preferred Mutual that the

17   only basis for rescission was the partnership issue.

18       The Court and Mr. Stewart zeroed in on Count 2, the

19   coverage claim.  The claim that, well, even if the policy

20   was in effect, there's no coverage under the policy

21   because there's an exclusion or it's actually a provision

22   that provides that the named insured is not covered or not

23   entitled to coverage if liability arises out of joint

24   venture.

25       In this case -- I shouldn't say this case, in

1    connection with the claims against Mr. Lodigiani, the

2    subrogation claims, he's being sued not in his capacity as

3    a joint venturer but in his capacity as an individual, and

4    we provided authority to this Court for a case in which

5    the facts were two parties -- there were actually three

6    parties involved, party A, party B, and party C.  Party C

7    was a joint venture between party A and party B.  In that

8    situation it is not uncommon for there to be three

9    insurance policies in play party A's insurance policy,

10   party B's insurance policy and the joint venture's itself

11   insurance policy.

12       Now certainly the individual joint venturer want

13   protections for things that they are doing individually.

14   Now a joint venture policy wouldn't cover that.  That only

15   covers the work they are doing together.

16       So, for example, -- and this is not atypical at all

17   in construction-type situations, you've got the three

18   entities and entity A is doing certain work and entity B

19   is doing certain work and the two of them together are

20   doing certain work and there's a claim, damage arises in

21   the course of the construction, they're pointing at all

22   three parties.  There's three policies in play.

23       In our case -- I have to take a step back here into

24   the realm of insurance coverage.  There are claims against

25   Mr. Lodigiani -- in the subrogation claims against Mr.

1     Lodigiani individually.  The insurance policy, as do all

2     liability insurance policies, provide two types of

3     coverage, defense coverage and indemnity coverage.

4         What Preferred Mutual seems to be seeking here is a

5     determination that there's no indemnity coverage because

6     they certainly cannot argue in good faith that there's no

7     defense coverage because a duty to defend is triggered by

8     the allegations in the complaint.

9         In the complaint against Mr. Lodigiani, the

10    allegations are Mr. Lodigiani is an individual and Mr.

11    Lodigiani is liable for the damage caused by the fire at

12    the Bridge Street location.  So under no circumstances in

13    this case can Preferred Mutual demonstrate that there is

14    no duty to defend.  If that's not a ripe issue in this

15    case, then what does the joint venture evidence have to do

16    with anything?

17        MR. STEWART:  Thank you, Judge.  I've been

18    involved in a few of these insurance cases and what

19    happens is if there's a declaratory judgment the policy

20    does not apply, then the -- I have no quibble with what

21    Mr. Zelle said, the duty to defend is triggered.  However,

22    the courts have said the proper course for insurance

23    companies is not to disclaim when they think there's no

24    coverage, they should defend and then seek guidance from

25    the court, seek a binding determination whether there's

1    coverage.

2        Obviously if there is a binding determination in this

3    court that there is no coverage, the duty to defend will

4    cease at that point.  So I don't know what Mr. Zelle is

5    talking about as far as -- we're going to find out here

6    whether the duty to defend goes forward from here.

7    Obviously if the policy doesn't apply, counsel can then

8    withdraw from the underlying tort case and somebody else

9    will have the responsibility to defend that case.

10        Judge, let me just try to see if we're all on the

11    same level of understanding.  My understanding according

12    to Mass. practice, "A joint venture" -- I'm quoting from a

13    case from the Supreme Judicial Court.  "A joint venture is

14    a partnership of a sort, where at least it has many of its

15    characteristics.  It differs, however, from a partnership

16    in that it's ordinarily, although not necessarily, limited

17    to a single enterprise where it's a partnership and

18    usually formed to the transaction of general business."

19        So I guess what I'm saying is the broad term is

20    partnership.  The narrow term which subsumes all

21    partnerships would be a joint venture.  So this exclusion

22    would apply equally as to a joint venture or a

23    partnership.

24        Obviously there were two corporate deponents that got

25    deposed.  Mr. Kagels said what he thought about -- what

Preferred has as far as evidence of a partnership and
basically he had no additional evidence beyond what he
said about a partnership on the issue of joint venture.

However, there was a second corporate defendant,
Mr. Griffin, this gentleman in the blue shirt back here,
and he was deposed and Mr. Zelle asked him what's your
understanding of a joint venture. "My understanding of a
joint venture is a partnership, is my interpretation of
what you mean by that in terms of how we underwrite this
exposure."

So these folks know that what we're saying is
partnership and joint venture are basically the same
thing, except partnership is a broader category.

We had a discussion at noontime last Monday about
even if neither of these gentlemen are articulating this,
the evidence that we're going to have as far as joint
venture a jury could infer from the evidence that we have,
this is at least going to go to a directed verdict whether
we have enough evidence and I suggest we will have enough
evidence, that the jury could infer that there was a joint
venture.

So maybe I'm missing the point here, Judge, but I
think we're got enough to go forward on and if we prove a
joint venture, then that exclusion applies and it will
terminate defense coverage and it will terminate any

1       question about duty to indemnify.

2                   THE COURT:  All right.

3                   MR. ZELLE:  Judge, can I respond to one point,

4       Your Honor?

5                   THE COURT:  Yes.

6                   MR. ZELLE:  I don't understand how evidence that

7       the relationship between Mr. Brantley and Mr. Lodigiani is

8       a joint venture resolves the issue of whether Preferred

9       Mutual has a duty to defend a lawsuit against Mr.

10      Lodigiani individually.  Maybe it is a joint venture but

11      if he's not being sued as a joint venturer, the policy

12      applies.

13          So the determining evidence is the complaint in the

14      subrogation claim.  We've already discussed that that's

15      not going to be introduced as evidence here because those

16      suits are brought in the name of the property insurers,

17      but totally apart from the evidence it is just legally

18      impossible in this lawsuit for Preferred Mutual to

19      establish that a joint venture exclusion precludes

20      coverage because the lawsuits are against Mr. Lodigiani

21      individually.

22                  MR. STEWART:  Judge, may I respond?  I think I

23      understand what Mr. Zelle is saying a little bit better.

24          We're suing for rescission.  It's a variety of a

25      breach of contract case where there's a misrepresentation

1    in a policy and if it's material, then the insured's

2    company is entitled to rescind the policy and the policy

3    is treated as if it never existed.  It's *void ab initio*.

4    So if there's no policy, how can Preferred be required to

5    defend anything, however, whatever?

6         Now Mr. Zelle is the one that drafted this complaint

7    where he's suing Mr. Lodigiani that he says now it doesn't

8    trigger or it does trigger, I don't know if he's pleading

9    cleverly, but I think if we established there's no policy,

10   there's no coverage.

11        THE COURT:  All right.  Clearly in the complaint

12   there is an assertion that Mr. Lodigiani and Brantley were

13   partners or joint venturers.  I agree that PMIC plaintiff

14   is suing for recission basically saying the policy is void

15   so why do we even need to get into a further conversation

16   because there was this joint venture or partnership

17   agreement which was misleading, at least that is your

18   theory.  I think that's clearly, not even close, but

19   clearly relevant.  I'm going to deny the defendants'

20   motion.

21        MR. ZELLE:  Just for clarification, I'm not

22   representing Continental Western in the subrogation case.

23   That's another lawyer.

24        MR. STEWART:  I misspoke, the 93a.

25        MR. ZELLE:  It has nothing to do with your

1    ruling.  I just wanted to clarify.

2              MR. STEWART:  I was wrong.

3              THE COURT:  Thank you for clearing that up for

4    the record.  So that motion, which was Docket 146, is

5    denied.

6        I'm looking at plaintiff's Docket Number 139,

7    plaintiff's motion for admission of disputed exhibits and

8    seeking an overruling of defendants' hearsay objection.

9    Now what we are talking about there?

10             MR. STEWART:  Judge, that's my motion.  I didn't

11   understand why they were making hearsay objections.  I'm

12   pointing out the fact that there's an --

13             THE COURT:  Stated a party opponent admission.

14             MR. STEWART:  Right.  Although I see on the

15   newest iteration of their exhibit list that they're saying

16   that -- they dropped the hearsay problem but they're

17   saying that the statements were a product of coercion,

18   apparently Mr. Doyle coerced these statements and they

19   shouldn't come in under that.

20             THE COURT:  Let me just kind of cut right to it.

21   As to the objection, is there any hearsay objection, a

22   statement of a party opponent?

23             MR. ZELLE:  It comes in under that exception

24   absolutely.  However, you still, as the Court I'm sure is

25   aware, need to look at the reliability issue that, okay,

1     it falls within the scope of the exception but does it

2     have the indicia of reliability that typically permits the

3     courts to admit evidence that is hearsay but nevertheless

4     accept it.  So it's the indicia of reliability.

5              THE COURT:  That's absolutely true, but when it

6     falls into that realm, that goes to the weight.  That goes

7     to the weight, not admissibility.  That would go arguably

8     to the weight that the jury could be urged to give or not

9     to give to it.

10        It would be an extreme set of circumstances where I

11    would say that's not allowed because it's so on its face

12    completely unreliable.  I understand that point.  It's

13    rare that I see that can't come up where the old principal

14    of weight not admissibility applies.  I think that's our

15    situation.

16             MR. ZELLE:  You zeroed in on the issue and

17    certainly it's goes to weight.  Our position is it will be

18    evidenced very early on that the statements were --

19    coerced is a bit strong, but.

20             THE COURT:  I think it is a bit strong from what

21    I know in this case.

22             MR. ZELLE:  It is.

23             THE COURT:  But it gives the correct feel to

24    what this litigation involves, and I think that I'm going

25    to allow plaintiff's motion for admission of those.  It is

1    not hearsay, and what I anticipate the evidence will be

2    and the evidence of we're using the term loosely coercion

3    will be is going to go to weight, not admissibility.  If

4    somehow that changes, you can come to sidebar and we will

5    talk about it.

6            MR. ZELLE:  That sounds good.  Let me just ask

7    this, Your Honor.  My understanding the ruling is it will

8    be admitted when offered.  Could we can premark all the

9    exhibits and just hold off on actually marking those in

10   and maybe I will have an objection, maybe not?

11           THE COURT:  Sure.

12           MR. ZELLE:  Thank you.

13           THE COURT:  All right.  Now Docket Number 147,

14   defendants' motion in limine to preclude evidence or

15   argument related to Mr. Lodigiani's cashing the returned

16   premium check.

17       Mr. Stewart argued that the cashing of that check is

18   evidence of conscience of guilt under the circumstances.

19   So although this is defendants' motion, I'm going to ask

20   that you address this first and by me asking you to

21   address this first, I'm broadcasting that your hill is

22   steep.

23           MR. STEWART:  Judge, I'm not sure what to say

24   beyond what I said the other day, but one thing, by way of

25   proffer, I would tell Your Honor is that there was a

1    letter delivered to Mr. Lodigiani by a deputy sheriff and

2    the deputy sheriff delivered a letter that says that

3    Preferred Mutual has deliberated on the matter and come to

4    the conclusion that they believe you were in a partnership

5    and are going to be seeking judicial rescission of the

6    policy.  And as a part of that under the rescission law,

7    the party seeking rescission must refund the consideration

8    for the contract.

9         So what they did is they mailed him a copy of the

10   check.  It was first certified mail and Mr. Lodigiani

11   never picked it up or there was something.  Anyway, we did

12   deliver it by deputy sheriff and it was cashed the next

13   day by Mr. Lodigiani.

14        It is our contention that this letter tells Mr.

15   Lodigiani that Preferred Mutual is rescinding based on the

16   misrepresentation of the policy that he was not in a sole

17   enterprise, that he was in a partnership, and in light of

18   that -- look, if Mr. Lodigiani thought he was not in a

19   partnership, it is our submission -- it is our contention

20   that he would not have cashed the check, but the fact he

21   cashed the check was some acceptance of what -- it's

22   almost like adoptive admission, Judge, where somebody says

23   something and then if it weren't true, then the natural

24   person would deny it.

25             THE COURT:  That has to be done under

1   circumstances where a reasonable person applying some

2   common sense would say I can see how anybody in that

3   situation would have said something, would have spoken up

4   or would have done something different so you couldn't

5   make that inference.

6       In this case I don't see that there is that

7   obviousness where an individual gets a check from an

8   insurance company.  The insurance company mails it out.

9   You get this insurance letter saying, guess what, you're

10  not going to get coverage, here's a check, and what is the

11  regular person suppose to do with that?

12      I think to infer conscience of guilt, that is not

13  just that, you want to infer that I, Mr. Lodigiani, by

14  cashing that and saying I know what a material

15  representation is, I know I thought about it, I know I

16  actually did it, I know why I intentionally did it, I

17  don't see how that would be a fair reading of this to

18  infer a conscience of guilt.  I don't see that.

19      The defendants' motion to preclude that evidence

20  regarding a conscience of guilt argument is allowed.  I

21  guess the question is, is it relevant to just being part

22  of the record to come in?  We sent this check and it was

23  cashed but just no argument about what else could be

24  inferred from that.

25      What's your position on that?  There is some marginal

1    relevance in the explanation of the entire process that a

2    check was issued.

3              MR. ZELLE:  I think it will be elicited on

4    Mr. Burstein's examination from Mr. Lodigiani why he

5    cashed the check, but if Mr. Lodigiani is testifying

6    against a backdrop of, well, you cashed the check, why did

7    you do it with the accusatory tone that I expect

8    Mr. Stewart would effectively use, that's a little bit

9    different.

10             THE COURT:  It makes a difference so let's look

11   at this down the road.  I mean, I'm allowing the

12   defendants' motion but I'm not doing this to give you a

13   sword knowing that Mr. Stewart won't be able to respond

14   back.

15        So if Mr. Lodigiani or other evidence comes in where

16   he is really going in too deeply why he cashed that check

17   and all those reasons are either very sympathetic or very

18   helpful to his cause, yeah, that may be considered opening

19   the door.

20             MR. ZELLE:  Absolutely, Your Honor.  And I will

21   make --

22             THE COURT:  All right.  Understood?

23             MR. ZELLE:  Yes.

24             MR. STEWART:  Yes.  I respect Your Honor's

25   ruling, but I would like at some point during Mr.

1    Lodigiani's testimony to be able to be permitted to come

2    to sidebar and make an offer of proof, have you preserve

3    my rights.

4        THE COURT:  Sure.  You just heard me put the old

5    you may open the door quote on the record and so they may

6    open the door.

7        MR. STEWART:  Just so Your Honor knows,

8    basically what I would be doing is I would be showing Mr.

9    Lodigiani the letter and highlighting the fact that

10   Preferred Mutual was refunding the check for the reasons

11   it says it was refunding the check and then that he cashed

12   it.

13       THE COURT:  I understand what you're saying, but

14   from my perspective right now just looking at things in

15   black and white on paper as they jump out and affect me

16   I'm saying no, you're not going to do that.  When this

17   trial starts to come to life and kind of develops where

18   it's going, we'll see.  All right.

19       Did I cover all the motions?  Do you think there's

20   anything else out there?

21       MR. ZELLE:  There's no more motions, Your Honor.

22   There was contrary or somewhat in -- there were two

23   separate statements of the case submitted.

24       THE COURT:  I have looked at them and there will

25   be -- I will merge the two of them.  Let me just

1    essentially try to piece together what I will be saying

2    for you.

3        I will be saying something to the effect of -- the

4    statement of the case is the plaintiff is Preferred Mutual

5    Insurance Company.  Preferred issued an insurance policy

6    to Leonard Lodigiani doing business as L.B. Plumbing.

7    Preferred is alleging that when Mr. Lodigiani, a plumber,

8    applied for his application it contained material

9    misrepresentations indicating his business had a single

10   owner as opposed to it being a partnership or a joint

11   venture.

12       After the policy was issued, Mr. Lodigiani was

13   working on a project in South Hadley, Massachusetts.  A

14   fire started and caused damage to the property.  The

15   damaged property was owned by the defendant C&K Limited

16   Liability and defendant Adnan Yildirim was renting a

17   portion of the property to operate a restaurant.

18       Mr. Lodigiani and the other defendants deny Preferred

19   Mutual's claim that Mr. Lodigiani's business was a

20   partnership or joint venture.  Mr. Lodigiani and the other

21   defendants also deny that Mr. Lodigiani had made a

22   misrepresentation in the course of applying for the

23   Preferred Mutual policy.

24       That will be what I plan on giving as a statement of

25   the case and then I will tell the jurors that there are

claims being made. I will tell them this is very general
at the beginning. I will emphasize that. The claims are
essentially of the plaintiff, Preferred Mutual, saying
that essentially this policy does not apply or it is void
for certain reasons and the insurance company does not
have to pay that policy, all of which will be explained
more in final arguments.

Also that the plaintiff, the insurance company, is
looking for a declaration essentially saying because of
the legal issues which are going to be examined by and
decided by the jury that they do not owe money to anyone
in the case for that particular fire event. That there is
a counterclaim by the defendants in this case which also
seek declaration in legal terms that the jury will have
explained to them in the final instructions saying, yes,
in fact the insurance company is obligated to make a
payment. I'm going to say that is generally, jury, what
you are going to be looking at.

MR. ZELLE: Go ahead.

MR. STEWART: Judge, it sounds like you're kind
of framing it in terms of whether Preferred Mutual has to
pay for the fire. I would rather hear that this is a case
about whether there's coverage for Mr. Lodigiani based on
the policy and either the policy is *void ab initio* and you
restore the status quo. I don't think you will say that

1  to the jury.

2         THE COURT:  I could say that the policy is

3  essentially void.  The claim of the plaintiff is the

4  policy is essentially void.

5         MR. STEWART:  Okay.  So that it never existed,

6  and then the other claim is that there's an exclusion that

7  applies which would eliminate coverage for Mr. Lodigiani

8  with respect to the fire, but the question of whether

9  Preferred has to pay for the fire is kind of a case for

10  another court on a different day.

11         THE COURT:  I can make some changes that it's

12  essentially void.

13         MR. STEWART:  I understand you're getting our

14  feedback and that was my thought.

15         THE COURT:  Yes, that's fantastic.  I can do

16  that.

17         MR. ZELLE:  That fine.  I mean, if you

18  generalize it, that would work for me as well.  My concern

19  again is that this jury is not going to have the evidence

20  before it to make the determination as to whether or not

21  the insurance applies for purposes of defense because it

22  doesn't have the complaint and subrogation claim but if

23  you just say void it, then I think we are fine.

24         THE COURT:  All right.  So you agree stay with

25  that very generic language.

1           MR. ZELLE:  As opposed to saying does not owe
2    the money because owing money is, well, you got to pay for
3    the defense regardless of whether or not there's an
4    indemnity obligation.
5           THE COURT:  Okay.  So other than that, I mean
6    you may have some -- you may not be happy with the entire
7    statement of the case but unless you have a significant --
8    is there any significant problem?
9           MR. ZELLE:  No.
10           THE COURT:  Okay.  I have your witness list.  I
11    have your voir dire questions which I think I'm asking
12    just about all of the voir dire questions in addition to
13    the standard ones by the court.  There will be some voir
14    dire allowed at sidebar, it's limited, but if there's a
15    good basis for it, I will give you some latitude to ask
16    some questions.
17           MR. ZELLE:  You indicated last week that you
18    will give the list, will you give us one of those as well?
19    Do we have one to check with their numbers?
20           THE COURT:  No.  You're not given anything to
21    help you organize.  No, that's a good suggestion but
22    that's too much work for me.
23           MR. ZELLE:  Okay.
24           THE COURT:  The jury will have notebooks so that
25    will help them keep track.  All right.

1           MR. ZELLE:  Okay.

2           THE COURT:  So I need the full list of documents

3  that you want me to review.

4           MR. GIROUARD:  The *in camera* review or the

5  exhibits?

6           THE COURT:  So what you want me to look at, let

7  me put this on the record again, it is what's been labeled

8  as Exhibit 16?

9           MR. GIROUARD:  Yes.

10          THE STEWART:  And Mr. Stewart give me an

11  unredacted portion of what's included in Exhibit 16.

12          MR. STEWART:  Yes.

13          MR. GIROUARD:  Your Honor, I think the defense

14  is asking that with respect to the Court that you review

15  the entire unredacted portion of the document.  In other

16  words, not just limited to that date.  Again, I have great

17  faith in Attorney Stewart's word but semantics when one is

18  paraphrasing is important.

19          THE COURT:  Do you have that?

20          MR. STEWART:  Judge, I'll gladly submit this.  I

21  thought we resolved that issue.

22          THE COURT:  Apparently not.  Let me take a look

23  at it.

24          MR. GIROUARD:  Thank you.

25          THE COURT:  Theresa, do we have any update for

1    time?

2              THE CLERK:  Judge Hillman is still with them.

3              THE COURT:  So the jurors are still dealing with

4    a criminal case.  Theresa will be in touch with you as

5    soon as we know what it looks like for our morning.

6              MR. GIROUARD:  Thank you.

7              THE COURT:  Thank you.

8    **(A recess was taken until 12:02.)**

9              THE COURT:  We are getting closer to having some

10   jurors ready so I wanted to come out to keep working on

11   this one particular motion regarding the claim of

12   unredacted portions and attorney-work product for attorney

13   privilege.

14        I've looked at what has been previously redacted and

15   then I also looked at -- so I looked at the unredacted

16   version of everything that was previously redacted and

17   then I looked at the unredacted version of the March 22,

18   2013 portion, again unredacted.

19        Putting aside the March 22nd entry right now and just

20   speaking to the issue of the redacted portion, other

21   portions of the log, I was asked to review that to

22   determine the appropriateness of redactions and I have.  I

23   find that all the redactions are entirely appropriate.  I

24   saw no reason at all to require those portions to have

25   redactions removed to that section.

1    On the March 22, 2013 I have a little bit of a

2    different question.  I also thought certain redacted

3    portions were appropriate.  However, an issue came up in

4    my mind that is relevant to Mr. Lodigiani's waiver of

5    attorney-client privilege that becomes very precise and

6    specific and Mr. Burstein articulated his client's waiver

7    earlier.

8        Attorney Burstein, I took you to say that you were

9    waiving your client's privilege -- Mr. Lodigiani was

10   waiving his attorney-client privilege with former Attorney

11   Doyle relative to the discussions they had related to

12   coverage dispute, is that correct?

13       MR. BURSTEIN:  That will be correct and that

14   would apply to the firm to the extent that Attorney

15   Perkins was involved.

16       THE COURT:  Now I took that to mean that you

17   limited your waiver to that particular issue coverage

18   dispute.

19       MR. BURSTEIN:  I don't believe it's limited,

20   Your Honor.  He's waiving his privilege with respect to

21   any discussions he had with that law firm.

22       THE COURT:  All right.  I'm going to ask to see

23   Attorney Burstein and Attorney Stewart at sidebar on a

24   very, very narrow issue that just rubs up against

25   attorney-client privilege and the need for me to get some

1    specific information regarding that and Mr. Lodigiani's

2    waiver.

3              THE COURT:  All right.  Thank you.

4    (Sidebar conference.)

5              MR. STEWART:  I appreciate this because I don't

6    hear well whispering so being able to talk is very

7    helpful.

8              THE COURT:  Okay.  On the issue of the waiver, I

9    understood your waiver -- I'm differentiating between the

10   waiver as it goes to coverage issues and Doyle's

11   conversation with Lodigiani's coverage issues and any

12   negligence issues aside from the coverage, and I just want

13   to make sure that if you're waiving complete

14   attorney-client privilege, that you're also doing that

15   knowing the distinction between coverage issues and

16   negligence issues.

17             MR. BURSTEIN:  Yes, Your Honor.

18             THE COURT:  I would bring your attention to --

19   I'm going to show you a portion -- well, I'm going to read

20   you a portion of the March 22nd log that was provided to

21   me by Mr. Stewart.  "Attorney Doyle passed on some

22   information to the plaintiff insurance company that Mr.

23   Lodigiani told him."  All right.  I am concerned that it

24   may reflect on this negligence underlying theory and

25   indicate that Doyle indicated essentially that Mr.

1    Lodigiani had said he may have some cognitive issues,

2    cognitive impairments, but he seems to have a good grasp

3    of details about the insurance loss.

4             MR. BURSTEIN:  That's an opinion of Doyle's

5    expressing to PMIC or something that Lodigiani stated?

6             MR. STEWART:  Kagels talked to Mr. Lodigiani and

7    I think that's where this is coming from.

8             THE COURT:  I think that's where this is coming

9    from.

10            MR. STEWART:  In other words, when Kagels -- he

11   has told me earlier Kagels was talking about him talking

12   to Mr. Lodigiani earlier I'd suggest to the Court.

13            THE COURT:  It seems to me that information is

14   coming from the mouth of Mr. Lodigiani.

15            MR. BURSTEIN:  I find that hard to believe, Your

16   Honor.

17            THE COURT:  Maybe so but that's what's in here

18   and so that could be considered to go towards negligence.

19   So if you're waiving attorney-client privilege as to this,

20   you may say that statement never happened.  I don't

21   believe that statement, that he would have made that

22   statement but that's not the point right now.  The point

23   right now is you're waiving attorney-client privilege as a

24   reason to keep this from becoming disclosed, you follow

25   me?

1          MR. BURSTEIN:  It's so hard without knowing the
2     full substance of this.
3          THE COURT:  Well, we have told you.  I'll let
4     you read it.
5          MR. STEWART:  I got it.
6          MR. BURSTEIN:  You okay with me looking at it?
7          MR. STEWART:  I'm just doing this under the
8     auspicious of the court.
9               (Mr. Burstein reading document.)
10          THE COURT:  So here's what I'm thinking.  I'm
11     inclined to think that perhaps, perhaps the court would
12     consider requiring that portion and only that portion that
13     talks about the cognitive ability to be unredacted.
14     However, I don't want to do that if Mr. Lodigiani has not
15     waived any attorney-client privilege that existed as to
16     anything that might be relevant on a negligence issue down
17     the road.
18          MR. BURSTEIN:  I believe he is willing to waive
19     his privilege with respect to all issues.
20          THE COURT:  All right.  Do you want to talk to
21     him about it?
22          MR. BURSTEIN:  I can.
23          THE COURT:  Okay.
24          MR. BURSTEIN:  I will report back to you.
25          THE COURT:  Take as much time as you need

because we have time.  I will give you a chance to talk to
him.

MR. BURSTEIN:  Thank you.  I appreciate that.

THE COURT:  Okay.

(End of sidebar conference.)

THE COURT:  Okay.

THE CLERK:  All rise.

(A recess was taken.)

(Jury selection not transcribed.)

THE COURT:  We'll try to deal with the ear
piece.

I've decided because of the lost time I'm going to
give the jury some of their remaining instructions.  We
are not going to do openings today.

MR. ZELLE:  Okay.

THE COURT:  We'll start in the morning.

MR. ZELLE:  I mean, I'll point something out
just because that's what lawyers do, but the jury list
profile actually says Eastern District of Massachusetts.
We're not going to call a mistrial or anything.

THE COURT:  Was that working all morning?

MR. BURSTEIN:  On and off.

MR. LODIGIANI:  On and off.

THE COURT:  So we are going to modify our
schedule and not do openings today.  I'm just going to

1    finish the pre-instructions to the jury.

2        I've considered a couple of times whether or not I

3    want to give a pre-instruction on the law, and although

4    it's generally my inclination to favor such a practice, in

5    the statement of this case we talked about a policy being

6    void, we talked about -- we mentioned the word joint

7    venture, we mentioned the word partnership, we mentioned a

8    policy specifically being void, and the issues are rather

9    narrow and straightforward in this case where I'm not sure

10   a pre-instruction is necessarily going to accomplish what

11   I usually do a pre-instruction for, and that is before a

12   long and complicated case give them something so they

13   don't lose sight while the case is going on.

14       At this point if I try to modify a final instruction,

15   it's not going to be detailed enough or it's going to be

16   too detailed and cause issues before we actually take the

17   evidence.  So in consideration of this case as a whole,

18   and given the issues that we've already flagged, when I

19   describe the statement of the case I'm not going to give

20   any pre-instruction on the law.  We will save all that for

21   final instructions.  All right.

22           MR. ZELLE:  I'd request Your Honor that the

23   Court at least explain misrepresentation, that that word

24   didn't come up in connection with the statement of the

25   case.

1        In particular, what I would request is the Court say

2   that a misrepresentation is a false statement; that the

3   person making the statement knows it's false.  I don't

4   think the Court needs to get into any of the other

5   details.

6        THE COURT:  Well, but doing that would be the

7   common interpretation of misrepresentation anyway and

8   probably unnecessary to give that definition, then I would

9   have to go into the intent of the speaker, whether or not

10  any loss was incurred by the insured.  It will just

11  require to be a full fair instruction to keep going down

12  the road.

13       MR. STEWART:  That's not our theory of the case.

14  The statute says you can either prove that the person

15  intended to or that the misrepresentation was material,

16  meaning it made a difference to an underwriter.

17       THE COURT:  And caused a loss.

18       MR. STEWART:  Correct, but we're not trying to

19  say Mr. Lodigiani did anything on purpose.  We are not

20  looking into his mind that he was doing this with any type

21  of intent.  The part of the statute that we're going on is

22  that the representation was material to an underwriter,

23  which is all we need to prove.

24       MR. ZELLE:  I disagree with that, but if that's

25  where they're going, then I have no concerns whatsoever.

1    I don't think they get over the rail on that.

2              MR. STEWART:  It says or and that's the part

3    we're going on.

4              THE COURT:  All right.  I am not going to

5    pre-instruct them right now.  I will consider it, but I

6    need to tell them a few other things and release them for

7    the day.  We're going to stay here and deal with a few

8    other issues.

9         I'm still not -- given the nature of the case, I'm

10   just not inclined to think that this would be beneficial

11   to the jury, but I will think about it.

12        Let's bring them in and give them some

13   pre-instructions and release them for the day.

14   **(The jury entered at 3:24.)**

15             THE COURT:  You can be seated.  Thank you.

16        Ladies and gentlemen, what I have to ask you when you

17   come to court every time is if you were able to follow my

18   instructions not to begin jury deliberations, not talk

19   about the case, not investigate the case on the Internet

20   or by any other means?  Were you able to comply with my

21   instructions?  Okay.  Thank you.

22        Now, as often happens, I hope it doesn't happen too

23   many times in the case, but unanticipated things happen

24   all the time when we are trying to run trials and this

25   trial is not immune from that problem.

1    We had a technical issue with some of our equipment

2    in the courtroom.  We worked through that.  That is all

3    set now, but that kind of did some damage to the way I

4    wanted to keep the schedule for the rest of the day.

5    I still have a few instructions I'm going to give you

6    then we are going to come back tomorrow morning.  Tomorrow

7    morning the case will start with what's called opening

8    statements.  All right.

9    The parties will have an opportunity, if they choose

10   to take it, to give you an opening statement, which is

11   just that.  It's a preview of the case, a generalized

12   synopsis of what they believe the evidence will show you

13   and a summary of what they believe their claims will be.

14   It is not evidence but it is their preview of the case.

15   We will start with that and then start taking witnesses

16   tomorrow as well.  All right.

17   So to take care of some business that I have to take

18   care of regarding your instructions, as I mentioned

19   before, this is a civil case.  The plaintiff in this case

20   has the burden of proving their claim by what is called a

21   preponderance of the evidence.  That means that for the

22   plaintiff to prevail, the jury must believe that what is

23   claimed by the plaintiff is more likely true than not.

24   To put another way, if you were to put the

25   plaintiff's evidence and the defendants' evidence on

1    opposite sides of the scale, the plaintiffs would have to

2    make that scale tip somewhat in their direction in order

3    to succeed.  Now this is different from a criminal case as

4    I have told you.

5        I mentioned the word evidence.  I expect the evidence

6    in this case will include the testimony of witnesses,

7    documents, and other things received as exhibits and any

8    facts that the parties can agree on.  There are rules that

9    control what you may consider as evidence.

10       When a lawyer asks a question or offers something as

11   evidence and the lawyer on the other side thinks that is

12   not permitted by the rules, that lawyer may object.  This

13   simply means that the lawyer is requesting that I make a

14   decision as to whether a certain rule of evidence applies

15   to a piece of evidence.

16       It may be necessary from time to time for me to

17   discuss the issues with the lawyers out of your hearing at

18   sidebar where we met earlier today.  We will try to keep

19   these conferences at sidebar at a minimum because they

20   interrupt the flow of the trial, but you should know we're

21   not trying to keep things from you.  We are trying to make

22   determinations -- I'm trying to make these determinations

23   to make sure what you do hear is in compliance with our

24   rules of evidence and make sure that people get a fair

25   trial.

1    There's some things that are not evidence.
2    Statements and arguments by the lawyers are not evidence.
3    The lawyers are not witnesses.  They're very experienced
4    lawyers involved in this case and what they tell you in
5    their openings, what they tell you in their closings, no
6    matter how artfully phrased their questions are, it is not
7    evidence what they say.
8        The evidence is what the witnesses say from that
9    witness stand and whatever exhibits you get that are
10   introduced at trial.
11       Objections are not evidence.  Lawyers actually have a
12   duty to their client to object when they believe something
13   is improper under the rules of evidence.  If I sustain an
14   objection -- in other words, I agree with the lawyer
15   making the objection -- you must ignore the question as if
16   that question were never asked.
17       So if something is objected to and I sustain that, I
18   might say to you now strike whatever was said.  So you
19   wipe that out of your mind if there's an objection, it's
20   like it never happened.
21       If I overrule an objection, that means you can go
22   ahead and you can ask the question again.  You can hear
23   that answer and you can consider the information.
24       Any time I tell you to disregard something, you have
25   to wipe the slate clean.  If a witness -- sometimes a

1  witness will say something and go on and it will be

2  irrelevant and the lawyer will object, I will go back.

3  Now I can't hit the rewind button, everyone heard the

4  witness say that, so if I tell you to disregard it, you

5  have to effectively just in your mind treat it as if that

6  was never said.

7      Anything you see or hear about this case outside the

8  courtroom is absolutely not evidence.

9      In deciding what the facts are in any case, you have

10 to decide what testimony you believe and what testimony

11 you do not believe.  You may believe everything a witness

12 says or only part of it or absolutely none of what a

13 witness says.  It is entirely up to you.

14      You will be given instructions, further instructions

15 at the end of this case on how to assess the credibility

16 of witnesses, but you must know this is completely your

17 realm, your domain, no one but you decides the credibility

18 of witnesses.  No one but you decides who you believe and

19 what you believe.

20      Let me now turn to the subject of how you conduct

21 yourselves during the trial.  First, do not talk amongst

22 yourselves about the case or about anyone involved in it

23 until the very end of the case when you go into the jury

24 room to decide the verdict.

25      You should absolutely feel free to get to know each

1    other and talk about anything else you want to, like your
2    families, what you do for work, the weather.  You can talk
3    about anything you want but do not talk about this case.

4    Do not make up your mind about what the verdict
5    should be until after you have gone to the jury room and
6    you start your deliberations in this case.  You must keep
7    an open mind until then.

8    For instance, there may be a case where you hear one
9    witness and something about what that witness says just
10   sits with you and you think that was just true, I believe
11   this, that doesn't mean you make up your opinion or draw a
12   conclusion about the case.  You keep an open mind until
13   you hear everything about the case.

14   Do not talk to anyone else about this case or about
15   anyone who has anything to do with it until the trial has
16   ended.  Anyone else includes members of your family and
17   friends, your employer, anyone.  You can tell people that
18   you're a juror on a case.  You can even tell them
19   generally what kind of a case it is, but you can't talk to
20   them about anything about the case, including what I told
21   you the facts are.

22   You just can't open up that conversation because you
23   might infer when you tell the person what you think this
24   case is about just from the expression on that person's
25   face, you might think, oh, well, you obviously think a

1     certain way about these certain types of cases.  You can't

2     tell them anything about the case other than you're a

3     juror on this civil case.

4          Do not discuss this case or do anything in an

5     electronic form regarding this case; that is, sending

6     e-mails or text messages, Twitter, Facebook any type of

7     social media.

8          If you need to mention this case on social media,

9     notify people in e-mail or Twitter, I'm a juror.  It's a

10    civil case.  I'm going to be tied up here until probably

11    Thursday or Friday.  That's all you can say.

12         Do not let anyone talk to you about the case.  If

13    someone tries to approach you about the case, you cannot.

14    You have to just walk away from that.

15         During the trial you may see lawyers or clerical

16    staff or parties walking through the halls.  Please don't

17    think it's rude if you happen to see a lawyer walk by you

18    in the hallway at lunch and that lawyer doesn't say

19    anything to you because the lawyers are trying hard not to

20    say something to you because you can't have conversations

21    with anyone about this case.

22         It is important not only that you do justice in this

23    case but that you also make sure there is the appearance

24    of everything and how you carry yourself that you are

25    doing justice.

1      Do not read any news stories or articles about the

2   case.  I don't know that there will be any media coverage

3   but I never know when the media reporters come in and out

4   of the courtroom.  So if there is any media written,

5   radio, television, turn it off.  Don't look at it.  Don't

6   read it.  Don't do any of your own research on Google or

7   any Internet search engines about this case.

8      Finally, during the course of the trial if you have

9   any problem at all, please just raise your hand.  Get my

10  attention, the court stenographer's attention, the clerk's

11  attention, get anyone's attention and we'll ask you to

12  come to sidebar or we will talk privately about what the

13  issue is.

14     I have no problem taking breaks if something comes up

15  and you need a break or there's a certain issue that you

16  need to attend to.  If you need a glass of water or any

17  reason you need a break, just let us know and we will

18  accommodate you.

19     Now I'm going to permit in this case -- it's a

20  relatively short case but I'm going to permit you to take

21  notes.  The clerk is going to distribute pads and pens for

22  you to take those notes so there's just a few warnings

23  about that.

24     You are not required to take notes if you don't want

25  to do so.  It's really a personal preference choice about

1    how you absorb information and then kind of process it and
2    think about it.

3         If you decide to take notes, don't allow your
4    note-taking to distract you from listening carefully to
5    what the testimony is that's being presented.

6         Sometimes you see a person taking notes they think
7    they have to be writing down everything the person says,
8    that's not the purpose of taking the note, that will be
9    more of a distinction.  So if you want to you can,
10   otherwise you don't have to.

11        Please remember that everything you write down is not
12   necessarily what was said.  Thus, when you return to the
13   jury room to discuss this case, do not assume simply
14   because you wrote something down that that's exactly the
15   way it was heard by all the people in the courtroom, all
16   the other jurors.

17        Notes are an aid to your recollection and nothing
18   more.  The fact that it's written down doesn't mean that
19   it's necessarily accurate.  It will be your collective
20   memory as jurors as everyone looks at the notes they took
21   and any discussion to determine what was said, what the
22   facts are, and what the evidence is.

23        Leave your notebooks on your seats every night when
24   we are done.  You can't take the notes home.  The clerk
25   will collect the notes at the end of the day.  The

1    notebooks are kept in a secure place by the clerk.  No one

2    looks at your notes.  No one opens your notebooks.  The

3    notes are destroyed at the end of the case so no one will

4    know or look at what was written.

5        Now as you can see, Ms. Moran is here as our court

6    reporter and you need to know the court reporter is

7    creating a record of everything that happens at the trial,

8    and sometimes jurors think they will be able to have a

9    transcript of the trial as soon as they get back to the

10   jury room.  This is not, and I say again, not true.

11       You are not going to be given a transcript of this

12   trial when you go and retire to deliberate.  There are a

13   number of reasons for that.  One of them really is

14   strictly practical.  Usually there's not enough time to

15   accurately prepare the official transcript, which is a

16   time-consuming job, taking a very raw record and creating

17   a final, correct transcript.  That is a multi-step process

18   that just takes up too much time for us to be able to

19   provide you with a transcript the moment you get into the

20   jury room.

21       So you need to know that so you're not listening to

22   evidence thinking that, well, if I miss it I have a fail

23   safe.  I'm going to get the transcript to look at.  You're

24   not going to have that the transcript in this case.

25       So as I said the first step in the trial will be the

opening statements.  In the opening statements the lawyer

for each party will tell you about the evidence that they

intend to put before you.  Again, the opening statements

are not themselves evidence.  Their purpose is to provide

a road map regarding the evidence that they expect you

will see and hear.  Their purpose is only to help you

understand what the evidence will be and what the parties

will try to prove.

In the opening the attorneys may reference what they

believe the applicable law is in this case.  It is,

however, for the Court to instruct you fully on the

applicable law in this case.  As I mentioned before, you

will get a complete and full instruction on the law and

the definition of the legal terms at the end of the case.

After opening statements the plaintiff will then

offer evidence that they indicate will support their

claims against the defendants.  The plaintiffs will call

witnesses and they could offer documents or exhibits.

The defendants will have an opportunity to put on

their own evidence, but both sides of course will have the

opportunity to cross-examine the witnesses.

After you have heard all the evidence on both sides,

both sides will be given time to make their closing

arguments to you.  The lawyers for both sides will

summarize the evidence as they see it to help you

understand the evidence and try to persuade you relative
to the evidence.

The final part of the trial occurs when I instruct
you about the rules of law that you are to use in reaching
your verdict.  After hearing my instructions you will
leave the courtroom together to make your decision.  Your
deliberations will be secret.

I've already explained to you how we work the lunch
break and our regular breaks for the day.  Given that
there's no way we are going to get it in between now and
four o'clock the opening statements, we're going to start
those in the morning so I'm going to excuse you for the
day.

Again, I am required to give you the admonition do
not discuss the case with anyone, talk amongst yourselves,
do any type of research or Internet searching or media
investigation on this case.  All right.  Have a good
evening.

**(The jury left at 3:33.)**

THE COURT:  All right.  I'm just going to do a
little housekeeping and get back to the motion that
remains undecided regarding the disclosure of the
unredacted portions of the plaintiff's discovery as it
affected attorney-client privilege.

There was a sidebar discussion that Attorney Stewart

1     and Attorney Burstein participated in regarding

2     specifically an issue of attorney-client privilege that is

3     unique to Attorney Burstein in his representation of Mr.

4     Lodigiani.

5          Attorney Burstein, I will now -- I gave you some time

6     and you've had considerable time now given the interim we

7     had in the breaks to consider whether or not you want to

8     specify or discuss or articulate if there is any

9     privilege, and if so, whether that is being waived

10    completely by your client.

11         MR. BURSTEIN:  Certainly, Your Honor.  I did

12    have extensive conversations with Mr. Lodigiani on that

13    issue and he is willing completely to waive the privilege.

14         THE COURT:  All right.  Now, having the

15    privilege being completely waived, Mr. Stewart, do you

16    have any argument considering that regarding whether or

17    not -- now we are only talking about the March 22nd and,

18    quite frankly, a portion of the March 22nd entry which

19    makes a reference to something Mr. Lodigiani said.  It's a

20    few sentences out of that entry only but as to that

21    specifically I'd like to hear you on that.

22         MR. STEWART:  Your Honor, I respect the Court's

23    -- well, let me put it this way.  I understand where we

24    are and as to disclosure, I think that this is

25    appropriately disclosed.  I believe Your Honor is ruling

1    that way.  I would like to be heard on admissibility.

2         What is in here is -- and, Judge, I don't know if you

3    want me to read it into the record now that it's in play?

4              THE COURT:  Well, I will rule that it's going to

5    be in play so as you just said, we might as well put it on

6    the record.  All right.

7              MR. STEWART:  Okay.  I gather Mr. Burstein has a

8    copy of this, but I will -- I have a couple of copies I

9    can give counsel.

10             THE COURT:  Sure.

11             MR. BURSTEIN:  I saw a copy but I don't have a

12   copy.

13             THE COURT:  All right.  We will get those copies

14   out.

15             MR. GIROUARD:  Thank you.

16             THE COURT:  Now the ruling will be the

17   previously -- other than this March 22nd entry, the other

18   entries I am ruling do not need to be unredacted.  They

19   remain redacted.  I have reviewed them as I previously

20   said, but as to this March 22nd entry the ruling is that

21   will be disclosed and there is no claim of privilege by

22   Mr. Burstein for his client.

23             MR. STEWART:  So let me speak to that, Judge.  I

24   understand the top part that Mr. Lodigiani waived the

25   privilege so what Mr. Doyle told him would be fair game

for disclosure.  So basically what we have is Mr. Kagels'
recording that he spoke to Joe Doyle earlier to give him
the heads' up where we are looking into coverage and we
will take the EUO.

I asked him "how far we should go into these events,
whether we should restrict our questions to coverage or go
into all the info insured can provide.  He suggested we
get everything on the record we can considering the
insured's advanced age."

Now, I don't know how much of this is probative.  I
suppose that Mr. Doyle could be cross-examined with some
of this about discussions, about coordination of the
coverage investigation, and coordination of the defense of
the tort suit.

I have some real concerns though with the next line
where Mr. Kagels records, "he has told me earlier," now
there may be some argument about what people mean here but
I believe that Mr. Kagels is telling me that the "he" here
has to do with Mr. Lodigiani, and that he had had
discussions with Mr. Lodigiani before, obviously before
this note, and that Mr. Lodigiani told him that he may
have some cognitive impairment.

However, Mr. Kagels says that for his own thought
that he thought Mr. Lodigiani had a good grasp of the
details of the loss.  In any event, Mr. Kagels adviced

1    him, I guess being Mr. Lodigiani, "he cannot" -- he being

2    Joe Doyle -- "cannot represent the insured in the EUO" so

3    maybe people can argue about who the he is.

4              THE COURT:  Who the he is?

5              MR. STEWART:  Yeah.  In other words, Mr. Kagels

6    is saying that Mr. Lodigiani told him and at any rate it

7    is what it is.

8         I just think as far as admissibility, this doesn't --

9    I think it will confuse the jury more than it would help

10   them and it's potentially inflammatory or prejudicial

11   having, you know, the insurance company making evaluative

12   judgments about what people are saying about possible

13   cognitive impairments of 84 year old insureds.  It's a

14   touchy area I guess is what I'm saying, Judge.

15        I don't want to get into a position where we've told

16   the jury more than is really useful and that we're getting

17   into an area where, you know, a concern that Mr. Kagels is

18   expressing that it be taken the wrong way and that that

19   prejudices my client in the fair consideration of the

20   case.

21             THE COURT:  I think you made a good point.  I

22   think there's difference between admissibility and

23   satisfying the relevance requirement and the obligation to

24   disclose.  Those are two different things.  So there's an

25   obligation to disclose which I ruled there is an

1   obligation to disclose.  It's now been satisfied.

2       I think you raise some interesting and good issues

3   regarding the relevance of this information, how it

4   becomes relevant, how it's offered, on what issue, and

5   really we can't anticipate how that's going to come up

6   other than to see how it plays in.

7       I'm not going to allow anyone, I doubt, in your

8   opening statement to go off on and somebody said something

9   about Mr. Lodigiani's cognitive abilities.  You're not to

10  say something like that in your opening.  But if this

11  somehow comes into play in a good-faith way in the trial,

12  we will deal with it when it comes up.  I just don't know

13  when or how that will be, but I do think Attorney Stewart

14  makes a good point what's the relevance of this and how it

15  would play in the case, we'll see how that goes.

16          MR. BURSTEIN:  Just for clarification, Your

17  Honor.  You indicated that part of this statement would

18  not be unredacted, what part?  I guess I'm confused as to

19  what part of this claim note would not be.

20          THE COURT:  I was going to, before Mr. Stewart's

21  reaction, I was only going to unredact the portion about

22  he has told me before where it talks about cognitive

23  abilities but seemingly Attorney Stewart's offer, well,

24  let's make this opening, deal with it, I accepted that and

25  unredacted the transcript.

1    MR. BURSTEIN:  If the proper foundation is laid

2    for Mr. Kagels, Mr. Doyle can be examined?

3         THE COURT:  If proper foundation is laid on this

4    entire March 22nd entry, if proper foundation is laid that

5    makes it relevant and not overly prejudicial but more

6    probative, yes.

7         MR. BURSTEIN:  Thank you.

8         THE COURT:  All right.  I'll consider if I can

9    draft something that's short enough given what the issues

10   are -- I really just think the issues in this case are

11   straightforward enough that if I try to draft a

12   pre-instruction, it becomes essentially the final

13   instruction.  So if the parties have some input, I'm

14   willing to listen to you.  We have a few minutes.

15        MR. GIROUARD:  I just had one question.  There

16   was a jury instruction presented to the Court referencing

17   a statute.

18        THE COURT:  I did review it, yes.

19        MR. GIROUARD:  And it is Massachusetts General

20   Law 142 Section 3B.  I would just be curious to know

21   whether the Court can instruct us as to whether we can

22   refer to that statute in opening statements?

23        Obviously if you're not instructing them prior to,

24   I'm always leery about saying to the jury you will hear

25   from the judge when he instructs you about X, Y, Z if that

1   hasn't been determined.  Do you anticipate you will be

2   instructing them on that statute?

3           THE COURT:  I can't anticipate that I'm going to

4   be instructing them in the way that you have requested so

5   I think you mentioning a specific statute in your opening

6   would be a problem.

7           MR. GIROUARD:  Would be a problem?

8           THE COURT:  Yes.

9       We will take a few minutes tomorrow morning after

10  I've had a chance to look over whether or not -- this all

11  hinges on whether or not I want to give that

12  pre-instruction.  So we will take a few minutes tomorrow

13  morning to let you know where I am on that.

14          MR. ZELLE:  That's fine, Your Honor.  Just for

15  the Court, it's Docket 143, we submitted, we, defendants,

16  a three-paragraph pre-charge and I don't think it provides

17  too much detail but it does delineate the issues in a way

18  we believe the jury will ultimately have to decide it.

19          THE COURT:  It certainly does but again I just

20  have -- let me ask you, Attorney Stewart, what's your

21  position on this?  There was a submission by the

22  defendants.  You were not required to but you could have

23  submitted a pre-instruction.  What is your position on

24  reading the pre-instruction, or would you suggest a

25  modification to what the defendants put in?

1          MR. STEWART:  I think it's not determinative of

2     anything.  Obviously we know that if there's a master

3     plumber and there's a journeyman plumber, they cannot go

4     to the Secretary of State and register themselves as a

5     legal partnership.  That is not what we're talking about

6     here.    We're talking about -- obviously if people were

7     only considered employees, if employers withheld taxes and

8     bought workers' comp. insurance, you know, the world is a

9     lot more complicated than that.

10         There's no doubt that this was not a legal

11    partnership in the eyes of the Secretary of State and

12    that's the laws that they're referring to that this could

13    never be a legally compliant partnership.  It was in fact

14    a partnership in fact however.  Obviously there's a

15    statute that says that where two people split profits,

16    it's *prima facie* evidence of a partnership.

17         THE COURT:  And I'm not sure the agreement has

18    to be in writing.

19         MR. STEWART:  Maybe this is a factor but I don't

20    think --

21         THE COURT:  But the question is what is your --

22    do you have an objection to the pre-instruction as

23    prepared and worded by the defense, which talks about a

24    partnership.  Their definition of a partnership doesn't

25    necessarily defend what you just said.

1      MR. STEWART:  I think it's too early to be

2   mentioning the law in the openings.  I don't intend to

3   mention any statutes in my opening.  I think it would be

4   somewhat unconventional for that to be allowed.  I don't

5   think it's that helpful to just talk about one piece -- in

6   your instructions one piece of the law.

7      Like I say, it really doesn't affect whether there's

8   a partnership or not as a legal matter in this case.  This

9   is not a legal compliance case.  This is whether there is

10  an agreement in fact to split profits and the men, you

11  know, said they were partners sometimes and other times

12  say they're not and the jury is going to make a

13  determination which version is controlling.

14      THE COURT:  All right.  I will consider it.

15      MR. ZELLE:  If I can be heard, Your Honor?

16  I am a little confused in as much as Mr. Stewart

17  suggests it doesn't matter whether it's a legal

18  partnership.  I mean, if it's simply left to the

19  discretion of an underwriter to say after a claim, oh, I

20  would have called this a partnership, I mean that's

21  totally arbitrary.  Obviously the underwriter, the

22  insurance company, has to use legal terms, has to use

23  legal definitions for partnerships or corporations.

24      Again, you will note on one of the exhibits where it

25  referred to the workers' compensation application it says

1    legal status and it says partnership, corporation, LLC, et

2    cetera.

3        If Mr. Lodigiani were to say I'm a corporation, again

4    using the prism that I believe Mr. Stewart is suggesting

5    the court should use, if he said that, then Preferred

6    Mutual could say, well, he called it a corporation and so

7    we can rescind.

8        I think the Court has to apply the law which defines

9    a partnership and that inasmuch as an insurance company

10   says we're going to rescind because you're a partnership,

11   the insurance company can't make up a definition.  They

12   have to use the legal definition.

13           THE COURT:  But this is why you're going to give

14   me more elaborate instructions, proposed instructions for

15   the closing of the case.

16           MR. ZELLE:  Yes.

17           THE COURT:  I absolutely agree.

18           MR. ZELLE:  And the pre-charge we don't make any

19   reference whatsoever to 142, 3B, that's not even in here.

20   So I think again Mr. Stewart maybe anticipated --

21           THE COURT:  I didn't think the pre-charge that

22   you suggested was unfair.  I thought it was fairly on

23   point.  I just thought my concern is giving the fairly

24   uncomplicated nature of the claims and language and

25   wording operative words in the short length of this trial

--

MR. ZELLE: -- they will get it at end.

THE COURT: They will get it at the end and I could only -- I may create more confusion.

MR. ZELLE: Here's why I don't think it will create confusion. As I heard Mr. Stewart say what his case is about, the plaintiff's theory is that we would have charged more and that makes the misrepresentation material and that I think conflates two concepts, misrepresentation and materiality.

Misrepresentation as set forth in the pre-charge, it's a statement of fact that is false. No question he said, not on the application of course but in his recorded statement, it's a partnership, that's a false statement. But the question is when he said -- or maybe that he's a sole proprietor is a false statement, but either one, whether it's false or not, is not a misrepresentation unless it is known by Mr. Lodigiani to be false.

Now, that's the first hurdle. If they clear that hurdle, then they can show and the misrepresentation was material because, and there's the two elements, intent to deceive or increased risk of loss. I don't believe, and I'll review the law, but just because an underwriter says we would have increased the premium, that doesn't increase the risk of loss. Those are entirely different concepts.

1          THE COURT:  But these are legal arguments you

2     might make at different times during the trial.  How does

3     this play into my pre-instruction?

4          MR. ZELLE:  My concern is that because in my

5     view Mr. Stewart's theory of the case is so divorce from

6     the law that without a pre-charge to orient the jury as to

7     what the law is, it's going to have more impact.  He's

8     going to do a lot better if the jury doesn't know these

9     distinct concepts of misrepresentation and materiality.

10          MR. BURSTEIN:  Your Honor, just very, very

11     briefly.  I'm not trying to beat this one to death, but

12     because partnership or partner is used in every day

13     speech, different than a legal definition, that I do think

14     it would be helpful to the jury before they hear a lot of

15     different language about partner and partnerships to have

16     some instruction from the Court of what the case is about.

17          MR. GIROUARD:  I think it's all been

18     discussed.

19          MR. ZELLE:  Thank you.

20          THE COURT:  Thank you.  I'll let you know where

21     we are in the morning on this.

22          Now are the witnesses all prepared and ready to go

23     tomorrow?

24          MR. BURSTEIN:  Yes.

25          MR. ZELLE:  John, what's the order?  Can you

1    tell us?

2          MR. STEWART:  If I just may, I'm quoting from

3    *Barnstable County v. Gale*, "A misrepresentation is deemed

4    material if it influences the premium."  So that's where

5    I'm coming from.

6          Tomorrow morning -- well, let me give you an update

7    on Mr. Doyle, remember the gentleman we subpoenaed?

8          THE COURT:  Yes.

9          MR. STEWART:  Well, he's going to be here

10   tomorrow.  My first witness is Mr. Trudeau.  If

11   Mr. Trudeau covers the waterfront that I want to get out

12   of him, I'm not planning on calling Mr. Doyle.  However,

13   Mr. Doyle is in town tomorrow.  So I'm suggesting that

14   these gentlemen maybe take Mr. Doyle at two o'clock,

15   interrupt wherever we are, to take Mr. Doyle to get

16   Mr. Doyle out and back to his criminal case in Salem.

17   He's coming here tomorrow.  I don't know who the superior

18   court judge is but he's giving him the day off.  I don't

19   know if they're impaneling today and starting Wednesday.

20         THE COURT:  So you're suggesting if you don't

21   call him, the defense can call him out of order?

22         MR. STEWART:  Yes.

23         MR. ZELLE:  Generally --

24         THE COURT:  I wouldn't force you to do that.

25         MR. ZELLE:  I would absolutely do that but my

1  concern is that if plaintiffs don't put Mr. Doyle on, my
2  decision as to whether to put him on would be based after
3  I hear everything.  I just can't make a decision on that
4  right now.  I'm sorry.
5          THE COURT:  That's not -- you don't have to
6  apologize.  We'll play it by ear.  I understand that.
7  He's going to remain under subpoena.  We might have to
8  work around his availability further down the road.
9          MR. STEWART:  I will have Mr. Trudeau.  My
10  intention is to call Mr. Lodigiani next and then the
11  underwriter who will testify about the premium, the
12  difference, is Mr. Griffin and I want to get him back to
13  New York.  Next after that would be Mr. Kagels and that
14  may be my case.  Mr. Brantley is subpoenaed.  I'm going to
15  call him, kind of see where he is.  I may have him on call
16  for tomorrow afternoon in case.
17          THE COURT:  You don't even need to tell me.  I
18  don't even need to know, nor does the other side need to
19  know the order of witnesses.  I just want to know we have
20  enough people to get us through the day.
21          MR. STEWART:  We should have a full day
22  tomorrow.
23          THE COURT:  Okay.
24          MR. STEWART:  Judge, I will tell you, and I
25  think I mentioned this earlier, I have a tape recording.

1  I came in Friday and tested it all out.  That will only be

2  about 20 seconds but that will be played during

3  Mr. Trudeau's part of this.

4          THE COURT:  We'll keep our fingers crossed that

5  the audio will work.

6          MR. STEWART:  I may replay it again.

7          THE COURT:  Okay.  So we'll see you in the

8  morning.

9  **(Court recessed at 4:02.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Alice Moran, RMR, RPR, CSR, Official Court

5     Reporter for the United States District Court for the

6     District of Massachusetts, do hereby certify that the

7     foregoing transcript constitutes, to the best of my skill

8     and ability, a true and accurate transcription of my

9     stenotype notes taken in the above-entitled matter.

10

11

12    Date:  June 30, 2015

13

14    /s/ Alice Moran

15    _____
      Alice Moran
16    Offical Court Reporter

17

18

19                   Alice Moran, CSR, RPR, RMR
                      Official Court Reporter
20                  300 State Street, Room 303D
                      Springfield, MA 01105
21                        413-731-0086
                    alice.moran@verizon.net
22

23

24

25